**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Redner's Markets, Inc.,<br><br>                     Plaintiff,<br><br>v.<br><br>Lamb Weston Holdings, Inc.; Lamb Weston, Inc.; Lamb Weston BSW, LLC; Lamb Weston/Midwest, Inc.; Lamb Weston Sales, Inc.; McCain Foods Limited; McCain Foods USA, Inc.; J.R. Simplot Co.; Cavendish Farms Ltd; Cavendish Farms, Inc.<br><br>                     Defendants. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

INTRODUCTION..................................................................................................... 1

I.    JURISDICTION AND VENUE............................................................4

II.    PARTIES .................................................................................................5

    A.    PLAINTIFF .................................................................................. 5

    B.    DEFENDANTS ............................................................................. 6

III.    AGENTS AND CO-CONSPIRATORS ...............................................10

IV.    FACTUAL ALLEGATIONS...............................................................11

    A.    Understanding the Frozen Potato Market: The Frozen Potato Products Market Serves Customers Across the Country and Affects United States Trade and Commerce. ...................................... 11

    B.    Defendants Coordinated Prices of Frozen Potato Products During the Class Period.......................................................................... 16

        1.    Prices for Frozen Potato Products Rose Dramatically as a Result of Defendants' Collusion..................................................... 16

        2.    Defendants Imposed Lockstep Price Increases. ......................... 18

    C.    The Structure and Characteristics of the Frozen Potato Product Industry Support the Existence of a Conspiracy. ................................ 22

        1.    Consolidation Made the Industry Highly Concentrated. .......... 23

        2.    Barriers to Market Entry Are High. ........................................... 25

        3.    Food Operators on the Buy-Side of the Market Are Fragmented. .................................................................................. 26

        4.    Demand for Frozen Potato Products Is Inelastic. ...................... 27

        5.    Frozen Potato Products, including French Fries, Are Not Easily Substituted.......................................................................... 27

        6.    Frozen Potato Products Are Commodity Products. .................. 28

        7.    Defendants' Executives Know and Communicate with Each Other, including Through Trade Associations and Co-Packing Agreements and other Mechanisms......................... 28

i

V.      INTERSTATE TRADE AND COMMERCE ...................................................31

VI.     ANTITRUST INJURY .................................................................................32

VII.    TOLLING OF THE STATUTES OF LIMITATIONS...................................33

VIII.   CLASS ACTION ALLEGATIONS ...............................................................34

IX.     CLAIMS FOR RELIEF ...............................................................................38

COUNT ONE Violation of the Sherman Act,
15 U.S.C. § 1, 3 (Against All Defendants) ......................................................... 38

PRAYER FOR RELIEF....................................................................................... 40

JURY TRIAL DEMANDED.................................................................................. 42

Plaintiff Redner's Markets, Inc., on behalf of itself and all others similarly situated, brings this Class Action Complaint for damages and injunctive relief against Defendants Lamb Weston Holdings, Inc., Lamb Weston, Inc., Lamb Weston BSW, LLC, Lamb Weston/Midwest, Inc., and Lamb Weston Sales, Inc. ("Lamb Weston"); McCain Foods Limited and McCain Foods USA, Inc., ("McCain"); J.R. Simplot Co. ("J.R. Simplot"); and Cavendish Farms Ltd. and Cavendish Farms, Inc. ("Cavendish Farms") (collectively "Defendants"). Plaintiff makes the following allegations based on actual knowledge as to its own actions, facts, and circumstances, and upon information and belief and the reasonable investigation of counsel as to all other matters.

## INTRODUCTION

1.     This is a price-fixing case against the four dominant processors of frozen french fries, hash browns, tater tots, and other frozen potato products ("Frozen Potato Products") sold in the United States. Together, they control 97% or more of the $68-billion-per-year Frozen Potato Products market.

2.     By at least the start of 2021, Defendants conspired to fix the prices of their Frozen Potato Products above competitive levels. Defendants affected this price-fixing conspiracy through implementation of lockstep price increases that allowed them to realize unprecedented margins. This conspiracy has continued, unabated, to the present. Defendants have been able to increase the price of their Frozen Potato Products even after their input costs significantly declined. The following graph shows how Frozen Potato Product prices increased and then soared and remained high even after the cost index fell.

1



3. In 2021 and again in the spring of 2022, while facing increased input costs, Defendants changed their pricing methods to collectively impose "strong arm" price hikes with no worry their customers could defect to competitors. Frozen Potato Product prices climbed 47% from July 2022 to July 2024. In contrast to their own sales prices, Defendants' input costs peaked in 2022 and fell steadily after that. Amid that cost input decline, two stock analysts predicted that Defendant Lamb Weston's "stepped-up margin expansion" would not "be durable longer term." Contrary to that prediction, Defendants' prices continued to climb and remained uncompetitively high.

4. Following Defendants' series of matching price increases, in April 2022, one restaurant owner remarked that it was "[a]mazing how all of the major suppliers for French fries and the like are all raising their prices at the same time and by the same amount."

5. Meanwhile, Defendants' conspiracy resulted in unprecedented margins. In 2023, the former VP of International at Lamb Weston acknowledged that Lamb Weston, J.R. Simplot,

and McCain "have never ever seen margins this high in the history of the potato industry." The reason for this success was, as he explained, that Defendants "absolutely" have "no incentive to fight that hard for each other's share"; instead, they are all "behaving themselves" in order to maintain high margins.

6.      And because of their agreement, Defendants had complete confidence in their ability to sustain their prices. A former Senior Director for McCain Foods commented in 2024 that McCain was unwilling to compete with Lamb Weston on the price of battered fries. He said that he originally thought McCain should compete and pursue additional market share, but "the higher ups in the room" advised not to do it.

7.      Likewise, J.R. Simplot's Director of Sales noted that customers threatened to switch to one of Simplot's competitors after Simplot increased its prices, "but we knew we weren't worried about it." In short, Defendants had confidence in their commitment to each other; they knew their co-conspirators would not undercut them on price.

8.      And to conceal their conspiracy, upon information and belief, at least Lamb Weston told its managers to communicate about competitor pricing and business intelligence using texting instead of emails to avoid creating emails that could be discovered in the event of an antitrust investigation. Although Lamb Weston managers obtained their competitors' price announcements, they were forbidden to email such announcements to C-suite executives so the latter could more plausibly deny receiving information about the announcements.

9.      Defendants were able to implement lockstep price increases and collectively raise prices because their industry is structurally susceptible to collusion. The Frozen Potato Products Market features highly concentrated sellers, high entry barriers, fragmented buyers, repetitive purchases, inelastic demand, and opportunities to collude through common co-packing

arrangements, trade association events, and mechanisms to exchange market share and likely other information enabling Defendants to implement and monitor their conspiracy.

## I.     JURISDICTION AND VENUE

10.     Plaintiff brings this antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover treble damages and the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiff and members of the Class; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the laws of the United States for violations of Section 1 of the Sherman Act (15 U.S.C. §1).

