**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE FROZEN POTATO PRODUCTS ANTITRUST LITIGATION | Case No.: 1:24-cv-11801 |
| This Document Relates To: | Judge: Jeffrey L. Cummings |
| *All Commercial Indirect Purchaser Actions* | Magistrate Judge Gabriel A. Fuentes |

**COMMERCIAL INDIRECT PLAINTIFFS'
FIRST CONSOLIDATED CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................................. 1

II. JURISDICTION AND VENUE ........................................................................... 5

III. PARTIES .............................................................................................................. 7

    A. PLAINTIFFS ............................................................................................. 7

    B. DEFENDANTS ......................................................................................... 9

    C. AGENTS AND CO-CONSPIRATORS ................................................. 13

IV. FACTUAL ALLEGATIONS .............................................................................. 14

    A. Background on the Frozen Potato Industry ........................................... 14

    B. Defendants Stopped Competing on Price in Search of Higher Profits in Furtherance of the Conspiracy ................................................................ 19

        Defendants Exchanged Competitively Sensitive Information and Exploited Circana as a Tool of the Conspiracy ..................................................... 26

    D. Defendants' Anticompetitive Conduct Caused Unprecedented Anticompetitive Price Increases for Frozen Potatoes ........................... 29

    E. The Structure and Characteristics of the Frozen Potato Market Render the Conspiracy Economically Plausible ...................................................... 33

    F. "Plus Factors" Outside of Market Characteristics Strengthen Claims of Price-Fixing ............................................................................................ 45

V. CLASS ACTION ALLEGATIONS .................................................................... 47

VI. DEFENDANTS ARE ENGAGED IN A CONTINUING ANTITRUST VIOLATION ....................................................................................................... 50

VII. PLAINTIFFS DID NOT DISCOVER, NOR COULD HAVE DISCOVERED THROUGH REASONABLE DILIGENCE, THE CLAIMS IN THIS LAWSUIT EARLIER ............................................................................................................. 51

VIII. DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY ... 52

IX. RELEVANT MARKET ....................................................................................... 53

X. ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT ................ 54

XI. CLAIMS FOR RELIEF ...................................................................................... 56

XII. PRAYER FOR RELIEF ...................................................................................... 89

XIII. DEMAND FOR JURY TRIAL .......................................................................... 90

Plaintiffs; 1911 Smoke House Group d/b/a 1911 Smoke House Bar-B-Que; Carlos Echevarria d/b/a El Jarocho Mexican Restaurant; Dawkit Inc. d/b/a Burger Barn Grill; Eric Meyers d/b/a Eat at Eric's; Filonek's, Inc. d/b/a Filonek's Bar and Grill; Gladys Mae Williams d/b/a Gladys Restaurant; Larson Saloon, Inc. and Larson Saloon 2, Inc.; Mark Beniger d/b/a Little Jewel of New Orleans; Nineteenseventynine, LLC d/b/a The Breakfast Joynt; Schilliano, LLC d/b/a Illiano's Ristorante & Pizzeria; and Vista Azul, Inc. (collectively, "Plaintiffs") bring this action on behalf of themselves, and all others similarly situated to recover damages and obtain injunctive relief against Defendants for violations of: (i) the antitrust laws of the United States; and (ii) the antitrust and consumer protection laws of the states set forth herein. Plaintiffs allege as follows based on personal knowledge as to themselves, and on information and belief as to all others.

## I. INTRODUCTION

1. From at least January 1, 2021 until the time that the adverse effects of Defendants' anticompetitive conduct cease (the "Class Period"), Defendants and their co-conspirators conspired to fix, raise, maintain, and stabilize the price of frozen french fries, hash browns, tater tots, and other frozen potato products (collectively, "Frozen Potato" or "Frozen Potatoes") sold in the United States. Defendants implemented and executed their conspiracy by increasing the price of Frozen Potatoes at nearly identical times, exchanging competitively sensitive pricing information, leveraging a temporary spike in input costs to justify permanent, industry-wide price increases, and utilizing other available means to exploit their collective market power and artificially increase prices of Frozen Potatoes.

2. The Frozen Potato industry in the United States is highly concentrated, making it ripe for collusion. In fact, the Frozen Potato industry is controlled by just four companies: Defendants Cavendish Farms, Ltd. and Cavendish Farms, Inc. (collectively, "Cavendish"), J.R.

Simplot Company ("Simplot"), Lamb Weston Holdings, Inc., Lamb Weston, Inc.; Lamb Weston BSW, LLC; Lamb Weston/Midwest, Inc.; Lamb Weston Sales, Inc. (collectively, "Lamb Weston"), and McCain Foods, Ltd. and McCain Foods USA, Inc. (collectively, "McCain").[1] Together, these Producing Defendants control over 97% of the Frozen Potatoes market in the United States.

3.      In recent years, the Producing Defendants utilized their market dominance, along with frequent interactions and access to each other's competitively sensitive information, to coordinate pricing for Frozen Potatoes at elevated levels. The efficiency of this arrangement was facilitated by the limited number of participating entities and the organized nature of their conduct, which allowed them to implement price increases with remarkable effectiveness.

4.      For example, over a five day period in February 2022, the four Producing Defendants announced nearly identical price hikes of roughly 12 cents per pound on Frozen Potatoes. Two months later, in April 2022, the Producing Defendants simultaneously increased prices again. The level of coordination demonstrated in these price increases as well as numerous others detailed in this complaint cannot be explained by non-conspiratorial factors and reflects a knowledge of competitor price decisions which according to one former Lamb Weston manager and analyst, "wasn't typical or historically how price increases" happened, and "was very suspect."

5.      During the Class Period, instead of competing on price, the Producing Defendants collaborated and were careful to ensure that any price increases were matched by their ostensible competitors. In fact, because of the interconnectedness of the industry, employees and executives could share pricing information directly, facilitated by the hiring of a former employee of one

---

[1] Collectively, these Defendants (which do not include Defendant Circana LLC) are referred to as the "Producing Defendants."

Producing Defendant by another Producing Defendant and the information exchange mechanisms detailed in this complaint.

6.      These developments continued despite a significant reduction in input costs for Frozen Potatoes and cannot be explained by independent economic factors. The simultaneous implementation of coordinated price increases continued to hold even in the face of declining production costs and resulted in exceptionally high, anticompetitive profit margin during the Class Period. For example, Defendant Lamb Weston reported that its first quarter fiscal year 2024 net income increased 111% year-over-year.[2] As one Lamb Weston executive observed, Lamb Weston, J.R. Simplot, and McCain "have never ever seen margins this high in the history of the potato industry," describing the market as "nirvana" for those Producing Defendants. From January to March 2023, while potato retail sales volume decreased by 4.4%, "all categories of potatoes increased in dollar sales, with the most significant occurring for frozen potatoes by 41.9%." Similarly, from July 2023 to June 2024, although sales *volume* remained flat, Frozen Potato sales in dollars increased by 14.6%.[3] Likewise, between January 2022 and December 2024, Frozen Potato prices jumped 62%. In contrast, in the twenty years before the Class Period (1991-2020), Frozen Potato prices only increased 2.5% per year.

7.      It initially appeared as if this type of success and record profits would not last, as market analysts noted in 2023 that Defendant Lamb Weston's "stepped-up margin expansion"

---

[2] Bill McColl, *Lamb Weston's Profit Soars on Higher Prices and Shares of the Potato Processor Jump*, INVESTOPEDIA.COM, Oct. 5, 2023, *available at* https://www.investopedia.com/lamb-weston-profit-soars-on-higher-prices-and-shares-jump-8348245 (last accessed Oct. 2, 2025).

[3] T.G. Lynn, *U.S. Frozen Potato Market Thrives Amid Challenges: Opportunities for Future Growth*, POTATOES NEWS, Oct. 23, 2024, *available at* https://potatoes.news/u-s-frozen-potato-market-thrives-amid-challenges-opportunities-for-future-growth/ (last accessed Oct. 2, 2025).

would not "be durable longer term," assuming, of course, the market for Frozen Potatoes was competitive.

8.     Defendants' pricing behavior during the Class Period defied fundamental economics and industry expectations. As a former regional sales manager at Lamb Weston observed that, "costs have come down. Pricing hasn't. Now there is excess capacity. Prices should be coming down." But that was not the case, and Defendants were able to maintain those increased margins through anticompetitive collusion that resulted in ongoing supracompetitive prices for Frozen Potatoes.

9.     The Producing Defendants' coordinated activities were also facilitated by the exchange of non-public, competitively sensitive data through Defendant Circana LLC ("Circana") and its data analytics platform PotatoTrac, of which the subscription is exclusive to the Producing Defendants. Through PotatoTrac, Circana delivered SKU-level shipment, pricing, and volume data for the U.S. frozen potato sector, shared exclusively among participants. PotatoTrac also delivered company projections to participants, enabling the Producing Defendants to track each other's adherence to the conspiracy. The Producing Defendants intentionally provided Circana with competitively sensitive internal information, knowing it would be disseminated to their ostensible competitors. Although it may be in a firm's independent self-interest to *receive* competitively sensitive internal information from its competitors, it is against firm's independent self-interest to *share* its competitively sensitive internal information to competitors.

10.     Numerous additional "plus factors" also existed during the Class Period, including but not limited to the following: (a) opportunities to collude through common co-packing arrangements and trade association events, the National Potato Promotion Board (Potatoes USA), as well as other forums; (b) the sharing of competitively sensitive information as a means to

implement the conspiracy including through Circana; (c) price increases that cannot be explained by higher input costs; (d) prices increases contrary to Producing Defendants' individual self-interest; (e) price increases that departed from established practices; and (f) multiple additional industry characteristics that facilitate collusion, such as high barriers to entry, highly concentrated sellers, fragmented buyers, repetitive purchases, and inelastic demand for a commodity product. Together, these "plus factors" enabled Defendants to successfully implement their conspiracy and maintain prices above competitive levels, and they further bolster the plausibility of Plaintiffs' price-fixing scheme allegations.

11. Defendants' wrongful and anticompetitive actions had the intended purpose and effect of artificially fixing, raising, maintaining, and stabilizing the price of Frozen Potatoes to Plaintiffs and members of the Classes (as defined herein). As a direct result of Defendants' concerted pricing and supply side decision making, Frozen Potato prices in the United States have been artificially inflated since at least January 1, 2021, causing businesses, such as Plaintiffs and members of the Classes, to pay more for Frozen Potatoes than they would have but for Defendants' collusion.

12. On behalf of a proposed class of thousands of businesses nationwide, Plaintiffs bring this class action to put an end to Defendants' illegal scheme, to recover damages, and to restore competition in the Frozen Potato marketplace.

## II. <u>JURISDICTION AND VENUE</u>

13. This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26). Plaintiffs' Sherman Act claim seeks injunctive relief, costs of suit, and reasonable attorney's fees, and the state law claims seek injunctive relief, treble damages, costs of suit, and reasonable attorneys' fees.

14.     This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1333(d), 1337(a), and 1367.

15.     This Court has personal jurisdiction over all Defendants pursuant to Section 12 of the Clayton Act, 15. U.S.C. § 22 and 28 U.S.C. § 1391.

16.     Defendants' unlawful, anticompetitive conduct substantially affected interstate commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed Class Members.

17.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

18.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of Frozen Potatoes throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

19.     The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

20.     No other forum would be more convenient for the parties and witnesses to litigate this case.

### III. PARTIES

**A.     PLAINTIFFS**

21.     Plaintiff 1911 Smoke House Group d/b/a 1911 Smoke House Bar-B-Que is a corporation organized under the laws of New Jersey. 1911 Smoke House Group owns and has operated 1911 Smoke House Bar-B-Que, with locations in and around Trenton, Mercer County, New Jersey and Willingboro, Burlington County, New Jersey. 1911 Smoke House Group indirectly purchased Frozen Potatoes sold by the Producing Defendants, including french fries, for commercial use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

22.     Plaintiff Carlos Echevarria owns and operates El Jarocho Mexican Restaurant, a foodservice business located in Jamestown, New York, which indirectly purchased Frozen Potatoes sold by the Producing Defendants, including french fries, for commercial use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

23.     Plaintiff Dawkit Inc. is a Florida business operating numerous Burger Barn and Grill restaurants in and around Jacksonville, Florida, and in Tallahassee, Florida, where it indirectly purchased Frozen Potatoes sold by the Producing Defendants, including french fries, for commercial use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

24.     Plaintiff Eric Meyers is a Tennessee resident that owns and operates Eat at Eric's a food truck operating in an around the Memphis, Tennessee area, where he indirectly purchased Frozen Potatoes sold by the Producing Defendants, including french fries, for commercial use

during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

25.     Plaintiff Filonek's, Inc., d/b/a Filonek's Bar and Grill is an Illinois corporation, duly organized under the laws of Illinois and operating in Illinois, where it indirectly purchased Frozen Potatoes sold by the Producing Defendants, including french fries, for commercial use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

26.     Plaintiff Gladys Mae Williams owns and operates Gladys Restaurant a foodservice business located in Lexington, Mississippi, where she indirectly purchased Frozen Potatoes sold by the Producing Defendants, including french fries, for commercial use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

27.     Plaintiffs Larson Saloon, Inc. and Larson Saloon 2, Inc. are Minnesota corporations duly organized under the laws of Minnesota that own operate the Pickled Loon Saloon in Grand Rapids, Minnesota and the Pickled Loon Saloon in Emily, Minnesota, where they indirectly purchased Frozen Potatoes sold by the Producing Defendants, including french fries, for commercial use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

28.     Plaintiff Mark Beniger owns and operates Little Jewel of New Orleans, a restaurant registered under the laws of California and located in Los Angeles, where he indirectly purchased Frozen Potatoes sold by the Producing Defendants, including french fries, for commercial use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

29.     Plaintiff Nineteenseventynine, LLC d/b/a The Breakfast Joynt is a limited liability company registered under the laws of Arizona. It operates a restaurant at 10101 East Bell Road in Scottsdale, Arizona, where it indirectly purchased Frozen Potatoes sold by the Producing Defendants, including french fries, for commercial use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

30.     Plaintiff Schilliano, LLC d/b/a Illiano's Ristorante & Pizzeria is a limited liability company registered under the laws of Connecticut. It operates a restaurant at 404 South Main Street, Middletown, Connecticut, where it indirectly purchased Frozen Potatoes, including french fries, for commercial use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

31.     Plaintiff Vista Azul, Inc. is a Colorado corporation that owns and operates The Grubsteak, a restaurant located in Estes, Park, Colorado, where it indirectly purchased Frozen Potatoes sold by the Producing Defendants, including french fries, for commercial use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

**B.     DEFENDANTS**

**1.     <u>Cavendish Farms</u>**

32.     Defendant Cavendish Farms, Inc. is a Delaware corporation that maintains its primary United States office at 25 Burlington Mall Road, Burlington, Massachusetts, and a manufacturing plant at 5855 Third Street, S.E. Jamestown, North Dakota. Cavendish Farms, Inc. is a wholly owned subsidiary of Defendant Cavendish Farms, Ltd., a company existing under the laws of the Province of New Brunswick, Canada with its principal place of business located at 100

Midland Dr. Dieppe, New Brunswick, Canada E1A 6X4. Cavendish Farms Ltd. is part of the J.D. Irving Group of Companies.[4]

33.     Cavendish Farms Ltd. and Cavendish Farms, Inc., are collectively referred to herein as "Cavendish."

34.     Cavendish manufactures frozen french fries and potato products at facilities throughout North America and is the fourth largest processor of Frozen Potato products in North America. At all times relevant to this action, Cavendish was doing business in the State of Illinois.

