**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| *In re Frozen Potato Products Antitrust Litigation* | Case No. 1:24-cv-11801 |
| THIS DOCUMENT RELATES TO: | Hon. Jeffrey L. Cummings |
| | Magistrate Judge Gabriel A. Fuentes |
| All Actions | **Oral Argument Requested** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CIRCANA LLC'S
<u>MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION
COMPLAINTS</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

LEGAL STANDARD........................................................................................................... 3

ARGUMENT ....................................................................................................................... 4

I.      PLAINTIFFS FAIL TO ALLEGE CIRCANA'S PARTICIPATION IN OR CONDUCT IN FURTHERANCE OF THE ALLEGED CONSPIRACY. ........................ 4

II.     PLAINTIFFS ALLEGE ONLY LAWFUL COMMONPLACE BENCHMARKING SERVICES PROVIDED BY CIRCANA. ....................................... 6

III.    THE COMPLAINTS FAIL TO ALLEGE THAT CIRCANA WOULD HAVE BENEFITED FROM, OR HAD ANY MOTIVE TO JOIN, THE CONSPIRACY......... 12

CONCLUSION.................................................................................................................... 14

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)............................................................................................14

*Bank of America, N.A. v. Knight,*
    725 F.3d 815 (7th Cir. 2013) ...............................................................................3

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..............................................................................................3

*In re Brand Name Prescription Drugs Antitrust Litig.,*
    288 F.3d 1028 (7th Cir. 2002) ......................................................................4, 5, 6

*In re Broiler Chicken Antitrust Litig.,*
    290 F. Supp. 3d 772 (N.D. Ill. 2017) ..............................................................9, 10

*In re Broiler Chicken Antitrust Litig.,*
    702 F. Supp. 3d 635 (N.D. Ill. 2023) .......................................................... *passim*

*In re Citric Acid Litig.,*
    191 F.3d 1090 (9th Cir. 1999) ..............................................................................7

*In re Flat Glass Antitrust Litig.,*
    385 F.3d 350 (3d Cir. 2004)................................................................................11

*Hansen v. Nw. Univ.,*
    No. 24 C 9667, 2025 WL 2731378 (N.D. Ill. Sept. 24, 2025)...............................6

*Jacobs v. Tempur-Pedic Int'l, Inc.,*
    626 F.3d 1327 (11th Cir. 2010) ..........................................................................13

*Lazarou v. Am. Bd. of Psychiatry & Neurology,*
    No. 24-1994, 2025 WL 3022661 (7th Cir. Oct. 29, 2025) ...................................14

*In re Loc. TV Advert. Antitrust Litig.,*
    No. 18 C 6785, 2022 WL 3716202 (N.D. Ill. Aug. 29, 2022)................................8

*Maple Flooring Mfrs.'Ass'n v. United States,*
    268 U.S. 563 (1925).............................................................................................7

*Marion Healthcare, LLC v. Becton Dickinson & Co.,*
    952 F.3d 832 (7th Cir. 2020) ...............................................................................4

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)............................................................................................13

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)..................................................................................13

*Mitchael v. Intracorp, Inc.*,
179 F.3d 847 (10th Cir. 1999) .............................................................................13

*In re MultiPlan Health Ins. Provider Litig.*,
789 F. Supp. 3d 614 (N.D. Ill. 2025) ...................................................................11

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
629 F.3d 697 (7th Cir. 2011) .................................................................................4

*In re Pork Antitrust Litig.*,
781 F. Supp. 3d 758 (D. Minn. 2025)......................................................................8

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*,
709 F. Supp. 3d 478 (M.D. Tenn. 2023)...............................................................11

*Standard Iron Works v. ArcelorMittal*,
639 F. Supp. 2d 877 (N.D. Ill. 2009) .....................................................................5

*Sugar Inst. v. United States*,
297 U.S. 553 (1936)..............................................................................................7

*United States v. Standard Oil Co.*,
316 F.2d 884 (7th Cir. 1963) ................................................................................6

*United States v. U.S. Gypsum Co.*,
438 U.S. 422 (1978)..............................................................................................7