11.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26). The Court has jurisdiction over Plaintiff's claim for injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

12.     The Court has personal jurisdiction over Defendants because they purposefully directed their business activity toward this jurisdiction and had substantial contacts with this jurisdiction. Defendants purposefully placed price-fixed Frozen Potato Products into the stream of commerce throughout the United States, including in this District. Defendants purposefully availed themselves of the laws and protections of this state. Plaintiff's claim for relief arises from and relates to illegal acts committed by Defendants within this jurisdiction because Plaintiff paid unlawful overcharges for Frozen Potato Products and suffered antitrust injury within this jurisdiction. The Court also has jurisdiction based on Defendants' minimum contacts with the United States as a whole.

13.     The Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k) and 15 U.S.C. § 22, which permit bringing an antitrust lawsuit against a corporation in any

district where the corporation may be found or transacts business and allow all process in such cases to be served in any district where the corporation may be found.

14.     Venue is proper in this district under 28 U.S.C. §§ 1391(a), (b), (c), and (d), and 15 U.S.C. §§ 15(a) and 22. During the Class Period (defined below), Defendants transacted business in this District, and a substantial portion of the activity at issue in this case occurred in this District. McCain Foods USA, Inc., has its corporate headquarters and principal place of business in Oak Brook, Illinois, within the Northern District of Illinois.

15.     Defendants' conduct alleged herein occurred within the flow of interstate commerce, including in this District, and was intended to and did have a direct and substantial effect upon such commerce.

16.     During the Class Period, Defendants processed and sold Frozen Potato Products in a continuous and uninterrupted flow of interstate commerce, which included the processing and sale of Frozen Potato Products in this District, advertisement of Frozen Potato Products in media in this District, and employment of sales personnel in this District. Defendants' conduct had and continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce within this District.

17.     No other forum would be more convenient for the parties and witnesses to litigate this case.

## II.     PARTIES

### A.     PLAINTIFF

18.     Plaintiff Redner's Markets, Inc. is a Pennsylvania corporation with its principal place of business at 3 Quarry Road, Reading, Pennsylvania 19605. Plaintiff purchased Frozen Potato Products at artificially inflated prices within the State of Pennsylvania directly from one or

more of the Defendants during the Class Period defined herein. Plaintiff suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

### B.    DEFENDANTS

#### Lamb Weston

19.    Defendant Lamb Weston Holdings, Inc. is a Delaware corporation with its headquarters in Eagle, Idaho. Lamb Weston Holdings, Inc. is a leading producer, distributor, and marketer of value-added Frozen Potato Products. Lamb Weston Holdings, Inc. stock is traded as "LW" on the New York Stock Exchange. Lamb Weston Holdings, Inc. began as part of Conagra Brands, Inc., which spun off Lamb Weston Holdings, Inc. to Conagra shareholders in 2016.

20.    Lamb Weston Holdings, Inc. owns and operates several United States subsidiaries, including Lamb Weston, Inc. (a Delaware corporation), Lamb Weston BSW, LLC (a Delaware LLC), Lamb Weston/Midwest, Inc. (a Washington corporation), and Lamb Weston Sales, Inc. (a Delaware corporation). These subsidiaries are included in the consolidated financial statements of Lamb Weston Holdings, Inc., indicating Lamb Weston Holdings, Inc. wholly owns and controls them and operates them as a unitary enterprise. On information and belief, Lamb Weston Holdings, Inc., conducts its Frozen Potato Products business in the United States through these subsidiaries, including manufacturing, pricing, and selling Frozen Potato Products in the United States. Lamb Weston's publicity for product purchasers and investments refers to "Lamb Weston" or "Lamb Weston Holdings, Inc." Accordingly, hereinafter this complaint refers to Lamb Weston Holdings, Inc., Lamb Weston, Inc., Lamb Weston BSW, LLC, Lamb Weston/Midwest, Inc., and Lamb Weston Sales, Inc. collectively as "Lamb Weston."

21.    Lamb Weston sells its Frozen Potato Products in North America to quick-service and full-service restaurants, food service distributors, non-commercial channels, and retailers. Its products include Frozen Potato Products, commercial ingredients, and appetizers sold under the

Lamb Weston brand as well as frozen potatoes sold under its owned or licensed brands, and brand names of North American restaurants, customer labels, and retailers' own brands (i.e., private label products). Its North American segment sales for fiscal year 2023 ran $4.2 billion.

22.     Lamb Weston operates 27 production facilities for its products and sources its products pursuant to "co-packing" agreements, "a common industry practice in which manufacturing is outsourced to other companies."

**McCain**

23.     Defendant McCain Foods Limited is a corporation organized under the laws of New Brunswick, Canada, with its corporate headquarters in Toronto, Canada. McCain Foods Limited operates on 47 sites on six continents. McCain Foods Limited states that it owns United States patents. McCain Foods Limited owns over 50 United States trademarks.[1]

24.     McCain Foods Limited is a privately owned company, with global revenues in excess of $14 billion Canadian dollars, and a dominant producer of Frozen Potato Products. McCain Foods is one of the world's largest manufacturers of french fry and potato products. McCain Foods boasts that one in four "fries in the world is a McCain Foods fry." In addition to Frozen Potato Products, McCain Foods Limited's product portfolio also includes, appetizers, pizzas, frozen fruits, vegetables, and desserts.

25.     McCain Foods Limited operates its United States operations through its subsidiary, McCain Foods USA, Inc.

---

[1] *McCain Foods Limited Trademarks*, Justia Trademarks, https://trademarks.justia.com/owners/mccain-foods-limited-116080/index.html (accessed August 26, 2024); McCain Foods Limited Trademarks, page two, Justia Trademarks, https://trademarks.justia.com/owners/mccain-foods-limited-116080/page2 (accessed August 26, 2024).

26.     McCain Foods USA, Inc., is a subsidiary of McCain Foods Limited, incorporated in Maine, and has its corporate headquarters and principal place of business at One Tower Lane, 11th Floor, Oakbrook Terrace, Illinois, within the Northern District of Illinois. According to the Illinois Secretary of State, McCain Foods USA, Inc.'s registered agent in Illinois is CT Corporation System's office in Chicago, Illinois. McCain Foods USA, Inc. provides frozen potato and other snack foods "primarily for foodservice customers, retail grocers and private label brands in restaurants and supermarket freezers nationwide" in the United States. The company states it has about 4,000 employees spread across its factories in Maine, Idaho, Nebraska, Washington, and Wisconsin.

27.     McCain Foods recently advertised for a Director of Sales, U.S. Retail with a "Position Location" of Oakbrook Terrace, Illinois. It states the position involves leading businesses, expanding commercial relationships, managing a team, developing new business, planning, and managing key customer relationships.[2]

28.     Further, McCain Foods also recently advertised to hire an employee for hybrid work at its Supply Chain Leadership Development Program at its Oakbrook Terrace, Illinois office.[3] It stated the position involves supporting McCain's customers (i.e., selling Frozen Potato Products) and "enabling our supply chain" (i.e., buying Frozen Potato Products or inputs for them). McCain Foods has posted 23 jobs located in Oakbrook Terrace, Illinois, or in Chicago, Illinois.[4]

---

[2] *Director Sales US Retail – McCain Foods,* Builtin Chicago (posted Oct. 2, 2024), https://www.builtinchicago.org/job/director-sales-us-retail/263884 (accessed October 7, 2024).