**2.     Circana**

35.     Circana LLC is a Delaware company with its principal place of business located in Chicago, Illinois. Circana emerged from the 2022 merger between Information Resources, Inc. and the NPD Group. Circana is a data analytics and market research company that aims to provide its customers with full-circle views of consumer behavior. Producing Defendants willingly provide their input, supply and pricing data to Circana knowing it will be distributed to one another.

36.     Circana publishes and sells a variety of reports, including PotatoTrac,[5] which include, among other information and data, quarterly survey data of all potato products moving from manufacturers to food service outlets. PotatoTrac enabled Producing Defendants to gather and standardize data, which subsequently provided them with the means to oversee the activities of its co-conspirators.

---

[4] "Our Story," CAVENDISHFARMS.COM, https://www.cavendishfarms.com/en/our-story/ (last accessed Oct. 2, 2025).

[5] PotatoTrac is one example of many reports published by Circana. On information and belief, Plaintiffs understand that other reports include but are not limited to SupplyTrac (or SupplyTrack). Unless otherwise noted, references to PotatoTrac or reports published by Circana include these other reports and any other supplemental data sources.

### 3. **J.R. Simplot Company**

37.     Defendant J.R. Simplot Company is a Nevada corporation with its principal place of business located at 1099 West Front Street, Boise, Idaho.

38.     Simplot manufactures Frozen Potatoes at facilities throughout the United States. Simplot is one of the largest potato companies in the world, with gross revenue in 2020 exceeding $6 billion. At all times relevant to this action, Simplot was doing business in the State of Illinois.

39.     J.R. Simplot Company is referred to hereinafter as "J.R. Simplot."

### 4. **Lamb Weston**

40.     Defendant Lamb Weston Holdings, Inc. is a Delaware corporation with its principal place of business located at 599 South Rivershore Lane, Eagle, Idaho. It is a publicly traded company on the New York Stock Exchange using the ticker symbol LW and it owns and operates a collection of subsidiaries that are all involved in the production and marketing of Frozen Potatoes, including Defendants Lamb Weston, Inc. (a Delaware corporation), Lamb Weston BSW, LLC (a Delaware LLC), Lamb Weston/Midwest, Inc. (a Washington corporation) and Lamb Weston Sales, Inc (a Delaware corporation).

41.     Lamb Weston Holdings, Inc., Lamb Weston, Inc., Lamb Weston BSW, LLC, Lamb Weston/Midwest, Inc., and Lamb Weston Sales, Inc. are referred to collectively as "Lamb Weston."

42.     Lamb Weston is the world's second largest producer of branded and private-label Frozen Potato products, including french fries, tots and hash browns, and number one in North America. It operates 27 production facilities worldwide, with more than half of those located in the United States and Canada. Approximately 86% of Lamb Weston's products are distributed to

businesses, like Plaintiffs, within the food-service industry, while the remaining 14% are sold at retail.

43.     At all times relevant to this action, Lamb Weston was doing business in the State of Illinois.

**5.     McCain Foods**

44.     Defendant McCain Foods USA, Inc. is a Maine corporation with its principal place of business located at One Tower Lane, 11th Floor, Oakbrook Terrace, Illinois. Defendant McCain Foods USA, Inc. is a wholly owned subsidiary of Defendant McCain Foods Limited, a company existing under the laws of the Province of New Brunswick, Canada, with its principal place of business located at 439 King Street West, 5th Floor, Toronto, Ontario, Canada. McCain Foods Group, Inc., doing business as McCain Foods Group (Canada), is a Canadian division or wholly-owned subsidiary of McCain Foods Limited, and operates a Frozen Potato Product manufacturing plant in Florenceville-Bristol, New Brunswick, Canada. McCain Foods Limited, McCain Foods USA, Inc. and McCain Foods Group, are collectively referred to as "McCain."

45.     McCain's products are manufactured throughout the United States and Canada at several food processing facilities. With 49 production facilities worldwide, McCain is among the largest global producers of french fries and potato products. According to the company, approximately one in four fries worldwide is produced by McCain Foods.[6] McCain also produces other snacks, appetizers, meals and vegetable products. McCain sells its products at retail as well as to food-service companies. McCain has significant operations in the United States, and at all

---

[6] "Our History," MCCAIN FOODS, https://www.mccain.com/about-us/our-history/ (last accessed Oct. 2, 2025).

times relevant to this action, McCain was doing business in the State of Illinois. In fact, McCain is the Official Fry of the Chicago Cubs.[7]

## C.    AGENTS AND CO-CONSPIRATORS

46.    Defendants' acts were performed by their respective officers, directors, agents, employees or representatives while actively engaged in the management, direction, control or transaction of Defendants' business affairs.

47.    Each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified entity.

48.    Various other persons, firms and corporations not named as Defendants participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their Co-conspirators, whether or not the co-conspirators are named as Defendants in this Complaint.

49.    Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affair.

50.    When Plaintiffs mention a corporate family in their allegations, Plaintiffs are alleging that employees or agents from any entity within that corporate family participated in conspiratorial acts on behalf of all related Defendant companies within that corporate family. Since Defendants operate as corporate families, individuals often did not know each other's specific affiliations or distinctions between the various entities. Therefore, all Defendant entities within

---

[7]  "The Official Fry of the Chicago Cubs," MCCAIN FOODSERVICE SOLUTIONS, https://mccainusafoodservice.com/cubs-operator-toolkit/ (last accessed Oct. 2, 2025).

each corporate family were knowingly involved in the conspiracy to keep Frozen Potato Product prices above competitive levels.

51.     Each Defendant named herein acted as the agent of or joint venturer with the other Defendants in carrying out the acts, violations and common course of conduct alleged herein.

52.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## IV. FACTUAL ALLEGATIONS

**A.     Background on the Frozen Potato Industry**

53.     Potatoes are the leading vegetable crop in the United States, and the United States is the fifth largest producer of potatoes in the world. Billions of pounds of potatoes are produced in the United States every year. For instance, in 2023, nearly a million acres of potatoes were harvested in the United States, producing 44 billion pounds of potatoes. Of those 44 billion pounds, 41 billion were sold for a total value of US $5 billion.[8]

---

[8] A "cwt," or "hundredweight," is equal to 100 pounds.

FIGURE 1: U.S. TOTAL POTATO PRODUCTION (MILLION CWT)[9]



54.     Approximately 70% of potatoes sold in the United States are sold to processors for Frozen Potatoes, chips, shoestrings, dehydrated potatoes, and other potato products.

---

[9] *N. Am. Potatoes*, USDA (Feb. 14, 2025), *available at* https://www.nass.usda.gov/Publications/Todays_Reports/reports/uscp0225.pdf (last accessed Oct. 2, 2025).



55. Of the potatoes sold to processors, approximately 60% are used for frozen french fries and other frozen products (defined herein as Frozen Potatoes) which, in 2023, accounted for 17.6 billion pounds of potatoes. Accordingly, as of 2023, almost half of all potatoes sold are used to produce Frozen Potato products.[10] According to one estimate, the average American consumes nearly 48 pounds of Frozen Potatoes each year.



---

[10] Catharine Weber, *Fries on the rise: Nearly half of potatoes now go into frozen products*, USDA Economic Research Serv. (Aug. 29, 2023), *available at* https://www.ers.usda.gov/data-products/charts-of-note/chart-detail?chartId=107266 (last accessed Oct. 2, 2025).

56.     As depicted in the graphic below, Frozen Potatoes are produced in a multi-step process that is highly automated using specialized machines. These machines clean and peel potatoes, cut them into strips or other shapes, blanch, dehydrate, par-fry, freeze, pack, and store them. Frozen Potato producers typically acquire potatoes in mass quantities from potato growers and produce a variety of products in their factories. They sell these products, typically through third party distributors such as Sysco, US Foods and Restaurant Depot, to a variety of customers in the food service industry, including restaurants, hotels, schools, hospitals and other facilities, and, in grocery stores, convenience stores and other retailers such as Target and Wal Mart.



57. Frozen Potatoes are intended to be sold to commercial foodservice entities, such as Plaintiffs and the Classes. Frozen Potatoes are popular both in the food service and retail sectors. Indeed, for frozen french fries alone, the market in 2023 was estimated at $14.84 billion; it has been projected to reach $20 billion annually by 2030. Throughout the Class Period, french fries appeared on 59-60% of restaurant menus nationwide. Likewise, retail sales of Frozen Potatoes increased nearly 10% from 2019 to 2024.

58. The United States is the foremost market for Frozen Potatoes in North America, with Americans accounting for a commanding 88% of Frozen Potatoes consumption in 2024. The North American Frozen Potato market as a whole was valued at $23.7 billion in 2023, and experts anticipate that it will inflate to US $35 billion by 2031.

59. Defendant Lamb Weston describes itself "is a leading supplier of frozen potato, sweet potato, appetizer and vegetable products to restaurants and retailers around the world."[11]

60. Defendant McCain asserts that it produces and markets "the best and most innovative prepared potato and appetizer products to our customers in the retail, foodservice and quick service restaurant (QSR) sectors."[12]

61. Defendant Simplot claims it "offers a complete line of frozen foodservice potatoes."[13]

---

[11] *Investor Relations*, LAMBWESTON.COM, https://investors.lambweston.com/company-profile (last accessed Oct. 4, 2025).

[12] *About McCain Foods*, MCCAINUSAFOODSERVICE.COM, https://mccainusafoodservice.com/about/ (last accessed Oct. 2, 2025).

[13] *Potatoes*, SIMPLOTFOODS.COM, https://www.simplotfoods.com/foodservice-categories/potatoes (last accessed Oct. 2, 2025).

**B.    Defendants Stopped Competing on Price in Search of Higher Profits in Furtherance of the Conspiracy**

62.     Defendants engaged in a conspiracy to fix and raise the price of Frozen Potatoes throughout the Class Period. Upon information and belief, Defendants' conspiracy was implemented by their exchange of detailed, competitively sensitive, and closely guarded, non-public information about Frozen Potatoes.

63.     During the Class Period, the Producing Defendants informed customers of their forthcoming price increases on Frozen Potatoes through various channels, including issuing form letters to customers that set forth the respective increase(s).

64.     This coordination was enabled, in part, by the limited number of individuals involved in setting prices for Frozen Potatoes. Lamb Weston's retail division included a category team with only three employees that set prices for its entire Frozen Potatoes category, while a former Simplot sales and marketing manager explained that Simplot pricing authority was in the hands of a single individual.

65.     Defendant Processors were so closely connected with one another that, according to one former McCain employee, McCain not only knew the capacity of other Defendant Processors but knew another Defendant Processor's cost per unit for Frozen Potato Products.

66.     In a competitive market, price increases would be viewed by competitors as opportunities to increase market share through more competitive pricing, especially when the price of the major cost input decreased, allowing them to undercut their competitors to gain business without sacrificing their current profit margin. However, this was not the case in the Frozen Potato industry. Instead, the Producing Defendants agreed to impose and maintain uniform price increases across their Frozen Potato products. As confirmed by Lamb Weston's former Vice President, who, in 2021, admitted that Lamb Weston would not only announce a price increase, despite the reduced

price of raw potatoes, but further admitted that its 2021 price increase: "will probably be exactly the price increase that McCain wanted, which was $0.04 on A grade and $0.02 they will announce a price increase." The former Vice President added, "And they hope McCain will follow, and Simplot will follow, and Cavendish will follow."

67.     In a subsequent conversation, the same Lamb Weston former Vice President further confirmed the sharing of pricing information between the Producing Defendants: "So it gets passed around, but not very quickly. So for example, if there's a price increase, I will get the price increase same day. It will be sent to me. And so it's public information. But that information, people, it would take a month. If you're not in the loop, it'd be a month or two before you even knew there was an increase. So these increases happen and this is exactly what happens. Lamb Weston raises the price, and they'll send their price increase through the waves. So Simplot will get Lamb Weston's increase. McCain will get Lamb Weston's increase. Cavendish will get the increase."

68.     Nevertheless, as demonstrated herein, during the Class Period the Defendants issued price increase letters of the exact same amounts within days of each other indicating they were in fact "in the loop" and coordinating increases prior to their issuance. Furthermore, since the decision to issue price increase letters requires adequate time for preparation and implementation, Defendants' price increase behavior cannot be explained away as independent pricing behavior. The public signaling statements detailed above were in furtherance of Defendants' conspiracy to artificially increase Frozen Potato prices as alleged in this Complaint.

69.     At the same time that the former Lamb Weston executive made the statements detailed above, Lamb Weston routinely prohibited its management from communicating via email about competitor pricing, instead instructing them to use text message to communicate, in order to

obfuscate the extent of company leadership's knowledge of competitor price increase announcements.

70.     Indeed, one long-time Simplot retail sales and marketing manager recalled that her supervisors rejected her suggestion to change how price increase announcements are distributed to mitigate the risk of recipients forwarding them to others, which led her to believe that her employer wanted its competitors to have knowledge of its pricing strategies.

71.     During the Class Period, the Defendants' desire to collude on prices rather than compete was reflected in numerous parallel price increases. Defendants coordinated price increases at identical or near-identical times during the Class Period to the detriment of Plaintiffs and the Classes. Defendants, at simultaneous or near-simultaneous times, sent price increase letters to their customers, noting the amount, outlining an effective date, and sometimes including purported justifications.

72.     For example, in January 2021, Simplot and McCain each sent identical price increase letters to their customers within one day of each other. Each letter informed their customers that the cost of Frozen Potatoes would increase by $0.04 per pound. Simplot also notified Plaintiffs and the Classes that the price of line flow potato products would increase by $0.02 per pound. The letters sent by Simplot and McCain both indicated an effective date of March 15, 2021.

73.     Around the time of the coordinated price increase amongst Producing Defendants, from January 5, 2021 to January 7, 2021, the National Potato Council held its Virtual Potato Expo. McCain, Lamb Weston, J.R. Simplot, and Cavendish are all members of the National Potato Council, and representatives from those Producing Defendants attended the conference.

74. A month later, in February 2021, McCain announced another price increase, followed soon thereafter by similar increase announcements by J.R. Simplot and Cavendish. Although Lamb Weston did not formally announce a price increase, it appears to have increased prices in conjunction with the others during that same time period.