**INTRODUCTION**

Circana is a data analytics company.  Its business is built on collecting and analyzing data, helping thousands of businesses of all kinds better compete in the market.  This case tries to turn antitrust law on its head by claiming decidedly procompetitive conduct is somehow illegal.  But Plaintiffs cannot state any such claim against Circana for three fundamental reasons, in addition to those set forth in Defendants' joint motion to dismiss.  First, Plaintiffs do not allege any agreement among Producer Defendants and Circana to use PotatoTrack to further a conspiracy, a pre-requisite of any such claim.  Instead, the Complaints establish no more than that each of Circana's customers independently concluded that it made business sense for each of them to participate in PotatoTrack.  Second, Plaintiffs' allegations cannot establish that Circana's conduct is anticompetitive.  As to PotatoTrack, Plaintiffs merely assert the noncontroversial fact that Circana's PotatoTrack product is a commonplace benchmarking service.  They concede PotatoTrack contains only aggregated, anonymized information, and Plaintiffs allege no more than that Circana provided Producer Defendants with PotatoTrack reports.  Plaintiffs do not allege that PotatoTrack included deanonymized or disaggregated information or that Circana had competitively sensitive conversations with report recipients in furtherance of any alleged conspiracy, allegations that courts have required before allowing antitrust claims against benchmarking companies to proceed. Finally, the Complaints lack any allegations that Circana had any motive to participate in any conspiracy.

Each of these reasons preclude Plaintiffs from stating an antitrust claim against Circana. Indeed, expanding the scope of antitrust law to include PotatoTrack and Circana here would set a

perilous precedent and jeopardize the continued viability of legitimate benchmarking services. Accordingly, all Counts in each of the Plaintiffs' Complaints against Circana should be dismissed.[1]

**BACKGROUND**

Circana is not a producer or seller of frozen potato products, does not profit when the price of frozen potato products increases, and does not compete with any of the Producer Defendants. Rather, Circana "is the leading advisor on the complexity of consumer behavior," servicing "almost 7,000 brands and retailers worldwide" across a host of industries.[2] As Plaintiffs allege, Circana has provided its PotatoTrack[3] benchmarking service since at least 2008. Consumer Compl. ¶ 102. Pursuant to Plaintiffs' Complaints, the alleged "price hikes" at issue did not occur until 2021, well after Circana began offering these services, and following the National Potato Council's Potato Expo—an event for which there is no allegation that Circana was present. *See id.* ¶¶ 109, 166–67; Direct Purchaser Compl. ¶ 104; Commercial Compl. ¶¶ 73, 137. Plaintiffs also do not allege that Circana changed its PotatoTrack reports or business practices at any point since 2008.

Moreover, Plaintiffs do not plausibly allege how Circana's PotatoTrack is problematic. In particular, Plaintiffs acknowledge that PotatoTrack reports present only aggregated data. *See, e.g.*, Direct Purchaser Compl. ¶ 89 ("[T]he data collected is categorized, and ***combined totals*** are played back to all PotatoTrack clients ….") (emphasis added); Commercial Compl. ¶ 98 ("PotatoTrack

---

[1] Circana moves to dismiss claims brought by the "Direct Purchaser Plaintiffs," the "Commercial Indirect Plaintiffs," and the "Consumer Indirect Purchaser Plaintiffs." ECF Nos. 182, 183, 184.

[2] Circana was formed by the merger of IRI and NPD in 2022. *IRI and NPD Rebrand as Circana, the Leading Advisor on the Complexity of Consumer Behavior*, CIRCANA (Mar. 6, 2023), https://www.circana.com/intelligence/press-releases/2023/news-press-releases-iri-and-npd-rebrand-as-circana/ (accessed Dec. 5, 2025). For convenience, this brief refers to Circana even when discussing activities that occurred pre-merger.

[3] Plaintiffs frequently refer to Circana's anonymized and aggregated data service as "PotatoTrac." The proper spelling for this service is "PotatoTrack."

data further provided the Producing Defendants with a means to determine whether their Frozen Potato prices were above or below the ***aggregate*** price per pound in any given product category.") (emphasis added); Consumer Compl. ¶ 104 ("The granularity of this data enables Defendant Processors to determine if their prices are above or below the ***aggregate*** price per pound in a given product category.") (emphasis added).  In other words, Circana does not disclose any individual Producer Defendant's production or pricing information to any other Producer Defendant.  Nor do Plaintiffs allege that Producer Defendants can deanonymize the PotatoTrack reports, or that the PotatoTrack reports provide forward-looking pricing requirements.  Moreover, Plaintiffs do not allege that Circana ever met with Producer Defendants to discuss furthering any conspiracy by using the PotatoTrack reports, or that either the PotatoTrack product or anyone at Circana ever made any pricing recommendations to any Producer Defendant.