[3] *Supply Chain Leadership Development Program – McCain Foods*, Builtin Chicago, (posted Oct. 7, 2024), https://www.builtinchicago.org/job/supply-chain-leadership-development-program/262066 (accessed Oct. 7, 2024).

[4] *McCain Foods in Chicago, Illinois, United States* LinkedIn, https://www.linkedin.com/jobs/mccain-foods-jobs-chicago-il/?currentJobId=4024758735 (accessed October 7, 2024).

Therefore, it is a reasonable inference that McCain Foods Limited and McCain Foods USA sell and have sold Frozen Potato Products in Illinois and in this Judicial District in furtherance of Defendants' conspiracy.

29.     McCain Foods Limited and McCain Foods USA, Inc., are collectively referred to as "McCain."

### J.R. Simplot

30.     J.R. Simplot Company is a Nevada Corporation with its headquarters in Boise, Idaho. J.R Simplot, a privately owned company with over 13,000 employees worldwide, claims to be one of the world's largest producers of french fries. J.R. Simplot Company sells Frozen Potato Products in this District, throughout the State of Illinois, and elsewhere in the United States. J.R. Simplot has admitted in other litigation about Frozen Potato Product patents that it sells products in this District, and that this District and the State of Illinois may exercise personal jurisdiction and venue over J. R. Simplot. Its other businesses include food brands, phosphate mining, farming, ranching, and fertilizer manufacturing. Its 2023 revenue was $9.8 billion. J.R. Simplot Company is referred to hereinafter as "J.R. Simplot."

### Cavendish Farms

31.     Cavendish Farms Ltd. is a part of the J.D. Irving Group of Companies, with its headquarters in Dieppe, New Brunswick, Canada. Cavendish Farms is North America's fourth largest processor of Frozen Potato Products. Cavendish Farms Ltd. operates four potato processing plants, including one in Jamestown, North Dakota. Cavendish Farms sells Frozen Potato Products in the United States.

32.     Cavendish Farms, Inc., is a Delaware corporation with its principal place of business in North Dakota. "Cavendish Farms, Inc. is the United States-based subsidiary of Cavendish Farms Ltd."

33. Cavendish Farms Ltd. and Cavendish Farms, Inc., are collectively referred to herein as "Cavendish Farms."

## III. AGENTS AND CO-CONSPIRATORS

34. The anticompetitive and unlawful acts alleged against the Defendants in this Complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the management, direction, or control of Defendants' businesses or affairs. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

35. Each corporate Defendant's agents operated under the authority and apparent authority of its respective principals.

36. Each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified entity.

37. Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

38. Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

39. When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all the Defendant companies within that family. Because Defendants market themselves as corporate families, individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they recognize the distinction between the entities within a corporate family. Thus, all Defendant entities within the corporate families were

10

active, knowing participants in the conspiracy to maintain supra-competitive prices of Frozen Potato Products.

## IV.     FACTUAL ALLEGATIONS

### A.     Understanding the Frozen Potato Market: The Frozen Potato Products Market Serves Customers Across the Country and Affects United States Trade and Commerce.

40.     Frozen Potato Products, including french fries, are ubiquitous food items in the United States, occupying the plates of many diners across the nation. A study for the National Potato Council estimated that the entire potato sector contributed $100.9 billion to the economy in 2021, and added $53.5 billion to the United States Gross Domestic Product. Of that $100.9 billion contribution, the Potato Council estimated $49.1 billion came from processing, wholesaling, and retail efforts. More than two thirds of the potatoes sold in the U.S. in 2018 were used for processing. "Food service is an especially important outlet for potatoes primarily in the form of fries."

41.     A study for POTATO BUSINESS estimated the Frozen Potato Products market would grow from $65.06 billion in 2022 to $92.63 billion in 2030. Another study valued the Frozen Potato Products market at approximately $68 billion in 2023.

42.     Frozen french fries provide the largest part of the Frozen Potato Products market. One source found 579,303 restaurants in the United States feature french fries on their menu, most often served alone or with a burger, sandwich, or salad. "French" describes a cutting style in which potatoes are sliced into strips, known as "frites" in French, and fried in cooking oils with high smoke points. Other fry cuts include spiral or curly fries and waffle fries. Along with french fries, the Frozen Potato Products market includes hash brown, tater tots, and potatoes that are frozen and shaped in other formats.

43.     About 39% of United States potatoes are frozen and become part of the Frozen Potato Products market. Another 26% of potatoes are sold fresh. Another 22% become potato chips. Another 7% are dehydrated, and 4% are sold refrigerated. The United States is the world's fifth largest potato producer.

44.     The United States produces most of the potatoes it uses for its Frozen Potato Products. For example, for 2023, the United States produced slightly over 17 billion pounds of potatoes for freezing. By comparison, the United States imported 6.39 billion pounds of potatoes for freezing that year.

45.     Imported Frozen Potato Products predominantly come to the United States from Canada. For example, for the 2019 to 2020 market year, the United States imported approximately $750 million worth of frozen french fries from Canada out of $810 million. Of Canada's Frozen Potato Products exports, it sends 91 percent of those exports, measured by Canadian dollars, to the United States. Two Defendants located in Canada, McCain Foods and Cavendish Farms are responsible for a significant portion of Frozen Potato Products exported to the United States each year.

46.     Frozen Potato Products provide business advantages to restaurants that use them. For a restaurant, making good fries from scratch requires both increased horizontal workspace and increased labor to cut up the potatoes. Lutece restaurant in Washington D.C., for example, buys and uses 100 pounds of fresh potatoes per week and dedicates a prep chef's time to working on those potatoes. If a restaurant orders fresh potatoes for fries, the potatoes can vary from week to week in size, shape, and starch levels. Based on these burdens, many restaurants order frozen fries instead. For example, Los Angeles restaurant Found Oyster cooks 40 cases of frozen fries a week, storing them in a dedicated fry freezer.

47.     Defendants purchase potatoes in bulk from potato growers and make their products in their factories. First, they typically wash and peel the potatoes, for example, with a brush roller washing and peeling machine. This process should produce peeled potatoes with a smooth surface and minimal product loss from the peeling. Residual skin, eyes, and green portions may be manually trimmed. In a standard industry procedure, manufacturers apply pulsed electrical fields to soften raw potatoes, which improves cutting, reduces starch content, energy use, and oil uptake.

48.     After cutting, the factory grades the potato strips for size and removes discolored or overly small fries.

49.     In the next manufacturing step, a blanching machine blanches the potato strips at 158° to 203° Fahrenheit for several minutes. Blanching removes certain enzymes to preserve freshness, unify the frying color and protect the strip's flavor. After blanching, a dewatering machine partially dries the strips to remove excess moisture. The plant freezes the fries to keep them fresher and crisper, to reduce their sticking together, and to protect their flavor.

50.     Then another machine feeds the fries into bags.



51.     An automatic packing machine can weigh and bag the fries, seal the bags, and print dates and lot numbers on the bags. This process allows all french fries and other Frozen Potato Products to be traced back to a particular factory and plant. The factory then ships the bagged fries to their final destinations.