75. In May 2021, Lamb Weston and McCain sent price increase letters within two weeks of each other. The Lamb Weston letter announced that the price of Frozen Potatoes would increase by $0.08 per pound effective July 1, while the McCain letter announced an increase of $0.04 per pound effective July 15. And on June 4, 2021, Cavendish also sent letters announcing a price increase of $0.04 per pound effective July 15.

76. The streak of coordinated price increases continued during the second half of 2021. In September of that year, during a discussion regarding an upcoming Lamb Weston price increase, the company's former Vice-President of International – who was a 40-year-veteran in the industry – anticipated that McCain would be amenable to the change and adopt a similar pricing strategy: "it will probably be exactly the price increase that McCain wanted, which was $0.04 on A grade and $0.02 they will announce a price increase."

77. And, as predicted, in October 2021, Lamb Weston, McCain, and Cavendish each sent price increase letters within five days of each other. The price increase letters all indicated that the cost of Frozen Potatoes would increase by $0.08 per pound, and all had the same effective date—December 15, 2021.

78. The Producing Defendants continued their coordinated price increases into 2022. That same year, J.R. Simplot, which had previously primarily increased prices on a yearly basis, implemented more frequent price increases, as recognized by a Sales Solutions Direct at J.R. Simplot.

79.     The 2022 increases started on February 11, 2022, when Lamb Weston announced a price increase of $0.12 per pound for battered and coated products and a $0.10 per pound increase on non-coated products effective April 2022.

80.     Within the week, the three other Producing Defendants had followed suit. More specifically, On February 15, 2022, J.R. Simplot announced identical price increases for the same two categories of products, while McCain declared a $0.12 per pound increase on all its potato products. Subsequently, on February 16, 2022, Cavendish announced a price increase of twelve cents per pound for battered and coated frozen potatoes, "formed items," as well as non-battered frozen potatoes.

81.     On February 14, 2023, McCain sent a letter to its customers announcing an $0.08 per pound price increase on "all potato products." Lamb Weston sent a letter on March 15 to, among others "All Lamb Weston Distributors," announcing a price increase on potato products ranging from $0.10 to $0.25 per pound, effective May 1, 2023. On March 31, 2023, J.R. Simplot sent a letter to its "Valued Distributors" announcing a price increase on potato products ranging from $0.04 to $0.15 per pound, effective May 15, 2023.

82.     These contemporaneously announced, simultaneously effective price increases caught the attention of at least one restaurant owner. An April 19, 2022 post on X (formerly Twitter) from a Washington, D.C. restaurant owner states: "Amazing how all of the major suppliers for French Fries and the like are all raising their prices at the same time and by the same amount. Totally not collusion or anything, right?"

83.     Even the Director of Sales at J.R. Simplot recognized that Producing Defendants had coordinated price hikes in 2022, referencing Lamb Weston's matching J.R. Simplot's increases

of $0.10 and $0.12 in April 2022. Similarly, the Director noted that when J.R. Simplot raised prices

again in May 2022, Lamb Weston again followed with $0.08 and $0.10 increases in July.

84.     The Producing Defendants could not achieve and maintain such substantial price

increases without agreement and coordination amongst one another, as facilitated by Defendant

Circana. Without an agreement, a company's independent decision to raise prices would be

undercut by its competitors in order to attract customers and increase their market share.

85.     In fact, in 2023, the Director of Sales Solutions for J.R. Simplot even acknowledged

that Lamb Weston took 35% in price increases, explaining that J.R. Simplot, McCain, and

Cavendish were also continuing to "push pricing" while "not going after new business."

86.     A former McCain Foods Senior Director stated in 2024 that the company chose not

to compete with Lamb Weston on battered fries pricing due to decisions from senior management.

Likewise, J.R. Simplot's Director of Sales noted that, despite customer threats to switch after price

increases, they were unconcerned because they trusted competitors would not lower prices. This

reflects confidence among the Producing Defendants in maintaining price agreements.

87.     The Producing Defendants' price increases have consistently aligned with one

another, resulting in collectively elevated prices that surpass competitive levels throughout the

Class Period. This trend, including additional price hikes in 2023, has adversely affected Plaintiffs

and Class Members.

88.     To be clear, the Producing Defendants have achieved profit margins during the

Class Period that would not have been attainable absent their involvement in the alleged

conspiracy. So much so that in 2023, a former Vice President at Lamb Weston acknowledged that

Lamb Weston, J.R. Simplot, and McCain "have never ever seen margins this high in the history

of the potato industry." He added that Producing Defendants "absolutely" have "no incentive to

fight that hard for each other's share" and instead maintain high margins by "behaving themselves". "I think we've done a pretty good job at taking margins within these price increases," he concluded.

89.     Overall, the Producing Defendants' collusion yielded substantial gains as they raised prices for Frozen Potatoes in the United States to supracompetitive levels as planned, even as their input costs dropped.

90.     Moreover, some Producing Defendants had implemented executive compensation schemes that incentivized their executives to maximize company earnings, therefore incentivizing executives to maximize Defendants' profit margins on Frozen Potatoes. For example, during and after the period in which Defendants' coordinated price increases took effect during 2022 and 2023, employees working for Defendant Lamb Weston received unprecedented bonuses.

91.     In a April 2024 conversation, a former Senior Director for Global Optimization at McCain Foods went even further in describing the agreed lack of competition amongst the big players in the industry, stating, "so your overall share of the market is becoming a little bit more proliferated, but between your big players, it's stable. He later added that McCain Foods had not been "willing" to "compete with Lamb on price on battered," since "they're going to race us to the bottom."

92.     That same former Senior Director at McCain Foods added that, although he wanted to compete with Lamb Weston on the price and market share of battered fries, the "higher ups in the room…[thought] we're going to screw it up for everyone. So we shouldn't risk it." Around the same time, a former VP at Lamb Weston opined there was "[a]bsolutely [] 100%" no incentive to fight for each other's market share, and that they were "behaving themselves."

93.     In 2023, the Director of Sales Solutions for J.R. Simplot acknowledged that Lamb Weston took 35% in price increases and explained that J.R. Simplot, McCain, and Cavendish were also continuing to "push pricing" and "not going after new business."

94.     One Lamb Weston manager and analyst observed that, while the Frozen Potato industry had seen price increases previously, these price increases were "very suspect," as they were not typical or historically how price increases were implemented by Defendants.

## C.     Defendants Exchanged Competitively Sensitive Information and Exploited Circana as a Tool of the Conspiracy

95.     Circana's PotatoTrac publication provides another avenue through which Defendants colluded and effectuated their conspiracy. It gives frozen potato producers detailed reports of the entire market, allowing Defendants and their co-conspirators to work together to fix prices at artificially high levels, maximizing their profit-margins instead of competing for volume.

96.     According to the *Potato Grower* magazine, PotatoTrac provides "SKU level data for all frozen potato shipments from the four major frozen potato processors – Cavendish, (Lamb-Weston), McCain, and Simplot – to all U.S. foodservice customers, as well as foodservice exports from the U.S. to foreign countries…While the PotatoTrac figures do not account for 100 percent of the frozen potato products sold to U.S. foodservice distributors and operators, they account for an estimated 93 percent of the total by the participants."[14] PotatoTrac data is "gathered via a survey of food service suppliers," unlike "retail scanner data," which measures only items that are actually purchased.

---

[14] *Potato Track Reports Give Marketing Data*, Feb. 28, 2009, POTATO GROWER, *available at* https://www.potatogrower.com/2009/02/potatotrac-reports-give-marketing-data (last accessed Oct. 2, 2025).

97.     PotatoTrac's subscribership is exclusive to the Producing Defendants. The Producing Defendants share their internal production and pricing information with PotatoTrac *weekly* by product type (*e.g.*, curly fries), knowing that the publication is distributed to its "competitors." This sharing of competitively sensitive information provides a mechanism by which Defendants can police one another, ensuring that the supply and pricing goals of the conspiracy are realized.

98.     PotatoTrac data further provided the Producing Defendants with a means to determine whether their Frozen Potato prices were above or below the aggregate price per pound in any given product category. A former senior regional sales manager at Lamb Weston explained that PotatoTrac provided unprecedented access to market data in an adaptable format that gave the Producing Defendants product category-level insight into their respective market position.

99.     The Producing Defendants paid Defendant Circana subscription fees in exchange for access to PotatoTrac data and reports, which were accessible, in part, through an online "dashboard," customizable for each client, which displayed market volume and price data, broken out by product category.

100.    In sum, data and information Producing Defendants obtained from Circana: (1) covered nearly 100% of the industry, (2) the data shared is highly granular, (3) the subscribership is limited to the Producing Defendants, and (4) the data is frequently collected and shared. These properties together enable PotatoTrac to be used by Producing Defendants to exchange competitively sensitive information and facilitate collusion. Although it may be a firm's independent self-interest to *receive* such competitively sensitive internal information from its competitors, it is against firms' independent self-interest to *share* its competitively sensitive internal information to competitors.

101. Additionally, Defendants often contract with the same third-party storage vendors, which allows them to monitor their competitors' inventory in real time, including the quantity, product type, and intended customer. Similarly, because many of Defendants' plants are located in close proximity, Defendants can monitor competitors' output.

102. The Producing Defendants coordinated pricing and production through coded signals, often citing inflation as a cover while actively collaborating to increase margins. For example, Lamb Weston executives would use public statements with phrases like "pricing discipline"[15] and "projected margins" to signal cooperation with the other Producing Defendants, deliberately avoiding detection. These terms, common in cartel activity, were used to maintain high prices and conceal their intent behind references to inflation.

103. The Supreme Court has long recognized that "[e]xchanges of current price information … have the greatest potential for generating anti-competitive effects and … have consistently been held to violate the Sherman Act." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978); *see also Todd v. Exxon*, 275 F.3d 191, 211 (2d Cir. 2001) (same). "By the same reasoning, exchanges of future price information are considered especially anticompetitive." *Todd*, 275 F.3d at 211. "Genuine competitors do not make daily, weekly, and monthly reports of the minutest details of their business to their rivals . . . ." *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 410 (1921); *see also United States v. Container Corp. of Am.*, 393 U.S. 333, 336-38 (1969) (information exchange of price data among competitors unlawful despite absence of agreement to adhere to a price schedule where the exchange had an anticompetitive effect in the industry). The DOJ has warned about such exchanges on numerous occasions, most recently in a

---

[15] The term "pricing discipline" is commonly used among members of cartels to refer to a coordinated effort to maintain prices above competitive levels while appearing to comply with market regulations.

Statement of Interest filed on June 24, 2025, in *In re: Granulated Sugar Antitrust Litigation*. *In re: Granulated Sugar Antitrust Litig.*, MDL No. 24-3110, DOJ Statement of Interest (ECF 415), at 1, (D. Minn. June 24, 2025), available at https://www.justice.gov/atr/media/1404496/dl?inline (last accessed Sept. 25, 2025) (the anticompetitive effects caused by the exchange of information amongst industry participants "can come to fruition regardless of whether the parties share information directly with one another, through third parties, or both.").

**D.     Defendants' Anticompetitive Conduct Caused Unprecedented Anticompetitive Price Increases for Frozen Potatoes**

104.    During the Class Period, the price of french fries and other Frozen Potato products has risen dramatically. The price increases that occurred in 2021, 2022 and 2023 were attributed to Producing Defendants implementing concurrent or nearly concurrent price increases. This unusual pattern was noted by industry participants, as one witness observed that such increases were atypical and represented a significant deviation from the industry's historical approach to price adjustments. He further remarked that this trend appeared questionable.

105.    Acting together, the four Producing Defendants—controlling nearly the entire Frozen Potatoes market—have extraordinary market power. Producing Defendants' market power enables them to influence pricing significantly. According to a former employee, this market power means that customers have limited alternatives for obtaining Frozen Potatoes, even if they are dissatisfied with price increases. As a result, if these Defendants collectively raise their prices, the market price tends to increase accordingly.

106.    If each Producing Defendant raised Frozen Potato prices independently, competitors would undercut them to gain market share. In this commodity industry, buyers often work with multiple suppliers, making it easy to switch to cheaper options. Normally, a manufacturer charging more than its rivals would lose customers. This is why analysts doubted

the Producing Defendants' high margins would last. The Producing Defendants' price hikes do not align with competitive market behavior and suggest collusive behavior is likely.

107.    Between January 2022 and December 2024, the Federal Reserve Bank of St. Louis (FRED) reported that Frozen Potatoes increased in price by approximately 62%; this is in stark contrast to the modest increases reported in the decades preceding the conspiracy.[16] For instance, between 2016 and 2018, the same data showed a mere 7.9% increase. As of January 1, 2025, the Federal Reserve Bank of St. Louis reported that Frozen Potato prices were at their highest recorded level since 1967.

108.    Plaintiffs analyzed the Producer Price Index (PPI) of Frozen Potatoes, which, as demonstrated by Figure 2, shows an increase in prices over time, with a notable spike commencing at the start of the Class Period.

---

[16] U.S. Bureau of Labor Statistics, *Produce Price Index by Commodity: Processed Foods and Feeds: Frozen Potato Products (French-Fried, Patties, Puffs, etc.)*, Federal Reserve Bank of St. Louis FRED, *available at* https://fred.stlouisfed.org/series/WPU02450202 (last updated Aug. 14, 2025).

FIGURE 2: PPI FROZEN POTATOES[17]



109.    Figure 3 illustrates the same data with an added trend line, showing the projection of Frozen Potatoes prices. The 1991-2021 dashed trendline shows the trajectory of prices of Frozen Potatoes prior to the beginning of the Class Period, extended to show the expected prices during the Class Period. Figure 3 shows that, prior to the Class Period, prices for Frozen Potatoes generally followed a relatively stable trendline, before spiking during the Class Period.

---

[17] The PPI of Frozen Potato products is sourced from the Federal Reserve Economic Data. *Producer Price Index by Commodity: Processed Foods and Feeds: Frozen Potato Products (French-Fried, Patties, Puffs, etc.)*, FRED, *available at* https://fred.stlouisfed.org/series/WPU024502.

FIGURE 3: PPI FROZEN POTATOES WITH TRENDLINE



110.    Furthermore, increases in frozen potato prices cannot be explained by non-conspiratorial demand and cost factors, which were substantially outpaced by the increased to the price of Frozen Potatoes during the Class Period. The table below compares the increase in frozen potato prices from 2020 to 2024 with changes in various demand and cost factors that could impact the price of frozen potatoes during the same period. As shown in the table, the 62.8% increases in frozen potato prices substantially outpaced increases in other factors, including the price of potatoes, price of cooking oil, inflation, population, disposable income, and labor, material, transportation, and energy costs, indicating that frozen potato price increases in the Class Period cannot be explained by non-conspiratorial demand and cost factors. 2020 is the last year before the Class Period while 2024 is the last year in the Class Period for which complete data was

available for these factors. Thus, this comparison shows how each factor has changed in the Class Period from the period before.

| Factor | Variable | 2020-2024 Increase |
|--------|----------|--------------------|
| **Product In Question** | **Frozen Potato Price Index** | **62.8%** |
| Inflation | Consumer Price Index (CPI) | 21.2% |
| Demand | Disposable Personal Income per Capita | 21.4% |
| Demand | Population | 3.2% |
| Material Cost | Russet Potato Price Index | -22.8% |
| Labor Cost | Food processing Worker Wage Rate | 10.2% |
| Transportation Cost | Truck Transportation Price Index | 26.1% |
| Energy Cost | Average Retail Price of Electricity | 22.2% |

111. Notably, when the price of raw potatoes dropped during the Class Period, the price of Frozen Potatoes continued to increase and remain artificially inflated. For example, according to the USDA's U.S. monthly Producer Price Indexes for fresh vegetables, potato prices have continued to decline following their peak in 2022. However, despite this decrease in fresh potato prices, the cost of frozen potato products has risen significantly, increasing by over 35% in August of 2023.