In short, the generalized allegations against Circana amount to nothing more than the assertion that Circana offers a standard benchmarking service—PotatoTrack—that gives Producer Defendants a general overview of the market, without disclosing any individual competitor's confidential information and using only historical (not forward-looking) data.

## LEGAL STANDARD

To survive a motion to dismiss, Plaintiffs must allege "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In other words, Plaintiffs must provide "allegations plausibly suggesting (not merely consistent with) agreement." *Id.* at 557.  In conspiracy cases with multiple defendants, the allegations must be sufficient "to show that a particular defendant joined the conspiracy and knew of its scope." *Bank of America, N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013).

For each defendant, the complaint must contain factual allegations plausibly suggesting that the defendant "had a conscious commitment to a common scheme designed to achieve an

3

unlawful objective." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 841 (7th Cir. 2020) (quotation omitted). To plead a conscious commitment to a common scheme, "the circumstances of the case must reveal 'a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.'" *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011) (quotation omitted). For a non-competitor defendant (like Circana) alleged to have joined an antitrust conspiracy, Plaintiffs must "show not only that the [non-competitor defendant] knew that the [other defendants']" activities were "collusive rather than individual, but also that the [non-competitor defendant] agreed with the [other defendants] to support" the alleged anti-competitive activity. *In re Brand Name Prescription Drugs Antitrust Litig.*, 288 F.3d 1028, 1033 (7th Cir. 2002). Plaintiffs cannot demonstrate that either is true.

## ARGUMENT

I.     **PLAINTIFFS FAIL TO ALLEGE CIRCANA'S PARTICIPATION IN OR CONDUCT IN FURTHERANCE OF THE ALLEGED CONSPIRACY.**

Plaintiffs do not allege any facts that directly establish or plausibly suggest that Circana—a non-competitor that neither produces nor sells frozen potato products—knew of, or made a conscious commitment to join, the alleged conspiracy. *See, e.g.*, *Marion Healthcare, LLC*, 952 F.3d at 841; *In re Brand Name Prescription Drugs Antitrust Litig.*, 288 F.3d at 1033. Nor do Plaintiffs allege any facts that Circana took any action to restrain trade—only that it provided a lawful benchmarking service (as Plaintiffs allege has been around for almost two decades). In fact, their only allegation against Circana is that its PotatoTrack reports were used to "facilitate" the conspiracy. *See* Direct Purchaser Compl. ¶ 91; Commercial Compl. ¶¶ 9, 84, 100, 210, 217. That generalized assertion cannot establish that Circana actively and knowingly joined any conspiracy to exchange competitively sensitive information for anti-competitive purposes. For all these reasons, the Court should dismiss all claims against Circana.

4

None of Plaintiffs' allegations approach the types of conduct that courts have found sufficient to support claims against such an information services defendant. Consider, for instance, that PotatoTrack is nothing new—nor has anything about it changed. This stands in stark contrast to other cases, which involve allegations of new actions or significant changes in conduct. For example, in *Standard Iron*, there was a "marked change in defendants' behavior" around the start of the conspiracy. *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 900 (N.D. Ill. 2009) ("Similar allegations showing 'that there was a marked change in defendants' behavior in the market around the time the conspiracy started' have been held sufficient to 'make an antitrust conspiracy plausible.'") (quotation omitted). Similarly, in a case involving another benchmarking company, Agri Stats, the plaintiffs alleged that a producer—Tyson—chose to re-join the service at the outset of the purported conspiracy, following a four-year absence and after spearheading production cuts in the industry. *In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 651 (N.D. Ill. 2023) ("Notably, in the years immediately preceding the alleged conspiracy period, Tyson, the second largest producer at the time, attempted unilateral production cuts to no avail. This failure led Tyson to rejoin Agri Stats … to gain access to information about its competitors, and, according to Plaintiffs, was the impetus for the conspiracy alleged in this case.").