52.     Defendants sell these french fries and other Frozen Potato Products to their customers. The food service sector is the largest buying segment for processed potatoes; it includes restaurants, hotels, schools, and hospitals.

53.     The retail segment constitutes another significant buying segment for Frozen Potato Products. This segment includes grocery stores, convenience stores, and club stores.

54.     Defendants also sell Frozen Potato Products to distributors. Smaller food service and retail companies often buy these products from distributors, along with other products.

55.     The following diagram generally shows the Frozen Potato Products supply chain.

56.     For example, Lamb Weston sells its Frozen Potato Products "to quick service and full-service restaurants and chains, foodservice distributors, non-commercial channels, and retailers." It sells to them through "a network of internal sales personnel and independent brokers, agents, and distributors to chain restaurants, wholesale, grocery, mass merchants, club retailers, specialty retailers, and foodservice distributors and institutions, independent restaurants, regional chain restaurants, and convenience stores."

57.     Similarly, McCain provides its products "to retailers, quick service restaurants, supermarket freezers and foodservice outlets worldwide." Another source describes McCain Foods USA, Inc. as providing frozen potato and other snack foods "primarily for foodservice customers, retail grocers and private label brands in restaurants and supermarket freezers nationwide."

B. **Defendants Coordinated Prices of Frozen Potato Products During the Class Period.**

1. **Prices for Frozen Potato Products Rose Dramatically as a Result of Defendants' Collusion.**

58.     Defendants acted in concert to fix, raise, maintain, and stabilize the price of Frozen Potato Products they manufactured, distributed, sold, or imported into the United States. This unlawful conspiracy in restraint of trade began at least as early as January 1, 2021 and continues into the present.

59.     Defendants' Frozen Potato Products prices tell a remarkable story because they would not have occurred in a competitive market that was free from Defendants' concerted action. Since Defendants collectively control 97% to 98% of the Frozen Potato Products market, changes in the industry price reflect Defendants' collective price changes to an unusual degree.

60.     Defendants' Frozen Potato Product prices increased in 2021 and then skyrocketed in 2022, and they continued to remain high through at least the end of July, 2024, resulting in unparalleled margins for Defendants. Stock analysts writing in May 2023 (unaware of Defendants' collusion) predicted that Defendant Lamb Weston's "stepped-up margin expansion" would not be "durable longer term." They were wrong.

61.     The FRED data from the Federal Reserve Bank of St. Louis indicate that as of August 1, 2024, Frozen Potato Products prices were at their highest recorded level since 1967. The data are indexed at 100 set in 1982. Compared to that 1982 setting, on August 1, 2024, the prices stood at 434.147.



62.     These increased Frozen Potato Product prices cannot be adequately explained by cost inputs. From July 2022 to July 2024, Frozen Potato Product prices increased 47%. During that same two-year period, Defendants' input costs *declined*. Defendants' input costs peaked around the third quarter of 2022, and declined substantially after that, but Defendants' Frozen Potato Product prices continued to rise. Defendants' prices remained near their peak from October 2023 through at least July 2024 despite a decline in input costs of about 33%. This comparison indicates that Defendants had for some time collusively raised and fixed their product prices including after their input costs declined.

63.     In May 2023, while Defendants' input costs were sliding downhill, two stock analysts predicted that Defendant Lamb Weston's "stepped-up margin expansion" would not "be durable longer term." Contrary to that prediction, Defendants' prices continued to climb and remained uncompetitively high after their input costs had resettled at lower levels.

## 2. Defendants Imposed Lockstep Price Increases.

64. The Frozen Potato Products price hikes in 2021 and 2022 were no accident. Rather, the Defendants imposed matching, simultaneous or near-simultaneous price increases on their customers.

65. The four Defendants—controlling 97% to 98% of the Frozen Potato Products market—acting in concert have extreme market power and the ability to control price. Therefore, if Defendants collectively raise their prices, that increase moves the market price.

66. By raising and maintaining Frozen Potato Products prices, each Defendant, acting individually, risks one of its competitors undercutting its prices to gain market share. In short, competition would not allow a single Frozen Potato Products manufacturer to elevate its prices to extreme levels beyond its input costs without one of its competitors undercutting that price and taking market share. That dynamic explains why analysts predicted that Lamb Weston's "stepped-up margin expansion" would not be "durable longer term." Defendants' price increase actions described herein are therefore inconsistent with their individual interests. By colluding, Defendants change their incentives and the incentives of their co-conspirators. Defendants followed their collective interests rather than their individual interests through their collective price increases.

67. On information and belief, prior to the conspiracy, Defendants' price adjustments focused on maintaining that company's profit margins, but that all changed. In February 2021, McCain announced a price increase that was soon followed by J.R. Simplot and Cavendish Farms. Lamb Weston did not formally announce a price increase at that time but was understood to increase prices more quietly in that same time period.

68. J.R. Simplot's Sales Director acknowledged that Simplot previously considered pricing annually, but then started to increase prices more often. In 2021, Defendants began a series of "tit for tat" price increases with each other multiple times per year.

69.     In discussing a forthcoming Lamb Weston price increase in September 2021, Lamb Weston's former Vice-President knowingly predicted that competitor McCain would be pleased with the increase and follow suit: "it will probably be exactly the price increase that McCain wanted, which was $0.04 on A grade and $0.02 they will announce a price increase."

70.     Early the next year, on February 11, 2022, Lamb Weston announced that it would increase prices to take effect in April, increasing prices on "battered and coated" products by 12 cents per pound and adding 10 cents per pound on non-battered products.

71.     Just four days later, on February 15, 2022, J.R. Simplot announced the same increase on the same two categories of products, and McCain announced a 12 cent per pound increase on all its frozen potato products.

72.     Then, one day later, on February 16, 2022, Cavendish Farms announced a price increase of 12 cents per pound for battered and coated frozen potatoes and "formed items," as well as non-battered frozen potatoes.

73.     On April 19, 2022, the owner of Ivey and Coney, a Washington, D.C. restaurant, posted on X (formerly Twitter) that the Defendants had informed it of uniform price increases, all effective on April 4, 2022.[5] The owner's post said, "Amazing how all of the major suppliers for French Fries and the like are all raising their prices at the same time and by the same amount." The post added, "Totally not collusion or anything, right?" Defendants' price increases for their main Frozen Potato Products matched as follows:

---

[5] Tweet, Insta@ivyconey, X (April 19, 2022),
https://x.com/ivyandconey/status/1516525216641466368 (accessed August 19, 2024).

| Frozen Potato Product Price Increases, Effective April 4, 2022 | | | | | |
|---|---|---|---|---|---|
| | Potato Products | Coated Potatoes | Roasted / Vegetable Products | Sweet Potato Products | Onion/ Onion Rings |
| Lamb Weston | 0.12 | 0.12 | 0.12 | 0.12 | |
| McCain | 0.12 | 0.12 | 0.12 | 0.12 | 0.23 |
| Cavendish | 0.12 | | 0.15 | | 0.23 |
| Simplot | 0.10 | 0.12 | 0.15 | 0.12 | |

74.     Additionally, the Director of Sales at J.R. Simplot acknowledged Defendants' lockstep price increases, noting that in 2022, "that's what we did . . . . like Lamb, they did the $0.10 and $0.12 like we did in April of 2022." He noted that J.R. Simplot took a price increase in May 2022, and Lamb took a similar price increase of $.08 and $.10 in July 2022.