112. Therefore, Defendants' anticompetitive conduct caused dramatic and unprecedented price increases in the Frozen Potato market, which is unexplainable absent Defendants' agreement to fix, raise, maintain, and stabilize the price of Frozen Potatoes in the United States.

**E. The Structure and Characteristics of the Frozen Potato Market Render the Conspiracy Economically Plausible**

113. According to economists, the United States Department of Justice (DOJ), and the United States Federal Trade Commission (FTC), certain features make an economic market more susceptible to collusion. The following market features make it easier for competitors to collude:

(1) high concentration (*i.e.*, the market is dominated by a few large sellers); (2) high barriers to entry; (3) the industry produces a product with low demand elasticity; (4) the industry produces a product with no close substitutes; (5) the industry produces a relatively homogenous commodity product; and (6) the employees of different companies in the industry have established social or professional relationships. These features are all present in the Frozen Potato Product industry.

### 1.  The Frozen Potato Industry is Highly Concentrated

114.  The Frozen Potatoes industry is highly concentrated, with just a few producers controlling the supply. Defendants comprise the four largest domestic sellers of Frozen Potatoes in North America, collectively holding over 97% of the market. According to one November 2023 analysis, Lamb Weston held more than a 40% market share, followed by McCain at 30%, Simplot at 20%, and Cavendish at 7–8%.[18]

115.  Defendants have long controlled the United States Frozen Potatoes market. Indeed, a 2001 book found that just three Defendants—Lamb Weston, McCain and J.R. Simplot—had a collective market share of 80%.[19] At present, Defendant Cavendish self-identifies as "the 4th largest processor of Frozen Potato products in North America."[20] Before that time, approximately 16 different companies maintained a meaningful presence in the market. But those players have dwindled down to the four Producing Defendants.

116.  This high market concentration paved the way for conspiracy, since Defendants only needed to agree with, and police, a few market participants for their price-fixing agreement

---

[18]  Morningstar, *Lamb Weston's Low-Cost Production and Solid Execution Capitalize on Continued Growth of Fries* (Nov. 20, 2023), https://www.morningstar.com/company-reports/1194572-lamb-westons-low-cost-production-and-solid-execution-capitalize-on-continued-growth-of-fries (last accessed Oct. 2, 2025).

[19]  *See* E. Schlosser, Fast Food Nation: The Dark Side of the All-American Meal, at p. 116–17, Houghton Mifflin: Boston (2001).

[20]  *See* Cavendish Farms, https://us.cavendishfarms.com/en/our-story/ (last accessed Oct. 2, 2025).

to be successful. Moreover, their large combined market share gave them the collective power to impose and sustain the price increases described herein.

117.    As recognized in 2021 by a former vice president from Lamb Weston, who boasted of record high margins in the market, even calling it "nirvana" for the largest market participants. When asked whether those margin increases were driven by an increase in demand, the individual said, "[i]t's driven by the consolidation of this industry . . . ."

118.    Likewise, that same year another industry executive commented on the extreme consolidation when recognizing that farmers interested in selling potatoes were limited to only the four major companies, meaning the Producing Defendants, if selling into the Frozen Potatoes market.

119.    Highly consolidated markets such as the Frozen Potato Products market raise notable concerns regarding potential anticompetitive impacts on purchasers. The U.S. Department of Justice and the Federal Trade Commission routinely utilize the Herfindahl-Hirschman Index (HHI) to assess market concentration and evaluate the likelihood of anticompetitive effects. The HHI ranges from close to zero in markets with numerous participants holding minimal shares to 10,000 in scenarios where a single entity dominates the market entirely.[21]

120.    A market with an HHI between 1,000 and 1,800 is considered moderately concentrated. A market with an HHI above 1,800 is classified as highly concentrated, where anticompetitive effects are presumed. Highly concentrated markets may have reduced competition and a higher possibility of coordination among competitors.

---

[21] U.S. Dep't. Justice, 2023 *Merger Guidelines* § 2.1 (Dec. 18, 2023), https://www.justice.gov/atr/2023-merger-guidelines.

121.    According to the data on market shares of the four Defendants in the frozen market from a November 2023 analysis mentioned above, Defendants comprise the four largest domestic sellers of Frozen Potatoes in North America. Thus, the frozen potatoes market has an estimated HHI of at least 2,949—well above the threshold of 1,800 for a highly concentrated market.[22]

## 2.    There Are High Barriers to Entry in the Frozen Potato Industry

122.    Under normal circumstances, a collusive agreement amongst horizontal competitors would attract new market entrants. However, high barriers to entry in the Frozen Potatoes industry prevented new firms from entering the market.

123.    Any new entrant would need to invest significant start-up capital in plants, specialized equipment, labor, infrastructure for distribution, and regulatory compliance. In addition, producers of Frozen Potato products are typically either vertically integrated (*i.e.*, they grow their own potatoes) such as Defendant J.R. Simplot, or they have long-established farm partners from whom they source their potatoes. For example, in 2016, Lamb Weston invested $200 million on a "second french fry processing line" alone at its Richland, Washington manufacturing campus. Cavendish planned to spend about $293 million on a new frozen potato processing plant it announced in 2017, and it spent $430 million building a new plant in Alberta, Canada, in 2019. This makes *de novo* entry by new participants even more challenging.

124.    Another barrier to entering the Frozen Potatoes market is that it requires a substantial amount of time before new businesses can begin operations and become profitable. For example, J.R. Simplot anticipated that constructing a new facility in Washington would take two years to complete.

---

[22] HHI "is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers." *Herfindahl-Hirschman Index*, https://www.justice.gov/atr/herfindahl-hirschman-index (last accessed Sept. 3, 2024).

125.    Another barrier is that the Producing Defendants' strong connections with potato growers would pose significant challenges to securing the raw potatoes required to effectively compete in the Frozen Potato Products Market. According to a former Lamb Weston executive, "this industry, just to let you know, if you were going to build a greenfield plant, it would take you five years to accumulate enough potatoes to run that plant…I mean you just can't start laying brick and expect to have potatoes. The farmers won't have it for you." He added, "yes, they could try to do it, but the industry wouldn't allow it to happen."

126.    As Defendants' executives have repeatedly admitted, Defendants have cultivated long-standing relationships with potato growers in regions where growing potatoes is both low-cost and yields a high quantity of high-quality potatoes, like Idaho, Washington, and Oregon. Indeed, as a former Lamb Weston executive put it, there's "only so many potatoes that go around in the basin area."

127.    As a result of the high barriers to entry, new competitors were prevented from responding to the supra-competitive prices caused by Defendants' price-fixing agreement by entering the market, thus facilitating Defendants' conspiracy.

**3.    The Frozen Potato Market is Characterized by Inelastic Demand**

128.    Demand is considered inelastic when a seller can increase prices without suffering a substantial reduction in demand. Demand inelasticity allows for collusion, because it enables producers to raise their prices collectively without triggering substitution to alternative products that could make the conspiratorial prices unprofitable.

129.    Consumer demand for Frozen Potatoes is relatively unaffected by price because Frozen Potatoes are historically considered to be an inexpensive good, and even when prices fluctuate, they comprise a small share of consumers' budgets. According to Rabobank's US Potato Outlook 2023/24, "Consumer purchases of frozen potatoes have shown minimal sensitivity to price

increases, indicating inelastic demand."[23] Moreover, as another analyst noted in 2023, "since potatoes are the most popular vegetable among U.S. consumers, the demand for potatoes is more price inelastic than that for less popular vegetables."[24] Likewise, according to a 2022 *Returns to Potatoes USA Marketing Programs* report, "foodservice demand" for potatoes "was found to be inelastic."

130.     Indeed, according to Defendant Lamb Weston, "[a] larger share of customers [are] adding [french fries] to meal orders than in the past." Lamb Weston's CEO, Thomas Werner, noted during a recent earnings call that: "[t]he fry attachment rate has stayed pretty consistent," though "[i]t's been above historical levels for the past two, three years," despite mounting reasons to tighten purse strings."[25]

131.     Because the price for Frozen Potatoes is highly inelastic, Producing Defendants were able to and did collectively raise prices to supra-competitive levels without losing revenue.

### 4.      Frozen Potato Products, Including French Fries, Have Limited Substitutability

132.     Collusion is more probable when there are limited alternatives to the products in question. In the United States, frozen potatoes have few substitutes, especially for food service establishments. Frozen Potatoes are sold in virtually all restaurants and grocery stores throughout the United States. This is because, due to their reduced preparation and ease of use, Frozen Potatoes are commercially accepted on a large scale. Although there are potential substitute products, such

---

[23] Potatopro.com, *US Potato Prices Expected to Ease but Stay Elevated according to Rabobank Report* (June 6, 2023), *available at* https://www.potatopro.com/es/news/2023/us-potato-prices-expected-ease-maintain-elevated-levels-rabobank-report (last accessed Oct. 2, 2025).

[24] *Id.*

[25] CNBC, *Demand for french fries reflects resilient consumer as so-called fry attachment rate holds steady* (Apr. 5, 2024) https://www.cnbc.com/2024/04/05/demand-for-french-fries-reflects-resilient-consumer-as-so-called-fry-attachment-rate-holds-steady.html (last accessed Oct. 2, 2025).

as fresh potatoes, the characteristics of those products lack the unique characteristics of Frozen Potatoes that make them attractive to both commercial and residential customers.

### 5. Frozen Potatoes are a Commodity Product, Which Encourages Collusion

133. Frozen potatoes are a commodity product and Defendants' Frozen Potato products do not differ significantly in terms of quality, appearance, or use, rendering them functionally interchangeable. Frozen potatoes are generally produced and sold to standard specifications (*e.g.*, grade of potatoes, style, dimensions, color, size, free fatty acid content, weight, method of cooking, etc.) and must adhere to standards set by the U.S. Department of Agriculture for production, packing, labeling, and packaging to be competitive. *See generally*, U.S. Dept. of Agric., Commodity Specification for Frozen Potato Products (December 2021).

134. When products are interchangeable, companies generally are forced to win business by competing on price. Thus, cartels are more likely to form between competitors selling interchangeable products in order to avoid price-based competition and because cartel members can more easily monitor and detect defections from a price-fixing agreement. Thus, while demand for Frozen Potatoes—as a category—is relatively unaffected by price, competition *within* the industry would have allowed commercial consumers to choose the cheapest brand. Put another way, had Defendants not coordinated their price increases, consumers would have preferred the cheapest brand. The commodity nature of Frozen Potato Products also made it easier to monitor and enforce the conspiracy, because comparisons between the substitutable products produced by each of the Producing Defendants focused on price and could be standardized by common specifications. As alleged in this Complaint, that is exactly what Defendants did using Circana and other means at their disposal.

6.      **Defendants had Numerous Opportunities to Collude**

135.    Defendants had ample opportunities to collude through trade association meetings, via movement of executives from one co-conspirator to another, and other contacts. The meetings events and communications organized by these associations provided Defendants with means to communicate and implement their conspiracy in addition to the exchange of price increase letters, exchange of information through Circana, and electronic communications.

136.    Each of the Producing Defendants is a "sustaining member" of the National Potato Council ("NPC").[26] The NPC bills itself as "the advocate for the economic well-being of the U.S. potato growers on federal legislative, regulatory, environmental, and trade issues."[27] The NPC holds annual and seasonal meetings each year, including an annual "Potato Expo," which it bills as "the largest annual potato industry conference and trade show held in North America," as well as countless other meetings, summits, and leadership institutes, which, combined, provide ample opportunities for Defendants to collude. Defendants Simplot, Lamb Weston, and McCain sponsored the 2025 National Potato Council Summer Meeting Potato Expo held in Idaho.[28]

137.    Notably, the NPC held its annual Potato Expo on January 5-7, 2021, approximately one week before Defendants began issuing lockstep price increase letters in January 2021.

---

[26]      *See Sustaining Members*, NATIONAL POTATO COUNCIL, https://www.nationalpotatocouncil.org/who-we-are/allied-partners/sustaining-members/ (last accessed Oct. 2, 2025).

[27]      *See Homepage*, NATIONAL POTATO COUNCIL, https://www.nationalpotatocouncil.org (last accessed Oct. 2, 2025).

[28]      *See Sponsors*, NATIONAL POTATO COUNCIL, https://www.nationalpotatocouncil.org/sponsors/ (last accessed Oct. 2, 2025).

Defendants Simplot and McCain were listed as Silver-level sponsors, and Defendant Lamb Weston was a Bronze-level sponsor.[29]

138.    The Producing Defendants work closely with the National Potato Promotion Board ("NPPB"), which conducts business as Potatoes USA.[30] The NPPB's stated mission is "to strengthen the demand for potatoes," by "promot[ing] the benefits of potatoes to an audience across the globe, including consumers, foodservice operators, retailers and health professional[s]."[31] The NPPB regularly hosts conferences, meetings, and expos for its members. For example, in Spring 2025, NPPB hosted its Spring meeting in Denver, Colorado.

139.    NPPB also disseminates joint marketing, provides export sales updates, and facilitates Defendant Processors' exchange of data. NPPB's quarterly reports include access to PotatoTrac data, which, as previously discussed, enables the Processor Defendants to coordinate their Frozen Potato Product Prices at supra-competitive levels.

140.    The Producing Members are also members of the Potato Association of America, which "serves as the official professional society for those involved in potato research, extension, production, and utilization."[32] The PAA organizes an annual meeting, and most recently held its

---

[29]    Potato Expo 2022, NATIONAL POTATO COUNCIL, *available at* https://web.archive.org/web/20210618115731/https://www.nationalpotatocouncil.org/potato-expo/ (last accessed Oct. 2, 2025).

[30]    *See National Potato Promotion Board*, USDA AGRI. MARKETING SERVICE, https://www.ams.usda.gov/rules-regulations/research-promotion/potato (last accessed Oct. 2, 2025).

[31]    *National Potato Promotion Board*, USDA AGRI. MARKETING SERVICE, https://www.ams.usda.gov/rules-regulations/research-promotion/potato (last accessed Oct. 2, 2025).

[32]    *About PAA*, THE POTATO ASSOCIATION OF AMERICA, *available at* https://www.potatoassociation.org/Pages/default.aspx (last accessed Oct. 2, 2025).