Here, there is no catalyst or event that converted PotatoTrack from a procompetitive benchmarking service into something nefarious. Quite the opposite; the timing does not add up. According to Plaintiffs' Complaints, Circana has provided PotatoTrack's benchmarking services since at least 2008, yet the challenged "price hikes" did not occur until 2021—following a meeting for which Plaintiffs do not allege that Circana attended. *See, e.g.*, *In re Brand Name Prescription Drugs Antitrust Litig.*, 288 F.3d at 1033–34 (rejecting argument that defendants conspired "because … the chargeback system was adopted before the alleged collusion of the manufacturers

5

began"); *Hansen v. Nw. Univ.*, No. 24 C 9667, 2025 WL 2731378, at *9 (N.D. Ill. Sept. 24, 2025) ("[T]he lack of details surrounding when each [] Defendant began to require [] financial information and the potential that *the period of time lasted almost twenty years* calls into question whether the use of [] financial information suggests coordinated action among all Defendants.") (emphasis added).

Most fundamentally, Plaintiffs do not allege a single phone call, text message, email, or meeting between Circana and any Defendant Producer *in furtherance of the alleged conspiracy* (either to restrain trade or exchange competitive information). [4] To be sure, calls about a legitimate benchmarking service do not count; they must show that Circana itself conspired here. That means explaining how Circana did something more than perform a requested, and entirely legal, benchmarking service. Instead, Plaintiffs allege nothing more than Circana was, at most, an "'unwitting conspirator.'" *United States v. Standard Oil Co.*, 316 F.2d 884, 890 (7th Cir. 1963). But as the Seventh Circuit explained in *Standard Oil*, there is "no such thing." *Id.*

Plaintiffs' failure to allege that Circana actually participated in, or even had knowledge of, the alleged conspiracy dictates dismissal of all counts and claims against Circana. *See In re Brand Name Prescription Drugs Antitrust Litig.*, 288 F.3d at 1033.

## II. PLAINTIFFS ALLEGE ONLY LAWFUL COMMONPLACE BENCHMARKING SERVICES PROVIDED BY CIRCANA.

Plaintiffs' allegations against Circana amount to nothing more than lawful benchmarking services that are consistent with legitimate, commercial conduct. Nowhere do Plaintiffs explain

---

[4] Indeed, Plaintiffs identified only a single trade meeting where Circana was a participant, which occurred four years *after* the alleged price increases. *See* Direct Purchaser Compl. ¶ 166 ("IFMA held another COEX meeting from March 2-4, 2025, in Kansas City, Missouri. Laurel Brown, Executive Director of Circana, attended this meeting."). Nor is there any specific allegation that any representative at Circana met with any representative of a Producer Defendant in furtherance of any conspiracy during this trade meeting.

how PotatoTrack is problematic or somehow distinct from standard, commonplace benchmarking. At bottom, the Complaints do not plausibly allege that Circana's activities fall outside the bounds of accepted business practices or that they support an inference of conspiracy. This Court should therefore dismiss all of Plaintiffs' claims against Circana.

*First*, benchmarking services like those provided by Circana's PotatoTrack reports are widely deemed to be pro-competitive and beneficial to consumers. Courts, including the Supreme Court, have long recognized that the collection and dissemination of aggregated market data, including price and production information, can enhance market efficiency and transparency and serve as an aid, rather than a restraint, to commerce. *See, e.g.*, *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("The exchange of price data and other information among competitors … can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive."); *Sugar Inst. v. United States*, 297 U.S. 553, 598 (1936) ("[T]he dissemination of information is normally an aid to commerce."); *Maple Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 582–83 (1925) (concluding that the "gathering and dissemination" of market-level data lead to efficiency and transparency); *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999) (noting that "[g]athering information about pricing and competition in the industry is standard fare for trade associations" and insufficient to allow an inference of conspiracy).