75.     On information and belief, in 2022, in furtherance of the conspiracy, McCain Foods figuratively "tore up" its contracts and increased all prices to a 30% margin, regardless of their contracts' remaining durations—an enormous margin a company would not be able to capture if it had to compete on price. The price increase was a "strong arm" approach, enforced because customers had no bargaining leverage and therefore could not contest the price increases. This change was implemented by McCain Foods' upper-level management.

76.     McCain and Lamb Weston could not enforce such substantial price increases without the pricing solidarity of J.R. Simplot and Cavendish Farms. Absent solidarity between all competitors, an individual company's price increase would have been undercut by the other competitors and used to win sales and gain market share by maintaining lower prices.

Defendants' price increases continued to conform with each other's, and Defendants have collectively raised and maintained prices at supra-competitive levels, including through price increases in 2023, to the detriment of Plaintiff and other direct purchasers of Frozen Potato

Products. In 2023, the Director of Sales Solutions for J.R. Simplot acknowledged that Lamb Weston took 35% in price increases and explained that J.R. Simplot, McCain, and Cavendish were also continuing to "push pricing" and "not going after new business."

77.     Indeed, Defendants have experienced margins they could not have enjoyed but for their conspiracy. In 2023, the then-former VP of International at Lamb Weston acknowledged that Lamb Weston, J.R. Simplot, and McCain "have never ever seen margins this high in the history of the potato industry." He explained that Defendants **"**absolutely" have "no incentive to fight that hard for each other's share"; instead, they are all "behaving themselves" in order to maintain high margins. He remarked that "I think we've done a pretty good job at taking margins with these price increases."

78.     A former Senior Director at McCain Foods' 2024 statement reflected similar price coordination. He noted McCain Foods was unwilling to compete with Lamb Weston on the price of battered fries. He said that he originally thought McCain should compete and pursue more market share for that product, but "the higher ups in the room" said not to risk it.[6] Similarly, J.R. Simplot's Director of Sales noted that a couple customers threatened to switch to one of Simplot's competitors after Simplot increased its prices, "but we knew we weren't worried about it." In short, Defendants had confidence in their solidarity; they knew their co-conspirators would not undercut them on price.

79.     Defendants' collusion reaped significant rewards as they implemented coordinated price hikes and continued to increase prices in the United States, as they intended, while their input

---

[6] This incident also shows that Defendants' pricing policies came from executives above the Senior Director level.

costs plummeted. Indeed, by Lamb Weston's Former VP of International's own account, they had

"never ever seen margins this high."

### C. The Structure and Characteristics of the Frozen Potato Product Industry Support the Existence of a Conspiracy.

80. Certain market characteristics make collusion more likely, for example by making

collusion more efficient or more profitable. The United States Department of Justice has explained

that collusion is likely to occur in industries that contain some or all of the following

characteristics:[7]

- Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories. Collusion may also occur when the number of firms is fairly large, but there is a small group of major sellers and the rest are "fringe" sellers who control only a small fraction of the market.

- The probability of collusion increases if other products cannot easily be substituted for the products in question or if there are restrictive specifications for the product being procured.

- The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service.

- Repetitive purchases may increase the chance of collusion, as the vendors may become familiar with other bidders and future contracts provide the opportunity for competitors to share the work.

- Collusion is more likely if the competitors know each other well through social connections, trade associations,

---

[7] *Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For*, at 5-6, Department of Justice, https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf (accessed August 29, 2024).

> legitimate business contacts, or shifting employment from one company to another.

- Bidders who congregate in the same building or town to submit their bids have an easy opportunity for last-minute communications.

81.     Such factors affecting the market for Frozen Potato Products include highly concentrated sellers, high entry barriers, fragmented buyers, repetitive purchases, inelastic demand, and opportunities within the seller's industry to collude.

### 1.     <u>Consolidation Made the Industry Highly Concentrated.</u>

82.     A concentrated market facilitates collusion in at least three ways. First, it gives a cartel of sellers more collective bargaining power by reducing buyers' alternatives. Second, communicating and agreeing upon collective action among fewer sellers requires less time and attention. Third, monitoring and policing the agreement among a smaller group of sellers is easier.

83.     The market for Frozen Potato Products has grown highly concentrated. Two decades ago, there were approximately 16 different companies with meaningful presence in the market; but those players have increasingly merged or otherwise consolidated their market share. That consolidation, as Defendants have admitted, has resulted in rising prices and rising margins. For example, in 2021 a former VP from Lamb Weston boasted of record high margins in the market, calling it "nirvana" for the largest market participants; when an analyst asked whether those margin increases were driven by an increase in demand, the VP said no, "[i]t's driven by the consolidation of this industry . . . ." That year another industry executive noted that farmers could sell potatoes for Frozen Potato Products, essentially, to only the four major companies, meaning the Defendants.

84.     The four Defendants control 97% to 98% of the Frozen Potato Products market:

Lamb Weston Holdings controls 40%;

McCain Foods Ltd. controls 30%;

J.R. Simplot Co. controls 20%; and

Cavendish Farms Corp. controls 7% to 8%.

85. All other market participants account for only 2% to 3% of the Frozen Potato Products Market.

86. Markets as consolidated as the Frozen Potato Products market present significant concerns for anticompetitive effects on purchasers. The U.S. Department of Justice and the Federal Trade Commission traditionally use the Herfindahl-Hirschman Index, or "HHI," to measure market concentration and the risk of anticompetitive effects within a market. The HHI can range from near zero in a market with many players each holding a small market share to 10,000 in a market in which there is only one participant.[8] So the higher the HHI, the more concentrated a market.

87. A market in which the HHI is between 1,000 and 1,800 is moderately concentrated. A market in which the HHI is above 1,800 is highly concentrated with presumptively anticompetitive effects. Highly concentrated markets lack competition and increase the likelihood of coordination among competitors.

88. The Frozen Potato Product Market has an estimated HHI of at least 2,958—well above the threshold for a highly concentrated market.[9]

---

[8] U.S. Dep't. Justice, 2023 *Merger Guidelines* § 2.1 (Dec. 18, 2023), https://www.justice.gov/atr/2023-merger-guidelines.

[9] HHI "is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers." Herfindahl-Hirschman Index, https://www.justice.gov/atr/herfindahl-hirschman-index (accessed September 6, 2024)

## 2. **Barriers to Market Entry Are High**.

89.     High barriers to entering a market facilitate collusion in that market. Price increases and supracompetitive profits can attract other potential competitors, but high entry barriers make their market entry slower, riskier, and less likely to succeed, deterring and repelling additional competition. The Frozen Potato Products market's high entry barriers support Defendants' collusion.

90.     One barrier here is that competitively entering the Frozen Potato Products Market would require extensive capital. For example, Cavendish Farms planned to spend about $293 million on a new frozen potato processing plant it announced in 2017 and spent $430 million building a new plant in Alberta, Canada, in 2019. Such necessary start-up costs and investments to participate in the Frozen Potato Products market deter new market entry.