2025 Annual Meeting over July 27-31 in Madison, Wisconsin.[33] As Crystal-level sponsors of the event, Defendant Simplot sponsored the welcome reception on July 27, 2025, and Defendant McCain sponsored lunch on July 28, 2025. Defendant Cavendish was also listed as a Bronze-level sponsor of the event.

141. Three Defendants are also "sustaining partners" of the World Potato Congress. McCain and Simplot are "platinum" partners, while Cavendish is a "silver" partner. The Congress's vision is to be "[r]ecognized world-wide as the premier global potato networking organization," and its mission is to "create networks to help drive sustainable growth of the potato."[34] The Congress's biennial meetings and networking focus provided opportunities for collusion as well.[35]

142. Defendants McCain and Cavendish sponsored the March 2024 Northeast Potato Technology forum in Charlottetown, PEI Canada.[36] The forum bills itself as an opportunity to "discuss potato research and promote collaboration and information exchange."[37]

143. Defendants Simplot, McCain, and Cavendish sponsored the July 2025 Potato Sustainability Alliance Summer Symposium at Prince Edward Island.[38] The Potato Sustainability

---

[33] *The Potato Association of America 2025 Meeting*, *available at* https://www.potatoassociation.org/Events/PAA2025/Pages/default.aspx (last accessed Oct. 2, 2025).

[34] *See Global Reach and Impact*, WORLD POTATO CONGRESS, https://potatocongress.org/about/ (last accessed Oct. 2, 2025).

[35] *See Dear Subscriber Message*, WORLD POTATO CONGRESS, https://potatocongress.org/sustaining-partners/presidents-invitation/ (last accessed Oct. 2, 2025).

[36] *See Northeast Potato Technology Forum*, NORTHEAST POTATO.COM, https://northeastpotato.com/ (last accessed Oct. 2, 2025).

[37] *See Conspectus*, 2023 Northeast Potato Technology Forum, *available at* https://northeastpotato.com/wp-content/uploads/2023/03/2023_NEPTF_Abstract_Book.pdf (last accessed Oct. 2, 2025).

[38] *See Potato Sustainability Alliance*, INSTAGRAM, July 1, 2025, https://www.instagram.com/p/DLkizV_xaYM/ (last accessed Oct. 2, 2025).

Alliance bills itself as "an inclusive, pre-competitive collaboration of all players in the potato value chain."[39] Defendants' executives serve on the Potato Sustainability Alliance's board of directors, including Richard Burres (Lamb Weston), Jeremy Buchman (McCain), John MacQuarrie (Cavendish), and Dave Hyde (J.R. Simplot).[40]

144.    Each Producing Defendant played a pivotal role in the formation of The Alliance for Potato Research & Education ("APRE"). APRE is a not-for-profit organization funded by the potato industry, including potato growers and potato food manufacturers. It is "dedicated to advancing the scientific understanding of the role potatoes play in promoting the health of all people."[41]Defendants Lamb Weston, Simplot, McCain and Cavendish created APRE. Defendant Simplot's Jolyn Rasmussen is currently the Chair of APRE's Board of Directors. Defendant McCain Foods USA's Daniel Metheringham is APRE's Secretary/Treasurer. Peter Johnston of Defendant Cavendish Farms and Blair Richardson of Potatoes USA serve on APRE's Board of Directors.[42]

145.    Defendants are also members of the American Frozen Foods Institute, which is a "member-driven national trade association that advances the interests of all segments of the frozen food and beverage industry." The AFFI maintains various affiliated organizations designed to meet

---

[39]    *See Advancing Potato Sustainability*, POTATO SUSTAINABILITY ALLIANCE, https://potatosustainability.org/about-the-alliance/ (last accessed Oct. 2, 2025).

[40]    Board of Directors, POTATO SUSTAINABILITY ALLIANCE, https://potatosustainability.org/about-the-alliance/board-of-directors/ (last accessed Oct. 2, 2025).

[41]    *About APRE*, ALLIANCE FOR POTATO RESEARCH & EDUCATION, https://apre.org/about-apre/ (last accessed Oct. 2, 2025).

[42]    *Id.*

the "unique public policy needs" of sectors of frozen foods, including the Frozen Potato Products Institute. Defendants are each represented on AFFI's 2025 Board of Directors.[43]

146. Defendants' executives also sit on the board of directors for the Frozen Potato Products Institute, including, in 2024, Kevin Browning (J.R. Simplot), Peter Johnson (Cavendish), Tina Almond (McCain), and Christian Rhynalds (Lamb Weston).[44]

147. Three Producing Defendants, Lamb Weston, McCain, and J.R. Simplot, are also members of IFMA the Food Away from Home Association, which bills itself as "the industry hub for facilitating relationships and illuminating business opportunities."[45] IFMA holds a number of meetings and events throughout the year, which are routinely attended by executives from Defendants Lamb Weston, McCain, and J.R. Simplot.

148. Three Producing Defendants, including Cavendish, Lamb Weston, and J.R. Simplot, are clients of research consulting firm FoodserviceIP, which utilizes data insights to "develop proven business strategies" for its clients.

149. In addition to serving together on the boards of numerous trade groups, research foundations and other industry organizations, an industry witness described the close relationships between executives across the Producing Defendants, explaining that many Frozen Potato industry executives have worked for numerous Defendants throughout their career and know each other personally. For example, in his December 2021 conversation, the former Lamb Weston executive described the management team from McCain Foods at that time being mostly "ex Lamb Weston

---

[43] *Meet Our Team*, AMERICAN FROZEN FOOD INSTITUTE, *available at* https://affi.org/team/ (last accessed Oct. 2, 2025).

[44] Frozen Potato Products Institute 2024 Tax Filings, PRO PUBLICA, *available at* https://projects.propublica.org/nonprofits/organizations/366080187 (last accessed Oct. 2, 2025).

[45] *Homepage*, THE FOOD AWAY FROM HOME ASSOC., https://www.ifmaworld.com/ (last accessed Oct. 2, 2025).

executives." He also described knowing Scott McCain, one of the "major owners" of McCain foods "personally" and confirmed he "know(s) the Irvings," who run Cavendish Farms.

150.    A former senior manufacturing manager at McCain and former plant manager at Lamb Weston stated that these relationships facilitated the exchange of confidential, sensitive pricing and capacity information between the Producing Defendants.

## F.    "Plus Factors" Outside of Market Characteristics Strengthen Claims of Price-Fixing

### 1.    Producing Defendants' price increases were contrary to their individual self-interest

151.    Evidence demonstrating that parallel actions contradict the alleged conspirators' economic self-interest is a key plus factor in proving a single conspiracy. The Producing Defendants would not have raised prices alone, as it would risk losing customers and market share without an agreement in place.

152.    No individual Producing Defendant could independently maintain substantial price increases when input costs declined substantially, as competitors would likely intervene, offer lower prices, and capture market share. This competitive dynamic led analysts to conclude that Lamb Weston's enhanced margin expansion was unlikely to be sustainable over the long term.

153.    During the Class Period, Defendants used pricing strategies that would typically drive customers to competitors. Despite the food service industry's slim margins and still-depressed customer traffic post-pandemic, operators usually seek the lowest-priced Frozen Potato Products. However, in 2022, due to an anticompetitive agreement, McCain Foods and its competitors raised prices collectively, allowing McCain to impose significant price hikes without fear of losing market share.

154.    Even the Producing Defendants' own public statements acknowledged efforts to raise prices and avoid competing for market share during the Class Period. For example, in 2023,

J.R. Simplot's Director of Sales Solutions noted that Lamb Weston raised prices by 35% and that other companies were also focused on increasing prices rather than securing new business. Likewise, a former Lamb Weston vice president confirmed that the Defendants had little incentive to compete over market share, instead prioritizing high margins through coordinated pricing strategies. He remarked that "I think we've done a pretty good job at taking margins with these price increases."

2. **Producing Defendants' price increases during the Class Period deviated from their normal pricing practices**

155.     Producing Defendants undertook actions that, in the absence of an agreement, would have been contrary to their own self-interest and inconsistent with their established historical practices. Such deviations further substantiate the allegations that the Producing Defendants engaged in anticompetitive conduct.

156.     During the Class Period, Frozen Potato Products pricing changed significantly from previous trends. So much so, a witness even acknowledged that such price increases were uncommon and seemed suspicious. As a former Vice President at Lamb Weston acknowledged as much in stating that Lamb Weston, Simplot, and McCain "have never ever seen margins this high in the history of the potato industry."

157.     In the past, industry standards dictated only an annual price increase for foodservice customers, according to a former sales director for one of the Producing Defendants. During the Class Period, however, as set forth in this Complaint, multiple price increases in 2022 and 2023. As a former sales director confirmed that J.R. Simplot issued three separate foodservice price increases during 2022 alone.

158.     As alleged herein, prices for Frozen Potatoes and Producing Defendants' pricing behavior diverged from the historic norm significantly during the Class Period. Frozen Potato

prices remained stable before the Class Period, but spiked well above historical trends and outpaced all major demand and cost factors during the Class Period.

## V. <u>CLASS ACTION ALLEGATIONS</u>

159.    Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure on behalf of the members of a class of commercial indirect purchasers seeking injunctive relief (the "Nationwide Class") defined as follows:

> All persons and entities who indirectly purchased Frozen Potatoes from the Producing Defendants or their co-conspirators for commercial food preparation in the United States from January 1, 2021 until such time that the adverse effects of Defendants' anticompetitive conduct cease.

160.    Plaintiffs also bring this action on behalf of themselves, and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable relief, on behalf of the following class (the "State Law Class"):

> All persons and entities who indirectly purchased Frozen Potatoes from the Producing Defendants or their co-conspirators for commercial food preparation in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and/or Wisconsin from January 1, 2021 until such time that the adverse effects of Defendants' anticompetitive conduct cease.

161.    Specifically excluded from the Nationwide Class and State Law Class (collectively "Classes") are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant; and any government entity. Also excluded from these Classes is any judicial officer presiding over this action and the members of his/her immediate family and judicial staff,

any juror assigned to this action, any business majority-owned by any such person, and any Co-conspirator identified in this action.

162. **Numerosity**: Plaintiffs do not know the exact number of Class Members[46] because such information presently is under exclusive control of Defendants. Plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of Class Members geographically dispersed throughout the United States, such that joinder of all Class Members is impracticable.

163. **Typicality**: Plaintiffs' claims are typical of the claims of the Classes because Plaintiffs purchased Frozen Potatoes indirectly from one or more of the Defendants for commercial food preparation, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Classes and the relief sought is common to the Classes.

164. **Common Questions Predominate**: There are questions of law and fact common to the Classes, including, but not limited to:

(a)    Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of Frozen Potatoes sold in interstate commerce in the United States;

(b)    The duration of the conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(c)    Whether the alleged conspiracy violated the antitrust laws alleged herein;

---

[46] Class Members refers to the members of the Classes as defined in this Complaint.

(d)      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiffs and Class Members;

(e)      The effect of Defendants' alleged conspiracy on the prices of Frozen Potatoes sold in the United States and applicable states listed in the State Law Class during the Class Period;

(f)      Whether Plaintiffs and other members of the Classes are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

(g)      The appropriate class-wide measure of damages.

These and other questions of law or fact which are common to the members of the Classes predominate over any questions affecting only individual members of the Classes.

165.     **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Classes in that Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Classes who indirectly purchased Frozen Potatoes for commercial purposes during the Class Period and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Classes.

166.     **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class Members is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual Class Members compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for Class Members to seek redress for the violations of law herein

alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

167. The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

168. **Common Grounds for Injunctive Relief:** Defendants have taken actions that generally impact the Classes in a consistent manner so that final injunctive relief is appropriate for the Classes collectively under Fed. R. Civ. P. 23(b)(2).

## VI. DEFENDANTS ARE ENGAGED IN A CONTINUING ANTITRUST VIOLATION

169. During the Class Period, Defendants continued to sell Frozen Potatoes to Plaintiffs and other putative Class Members at prices artificially inflated by Defendants' price-fixing conspiracy. The artificial increases to the pricing of Frozen Potato Products set forth in this Complaint had long lasting and continuing effects which resulted in Class Members continue to pay artificially inflated prices for Frozen Potato Products continuing until the present. Furthermore, Class Members purchased Frozen Potato Products frequently and consistently throughout the Class Period.

170. Due to ever-fluctuating economic and market conditions, Defendants needed to continually renew, monitor, and adjust their price-fixing agreement. This resulted in multiple coordinated price increases throughout the Class Period, as described herein. Moreover, each of

these activities resulted in new, overt acts that injured Plaintiffs and the putative Classes, thus creating a new cause of action for purposes of the statute of limitations.

171.    In addition, each sale of Frozen Potatoes made to Plaintiffs or the putative Classes that was artificially inflated as a result of the conspiracy also constituted a new, overt act that restarted the statute of limitations.

172.    These new, overt acts—which would not have occurred had the conspiracy disbanded—were not merely reaffirmations of Defendants' previous acts. Rather, they were new and independent acts that were necessary to renew and refine Defendants' agreement, resulting in new and accumulating injury to Plaintiffs and the other members of the proposed Classes.

173.    As a result, Defendants engaged in a continuing antitrust violation throughout the Class Period and, regardless of any tolling- and estoppel-related arguments, Plaintiffs' claims and those of the putative Classes are not time barred.

## VII. PLAINTIFFS DID NOT DISCOVER, NOR COULD HAVE DISCOVERED THROUGH REASONABLE DILIGENCE, THE CLAIMS IN THIS LAWSUIT EARLIER

174.    Plaintiffs' antitrust claims are governed by the discovery rule—*i.e.*, the statute of limitations does not begin to run until discovery of the injury from the alleged violation. Prior to the investigation and analysis performed by and for Plaintiffs' counsel, Plaintiffs and putative Class Members did not know—nor could they have known through the exercise of reasonable diligence—that the prices they were paying for Frozen Potatoes were artificially inflated and causing them injury.

175.    Furthermore, even assuming Plaintiffs could have somehow discovered their injury sooner (which is not the case), they could not have determined that those injuries were the result of Defendants' price-fixing conspiracy. As discussed below, not only did Defendants never reveal

the existence of their price-fixing conspiracy, they also actively concealed its existence by, among other things, blaming price increases on rising raw material, packaging, labor, and energy costs, as well as environmental conditions such as heatwaves and droughts. Plaintiffs did not know and had no reasonable way of knowing that these statements were false and, in fact, they were being injured by Defendants' price-fixing conspiracy.

176.     For these reasons, both the discovery rule and the doctrine of equitable tolling dictate that all of Plaintiffs' claims and those of the putative Classes, going back to the beginning of the Class Period, are timely.

## VIII. <u>DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY</u>

177.     Throughout the Class Period, each of the Defendants effectively, affirmatively, and fraudulently concealed their conspiracy from Plaintiffs and putative Class Members.