Academic and industry literature has likewise recognized the importance and prevalence of benchmarking in the marketplace across industries. *See, e.g.*, Matteo Aquilina et al., *The Visible Hand: Benchmarks, Regulation, and Liquidity*, JOURNAL OF FINANCIAL MARKETS (November 2022) ("Benchmarks are critical to the efficient functioning of markets. Many industries, but particularly the financial services industry, use benchmarks to settle contracts, monitor trade

7

execution, and signal sentiment in the market."); Mohamed Zairi et al., *The Role of Benchmarking in Best Practice Management and Knowledge Sharing*, THE JOURNAL OF COMPUTER INFORMATION SYSTEMS (Summer 2005) ("Benchmarking is now well defined as a critical business process that is being continuously improved within most major organizations."); *id.* ("Today we see examples of successful benchmarking in all sectors like Health Services, Insurance, Financial Services, Construction, Real Estate Advisors, Banking, Government, Maintenance Management, Higher Education, Brand Management, etc."). To hold that Circana's PotatoTrack services constitute a conspiracy to restrain trade or exchange competitively sensitive information would threaten the continued viability of these crucial, commonplace benchmarking services.

*Second*, Plaintiffs do not (and cannot) allege that Circana's PotatoTrack reports disclose any individual company's confidential production or pricing information to other companies, or any level of detail that would make its ordinary benchmarking services improper. The Complaints acknowledge that the PotatoTrack reports provide only aggregated production and pricing data. *See, e.g.*, Direct Purchaser Compl. ¶ 89; Commercial Compl. ¶ 98; Consumer Compl. ¶ 104. Nor are there any allegations that Producer Defendants can deanonymize the reports to discern individual company data, or that Circana knew Producer Defendants were doing so and failed to act in the face of such knowledge. *Cf. In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 829–30 (D. Minn. 2025) (noting that the reports provided by defendant Agri Stats "could be used to decipher competitors' business plans"); *id.* at 833 ("[I]n the face of evidence that participants were attempting to deanonymize the reports, Agri Stats did nothing.").

In contrast, Plaintiffs broadly allege that the PotatoTrack reports provide "competitors with a view of the entire market," Consumer Compl. ¶ 77, which courts have held "do[es] not support Plaintiffs' antitrust claim." *In re Loc. TV Advert. Antitrust Litig.*, No. 18 C 6785, 2022 WL

8

3716202, at *7 (N.D. Ill. Aug. 29, 2022) (granting motion to dismiss where plaintiff alleged that defendant "uses this data to show clients **a picture of what is happening in the market as a whole** alongside each client's *own* expected share of a market's revenue.") (cleaned up) (emphasis in original).

Indeed, in *Broiler*, the court initially denied Agri Stat's motion to dismiss, after indicating that "the extent of information sharing through Agri Stats is *unusual*" where:

> Agri Stats reports provide information about where Broiler producers buy their breeder stock and feed, the size of production facilities, and actual production numbers. *Id.* ¶ 130. The reports also provide *detailed information* regarding production capacity, including numbers of eggs, the size of breeder flocks, and other inventory numbers, as well as financial information about each company. *Id.* ¶¶ 130, 135C. Although the reports do not identify the Broiler producers by name, the reports are *so detailed that a reasonably informed producer can discern the other producers' identities,* and it is common knowledge among producers that this is possible. *Id.* ¶ 124. This ability to identify each other by the information in the reports is enhanced by *tours* Defendants' executives take of each other's production facilities, *see id.* ¶ 313, and by the relatively frequent *movement of employees* and executives among the Defendant companies, without the protection of noncompete clauses. *Id.* ¶ 314.
>
> …
>
> Beyond the contact necessary to collect data, Agri Stats employees also interact regularly with Broiler producer executives and employees at trade association meetings. *Id*. ¶ 127. Agri Stats also *offers to meet with Broiler producer executives on a quarterly basis to make detailed presentations* about company and industry data, including whether the industry is over- or undersupplying the market. *Id*. ¶ 127. Plaintiffs allege that Agri Stats breaches the anonymity of the reports at these meetings by matching the data to particular companies. *Id*.

*In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 781–82 (N.D. Ill. 2017) (emphasis added). When comparing these allegations in *Broiler* to the conclusory, generalized, and limited allegations against Circana's PotatoTrack here, the difference is stark.