91.     Another barrier is that entering the Frozen Potato Products Market takes significant time, meaning that a new market entrant could not start operating and profiting immediately. For example, J.R. Simplot expected completion of one new plant in Washington to take two years.

92.     Another barrier is that Defendants' extensive relationships with potato growers in the low-cost basin of the Pacific Northwest would make it difficult to obtain the raw potatoes necessary to compete in the Frozen Potato Products Market. When asked about competitors entering the Washington-Oregon growing area, a former Lamb Weston executive remarked there were "only so many potatoes to go around in the basin area." The executive stated that new competitors had tried to enter the market in the past but did not survive. A stock analyst similarly noted the Idaho-Washington basin region's "minimal unused land and water resources," Lamb Weston's advantage in that area, and all four Defendants' long-standing contractual relationships with the potato farmers in that region, which add barriers to entering the market.

### 3. <u>Food Operators on the Buy-Side of the Market Are Fragmented</u>.

93. Having numerous buyers for a product supports seller collusion by giving the sellers more collective bargaining power and making it harder for buyers to monitor sellers' conduct. Several segments of buyers for Frozen Potato Products are fragmented in this way.

94. About half of the $1.5 trillion United States food sector operates in the retail segment, where grocery and convenience stores provide food to consume at home. The other half of the food sector operates in the growing food service segment, selling food to consume away from home in restaurants, workplaces, schools, and other locations.

95. As of 2019, the United States had 1,249,737 food operators. Of these operators, retail food service firms like supermarkets and convenience stores accounted for 264,125 units. Restaurants provided 648,462 food operator locations. On-site food service operations, such as schools, colleges, hospitals, nursing homes, workplace cafeterias, caterers, lodging and recreation, and military sites, accounted for another 337,150 sites.

96. Before, 2020, the National Restaurant Association estimated the United States had over 1 million restaurants. As of 2023, after the main Covid-19 era, there were an estimated 749,000 restaurants.

97. Nine out of ten restaurants have fewer than 50 employees. Seven in ten restaurants are single unit operations.

98. Producers like Defendants also sell their production to food service operators through wholesalers and other distributors. Such distributors break down orders from producers, provide warehousing, logistics and transportation, and sell usable quantities of the products to operators. The distributor segment has a competitive market structure and has been described as "highly fragmented." One report found 17,100 United States food distribution locations.

### 4. <u>Demand for Frozen Potato Products Is Inelastic</u>.

99. "Elasticity" describes the sensitivity of supply and demand to changes in price or quantity such that demand is "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. With inelastic demand, those customers have nowhere to turn for alternative, cheaper products of similar quality, so they continue to purchase despite a price increase.

100. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would cause unduly declining sales, revenues, and profits, as customers purchase substitute products or decline to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

Demand for Frozen Potato Products is highly inelastic. When the price of potatoes increases, the quantity demanded decreases by only a smaller percentage. Frozen french fries, in particular, are an important offering for food services and restaurants, so processors can raise prices without hurting demand. Lamb Weston CEO Thomas P. Werner said in April 2022 that they "haven't seen" the elasticity for french fries. This comment indicates that at least Lamb Weston's price increases did not reduce its sales. In other words, Frozen Potato Products' demand is highly inelastic. Because the price for Frozen Potato Products is highly inelastic, Defendants were able to and did collectively raise prices to supra-competitive levels without losing revenue.

### 5. <u>Frozen Potato Products, including French Fries, Are Not Easily Substituted</u>.

101. Collusion is also more likely if other products cannot easily substitute for the products in question. Frozen Potato Products lack substitutes in the United States, particularly for

food service customers. For example, french fries are the most profitable food item for restaurants, and diners expect to see them on the menu..

### 6.   Frozen Potato Products Are Commodity Products.

102.   Defendants make similar Frozen Potato Products, and Frozen Potato Products do not differ significantly in quality, appearance, or use. As a result, Frozen Potato Products are functionally interchangeable and considered a commodity product. For example, the Federal Reserve analyzes Frozen Potato Products as a "Producer Price Index by Commodity." In fact, executives from both McCain Foods and Lamb Weston referred to the market or industry as a "mature" market, one characteristic of which is homogeneous product offerings.

103.   When products are interchangeable, the primary way to compete is on the basis of price. The avoidance of price-based competition is the primary motivation for forming a cartel. Thus, cartels are more likely when the participants sell interchangeable products. Where products like Frozen Potato Products are interchangeable, economics suggest that cartel behavior is facilitated because, *inter alia*, cartel members can more easily monitor and detect defections from a price-fixing agreement.

### 7.   Defendants' Executives Know and Communicate with Each Other, including Through Trade Associations and Co-Packing Agreements and other Mechanisms.

104.   Opportunities for collusion facilitate price-fixing by providing cartelists with otherwise legitimate-appearing opportunities to discuss prices and production. Communications among competitors can therefore provide circumstantial evidence of price-fixing. As described below, the Frozen Potato Products industry features both co-packing arrangements and trade association meetings that provided Defendants with opportunities to collude.

105.   In so-called "co-packing" arrangements, a manufacturer outsources part of its production to another company and then sells the products the other company has made. Co-

packing agreements give manufacturers an opportunity to discuss prices and their production quantities with each other while discussing their arrangements.

106.    Lamb Weston has admitted that it sources part of its production to other companies in co-packing arrangements. It called co-packing "a common industry practice." Later, it stated there "are a limited number of competent, high-quality co-packers in the industry," and having to make alternative arrangements might be unsatisfactory and could affect their ability to "implement our business plan or meet industry demand."

107.    Defendants also share membership in multiple trade organizations in this industry. For example, McCain, Lamb Weston, and J.R. Simplot are all members of the Potato Association of America. The "paramount objective" of the Potato Association of America is the "collection and dissemination of the best available technical and practical information relating to all aspects of potato production, biology, and utilization." The Potato Association of America "serves as the official professional society for those involved in potato research, extension, production, and utilization." The Potato Association of America hosts a multi-day meeting each year of industry participants, including Defendants. For example, the Association held its 2022 meeting from July 17 to 22, 2022, in Missoula, Montana, its 2023 annual meeting from July 23 to 27, 2023 in Charlottetown, Prince Edward Island, and its 2024 meeting in Portland, Oregon. The 2025 meeting is scheduled for July 27 to 31, 2025, in Madison, Wisconsin.

108.    Lamb Weston, McCain, J.R. Simplot, and Cavendish Farms are also all members of the National Potato Council. The National Potato Council "is the voice of U.S. potato growers and industry members" in Washington DC. The National Potato Council advances and protects potato growers' interests in Washington, D.C. "by addressing issues that affect the potato industry, from policy issues debated in Congress to regulatory issues proposed by federal agencies."

109.     The National Potato Council held its Potato Expo 2021 from January 5, 2021 to January 7, 2021 as a virtual event. The Council described its event, saying "[e]ach year, the Potato Expo brings together growers, suppliers and industry experts to make the largest conference and trade show for the potato industry."