178.     In engaging in the price increases and other conspiratorial acts set forth in this Complaint, the Defendants pointed to and utilized false and misleading pretexts, including assertions that the price increases were due to rising costs of potatoes and other inputs for Frozen Potatoes. As set forth herein, and based on Plaintiffs' analysis, such pretexts cannot explain or justify the prices increases set forth herein and were intended to conceal Defendants' conspiracy.

179.     For example, in a price increase sent to its customers dated March 15, 2023, Lamb Weston specifically cited "higher costs related to the procurement and processing of raw potatoes; higher costs in edible oils, ingredients, batters and fertilizers; higher fuel, power and water costs; (and) volatility in the storage market." In a March 2023 price increase letter J.R Simplot pointed to disruptions in "our food supply network, resulting in additional higher operating costs." And a McCain February 2023 price increase letter stated that increases were "being driven by cost of production inflation in potato and continue labor cost increases." Cavendish also provided

pretextual reasons in its price increase letters, like in October 2021 when it told its customers the price increase going into effect in December of 2021 was due to "unprecedented inflation and challenges" related to "potato crop conditions and yield" as well as "rising energy costs, freight and storage price increases."

180.     These pretextual explanations were intended to and did conceal the existence of Defendants price fixing agreement from the Class Members. As a result of this active concealment, Plaintiffs and putative Class Members neither knew, nor in the exercise of due diligence could they have reasonably known, of the facts that form the basis for their claims. Thus, even if the discovery rule or equitable tolling were somehow inapplicable, Defendants should nonetheless be estopped from raising any statute of limitations defense.

## IX. <u>RELEVANT MARKET</u>

181.     This action alleges that the Defendants engaged in *per se* violations of federal and state antitrust laws. In the alternative, Plaintiffs also allege that under Section 1 of the Sherman Act and the various state laws, the Defendants' agreement to unlawfully exchange competitively sensitive business information amongst Frozen potato Producers violates the rule of reason.

182.     The Producing Defendants compete in the Frozen Potatoes market for sales of Frozen Potatoes to customers; however, the Producing Defendants' agreement to exchange competitively sensitive business information, including through Circana, has enabled the Producing Defendants to reduce competition in the Frozen Potatoes market.

183.     The relevant product market is the market for Frozen Potatoes.

184.     The relevant geographic market is the United States.

185.     As alleged above, high barriers to entry into the Frozen Potatoes market exist, precluding other entrants or would-be competitors from entering the market.

186. As further alleged above, the Producing Defendants and their co-conspirators exerted significant market power in the Frozen Potatoes market.

187. Competition is likely to be harmed when competitors with market power in a concentrated market, such as the market at issue here, exchange strategic business information about current and forward-looking plans for prices. The information exchanged between the Producing Defendants was competitively sensitive and a material factor in sales negotiations with customers. When market participants that are competing for the same customers exchange their strategic plans, comfort replaces uncertainty and reduces incentives to compete on price.

188. The information exchange took place in non-public settings and involved the exchange of confidential, non-public information.

189. The market for Frozen Potatoes is characterized by numerous attributes that mean the type of information exchanged by the Producing Defendants is particularly likely to have anticompetitive effects. In particular, as alleged above, the market for Frozen Potatoes features few sellers, commoditized products, price-based competition, and inelastic demand.

190. The Producing Defendants' unlawful information exchanges, including through Circana, were not reasonably necessary to further any procompetitive purpose.

## X. ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT

191. Defendants' anticompetitive conduct had the following effects, among others:

    (a) Price competition was restrained or eliminated with respect to Frozen Potatoes;

    (b) The prices of Frozen Potatoes were fixed, raised, stabilized, or maintained at artificially inflated levels;

(c)     Indirect purchasers of Frozen Potatoes were deprived of free and open competition; and

(d)     Indirect purchasers of Frozen Potatoes paid artificially inflated prices.

192.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, or maintain the price of Frozen Potatoes. As a direct and foreseeable result, Plaintiffs and the Classes paid supra-competitive prices for Frozen Potatoes during the Class Period.

193.    The price effects of Defendants' conduct particularly impacted the commercial Class Members in this case, *e.g.*, restaurants and retail stores, who had no choice but to pay higher prices for the Frozen Potatoes they needed to operate and, therefore, bore the brunt of the conspiracy.

194.    According to a 2022 report from the American Frozen Food Institute, 86% of food service operators indicated that rising food costs have been significantly or somewhat impactful to their operations. That same report indicated that 78% of foodservice operators had purchased frozen potatoes that year.

195.    In October 2024, Blair Richardson, then President of Potatoes USA recognized that "price shocks" have had a negative impact on foodservice operators despite menu penetration for fries remaining at near historic highs.

196.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the Classes sustained injury to their businesses or property, having paid higher prices for Frozen Potatoes than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy.

197.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

# XI. CLAIMS FOR RELIEF

## COUNT 1
### RESTRAINT OF TRADE IN VIOLATION OF THE SHERMAN ACT § 1
### 15 U.S.C. § 1
### (On Behalf of Nationwide Class for Injunctive and Equitable Relief)

198.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

199.    Producing Defendants are direct competitors in the Frozen Potatoes market throughout the United States.

200.    Beginning as early as January 1, 2021, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement to unlawfully and unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 by artificially reducing or eliminating competition for the pricing of Frozen Potatoes. The agreement was intended to and did unreasonably restrain trade and suppress competition with the purpose and effect of artificially raising, fixing, maintaining, or stabilizing prices in the Frozen Potatoes market in the United States. Pursuant to the agreement, Defendants agreed to and did share pricing and other information that distorted and suppressed competition in the relevant market knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of Frozen Potatoes sold to Plaintiffs and members of the Class.

201.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

202.    Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for Frozen Potatoes throughout the United States to be higher than they otherwise would have been in a competitive market.

203.     Defendants' conspiratorial acts caused unreasonable restraints in the market for Frozen Potatoes.

204.     As a result of Defendants' unlawful conduct, Plaintiffs and the members of the Nationwide Class were harmed by being forced to pay inflated, supra-competitive prices for Frozen Potatoes.

205.     In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and all their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

(a)     Price competition in the market for Frozen Potatoes was restrained, suppressed, and/or eliminated in the United States;

(b)     Prices for Frozen Potatoes sold by Defendants, their divisions, subsidiaries, and affiliates, and all their co-conspirators were fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

(c)     Plaintiffs and members of the Nationwide Class were deprived of the benefits of free and open competition in the purchase of Frozen Potatoes.

206.     Defendants took all the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of Frozen Potatoes to be higher than it would be but for Defendants' conduct.

207.     As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and members of the Nationwide Class were injured in their business or property and will continue

to be injured in their business and property by paying more for Frozen Potatoes than they would have paid and will pay in the absence of the conspiracy.

208.     The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

### COUNT 2
### UNLAWFUL EXCHANGE OF COMPETITIVE INFORMATION IN VIOLATION OF THE SHERMAN ACT,
### 15 U.S.C. § 1
### (On Behalf of Nationwide Class for Injunctive and Equitable Relief)

209.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

210.     Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2021, and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information about the Producing Defendants' operations. Defendant Circana facilitated this information exchange. This is an unreasonable restraint on trade and an independent violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

211.     For purposes of this Count 2, which is based upon a claim subject to a Rule of Reason analysis, the relevant product market is Frozen Potato Products, and the relevant geographic market is the continental United States. Producing Defendants possessed market power in the relevant product market during the Class Period.

212.     Frozen Potatoes are fungible products. Frozen Potatoes are generally interchangeable, permitting Producing Defendants to readily share competitively sensitive information, with the assistance and cooperation of Defendant Circana, that would harm competition in the relevant market.

213. The information regularly exchanged by Defendants pursuant to the agreement consisted of detailed, competitively sensitive, and non-public information about pricing regarding Frozen Potato Products. Defendants' information exchanges were in the form of communications via telephone, text, and e-mail. Defendants were able to share and discuss real-time and forward-looking prices and pricing strategies with their competitors.

214. Producing Defendants' regular information exchanges reflected the concerted action between horizontal competitors in the Frozen Potatoes market.

215. Each Producing Defendant furnished competitively sensitive information to other Defendants with the understanding that it would be reciprocated.

216. The agreement to regularly exchange, and the actual exchange of detailed and non-public information about current and future pricing suppressed competition between Producing Defendants, and specifically permitted Producing Defendants to agree upon, coordinate, and enforce price increases.

217. When market participants competing for the same customers exchange competitive information, it reduces the incentives to compete on price. Accordingly, Producing Defendants used data to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering, and intending to offer, with respect to price in the Frozen Potato market. This strategic information exchange facilitated and supported by Defendant Circana was a material factor in Defendants' agreements to inflate the prices that Plaintiffs and Class Members ultimately paid for Frozen Potatoes during the Class Period.

218. Defendants' unlawful agreements to exchange, and the actual exchanges of the non-public, timely, and detailed data were not reasonably necessary to further any procompetitive

purpose. The information exchanged between Defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

219. The information exchange agreement has had the effect of: (1) suppressing competition among Producing Defendants in the Frozen Potatoes market in the United States; and (2) inflating the prices of Frozen Potato Products during the Class Period.

220. As a result of the unlawful agreement alleged herein to exchange information, Plaintiffs and Class Members have been injured in their business or property by paying artificially inflated prices for Frozen Potato Products during the Class Period. Plaintiffs and Class Members are entitled to injunctive relief against Defendants, preventing and restraining the violations alleged herein.

## VIOLATIONS OF STATE ANTITRUST AND CONSUMER PROTECTION LAWS

221. Plaintiffs repeat and reallege, as if fully set forth herein, each allegation, and each of the state-specific causes of action described below incorporates the allegations as if fully set forth therein.

222. During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, raise, maintain, and stabilize the price of Frozen Potato prices in various states to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust and consumer protection laws set forth below.

223. In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the alleged combination and conspiracy, including agreeing to fix, raise, maintain, and stabilize the price of Frozen Potatoes which injured Plaintiffs and members of the State Law Class.

224. Defendants and their co-conspirators engaged in actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize Frozen

Potato prices at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the State Law Class were deprived of free and open competition and paid more to purchase Frozen Potatoes than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

225.     In addition, Defendants profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiffs and members of the State Law Class.

226.     Accordingly, Plaintiffs and the members of the State Law Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each jurisdiction's law, injunctive relief (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

227.     Defendants' anticompetitive acts described above were knowing, willful, and constitute violations of the following state antitrust and consumer protection statutes.

### COUNT 3: ALABAMA
**VIOLATION OF ALABAMA CODE §§ 6-5-60, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in Alabama)**

228.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

229.     Due to Defendants' unlawful conduct, (1) competition for Frozen Potatoes was restrained, suppressed, and eliminated within Alabama; (2) Frozen Potato prices in the State of Alabama were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals were deprived of free and open competition.

230.     Defendants' agreement was an unlawful agreement to restrain trade in the State of Alabama in violation of Alabama Code §§ 6-5-60, *et seq.* Defendants' conspiracy substantially affected Alabama commerce and accordingly, Plaintiffs and the members of the State Law Class seek all forms of relief available under Alabama Code §§ 6-5-60, *et seq.*

## COUNT 4: ARIZONA
### VIOLATION OF THE ARIZONA UNIFORM STATE ANTITRUST ACT, ARIZ. REV. STAT. §§ 44-1401, *et seq.*
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in Arizona)**

231.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

232.     Defendants' conspiracy had the following effects: (1) price competition for Frozen Potatoes was restrained, suppressed, and eliminated throughout Arizona; (2) prices of Frozen Potatoes in the State of Arizona were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

233.     Defendants' agreement was an unlawful agreement to restrain trade in the State of Arizona in violation of Arizona Revised Statutes §§ 44-1401, *et seq.* Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Arizona Revised Statutes §§ 44-1401, *et seq.*

## COUNT 5: ARKANSAS
### VIOLATION OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT, ARK. CODE ANN. §§ 4-88-101, *et seq.*
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in Arkansas)**

234.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

235.     Defendants' conspiracy had the following effects: (1) price competition for Frozen Potatoes was restrained, suppressed, and eliminated throughout Arkansas; (2) prices of Frozen

Potatoes in the State of Arkansas were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce.

236.     Defendants' conspiracy unlawfully misleads consumers into believing the price of Frozen Potatoes sold in Arkansas was the result of a free market and Defendants' conduct is substantively unconscionable because it unfairly benefits Defendants at the expense of Plaintiffs and members of the Class. Arkansas Code Annotated § 4-88-107. Accordingly, Plaintiffs and members of the State Law Class seek all available relief under Arkansas Code Annotated §§ 4-88-101, *et seq.*, resulting from Defendants' deceptive and unconscionable trade practices.

<u>**COUNT 6: CALIFORNIA**</u>
**VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 16700, *et seq.***
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in California)**

237.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

238.     Defendants' conspiracy had the following effects: (1) price competition for Frozen Potatoes was restrained, suppressed, and eliminated throughout California; (2) Frozen Potato prices in the State of California were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

239.     Defendants entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code §§ 16700, *et seq.* During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce. Each defendant has acted in violation of California Business and Professions Code § 16720 to fix, raise, maintain, and stabilize the price of Frozen Potatoes. The violations of California Business and Professions Code § 16720 consisted, without limitation, of a continuing

unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the price of Frozen Potatoes. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators did those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the prices of Frozen Potatoes. As a result of Defendants' violation of California Business and Professions Code § 16720, Plaintiffs and members of the Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to California Business and Professions Code § 16750(a).

### COUNT 7: CALIFORNIA
**VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200,** *et seq.*
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in California)**

240.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

241.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of California Business and Professions Code §§ 17200, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

242.    Defendants' acts and practices are unfair in that: (1) they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers; (2) they harmed and continue to harm consumers in a manner far outweighing any legitimate utility of their conduct; (3) the injury was not one that consumers reasonably could have avoided; and (4) they were contrary to legislatively declared and public policy.

243.    Defendants financially benefited from their conduct to the financial detriment of Plaintiffs and Class Members.

244.     As a direct and proximate result of Defendants' unlawful and unfair acts and practices, Plaintiffs and Class Members suffered substantial injury in fact, and lost money and/or property. The injuries suffered by Plaintiffs and Class Members include, but are not limited to, paying higher prices for Frozen Potato Products than they would have otherwise paid in the absence of Defendants' anticompetitive conspiracy.

245.     Defendants' conduct is continuing and unless injunctive relief is granted, artificially and anticompetitively inflated prices for Frozen Potato Products will continue unabated.

246.     Defendants thus have engaged in unlawful and unfair business acts and practices in violation of California Business and Professions Code §§ 17200, *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

## COUNT 8: COLORADO
### VIOLATION OF THE COLORADO ANTITRUST ACT, COLO. REV. STAT. §§ 6-4-101, *et seq*.
### (On Behalf of State Law Class Members that Purchased Frozen Potatoes in Colorado)

247.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

248.     Defendants' conspiracy had the following effects: (1) price competition for Frozen Potatoes was restrained, suppressed, and eliminated throughout Colorado; (2) Frozen Potato prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers.