Plaintiffs generally allege that PotatoTrack offered Producer Defendants access to granular and competitively sensitive data—including pricing data broken down by product type and

9

geographic region. *See e.g.*, Direct Purchaser Complaint ¶¶ 86, 93, 95. Plaintiffs allege that by viewing this data, Producer Defendants could "determine if their prices were above or below the ***aggregate price*** per pound in a given product category." *Id.* at ¶ 95 (emphasis added). They further claim that PotatoTrack's only commercial clients are the four Producer Defendants (*id.* at ¶ 87), and that Circana, as with any standard business practice, charged Producer Defendants "fees for their PotatoTrac[k] subscriptions" (and without any characterization that these fees are excessive, or tied to the price of potatoes). *Id.* at ¶ 94. And they speculate—and that is all it is— that PotatoTrack "on information and belief" (and without citing any sources) includes company projections. *Id.* at ¶ 96. That's it. In contrast to *Broiler*, there is no allegation of "unusual" data being exchanged, "quarterly" meetings between Circana and Producer Defendant executives to make any "detailed presentations about company and industry data", frequent "de-anonymization" of information attributed to a specific competitor, Circana breaching the "anonymity of the reports at [] meetings by matching the data to particular companies", any presentations by Circana executives making recommendations on production management, or any "regular" interaction between Circana and Producer Defendant executives at trade association meetings. *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d. at 781–82, 785.

Even after years of discovery and tremendous burden on both the court and Agri Stats, the *Broiler* court ultimately rejected the price-fixing claim against Agri Stats where—similar to Circana—its reports merely "provided Defendants with general market production and pricing data." *In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d at 678. And Plaintiffs' allegations against Circana are ***significantly weaker*** and more bare bones than the claims against Agri Stats, such that the claims against Circana—even more so—must be dismissed.

***Third***, this case does not involve algorithmic pricing or the setting of prices by Circana. Plaintiffs do not allege that Circana mandates, recommends, or influences the prices charged by Producer Defendants, nor do they allege that PotatoTrack contains forward-looking pricing information. Unlike cases involving algorithmic pricing platforms—where courts have found plausible conspiracy allegations based on the use of software to coordinate or fix prices—there is no suggestion here that Circana's services played any such role. *Compare In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 370 (3d Cir. 2004) (affirming summary judgment for the defendant because "there is no evidence that PPG or any other automotive replacement glass producer exerted influence over the truckload prices that NAGS selected to formulate recommended prices" or that "the automotive replacement glass manufacturers agreed to adjust their list prices according to the NAGS recommended price"), *with In re MultiPlan Health Ins. Provider Litig.*, 789 F. Supp. 3d 614, 638 (N.D. Ill. 2025) (concluding that the plaintiffs plausibly alleged that the defendant's algorithmic "rate calculation" is "more akin to mandates" and that "third-party payors often adopt [Defendant]-calculated rates with little to no changes"), *and In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 512 (M.D. Tenn. 2023) ("[T]he Multifamily Complaint unequivocally alleges that RealPage's revenue management software inputs a melting pot of confidential competitor information through its algorithm and spits out price recommendations based on that private competitor data."). The Complaints do not allege that Circana's benchmarking services dictated or even suggested pricing decisions to Producer Defendants.

At most, Plaintiffs allege that Circana "'helped' Defendants navigate the market," *see In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d at 676 (quotation omitted); Direct Purchaser Compl. ¶ 87 (alleging that "PotatoTrac[k] … help[s] clients make better business decisions"),

11

which is precisely the type of lawful, pro-competitive conduct that benchmarking services are designed to provide. Therefore, such an assertion is insufficient to allege conspiracy to restrain trade or exchange competitive information as to Circana.

## III. THE COMPLAINTS FAIL TO ALLEGE THAT CIRCANA WOULD HAVE BENEFITED FROM, OR HAD ANY MOTIVE TO JOIN, THE CONSPIRACY.

Plaintiffs' Complaints do not plausibly allege that Circana had any reason—economic or otherwise—to participate in any purported conspiracy to restrain trade or exchange competitive information. The absence of any benefit to Circana from the alleged conduct further undermines Plaintiffs' claims.

Because Circana does not produce or sell frozen potato products, it does not benefit from "artificially high … prices" or the restraint of trade in the potato market. *See* Consumer Compl. ¶ 208. Courts have recognized that when a defendant does not stand to gain from the alleged anticompetitive conduct, it is untenable to infer that the defendant knowingly joined a conspiracy.