110.      In addition, three of the Defendants have executives on the board of directors of the Potato Sustainability Alliance. As of August 27, 2024, those board members were Richard Burres (Lamb Weston), Spencer Karabelas-Pittman (McCain Foods), and John MacQuarrie (Cavendish Farms).  As of November 4, 2024, Richard Burres (Lamb Weston), Audrey Leduc (McCain Foods), John MacQuarrie (Cavendish Farms), and Jolyn Rasmusen (J.R. Simplot) sit on that board of directors.

111.     The industry's common co-packing arrangements and the above contact at industry trade events gave Defendants opportunities to meet and conspire about their prices for and production of Frozen Potato Products. In addition, it follows from these contacts that Defendants' executives were aware of where their co-conspirators bought and sold their Frozen Potato Products.

112.    Defendants' executives also sit on the board of directors of the American Frozen Food Institute (AFFI). AFFI's 2024 board of directors includes Tina Almond (McCain Foods USA), Michelle Damon (J.R. Simplot Foods), Peter D. Johnston (Cavendish Farms Corporation), and Jennifer Weekes (Lamb Weston).

113.    AFFI's web site describes its "AFFI-CON" event as the "premier frozen ingredients show that brings together over 500 companies and 1,500+ attendees in a single location, allowing them to meet one-on-one to discuss current and future business opportunities. The average attendee

will have 40+ private business meetings that will lay the foundation for their year." The next meeting is scheduled for February 22 to 25, 2025, at the Hyatt Regency Dallas, in Dallas Texas.

114.    In addition, all Defendants participate in PotatoTrac, an industry service run through NPD Group, Inc., now known as Circana ("NPD"), a corporation which "provides market information, tracking, analytic, and advisory services to help clients in making better business decisions." Defendants either sell or supply NPD Group, Inc. with their company-specific ship data. PotatoTrac/NPD then sends the Defendants one another's market share information so that each knows where they and their competitors "sit" within the industry. Potato Trac's commercial clients are limited to the four defendants. On information and belief, PotatoTrac also includes company projections. Each of the Defendants willingly share their commercial data and information with PotatoTrac/NPD, knowing that the only other commercial industry participants are their major Frozen Potato Products competitors. By knowing and monitoring each other's "share" information, Defendants are disincentivized to compete on price or for market share. Instead, they can keep Frozen Potato Prices artificially high and monitor their conspiracy.

## V.    INTERSTATE TRADE AND COMMERCE

115.    Beginning at least as early as January 1, 2021, and continuing until the present, Defendants engaged in a continuing conspiracy or combination in restraint of trade in violation of the Sherman Act. During the Class Period, Defendants sold substantial quantities of Frozen Potato Products in a continuous and uninterrupted flow in interstate commerce to customers located in states other than where Defendants produced their Frozen Potato Products.

116.    Defendant's conspiracy had a direct, substantial, intended, and foreseeable impact on interstate commerce in the United States and its territories. Economic studies estimated the Frozen Potato Products market transacted over $65 billion in 2022 and predicted it would grow to over $92 billion by 2030. The Defendants' own facilities in the United States made and sold

products in the United States. Further, Defendants knew that their Frozen Potato Products would enter the United States stream of commerce and would affect United States commerce, including harm to Plaintiff and the proposed class in the payment of supra-competitive prices for Frozen Potato Products. To the extent any Defendant sold Frozen Potato Products from Canada into the United States, those sales constitute import commerce into the United States, and Defendants' price-fixing had a substantial intended effect on United States import commerce by increasing the prices that buyers paid for Frozen Potato Products.

117.    Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for Frozen Potato Products in the United States.

118.    Defendants' unlawful conduct described herein caused inflated prices for Frozen Potato Products in the United States, and within those States.

119.    Defendants' unlawful conduct has a direct and adverse impact on competition in the United States and its territories. Absent Defendants' conspiracy to fix the prices of Frozen Potato Products sold in the United States, the price of Frozen Potato Products would have been determined by a competitive market.

## VI.    ANTITRUST INJURY

120.    Defendants' antitrust conspiracy had the following effects, among others:

(a)    Price competition has been restrained or eliminated with respect to the pricing of Frozen Potato Products;

(b)    The prices of Frozen Potato Products have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)     Purchasers of Frozen Potato Products have been deprived of the benefits of free and open competition; and,

(d)     Plaintiff and other Class members have paid higher and artificially inflated prices for Frozen Potato Products as a direct, foreseeable and proximate result of Defendants' conduct.

121.     The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize, and/or maintain the price of Frozen Potato Products.

122.     Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

123.     The precise amount of the overcharge impacting the prices of Frozen Potato Products paid by Plaintiff and the Class can be measured and quantified using well-accepted models.

124.     By reason of the alleged violations of the antitrust laws, Plaintiff and the other members of the Class have sustained injury to their business or property, having paid higher prices for Frozen Potato Products than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. Paying such collusive overcharges is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII.     TOLLING OF THE STATUTES OF LIMITATIONS

125.     Plaintiff and other Class members' purchases of Frozen Potato Products within four years prior to the filing of this Complaint are not barred by the applicable four-year statutes of limitations; the statutes are not required to be tolled for these claims to be actionable.

126.     Defendants committed, or continued to commit, their antitrust violations within applicable periods of limitation. Defendants increased their prices and caused Plaintiff and other

Class members to pay supra-competitive prices because of those price increases. Accordingly, Defendants committed overt acts in furtherance of their conspiracy and their antitrust violation within any applicable period of limitations. Therefore, Defendants committed a continuing violation of the antitrust laws.

127.     As described herein, Defendants engaged in affirmative acts that were designed to mislead and conceal their illegal conduct and used pretextual justifications to justify their price increases. Further, price-fixing conspiracies like Defendants' conspiracies are inherently self-concealing.

128.     On information and belief, at least Lamb Weston told its managers to communicate about competitor pricing and business intelligence using texting instead of emails to avoid creating emails that could be discovered in the event of an antitrust investigation. Although Lamb Weston managers obtained their competitors' price announcements, the managers were forbidden to email such announcements to C-suite executives so the latter could more plausibly deny receiving information about the announcements.

129.     Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiff and the Class, the four-year statutes of limitations governing claims under the Sherman Act were tolled pursuant to the doctrine of fraudulent concealment.

## VIII.   CLASS ACTION ALLEGATIONS

130.     Plaintiff brings this action for damages and injunctive relief on behalf of itself and a class of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), with the class initially defined to include (the "Class"):

> All persons or entities that directly purchased Frozen Potato Products from one or more Defendants within the United States from January 1, 2021, until the time that the adverse effects of Defendants' anticompetitive conduct cease (the "Class Period").

131.    The class definition specifically excludes the following persons or entities: (a) any of the Defendants named herein; (b) any of the corporate Defendants' parent companies, subsidiaries, and affiliates; (c) any of the Defendants' officers, directors, management, employees, subsidiaries, affiliates or agents; (d) all governmental entities; (e) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; (f) the judges and chambers staff in this case, as well as any members of their immediate families; and (g) all jurors assigned to this case.

132.    Plaintiff reserves the right to modify or amend the definition of the class before the Court determines whether certification is appropriate.