249.     Defendants violated Colorado Revised Statutes §§ 6-4-101, *et seq.* Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under violated Colorado Revised Statutes §§ 6-4- 101, *et seq*.

## COUNT 9: COLORADO
### VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT,
### COLO. REV. STAT. §§ 6-1-101, *et seq*.
### (On Behalf of State Law Class Members that Purchased Frozen Potatoes in Colorado)

250.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

251.     Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Revised Statutes §§ 6-1-101, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

## COUNT 10: CONNECTICUT
### VIOLATION OF THE CONNECTICUT ANTITRUST ACT,
### CONN. GEN. STAT. §§ 35-24, *et seq*.
### (On Behalf of State Law Class Members that Purchased Frozen Potatoes in Connecticut)

252.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

253.     Defendants entered into an unlawful agreement in restraint of trade in violation of Connecticut General Statutes §§ 35-24, *et seq.* Defendants' combination or conspiracy had the following effects: (1) price competition for Frozen Potatoes was restrained, suppressed, and eliminated throughout Connecticut, and (2) Frozen Potato prices in the State of Connecticut were fixed, controlled, and maintained at artificially high levels; and (3) individuals were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.

254.     As such, Defendants entered into agreements in restraint of trade in violation of Connecticut General Statutes §§ 35-24, *et seq.* Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Connecticut General Statutes § 35-24, *et seq.*

## COUNT 11: DISTRICT OF COLUMBIA
### VIOLATION OF DISTRICT OF COLUMBIA CODE §§ 28-4501, *et seq*.
### (On Behalf of State Law Class Members that Purchased Frozen Potatoes in the District of Columbia)

255.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

256.    Defendants' combination or conspiracy had the following effects: (1) price competition for Frozen Potatoes was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Frozen Potato prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) Plaintiffs and members of the Class, including those who resided in the District of Columbia and purchased Frozen Potatoes in the District of Columbia, paid supra-competitive, artificially inflated prices for Frozen Potatoes. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia.

257.    Defendants entered into agreements in restraint of trade in violation of D.C. Code §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under D.C. Code, §§ 28-4501, *et seq*.

## COUNT 12: DISTRICT OF COLUMBIA
### VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION ACT, D.C. CODE §§ 28-3901, *et seq*.
### (On Behalf of State Law Class Members that Purchased Frozen Potatoes in the District of Columbia)

258.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

259.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code, §§ 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

## COUNT 13: FLORIDA
### VIOLATION OF
### THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT,
### FLA. STAT. §§ 501.201, *et seq.*
### (On Behalf of State Law Class Members that Purchased Frozen Potatoes in Florida)

260.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

261.     Through Defendants' actions and actions of co-conspirators, Frozen Potato prices in the State of Florida were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiffs and the State Law Class. Throughout the Class Period, competition in the Frozen Potatoes market was restrained, suppressed, and eliminated throughout Florida. Plaintiffs and members of the State Law Class, including those who purchased Frozen Potatoes in the State of Florida, paid supra-competitive, artificially inflated prices for Frozen Potatoes. During the Class Period, Defendants' illegal conduct substantially affected commerce in Florida.

262.     Defendants violated the Fla. Stat. §§ 542.15, *et seq.*, through their anticompetitive actions, and, therefore, Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §§ 501.201, *et seq.* Accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

## COUNT 14: HAWAII
### VIOLATION OF HAWAII ANTITRUST LAW,
### HAW. REV. STAT. ANN. §§ 480-1, *et seq.*
### (On Behalf of State Law Class Members that Purchased Frozen Potatoes in Hawaii)

263.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

264.     Defendants violated Haw. Rev. Stat. Ann. §§ 480-1, *et seq*., through their actions. *See* Haw. Rev. Stat. Ann. §§ 480-4, 480-13. Through Defendants' actions and the actions of their co-conspirators, Frozen Potato prices in the State of Hawaii were raised, fixed, maintained, and

stabilized at artificially high levels, thereby injuring Plaintiffs and the State Law Class. Throughout the Class Period, price competition for Frozen Potatoes was restrained, suppressed, and eliminated throughout the State of Hawaii. Plaintiffs and members of the State Law Class, including those who resided in the State of Hawaii and purchased Frozen Potatoes in Hawaii, paid supra-competitive, artificially inflated prices for their Frozen Potatoes. During the Class Period, Defendants' illegal conduct substantially affected commerce in Hawaii.

265.    Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Haw. Rev. Stat. Ann. §§ 480-1, *et seq*.

**COUNT 15: ILLINOIS**
**VIOLATION OF THE ILLINOIS ANTITRUST ACT,**
**740 ILL. COMP. STAT. §§ 10/1, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in Illinois)**

266.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

267.    Defendants' combination or conspiracy had the following effects: (1) price competition in the Frozen Potatoes market was restrained, suppressed, and eliminated throughout the State of Illinois, and (2) Frozen Potato prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

268.    Defendants entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. 10/1 *et seq*. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under 740 Ill. Comp. Stat. 10/1 *et seq*.

## COUNT 16: ILLINOIS
### VIOLATION OF
### THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT,
### 815 ILL. COMP. STAT. ANN. §§ 505/1, *et seq.*
### (On Behalf of State Law Class Members that Purchased Frozen Potatoes in Illinois)

269.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

270.     Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1 *et seq.*, and 720 Ill. Comp. Stat. 295/1a, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

## COUNT 17: IOWA
### VIOLATION OF THE IOWA COMPETITION LAW, IOWA CODE §§ 553.1, *et seq.*
### (On Behalf of State Law Class Members that Purchased Frozen Potatoes in Iowa)

271.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

272.     Defendants entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) price competition for Frozen Potatoes was restrained, suppressed, and eliminated throughout the State of Iowa, and (2) Frozen Potato prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa.

273.     During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

**COUNT 18: KANSAS**
**VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT,**
**KAN. STAT. ANN. §§ 50-101, *et seq.***
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in Kansas)**

274.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

275.    Defendants entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated §§ 50-101, *et seq.* Defendants' conspiracy had the following effects: (1) price competition for Frozen Potatoes was restrained, suppressed, and eliminated throughout the State of Kansas; (2) Frozen Potato prices in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

276.    Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Kansas Statutes Annotated §§ 50-101, *et seq.*

**COUNT 19: MAINE**
**VIOLATION OF THE MAINE ANTITRUST STATUTE,**
**ME. STAT. TIT. 10, §§ 1101, *et seq.***
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in Maine)**

277.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

278.    Defendants entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes Title 10 § 1101. Defendants' conspiracy had the following effects: (1) price competition for Frozen Potatoes was restrained, suppressed, and eliminated throughout the State of Maine; and (2) Frozen Potato prices in the State of Maine were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

279.     Accordingly, Plaintiffs and members of the State Law Class seek all relief available under Maine Revised Statutes Title 10 § 1104.

## COUNT 20: MARYLAND
**VIOLATION OF THE MARYLAND ANTITRUST ACT, MD. CODE §§ 11-209(a), *et seq*.**
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in Maryland)**

280.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

281.     Defendants' combination or conspiracy detrimentally affected the price competition in the State of Maryland for Frozen Potatoes by restraining, suppressing, and eliminating competition. Furthermore, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Frozen Potato prices in the State of Maryland at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

282.     Defendants violated the Maryland Code §§ 11-201, *et seq.*, by entering into unlawful agreement in restraint of trade in the State of Maryland. Accordingly, Plaintiffs and members of the State Law Class seek all relief available under Maryland Code §§ 11-201, *et seq.*

## COUNT 21: MASSACHUSETTS
**VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION LAW,**
**MASS. GEN. LAWS ANN. Ch. 93A §§ 1, *et seq*.**
(**On Behalf of State Law Class Members that Purchased Frozen Potatoes in** Massachusetts)

283.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

284.     Defendants' combinations or conspiracies had the following effects: (1) price competition for Frozen Potatoes was restrained, suppressed, and eliminated throughout the State of Massachusetts, and (2) Frozen Potatoes prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Massachusetts. During the Class Period, Defendants' illegal conduct substantially affected Massachusetts commerce.

285.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Laws Ann. Ch. 93A §§ 1, *et seq*. by entering into unlawful agreement in restraint of trade in the State of Massachusetts and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**COUNT 22: MICHIGAN**
**VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT,**
**MICH. COMP. LAWS §§ 445.771, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in Michigan)**

286.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

287.     Defendants' combination or conspiracy had the following effects: (1) price competition for Frozen Potatoes was restrained, suppressed, and eliminated throughout the State of Michigan, and (2) Frozen Potato prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

288.     Defendants entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws §§ 445.771, *et seq.* Accordingly, Plaintiffs and members of the State Law Class seek all relief available under Michigan Compiled Laws §§ 445.771, *et seq.*

289.     Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Michigan Compiled Laws §§ 445.903, *et seq*., and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

**COUNT 23: MICHIGAN**
**VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT,**
**MICH. COMP. LAWS §§ 445.903, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in Michigan)**

290.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

291.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices by conspiring to restrain trade in the State of Michigan in violation of Michigan Compiled Laws §§ 445.903, *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

**COUNT 24: MINNESOTA**
**VIOLATION OF THE MINNESOTA ANTITRUST LAW,**
**MINN. STAT. §§ 325D.49, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in Minnesota)**

292.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

293.     Through their actions and actions of co-conspirators, Frozen Potato prices in the State of Minnesota were raised, fixed, maintained, and stabilized at an artificially high level, thereby injuring Plaintiffs and the State Law Class. Throughout the Class Period, price competition in the market for Frozen Potatoes was restrained, suppressed, and eliminated throughout the State of Minnesota. Plaintiffs and members of the State Law Class, including those who resided in the State of Minnesota and purchased Frozen Potatoes there, paid supra-competitive, artificially inflated prices for Frozen Potatoes. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Minnesota.

294.     Defendants violated Minnesota Statutes §§ 325D.49, *et seq.*, through their anticompetitive actions. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Minnesota Statutes §§ 325D.49, *et seq.*

**COUNT 25: MINNESOTA**
**VIOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT,**
**MINN. STAT. §§ 325D.43, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in Minnesota)**

295.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

296. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation Minnesota Statutes §§ 325d.43-48, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

**COUNT 26: MISSISSIPPI**
**VIOLATION OF THE MISSISSIPPI ANTITRUST LAW,**
**MISS. CODE ANN. §§ 75-21-1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in Mississippi)**

297. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

298. Defendants entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated §§ 75-21-1, *et seq. See* MISS. CODE ANN. § 75-57-63. Defendants' combination or conspiracy had the following effects: (1) price competition for Frozen Potatoes was restrained, suppressed, and eliminated throughout the State of Mississippi, and (2) Frozen Potato prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Mississippi. During the Class Period, Defendants' illegal conduct substantially affected the State of Mississippi commerce.

299. Accordingly, Plaintiffs and members of the State Law Class seek all relief available under Mississippi Code Annotated §§ 75-21-1, *et seq.*, and § 75-57-63.

**COUNT 27: MONTANA**
**VIOLATION OF THE MONTANA CONSUMER PROTECTION ACT,**
**MONT. CODE, §§ 30-14-101, *et seq.***
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in Montana)**

300. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

301. By reason of the conduct alleged herein, Defendants have violated Montana Code §§ 30-14-101, *et seq*. Defendants' unlawful conduct had the following effects: (1) Frozen Potatoes price competition was restrained, suppressed, and eliminated throughout Montana; (2) Frozen

Potatoes prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs and members of the Class paid supracompetitive, artificially inflated prices for Frozen Potatoes.

302. During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs were injured and are threatened with further injury. Accordingly, Plaintiffs and members of the Class seek all relief available under the Montana Consumer Protection Act of 1973, Montana Code §§ 30-14-101, *et seq.*

**COUNT 28: NEBRASKA**
**VIOLATION OF THE NEBRASKA JUNKIN ACT, NEB. REV. STAT. §§ 59-801,** *et seq.*
**(On Behalf of Class Members that Purchased Frozen Potatoes in Nebraska)**

303. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

304. Defendants' combination or conspiracy had the following effects: (1) price competition for Frozen Potatoes was restrained, suppressed, and eliminated throughout the State of Nebraska, and (2) Frozen Potato prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Nebraska. During the Class Period, Defendants' illegal conduct substantially affected the State of Nebraska commerce.

305. Defendants restrained trade and commerce in the State of Nebraska by entering into an unlawful agreement in violation of Nebraska Revised Statutes §§ 59-801, *et seq.* Accordingly, Plaintiffs and members of the State Law Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

## COUNT 29: NEBRASKA
### VIOLATION OF THE NEBRASKA DECEPTIVE TRADE PRACTICES ACT,
### NEB. REV. STAT. §§ 59-1601, *et seq.*
### (On Behalf of Class Members that Purchased Frozen Potatoes in Nebraska)

306. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

307. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Nebraska Revised Statutes §§ 59-1601, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

## COUNT 30: NEVADA
### VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT,
### NEV. REV. STAT. §§ 598A, *et seq.*
### (On Behalf of Class Members that Purchased Frozen Potatoes in Nevada)

308. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

309. Defendants' conspiracy had the following effects: (1) price competition for Frozen Potatoes was restrained, suppressed, and eliminated throughout the State of Nevada; (2) Frozen Potato prices in the State of Nevada were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals been deprived of free and open competition.

310. Defendants violated the Nevada Revised Statutes Annotated §§ 598A.210, *et seq.*, by entering into unlawful agreements in restraint of trade in the State of Nevada. As a result of Defendants' violation of Nevada Revised Statutes Annotated §§ 598A.210, *et seq.* Plaintiffs and members of the State Law Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to Nevada Revised Statutes Annotated § 598A.210.

## COUNT 31: NEVADA
## VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT,
### NEV. REV. STAT. §§ 598.0903, *et seq.*
### (On Behalf of Class Members that Purchased Frozen Potatoes in Nevada)

311.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

312.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Nevada Revised Statutes Annotated §§ 598.0903, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

## COUNT 32: NEW HAMPSHIRE
## VIOLATION OF THE NEW HAMPSHIRE ANTITRUST LAW,
### N.H. REV. STAT. ANN. §§ 356:1, *et seq.*
### (On Behalf of State Law Class Members that Purchased Frozen Potatoes in New Hampshire)

313.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

314.    Defendants' combination or conspiracy detrimentally affected the price competition in the State of New Hampshire Frozen Potatoes market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Frozen Potato prices in the State of New Hampshire at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected the State of New Hampshire commerce.