Take, for example, again the case brought against Agri Stats in the chicken industry. There, the plaintiffs alleged that Agri Stats was the means by which the so-called conspiracy operated. Plaintiffs claimed that the chicken producers were able to deanonymize the Agri Stats reports, which they alleged is evidence of an agreement to join an unlawful conspiracy to restrict supply and increase price. *See In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d at 674, 676. Plaintiffs further posited that Agri Stats joined the conspiracy so that the chicken producers would continue paying its subscription fees. *Id.* at 678.

The court disagreed, granting summary judgment in favor of Agri Stats on all claims brought by all plaintiffs. Critical to that decision was the fact that Agri Stats—a benchmarking company in the service of providing data to a wide variety of industries—had no real motive to conspire. As the court explained:

> Agri Stats is not a Broiler producer and so did not stand to profit directly from restricted supply and increased prices … Agri Stats's distance from the benefits of the alleged conspiracy makes it less likely that Agri Stats would have joined.

*Id.* at 677–78. That is equally true here. Plaintiffs do not allege that Circana received any sort of financial incentive or compensation aside from the ordinary PotatoTrack subscription fees (which are neither tied to the price of potato products nor alleged to be unreasonable). Stated differently, Circana's economic position would be unchanged whether or not the alleged conspiracy existed. *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1342 (11th Cir. 2010) (dismissing conspiracy claim "where independent economic activity would yield the same benefits with none of the costs" of participating in a conspiracy). Without any plausible economic benefit, there is "no rational economic motive" for Circana to join the alleged conspiracy or act to restrain trade. *See e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596–97 (1986) ("Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy."); *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 138–39 (2d Cir. 2013) (affirming dismissal of antitrust complaint, in part, because "Plaintiffs' factual allegations do not plausibly suggest a 'common motive to conspire'"); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999) (rejecting antitrust conspiracy claim when "plaintiffs d[id] not even seriously attempt to articulate [one defendant's] motive or necessity to conspire with the [other defendants]").

In fact, the Complaint does not mention any motive whatsoever—neither speculative, real, nor alleged. Plaintiffs do not even assert that Circana was pressured to create the service, to continue offering it, or to add specific fields. It is merely alleged that PotatoTrack was a

13

benchmarking service, which Plaintiffs speculate ***could*** have been used (by companies other than Circana) for improper purposes.  Such bare allegations are insufficient to state a claim against Producer Defendants—and are even less adequate with respect to Circana.

In an attempt to turn antitrust law on its head, Plaintiffs argue that the mere existence of a benchmarking service renders Circana a proper defendant in a massive antitrust case.  But Plaintiffs' theory is neither supported by law, nor Plaintiffs' own allegations.  As such, the claims against Circana should be dismissed.  *See Lazarou v. Am. Bd. of Psychiatry & Neurology*, No. 24-1994, 2025 WL 3022661, at *6 (7th Cir. Oct. 29, 2025) ("[W]here taking an antitrust plaintiff's theory as true requires accepting a premise we find implausible, the plaintiff fails to meet the facial plausibility standard[.]"); *id.* ("'common sense' plays a role in the plausibility inquiry") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

### CONCLUSION

For the foregoing reasons, and those set forth in Defendants' joint motion to dismiss, Circana respectfully requests that the Court dismiss all claims against Circana.

14

Dated: December 5, 2025

Respectfully submitted,

/s/ Christa C. Cottrell

Daniel E. Laytin, P.C.
Christa C. Cottrell, P.C.
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: +1 312 862 2000
Facsimile: +1 312 862 2200
daniel.laytin@kirkland.com
christa.cottrell@kirkland.com

Christine Shang
KIRKLAND & ELLIS LLP
609 Main Street
Houston, TX 77002
Telephone: +1 713 836 3600
Facsimile: +1 713 836 3601
christine.shang@kirkland.com

Neil K. Gilman
Jonathan L. Lewis
Nicole R. Johnson
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, D.C. 20037
Telephone: +1 202 955 1500
Facsimile: +1 202 778 2201
ngilman@hunton.com
lewisj@huntonak.com
njohnson@hunton.com

*Attorneys for Defendant Circana LLC*

15