133.    <u>Numerosity</u>, Fed. R. Civ. P. 23(a)(1):  Plaintiff does not know the exact number of Class members because such information presently is in the Defendants' control. But based on the nature of the trade and commerce involved, the Class is so numerous and geographically dispersed across the United States that joinder of all members is impracticable. Plaintiff reasonably believes that there are at least thousands of members in the Class.

134.    <u>Common Questions Predominate</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3):  Numerous questions of law and fact are common to the Class related to the existence of the anticompetitive conduct alleged, and the type and common pattern of injury sustained as a result thereof, including but not limited to:

    a.    Whether Defendants engaged in an agreement, combination, or conspiracy to fix, inflate, maintain, or stabilize the prices paid for Frozen Potato Products during the Class Period;

    b.    Whether such agreements constituted violations of the Sherman Antitrust Act;

    c.      The identity of the participants of the alleged conspiracy;

    d.      The duration of the conspiracy alleged herein, and the acts performed by

                Defendants and their co-conspirators in furtherance of the conspiracy;

    e.      Whether Defendants fraudulently concealed their misconduct;

    f.      Whether and to what extent Defendants' anticompetitive scheme inflated

                prices of Frozen Potato Products above competitive levels;

    g.      The nature and scope of injunctive relief necessary to restore competition;

                and

    h.      The measure of damages suffered by Plaintiff and the Damages Class.

These and other questions of law or fact that are common to the members of the Class predominate over any questions affecting only individual members of the Class. Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

135.    <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of the claims of other members of the Class. Plaintiff's claim arises from the same common course of conduct giving rise to the claims of the Class, and the relief sought is common to the Class.

136.    Plaintiff and the other Class members were injured by the same unlawful conduct, which resulted in their paying more for Frozen Potato Products than they would have in a competitive market.

137.    <u>Adequacy of Representation</u>, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent the interests of the Class because Plaintiff purchased Frozen Potato Products directly from Defendants within the United States during the Class Period. Plaintiff has no material conflicts with any other members of the Class that would be antagonistic to those of the other

members of the Class. Plaintiff seeks no relief that is adverse to the interests of other members of the Class, and the infringement of rights and damages Plaintiff sustained are typical of those of other members of the Class. Furthermore, Plaintiff has retained sophisticated and competent counsel who are experienced in prosecuting antitrust class actions, as well as other complex litigation. Plaintiffs intend to prosecute this action vigorously.

138. <u>Common Grounds for Injunctive Relief</u>, Fed. R. Civ. P. 23(b)(2): Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

139. <u>Superiority</u>, Fed. R. Civ. P. 23(b)(3): Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual joinder of all damaged members of the Class is impractical, and the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that are not practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

140.     This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

141.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## IX.      CLAIMS FOR RELIEF

**COUNT ONE**
**Violation of the Sherman Act, 15 U.S.C. § 1, 3**
**(Against All Defendants)**

142.     Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

143.     From at least January 1, 2021 until the effects of their unlawful conduct cease, Defendants entered into and engaged in a contract, combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of Section 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3) by artificially restraining competition with respect to the price of Frozen Potato Products sold within the United States.

144.     The contract, combination or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for Frozen Potato Products in the United States.

145.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

      (a)     exchanging competitively sensitive information among themselves, with the aim to fix, increase, maintain, or stabilize prices of Frozen Potato Products sold in the United States;

      (b)     participating in meetings, conversations, communications, and using mechanisms among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain, or stabilize prices of Frozen Potato Products sold in the United States;

      (c)     participating in meetings, conversations, and other communications among themselves to implement, adhere to, and police the agreements they reached;

      (d)     engaging in conduct designed to raise and stabilize the prices of Frozen Potato Products sold on the spot market and pursuant to contracts.

146.  Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to fix, maintain, raise, or stabilize prices of Frozen Potato Products.

147.  The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize, and maintain the price of Frozen Potato Products.

148.  Defendants' activities constitute a *per* se violation of Sections 1 and 3 of the Sherman Act.

149.  Defendants' conspiracy had the following effects, among others: (a) Price competition in the market for Frozen Potato Products has been restrained, suppressed, and/or eliminated; (b) Prices for Frozen Potato Products provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels

throughout the United States and elsewhere; (c) Plaintiff and members of the Class who purchased Frozen Potato Products from Defendants and their co-conspirators have been deprived of the benefits of free and open competition; and (d) purchasers of Frozen Potato Products paid artificially inflated prices.

150.    Defendants' production restrictions, price-fixing, and other actions in furtherance of their conspiracy, as Defendants intended, directly, substantially, and foreseeably increased prices that purchasers paid in the United States for Frozen Potato Products produced in or imported into the United States.

151.    Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by paying more for Frozen Potato Products purchased from Defendants than they would have paid in the absence of the conspiracy. As a direct and proximate result, Plaintiff and other members of the Class have suffered damages in an amount to be determined at trial. Paying such collusive overcharges is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

152.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

153.    For this conduct, Plaintiff and members of the Class are entitled to treble damages, injunctive relief, and attorneys' fees and costs pursuant to Section 4 of the Clayton Act (15 U.S. Code § 15) and 15 U.S.C. § 26.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment on its behalf and on behalf of the Class, by adjudging and decreeing as follows:

A.    Determining that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure,

B.    Appointing Plaintiffs as representatives of the Class and the undersigned law firms as Class Counsel, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

C.    Adjudging and decreeing that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

D.    Awarding damages for Defendants' violations of the Sherman Act (15 U.S.C. §§ 1, 3);

E.    Entering judgment against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

F.    Permanently enjoining and restraining Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G.     Permanently enjoining each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, restraining them against, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

H.     Awarding Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims asserted in this Complaint that are so triable.

Dated: November 15, 2024

Respectfully submitted,

By: /s/ Kenneth A. Wexler

Kenneth A. Wexler
Justin N. Boley
WEXLER BOLEY & ELGERSMA LLP
311 S. Wacker Dr., Suite 5450
Chicago, Illinois 60606
T: (312) 346-222
kaw@wbe-llp.com
jnb@wbe-llp.com

Heidi M. Silton (MN #025759X)
Jessica N. Servais (MN #0326744)
Joseph C. Bourne (MN #0389922)
Craig S. Davis (*pro hac vice* forthcoming)
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
T: (612) 339-6900
hmsilton@locklaw.com
jnservais@locklaw.com
jcbourne@locklaw.com
csdavis@locklaw.com

Kyle J. Pozan (IL Bar No. 6306761)
LOCKRIDGE GRINDAL NAUEN PLLP
1165 N. Clark Street, Suite 700
Chicago, IL 60610
T: (312) 205-8968
kjpozan@locklaw.com

Daniel E. Gustafson
Michelle J. Looby
Catherine K. Smith
Emily B. Egart
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
T: (612) 333-8844
dgustafson@gustafsongluek.com
mlooby@gustafsongluek.com
csmith@gustafsongluek.com
eegart@gustafsongluek.com

Joshua H. Grabar
GRABAR LAW OFFICE
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
T: (267) 507-6085
jgrabar@grabarlaw.com

**Counsel for Plaintiff Redner's Markets, Inc. and the Proposed Class**