315.    Defendants entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes Annotated §§ 356:1, *et seq.* Accordingly, Plaintiffs and members of the State Law Class seek all relief available under New Hampshire Revised Statutes Annotated §§ 356:1, *et seq.*

<u>COUNT 33: NEW HAMPSHIRE</u>
**VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT,**
**N.H. REV. STAT. ANN. §§ 358-A:1, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in New**
**Hampshire)**

316.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

317.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of New Hampshire Revised Statutes Annotated §§ 358-A:1, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

<u>COUNT 34: NEW JERSEY</u>
**VIOLATION OF THE NEW JERSEY ANTITRUST ACT,**
**N.J. STAT. ANN. §§ 56-9-3, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in New Jersey)**

318.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

319.    Defendants' conspiracy detrimentally affected the price competition for Frozen Potatoes purchased in the State of New Jersey by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Frozen Potato prices in the State of New Jersey at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected the State of New Jersey commerce.

320.    Defendants engaged in a conspiracy in restraint of the trading of Frozen Potatoes in violation of the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-3. Accordingly, Plaintiffs and members of the Class seek equitable relief and compensatory damages, together with reasonable attorneys' fees, filing fees and reasonable costs of suit, including but not limited to expenses of discovery and document reproduction. N.J. Stat. Ann. §56:9-12.

**COUNT 35: NEW JERSEY**
**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT,**
**N.J. STAT. ANN. §§ 56-8-2, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in New Jersey)**

321.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

322.     Defendants engaged in unfair competition or unfair or deceptive acts or practices by conspiring to restrain trade in the State of New Jersey in violation of N.J. Stat. Ann. §§ 56-8-2, *et seq*. Accordingly, Plaintiffs and members of the Class seek all forms of relief available under the relevant statute.

**COUNT 36: NEW MEXICO**
**VIOLATION OF THE NEW MEXICO ANTITRUST LAW,**
**N.M. STAT. ANN. §§ 57-1-1, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in New Mexico)**

323.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

324.     Defendants' combination or conspiracy detrimentally affected the price competition in the State of New Mexico for Frozen Potatoes by restraining, suppressing, and eliminating competition. Furthermore, Defendants' unlawful conduct raised, fixed, maintained and stabilized Frozen Potato prices in the State of New Mexico at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of New Mexico.

325.     Defendants violated the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*, by entering into unlawful agreements in restraint of trade in the State of New Mexico. Accordingly, Plaintiffs and Members of the State Law Class seek all relief available under New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

**COUNT 37: NEW MEXICO**
**VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT,**
**N.M. STAT. ANN. §§ 57-12-1, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in New Mexico)**

326. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

327. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Statutes Annotated §§ 57-12-1, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

**COUNT 38: NEW YORK**
**VIOLATION OF THE DONNELLY ACT, N.Y. GEN. BUS. LAW §§ 340, *et seq*.**
**(On Behalf of Class Members that Purchased Frozen Potatoes in New York)**

328. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

329. Defendants entered into an unlawful agreement in restraint of trade in violation of New York General Business Law §§ 340, *et seq.* Defendants' conspiracy had the following effects: (1) price competition in the market for Frozen Potatoes was restrained, suppressed, and eliminated throughout the State of New York, and (2) Frozen Potato prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of New York. During the Class Period, Defendants' illegal conduct substantially affected the State of New York commerce. The conduct set forth above is a *per se* violation of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.*

330. Accordingly, Plaintiffs and members of the State Law Class seek all relief available under New York General Business Law §§ 340, *et seq.*

## COUNT 39: NORTH CAROLINA
### VIOLATION OF THE NORTH CAROLINA UNFAIR TRADE AND BUSINESS PRACTICES ACT, N.C. GEN. STAT. §§ 75-1, *et seq.*
### (On Behalf of State Law Class Members that Purchased Frozen Potatoes in North Carolina)

331.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

332.     Defendants entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes §§ 75-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) price competition in the market for Frozen Potatoes was restrained, suppressed, and eliminated throughout the State of North Carolina, and (2) Frozen Potato prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of North Carolina. During the Class Period, Defendants' illegal conduct substantially affected the State of North Carolina commerce.

333.     Accordingly, Plaintiffs and members of the State Law Class seek all relief available under North Carolina General Statutes §§ 75-1, *et seq*.

## COUNT 40: NORTH DAKOTA
### VIOLATION OF THE NORTH DAKOTA UNFAIR TRADE PRACTICES LAW, N.D. CENT. CODE §§ 51-10, *et seq.*
### (On Behalf of State Law Class Members that Purchased Frozen Potatoes in North Dakota)

334.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

335.     Defendants' actions violated North Dakota Century Code §§ 51-08.1-01, *et seq.* through their anticompetitive actions. Through their actions and actions of co-conspirators, Frozen Potato prices in the State of North Dakota were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiffs and members of the State Law Class. Throughout the Class Period, price competition in the market for Frozen Potatoes was restrained, suppressed,

and eliminated throughout the State of North Dakota. Plaintiffs and members of the State Law Class, including those who resided in the State of North Dakota and purchased Frozen Potatoes there, paid supra-competitive, artificially inflated prices. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of North Dakota.

336.     Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under North Dakota Century Code §§ 51-08.1-01, *et seq.*

**COUNT 41: OREGON**
**VIOLATION OF THE OREGON ANTITRUST LAW,**
**OR. REV. STAT. §§ 646.725,** ***et seq.***
**(On Behalf of Class Members that Purchased Frozen Potatoes in Oregon)**

337.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

338.     Defendants' combination or conspiracy had the following effects: (1) price competition for Frozen Potatoes was restrained, suppressed, and eliminated throughout the State of Oregon; (2) Frozen Potato prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected the State of Oregon commerce.

339.     Defendants entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes §§ 646.725, *et seq.* Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Oregon Revised Statutes §§ 646.725, *et seq.*

**COUNT 42: OREGON**
**VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT, OR. REV.**
**STAT. §§ 646.605,** ***et seq.***
**(On Behalf of Class Members that Purchased Frozen Potatoes in Oregon)**

340.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

341.     Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Oregon Revised Statutes §§ 646.605, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

**COUNT 43: PUERTO RICO**
**VIOLATION OF THE PUERTO RICO ANTITRUST ACT,**
**PR. LAWS ANN. TIT. 10, CH. 13, §§ 257, *et seq*.**
**(On Behalf of Class Members that Purchased Frozen Potatoes in Puerto Rico)**

342.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

343.     Defendants' actions violated P.R. Laws Ann. tit. 10, ch. 13, § 258, *et seq.*, through their anticompetitive actions. Through their actions and actions of co-conspirators, Frozen Potato prices in Puerto Rico were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiffs and members of the State Law Class. Throughout the Class Period, price competition in the market for Frozen Potatoes was restrained, suppressed, and eliminated throughout Puerto Rico. Plaintiffs and members of the State Law Class, including those who resided in Puerto Rico and purchased Frozen Potatoes there, paid supra-competitive, artificially inflated prices. During the Class Period, Defendants' illegal conduct substantially affected commerce in Puerto Rico.

344.     Defendants entered into an unlawful agreement in restraint of trade in violation of P.R. Laws Ann. tit. 10, ch. 13, § 258. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under P.R. Laws Ann. tit. 10, ch. 13, § 258, *et seq.*

**COUNT 44: RHODE ISLAND**
**VIOLATION OF THE RHODE ISLAND ANTITRUST LAW,**
**R.I. GEN. LAWS §§ 6-36-7, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in Rhode Island)**

345.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

346.    Defendants' combination or conspiracy detrimentally affected the price competition in the State of Rhode Island for Frozen Potatoes by restraining, suppressing, and eliminating competition. Furthermore, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Frozen Potato prices in the State of Rhode Island at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Rhode Island.

347.    Defendants entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Laws §§ 6-36-7, *et seq.* Accordingly, Plaintiffs and members of the State Law Class seek all relief available under Rhode Island General Laws §§ 6-36-7, *et seq.*

### COUNT 45: RHODE ISLAND
### VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT, R.I. GEN. LAWS §§ 6-13.1-1, *et seq.*
### (On Behalf of State Law Class Members that Purchased Frozen Potatoes in Rhode Island)

348.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

349.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island General Laws § 6-13.1-1, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

### COUNT 46: SOUTH DAKOTA
### VIOLATION OF THE SOUTH DAKOTA ANTITRUST LAW, S.D. COD. LAWS §§ 37-1-3.1, *et seq.*
### (On Behalf of State Law Class Members that Purchased Frozen Potatoes in South Dakota)

350.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

351.    Through their actions and actions of co-conspirators, Frozen Potato prices in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiffs and the State Law Class. Throughout the Class Period, price competition

in the market for Frozen Potatoes was restrained, suppressed, and eliminated throughout the State of South Dakota. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of South Dakota. Plaintiffs and members of the State Law Class, including those who resided in the State of South Dakota and purchased Frozen Potatoes there, paid supra-competitive, artificially inflated prices for their Frozen Potatoes.

352.     Defendants violated South Dakota Codified Laws §§ 37-1-3.1, *et seq.*, through their anticompetitive actions. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under South Dakota Codified Laws §§ 37-1-3.1, *et seq*.

### COUNT 47: SOUTH DAKOTA
### VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT, S.D. COD. LAWS §§ 37-24-1, *et seq*.
### (On Behalf of State Law Class Members that Purchased Frozen Potatoes in South Dakota)

353.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

354.     Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of South Dakota Codified Laws §§ 37-24-1, *et seq.*, and, accordingly, Plaintiffs and members of the State Law Class seek all relief available under that statute.

### COUNT 48: TENNESSEE
### VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT, TENN. CODE ANN. §§ 47-25-101, *et seq*.
### (On Behalf of State Law Class Members that Purchased Frozen Potatoes in Tennessee)

355.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

356.     Defendants entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated §§ 47-25-101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) price competition for the sale of Frozen Potatoes, tangible goods, was restrained, suppressed, and eliminated throughout the State of Tennessee; (2) prices for Frozen

Potatoes, tangible goods, in the State of Tennessee were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Tennessee.

357. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Tennessee Code Annotated §§ 47-25-101, *et seq.*

## COUNT 49: UTAH
### VIOLATION OF THE UTAH ANTITRUST ACT,
### UTAH CODE ANN. §§ 76-10-3101, *et seq.*
### (On Behalf of State Law Class Members that Purchased Frozen Potatoes in Utah)

358. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

359. Defendants violated Utah Code Annotated §§ 76-10-3101, *et seq.* by entering into an unlawful agreement in restraint of trade in the State of Utah. Specifically, Defendants' combination or conspiracy detrimentally affected the price competition in the State of Utah for the Frozen Potatoes market by restraining, suppressing, and eliminating competition. Furthermore, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Frozen Potato prices in Utah at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Utah.

360. Accordingly, Plaintiffs and Members of the State Law Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq.*

## COUNT 50: VERMONT
### VIOLATION OF THE VERMONT CONSUMER FRAUD ACT,
### 9 V.S.A. §§ 2451, *et seq.*
### (On Behalf of State Law Class Members that Purchased Frozen Potatoes in Vermont)

361. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

362.     Defendants' combination or conspiracy had the following effects: (1) price competition for Frozen Potatoes was restrained, suppressed, and eliminated throughout the State of Vermont; (2) Frozen Potato prices in the State of Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. Defendants entered into an unlawful agreement in restraint of trade in violation of Vermont Consumer Fraud Act, Vermont Statutes Annotated, Title 9 §§ 2453, *et seq.* During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Vermont.

363.     Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Vermont Consumer Fraud Act, Vermont Statutes Annotated, Title 9 §§ 2465, *et seq*.

## COUNT 51: WEST VIRGINIA
## VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT,
## W. VA. CODE §§ 47-18-1, *et seq*.
## (On Behalf of State Law Class Members that Purchased Frozen Potatoes in West Virginia)

364.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

365.     Defendants' conspiracy had the following effects: (1) price competition for Frozen Potatoes was restrained, suppressed, and eliminated throughout the State of West Virginia; (2) Frozen Potato prices in the State of West Virginia were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. Defendants entered into an unlawful agreement in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of West Virginia. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under West Virginia Code §§ 47-18-1, *et seq*.

## COUNT 52: WISCONSIN
### VIOLATION OF THE WISCONSIN ANTITRUST ACT, WIS. STAT. § 133.03
**(On Behalf of State Law Class Members that Purchased Frozen Potatoes in Wisconsin)**

366. Plaintiffs incorporate by reference the allegations in the preceding paragraphs, excluding causes of action.

367. Defendants entered into an unlawful contract and conspiracy in restraint of trade in violation of Wisconsin Statute § 133.03(1). Defendants' conspiracy had the following effects: (1) price competition for Frozen Potatoes was restrained, suppressed, and eliminated throughout the State of Wisconsin; (2) Frozen Potato prices in the State of Wisconsin were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. Accordingly, Plaintiffs and members of the State Law Class seek all forms of relief available under Wisconsin Statute § 133.03.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court enter judgment as follows:

1) The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as the Class Representatives and its counsel of record as Class Counsel, and direct that at a practicable time notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes;

2) Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and

from adopting or following any practice, plan, program, or device having a similar purpose or effect;

3)      The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed a *per se* violation of Section 1 of the Sherman Act, and a violation of each of the state law statutes alleged herein;

4)      Awarding Plaintiffs and the relevant Class Members compensatory damages under the state statutes in an amount to be proven at trial, multiple damages according to law against Defendants, jointly and severally;

5)      Awarding Plaintiffs and the relevant Class Members punitive, exemplary, statutory, and full consideration damages under the aforementioned state laws;

6)      Ordering Defendants to disgorge their profits earned as a result of their wrongful conduct and ordering them to make restitution to Plaintiffs and Class Members;

7)      Plaintiffs and the Class Members be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8)      Plaintiffs and the Class Members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9)      Granting Plaintiffs and the Class Members such other and further relief as the Court deems just and proper.

## XIII. <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED: October 6, 2025

By: */s/ Daniel L. Warshaw*

Daniel L. Warshaw
Bobby Pouya
Michael H. Pearson
Matthew A. Pearson (*Pro Hac Vice*)
Naveed Abaie (*Pro Hac Vice*)
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
dwarshaw@pwfirm.com
bpouya@pwfirm.com
mpearson@pwfirm.com
mapearson@pwfirm.com
nabaie@pwfirm.com

Douglas A. Millen
Robert J. Wozniak
Matthew W. Ruan
**FREED KANNER LONDON
& MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
dmillen@fklmlaw.com
rwozniak@fklmlaw.com
mruan@fklmlaw.com

Kimberly A. Justice
**FREED KANNER LONDON
& MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Telephone: (484) 243-6335
kjustice@fklmlaw.com

Brian S. Pafundi (*Pro Hac Vice*)
**PEARSON WARSHAW, LLP**
328 Barry Ave. South, Suite 200
Wayzata, MN 55391
Telephone: (612) 389-0600
bpafundi@pwfirm.com

***Interim Co-Lead Counsel for the Commercial Indirect
Purchaser Class***

Steven A. Hart
Julie A. Murphy
**HART McLAUGHLIN & ELDRIDGE, LLC**
One South Dearborn, Suite 1400
Chicago, Illinois 60603
Telephone: (312) 955-0545
shart@hmelegal.com
jmurphy@hmelegal.com

*Liaison Counsel for the Commercial Indirect Purchaser Class*