**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE FROZEN POTATO PRODUCTS ANTITRUST LITIGATION | Civil Action No. 1:24-cv-11801 |
| | Judge Jeffrey I. Cummings |
| This Document Relates To: | Magistrate Judge Gabriel A. Fuentes |
| *All Actions* | **Oral Argument Requested** |

**MEMORANDUM OF LAW IN SUPPORT OF ALL DEFENDANTS' JOINT MOTION**
**TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINTS**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

SUMMARY OF PLAINTIFFS' ALLEGATIONS ............................................... 3

    A.    The Frozen Potato Product Industry ....................................................... 3

    B.    Input Costs Surge Amid Post-COVID Inflation, Prompting Subsequent Price Increases during 2021–2023 ......................................................... 4

    C.    Plaintiffs' Claims Under the Sherman Act and State Law ..................... 6

LEGAL STANDARD ........................................................................................... 8

ARGUMENT ........................................................................................................ 9

I.    COUNT I SHOULD BE DISMISSED BECAUSE THE COMPLAINTS DO NOT PLAUSIBLY ALLEGE A PRICE-FIXING CONSPIRACY. ........................................... 9

    A.    Plaintiffs do not allege any direct evidence of a conspiracy.................................. 10

    B.    Plaintiffs do not allege circumstantial evidence of a plausible conspiracy ......... 10

        1.    Plaintiffs fail to plead parallel conduct ...................................... 11

        2.    At most, Plaintiffs allege lawful independent conduct ............................. 13

        3.    Plaintiffs' "plus factors" do not plausibly support a conspiracy............... 14

            a.    Participation in PotatoTrack does not support a conspiracy......... 14

            b.    Plaintiffs do not allege that the Producer Defendants acted against their independent self-interest by not reducing prices when costs stabilized................ 17

            c.    Opportunity to collude, without more, is not sufficient to establish a conspiracy ................................................................. 18

    C.    Plaintiffs' own allegations undermine any plausible inference of conspiracy ...... 21

II.    COUNT II SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE NOT ALLEGED AN UNLAWFUL INFORMATION EXCHANGE UNDER THE RULE OF REASON. ............ 22

    A.    Plaintiffs do not properly allege that the Producer Defendants entered into an agreement to share information via PotatoTrack ............................................. 23

    B.    Plaintiffs fail to plausibly allege anticompetitive effects.................................... 25

    C.    Consumer Plaintiffs fail to state an information-exchange claim because they do not allege any exchanged information on Frozen Potato Products in the retail channel........................................................................................... 28

III.    INDIRECT PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED ......... 29

    A.    Indirect Plaintiffs' state antitrust and consumer protection claims fail for the same reasons their federal Sherman Act claims fail ..................................... 29

    B.    The state law claims also fail for independent, state-specific reasons.................. 31

1.    *Illinois Brick* bars Plaintiffs' antitrust claims in certain states ................. 31

2.    Certain state laws prohibit private class actions ....................................... 31

3.    The consumer protection laws of certain states do not apply to antitrust violations .................................................................................... 32

4.    Commercial Plaintiffs cannot bring claims under consumer protection statutes that apply only to purchases for personal use ............. 32

5.    Indirect Plaintiffs cannot bring claims under the laws of states in which they did not purchase Frozen Potato Products .............................. 32

6.    Certain claims lack sufficient allegations of intrastate conduct................ 33

7.    Plaintiffs' Massachusetts claim fails for failure to notify Defendants ................................................................................................................ 34

CONCLUSION ....................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Lab'ys v. Durrett*,
    746 So. 2d 316 (Ala. 1999) ................................................................................34

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
    683 F.3d 328 (7th Cir. 2012) .............................................................8, 23, 26, 28

*Am. Dental Ass'n v. Cigna Corp.*,
    605 F.3d 1283 (11th Cir. 2010) .........................................................................19

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*,
    15 F.4th 831 (7th Cir. 2021) ...............................................................................8

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999) .........................................................................10, 18

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................. *passim*

*In re Broiler Chicken Antitrust Litig.*,
    702 F. Supp. 3d 635 (N.D. Ill. 2023) ...................................................... *passim*

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011) .........................................................................22, 23

*California v. Infineon Techs. AG*,
    531 F. Supp. 2d 1124 (N.D. Cal. 2007) ............................................................34

*In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*,
    No. 14-MD-2508, 2015 WL 5166014 (E.D. Tenn. June 24, 2015) ...............32, 35

*In re Concrete & Cement Additives Antitrust Litig.*,
    No. 24-MD-3097, 2025 WL 1755193 (S.D.N.Y. June 25, 2025) .......................30

*Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*,
    715 F.2d 1115 (6th Cir. 1983) ...........................................................................26

*In re Dairy Farmers of Am. Cheese Antitrust Litig.*,
    No. 9-CV-3690, 2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) ...........................33

*In re Dairy Farmers of Am. Cheese Antitrust Litig.*,
    60 F. Supp. 3d 914 (N.D. Ill. 2014) ..................................................................10

*In re Dairy Farmers of Am. Cheese Antitrust Litig.*,
    No. 9-CV-3690, 2015 WL 3988488 (N.D. Ill. June 29, 2015) ...........................31

*In re DRAM*,
    28 F.4th 42 (9th Cir. 2022) ........................................................................................18

*In re Flonase Antitrust Litig.*,
    692 F. Supp. 2d 524 (E.D. Pa. 2010) .......................................................................32

*In re Generic Pharm. Pricing Antitrust Litig.*,
    No. 16-MD-2724, 2025 WL 388813 (E.D. Pa. Feb. 3, 2025) ...........................24, 26

*Gibson v. Cendyn Grp., LLC*,
    148 F.4th 1069 (9th Cir. 2025) ......................................................................14, 25, 27

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..................................................31, 32, 33

*Greco v. Mallouk*,
    No. 22-CV-2661, 2024 WL 4119169 (N.D. Ill. Sep. 9, 2024) ..............9, 12, 14, 15, 21

*Hansen v. Northwestern Univ.*,
    No. 24-CV-9667, 2025 WL 2731378 (N.D. Ill. Sep. 24, 2025) ....................... *passim*

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) .....................................................................................10

*In re Humira (Adalimumab) Antitrust Litig.*,
    465 F. Supp. 3d 811 (N.D. Ill. 2020) ...................................................................30, 31

*Hyland v. Homeservices of Am., Inc.*,
    771 F.3d 310 (6th Cir. 2014) .....................................................................................18

*Ill. Brick Co. v. Illinois*,
    431 U.S. 720 (1977) .............................................................................................31, 32

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) .......................................................................................21

*Intel Corp. v. Fortress Inv. Grp. LLC*,
    No. 21-CV-16817, 2022 WL 16756365 (9th Cir. Nov. 8, 2022) ...........................27

*Kleen Prods. LLC v. Int'l Paper*,
    276 F. Supp. 3d 811 (N.D. Ill. 2017) ...................................................................13, 19

*Kleen Prods. LLC v. Georgia-Pac. LLC*,
    910 F.3d 927 (7th Cir. 2018) .............................................................2, 12, 13, 14

*Llacua v. W. Range Ass'n*,
    930 F.3d 1161 (10th Cir. 2019) .................................................................................19

iv

*In re Loc. TV Advert. Antitrust Litig.*,
  No. 18-C-6785, 2022 WL 3716202 (N.D. Ill. Aug. 29, 2022) ..............................................28

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...........................................................................................................33

*Madison St. Props., LLC v. Marcus Corp.*,
  No. 20-CV-50471, 2023 WL 5860318 (N.D. Ill. Sep. 11, 2023) ...........................................6

*In re Manufactured Home Lot Rents Antitrust Litig.*,
  No. 23-CV-06715, 2025 WL 3485693 (N.D. Ill. Dec. 4, 2025)........................2, 3, 21, 22, 27

*Maple Flooring Mfrs. Ass'n v. United States*,
  268 U.S. 563 (1925) ...........................................................................................................26

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
  952 F.3d 832 (7th Cir. 2020) ..............................................................................................24

*Mayor of Balt. v. Abbvie Inc.*,
  42 F.4th 709 (7th Cir. 2022) ...............................................................................................30

*Miami Prods. & Chem. Co. v. Olin Corp.*,
  546 F. Supp. 3d 223 (W.D.N.Y. 2021) .................................................................................32

*Mitchael v. Intracorp, Inc.*,
  179 F.3d 847 (10th Cir. 1999) .......................................................................................15, 16

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984) .............................................................................................................9

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
  629 F.3d 697 (7th Cir. 2011) ..............................................................................................15

*In re Passenger Vehicle Replacement Tires Antitrust Litig.*,
  767 F. Supp. 3d 681 (N.D. Ohio 2025).................................................................................16

*In re Petroleum Prods. Antitrust Litig.*,
  906 F.2d 432 (9th Cir. 1990) .........................................................................................20, 21

*Payton v. Cnty. of Kane*,
  308 F.3d 673 (7th Cir. 2002) ..............................................................................................33

*In re RealPage, Inc.*,
  709 F. Supp. 3d 478 ...........................................................................................................29

*Rodi v. S. New England Sch. Of L.*,
  389 F.3d 5 (1st Cir. 2004)...................................................................................................35

*Rsrv. Supply Corp. v. Owens-Corning Fiberglas Corp.*,
    971 F.2d 37 (7th Cir. 1992) ................................................................14, 20

*Segal v. Amadeus IT Grp., S.A.*,
    No. 24-CV-1783, 2025 WL 963751 (N.D. Ill. Mar. 31, 2025)...............................26

*Simpson Elec. Co. v. NLRB*,
    654 F.2d 15 (7th Cir. 1981) ...................................................................6

*Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*,
    738 F. Supp. 2d 505 (D. Del. 2010)....................................................13, 14

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) ..............................................................18, 19

*In re Text Messaging Antitrust Litig.*,
    782 F.3d 867 (7th Cir. 2015) .........................................................12, 13, 19

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)................................................................. 28

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978).......................................................................15, 23

*In re Visa Debit Card Antitrust Litig.*,
    No. 24-CV-7435, 2025 WL 3019893 (S.D.N.Y. Oct. 28, 2025)......................................31, 32

*Vital Pharms., Inc. v. Berlin Packaging LLC*,
    632 F. Supp. 3d 780 (N.D. Ill. 2022) ......................................................26

*Wallace v. Bank of Bartlett*,
    55 F.3d 1166 (6th Cir. 1995) ..............................................................20

*Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
    328 F. Supp. 3d 824 (N.D. Ill. 2018) .............................................. *passim*

*Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
    No. 16-CV-10324, 2020 WL 1666454 (N.D. Ill. Apr. 3, 2020).....................................11, 19

**Statutes**

Ark. Code Ann. § 4-88-113(f)(1)(B) ...........................................................32

Colo. Rev. Stat. § 6-4-115(1).................................................................32

Mass. Gen. Laws ch. 93A, § 9(3) ..............................................................35

Md. Code Ann., Com. Law § 11-202(a)(1), 204 ......................................................34

N.J. Stat. § 56:9-12(a) ................................................................................................32

Potato Research and Promotion Act, 7 U.S.C. § 58 .....................................................7

**Other Authorities**

Fed. R. Civ. P.  12(b)(6)................................................................................................8

Potato Grower, *PotatoTrac Reports Give Marketing Data* (Feb. 28, 2009),
    potatogrower.com/2009/02/potatotrac-reports-give-marketing-data, (last
    accessed Dec. 5, 2025)............................................................................................16

U.S. Dep't of Agric., Agric. Mktg. Serv., Nat'l Potato Promotion Bd.,
    https://www.ams.usda.gov/rules-regulations/research-promotion/potato
    (last accessed Dec. 5, 2025) ................................................................................7, 20

## INTRODUCTION

These consolidated actions, brought on behalf of three putative classes of Frozen Potato Product purchasers, implausibly allege that four producers of Frozen Potato Products (the "Producer Defendants") conspired with each other and with Circana, a third-party data service provider, to fix prices. All of Plaintiffs' claims fail for the same basic reason: they identify price increases implemented from 2021–2023—amid surging input costs and historic, pandemic-era inflation—without pleading facts that show that those increases resulted from an unlawful conspiracy. Plaintiffs' reliance on Circana's PotatoTrack industry reports fares no better. The reports provide aggregated, historical, anonymized data, and the Complaints allege no facts showing that Producer Defendants agreed to exchange information pursuant to a conspiracy to inflate prices. Both are fatal deficiencies. Under the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, Plaintiffs must do more than assign antitrust "labels and conclusions" to conduct consistent with competition; they must plead facts that render a conspiracy "plausible." 550 U.S. 544, 555–56 (2007).

Plaintiffs fail to meet this standard. They offer no direct evidence of any communication among the Producer Defendants to coordinate prices, let alone a multi-year, industry-wide agreement to fix prices for Frozen Potato Products. Plaintiffs instead rely solely on "circumstantial evidence," claiming that because certain Producer Defendants announced price increases close in time between January 2021 and March 2023—and did not promptly announce comparable price decreases once input costs stabilized—unlawful collusion must be the only explanation.

***First***, Plaintiffs have no evidence that the four Producer Defendants all engaged in parallel conduct: the timing and details of the various price increases alleged in the Complaints make it clear that none of the potato producers increased price in "lockstep," as Plaintiffs assert. And even if Plaintiffs had plausibly alleged that Producer Defendants' price increases were in "lockstep"

1

(they do not), allegations of parallel conduct alone are insufficient to show a conspiracy. Parallel price movements—even pricing that is "consciously parallel"—is not proof of conspiracy because "[f]ollowing a competitor's price increases can be consistent with rational self-interest." *Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 935 (7th Cir. 2018) ("*Kleen II*").

**Second**, Plaintiffs identify no additional facts or "plus factors" that render the alleged parallel price increases suggestive of a conspiracy. Their reliance on PotatoTrack reports from Defendant Circana—a data analytics firm that does not produce Frozen Potato Products—adds nothing. By Plaintiffs' own account, those reports consist of historical, aggregated, industry-level, and anonymized sales volume data that have been in circulation since at least 2008; Plaintiffs plead no facts explaining how such industry reports suddenly enabled price increases thirteen years later. Nor do Plaintiffs salvage their theory by noting that, as in virtually every industry, Producer Defendants participated in various trade associations and industry groups. Mere participation in such organizations is insufficient to state a plausible conspiracy claim.

**Third,** Plaintiffs cannot overcome the obvious, non-collusive explanations for the 2021–2023 pricing. The Complaints concede that ***five of the seven*** alleged conspiratorial price increases occurred while input costs were still rising following the extraordinary surge in costs triggered by COVID-19. *E.g.*, DPP Comp. ¶ 6 (alleged that "while facing increased input costs" in "2021 and…the Spring of 2022," Producer Defendants "impose[d] 'strong arm' price hikes"). That firms raised prices in response to rising costs is basic economics, not collusion. *See In re Manufactured Home Lot Rents Antitrust Litig.*, No. 23-CV-06715, 2025 WL 3485693, at *13 (N.D. Ill. Dec. 4, 2025) (dismissing conspiracy claim because Plaintiffs failed to address the "obvious alternative explanation" that was "'in line with . . . rational and competitive business strategy unilaterally prompted by common perceptions of the market.'") (quoting *Twombly*, 550 U.S. at 567).

Whether framed as price-fixing (Count I), information exchange under the rule of reason (Count II), or derivative state law claims that track the Sherman Act claims, Plaintiffs' theories remain implausible. This entire case should be dismissed with prejudice.

## SUMMARY OF PLAINTIFFS' ALLEGATIONS

### A.      The Frozen Potato Product Industry

Plaintiffs bring antitrust claims on behalf of three separate putative classes of Frozen Potato Product purchasers, including groups of Direct Purchaser Plaintiffs, Commercial Indirect Plaintiffs, and Consumer Indirect Purchaser Plaintiffs.[1]

The Producer Defendants belong to four corporate groups—Cavendish, Lamb Weston, McCain, and Simplot[2]—that produce and sell "Frozen Potato Products," which Plaintiffs define to include a diverse array of "frozen french fries, hash browns, tater tots, and other potato products." DPP Compl. ¶ 1; Commercial Compl. ¶ 1; Consumer Compl. ¶ 1. Plaintiffs allege that the industry has been highly concentrated since at least 2001, *see* Commercial Compl. ¶¶ 114–15, and that these four Producer Defendants currently control approximately 98% of the alleged market. DPP Compl. ¶ 130; Commercial Compl. ¶¶ 114–21; Consumer Compl. ¶ 145. To produce the products at issue, the Defendant Producers procure raw potatoes from growers, which Plaintiffs contend can be "scarce," particularly in the Pacific Northwest where there is "minimal unused land and water resources" and "only so many potatoes that go around." DPP Compl. ¶¶ 62, 69, 138; Consumer

---

[1] The Direct Purchaser Plaintiffs are three retail chain operators and distributors that allege they purchased Frozen Potato Products "directly from [Producer Defendants]." Dkt. No. 183 ("DPP Compl.") ¶¶ 26–28. The Commercial Indirect Plaintiffs ("Commercial Plaintiffs") comprise restaurants and restaurant owners that claim they bought the products "indirectly" from Producer Defendants for "commercial use." Dkt. No. 182 ("Commercial Compl.") ¶¶ 21–31. Finally, the Consumer Indirect Purchaser Plaintiffs ("Consumer Plaintiffs") are individuals who allege they indirectly purchased Frozen Potato Products for "personal use." Dkt. No. 184 ("Consumer Compl.") ¶¶ 23–60.
[2] Plaintiffs collectively refer to Cavendish Farms Ltd. and Cavendish Farms, Inc. as "Cavendish"; to Lamb Weston Holdings, Inc., Lamb Weston, Inc., Lamb Weston BSW, LLC, Lamb Weston/Midwest, Inc., and Lamb Weston Sales, Inc. as "Lamb Weston"; to McCain Foods Limited and McCain Foods USA, Inc. as "McCain"; and to J.R. Simplot Co. as "Simplot." *See, e.g.*, Commercial Compl. ¶¶ 33, 39, 41, 44.

Compl. ¶ 149. Plaintiffs further allege that demand for Frozen Potato Products is inelastic. *Id*. ¶ 144.

Defendant Circana, LLC ("Circana") is a data analytics firm whose products include PotatoTrack,[3] an anonymized, aggregated benchmarking service that allegedly provides "market information" to clients, including the Producer Defendants. DPP Compl. ¶ 87; Commercial Compl. ¶¶ 35–36; Consumer Compl. ¶¶ 76–77. Plaintiffs allege that Circana has offered PotatoTrack to Producer Defendants since at least 2008. DPP Compl. ¶¶ 46, 87; Commercial Compl. ¶¶ 35–36; Consumer Compl. ¶¶ 75–77, 102. PotatoTrack compiles historical "sales and volume data in dollars, pounds, units, and product type" and presents it as industry-level averages, or "combined totals," without competitor-specific data. DPP Compl. ¶¶ 88–93; Commercial Compl. ¶¶ 95–98; Consumer Compl. ¶¶ 101–03. The Producer Defendants allegedly accessed individualized "dashboards" showing "market volume and price data broken down by product category (e.g., french fries, curly fries, or hashbrowns)." DPP Compl. ¶ 93; Commercial Compl. ¶ 99; Consumer Compl. ¶ 103. PotatoTrack employs no algorithms and offers no pricing recommendations. Nor do the Complaints allege that this industry-level volume or price data revealed pricing about any other specific Producer Defendant.

**B.** **Input Costs Surge Amid Post-COVID Inflation, Prompting Subsequent Price Increases during 2021–2023**

Plaintiffs allege that, until mid-2020, the underlying input costs for Frozen Potato Products were largely stable—indeed, at times flat—for nearly a decade. *See* DPP Compl. ¶ 5; Consumer Compl. ¶ 11. However, beginning in mid-2020 and continuing through 2022, input costs rose sharply as a result of the pandemic, yet Frozen Potato Product sales prices generally remained flat

---

[3] Plaintiffs frequently refer to Circana's anonymized and aggregated data service as "PotatoTrac." The proper spelling for this service is "PotatoTrack."

during that same time period. Plaintiffs rely on a chart—reproduced below—comparing a Potato

Processing Cost Index to an index for Frozen Potato Product prices to illustrate this divergence.

*See* DPP Compl. ¶ 5; Consumer Compl. ¶ 11.[4]



Plaintiffs' own chart—and their Complaints—acknowledge that the Producer Defendants

"fac[ed] increased input costs" through at least the spring of 2022, coinciding with a period of

record, economy-wide post-pandemic inflation. DPP Compl. ¶ 6; *see also* Commercial Compl. ¶¶

107–11; Consumer Compl. ¶ 98.[5] From late 2021 into 2023, the Producer Defendants announced

---

[4] While Commercial Plaintiffs do not cite this specific chart, they too acknowledge "a temporary spike in input costs" and cite a chart reflecting price increases did not begin until 2022, when costs began to decline. Commercial Compl. ¶¶ 1, 109–11.

[5] The Court can take judicial notice of inflation. *See Simpson Elec. Co. v. NLRB*, 654 F.2d 15, 16 (7th Cir. 1981) ("We may take judicial notice that inflation was raging on the pertinent dates"); *Madison St. Props., LLC v. Marcus Corp.*, No. 20-CV-50471, 2023 WL 5860318, at *7 (N.D. Ill. Sep. 11, 2023) (taking judicial

price increases for different Frozen Potato Products at different times and in varying amounts. Plaintiffs allege that these increases were publicly disclosed by letters to customers—including thousands of food service distributors, grocers, and restaurants nationwide—and that, after one Producer Defendant announced a price increase, other producers sometimes implemented similar increases within days or weeks. *See, e.g.*, DPP Compl. ¶ 78; Commercial Compl. ¶ 63; Consumer Compl. ¶ 93. But Plaintiffs do not allege any planning or coordination among the Producer Defendants; rather, they allege that price increases varied by amount and timing and sometimes did not occur at all. *See infra* Section I.B.1. Nor do Plaintiffs allege that any Producer Defendant's decision to increase prices while input costs were surging was contrary to such Producer Defendant's unilateral, rational economic self-interest.

Although Plaintiffs assert that "input costs peaked in 2022" and later declined while Frozen Potato Product prices remained elevated, their chart shows otherwise. Input costs remained significantly above pre-COVID levels and began rising again in 2024, while the Frozen Potato Products pricing index plateaued, with no price increases announced after March 2023. *See* DPP Compl. ¶¶ 5–6, 117. The same chart reflects a ***decrease*** in the price index from May 2023 into early 2024, followed by more stable market prices later in 2024. *See id*. ¶ 5.

### C. Plaintiffs' Claims Under the Sherman Act and State Law

Plaintiffs allege that Defendants conspired to fix prices for Frozen Potato Products since at least January 1, 2021, but they plead no direct evidence of any such unlawful agreement. *See* DPP Compl. ¶ 76; Commercial Compl. ¶¶ 1, 169; Consumer Compl. ¶¶ 92, 180. Instead, Plaintiffs urge the Court to infer a conspiracy from circumstantial allegations that price movements between 2021

---

notice "that to address rising inflation, the Federal Reserve began hiking interest rates beginning in the spring of 2022 through the summer of 2022").

and 2023 resulted from coordination among the four Producer Defendants. DPP Compl. ¶¶ 104–17; Commercial Compl. ¶¶ 72–83; Consumer Compl. ¶¶ 118–33.[6]

Plaintiffs contend that a series of price increases during this period—despite occurring at different times, in different amounts, and sometimes not at all for certain Producer Defendants—constitutes parallel conduct, and that "plus" factors render the inference of conspiracy plausible. Those asserted plus factors are: (1) the Producer Defendants' access to Circana's PotatoTrack data, a tool in use since at least 2008, which Defendants allegedly used to "police" prices in 2021 notwithstanding no prior allegations of such use (DPP Compl. ¶ 87; Commercial Compl. ¶ 95; Consumer Compl. ¶ 102); (2) purported conduct against self-interest because Producer Defendants allegedly declined to cut prices more aggressively to capture market share at the expense of profit margins (DPP Compl. ¶¶ 175–79; Commercial Compl. ¶¶ 151–54; Consumer Compl. ¶ 111); and (3) alleged opportunities to conspire arising from business relationships and membership in trade associations—including the National Potato Promotion Board,[7] National Potato Council, American Frozen Food Institute, and Potato Sustainability Alliance—despite the absence of any alleged improper conversation, let alone an agreement to conspire on pricing. DPP Compl. ¶¶ 154–69; Commercial Compl. ¶¶ 135–50; Consumer Compl. ¶¶ 106–08.

Plaintiffs additionally bring a separate count, claiming that the Producer Defendants agreed to exchange competitively sensitive information through their subscriptions to PotatoTrack. DPP Compl. ¶ 242; Commercial Compl. ¶ 210; Consumer Compl. ¶¶ 218–20. Plaintiffs allege that PotatoTrack's aggregated, historic, industry-level data on Frozen Potato Product volume—which

---

[6] The DPP and Commercial Complaints identify six examples of Defendants allegedly coordinating price increases, while the Consumer Complaint identifies seven examples.

[7] The National Potato Promotion Board, doing business as Potatoes USA, was created under the Potato Research and Promotion Act, 7 U.S.C. § 58, and is overseen by the U.S. Department of Agriculture. *See* U.S. Dep't of Agric., Agric. Mktg. Serv., Nat'l Potato Promotion Bd., https://www.ams.usda.gov/rules-regulations/research-promotion/potato (last accessed Dec. 5, 2025) (cited by DPP Compl. ¶ 144 n.78).

had been available for over a decade—somehow allowed the Producer Defendants to "suppress[] competition" between each other, although they do not allege that any PotatoTrack report connects to any alleged price increase in this case. DPP Compl. ¶¶ 90, 243; Commercial Compl. ¶ 216; Consumer Compl. ¶ 221.

Finally, the Commercial Plaintiffs and the Consumer Plaintiffs bring claims under state antitrust and consumer protection laws based on the same alleged conduct underpinning their federal law claims. Commercial Compl. ¶¶ 221–367; Consumer Compl. ¶¶ 226–387. As set forth below, none of Plaintiffs' allegations plausibly state an antitrust claim.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must state a claim for relief that is plausible on its face. *Twombly*, 550 U.S. at 555–56, 570. In the antitrust context, this "pleading burden 'requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 835 (7th Cir. 2021) (quoting *Twombly*, 550 U.S. at 555). That is because "[o]nly by requiring plaintiffs to plead facts plausibly suggesting conspiracy can we 'avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery process will reveal relevant evidence to support a [Section] 1 claim.'" *Id.*

To state a Section 1 conspiracy claim, a plaintiff must plead facts plausibly suggesting: (1) a contract, combination, or conspiracy (meaning, an agreement); (2) an unreasonable restraint of trade in a relevant market; and (3) resulting injury. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). Meeting the first element requires "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. "[T]he crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Id.* at 553 (internal quotation marks and citations omitted). Thus,

"when allegations of parallel conduct are set out in order to make a [Section] 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. Plaintiffs must thus plausibly allege facts showing that each defendant "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984); *Greco v. Mallouk*, No. 22-CV-2661, 2024 WL 4119169, at *5 (N.D. Ill. Sep. 9, 2024).

## ARGUMENT

The Court should dismiss Plaintiffs' Section 1 claims because the Complaints fail to plausibly allege that Defendants conspired to fix prices for Frozen Potato Products. Plaintiffs identify no instance in which any Producer Defendant agreed with another to do anything—let alone shared a conscious commitment to a common price-fixing scheme—and they plead neither direct nor circumstantial evidence of any such conspiracy under Count I.

Under Count II, Plaintiffs likewise fail to plausibly allege that the Producer Defendants agreed to exchange competitively sensitive information through Defendant Circana or that any such exchange produced anticompetitive effects in any cognizable relevant market. And although many of the state law claims are independently defective, they also rise and fall with the deficient Sherman Act claims and must be dismissed for the same reasons.

## I. COUNT I SHOULD BE DISMISSED BECAUSE THE COMPLAINTS DO NOT PLAUSIBLY ALLEGE A PRICE-FIXING CONSPIRACY.

To survive dismissal, Plaintiffs must plausibly allege facts demonstrating either direct or circumstantial evidence of conspiracy. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002). Where, as here, there is no direct evidence, Plaintiffs' allegations of

circumstantial evidence must be sufficient to plausibly infer an agreement. *See Twombly*, 550 U.S. at 564–66. Plaintiffs fail to allege such facts, and Count I should be dismissed.

### A. Plaintiffs do not allege any direct evidence of a conspiracy.

Plaintiffs fail to allege any direct evidence that Defendants conspired to fix the prices of Frozen Potato Products in the United States. Direct evidence is the "smoking gun," or evidence that "is explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Dairy Farmers of Am. Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 950 (N.D. Ill. 2014) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999)). Plaintiffs allege nothing of the sort here. The Complaints tellingly do not allege a single example of a phone call, text, email, or meeting in which an agreement to raise prices was reached or even discussed. *See generally* DPP Compl.; Commercial Compl.; Consumer Compl.

### B. Plaintiffs do not allege circumstantial evidence of a plausible conspiracy.

Plaintiffs' allegations of circumstantial evidence and flimsy inferences also fail. A plaintiff who relies on circumstantial evidence must allege actual facts showing "parallel conduct," together with "plus factors" that support a plausible inference of an agreement. *Hansen v. Northwestern Univ.*, No. 24-CV-9667, 2025 WL 2731378, at *8 (N.D. Ill. Sep. 24, 2025). And where the alleged facts are "as consistent with a wide range of lawful and independent business conduct as they are with an anticompetitive agreement, then the first element of [Section] 1 is not satisfied." *Id.*

Plaintiffs' purported circumstantial showing here fails to plausibly support an inference of an agreement for multiple reasons. ***First***, Plaintiffs do not adequately plead parallel conduct. The Producer Defendants' disparate pricing decisions—made against the backdrop of pandemic-era cost increases during the COVID pandemic—cannot plausibly be characterized as parallel under any standard. ***Second***, even if Plaintiffs had alleged parallel pricing, such parallelism in a highly concentrated market—even conscious parallelism—is insufficient to establish a conspiracy. *See*

*Twombly*, 550 U.S. at 553–54 ("Even conscious parallelism, a common reaction of firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions is not in itself unlawful." (internal quotation marks omitted, alterations in original)); *Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, No. 16-CV-10324, 2020 WL 1666454, at *7 (N.D. Ill. Apr. 3, 2020) ("*Baxter II*") ("Self-interested but not unlawful oligopolistic behavior supplies an 'obvious alternative explanation' for parallel conduct that renders an inference of agreement implausible." (citation omitted)). ***Third***, the alleged "plus factors"—such as receipt of industry reports and participation in trade associations—are routine, benign features of lawful competition and do not convert supposed parallel behavior into a price-fixing conspiracy.

### 1. Plaintiffs fail to plead parallel conduct.

Plaintiffs' price-fixing theory hinges on the claim that Defendants "coordinated price hikes" by moving in "lockstep" over two years. *See* DPP Compl. ¶ 122; Commercial Compl. ¶¶ 83, 137; Consumer Compl. ¶¶ 108, 139. But their own pleadings show no such lockstep. The alleged increases varied by Producer Defendant, timing, and amount. For example, when McCain and Simplot announced increases in January 2021, Lamb Weston and Cavendish did not; when McCain announced increases in February 2023, Simplot waited more than six weeks, and Cavendish did not increase prices at all. The Complaints include many similar instances, as well as repeated episodes of competitors undercutting each other—conduct inconsistent with conspiracy. *See In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 877 (7th Cir. 2015) (noting that lack of actual "lockstep" pricing undercuts likelihood of collusion); *see Kleen II*, 910 F.3d at 936 (explaining that plaintiffs' emphasis on "lockstep" timing overstated coordination). Nor does

it matter that, in some isolated instances, some firms raised prices "close in time" to others, given the broader pattern of disparate pricing actions. *Greco*, 2024 WL 4119169, at *7.

The examples below fatally undermine Plaintiffs' allegation of "parallel conduct" and show that price competition persisted during the alleged conspiracy.

- ***January and February 2021.*** Plaintiffs' first alleged coordinated price increases in January 2021 involved only two Producer Defendants—Simplot and McCain. DPP Compl. ¶ 105; Commercial Compl. ¶ 72; Consumer Compl. ¶ 118. The supposed market leader Lamb Weston did not increase prices. *Id*. Lamb Weston again declined to raise prices during the next alleged coordinated increase in February 2021, which McCain initiated, and Simplot and Cavendish followed on unspecified dates and for unspecified amounts. DPP Compl. ¶ 106; Commercial Compl. ¶ 74; Consumer Compl. ¶ 119. Lamb Weston did not announce any price increase until May 2021—***five months*** after the first alleged conspiratorial move. DPP Compl. ¶ 107; Commercial Compl. ¶ 75; Consumer Compl. ¶ 121.[8]

- ***February 2022.*** In the only instance in which all four Producer Defendants allegedly adopted the same effective date (April 2022), the timing and pricing still reflect competition, not coordination. Lamb Weston announced in February 2022; others announced days later; and Simplot undercut every competitor by $0.02 for "Potato Products." DPP Compl. ¶¶ 111–14; Commercial Compl. ¶¶ 80, 82; Consumer Compl. ¶¶ 124–27, 129.

- ***February and March 2023.*** The alleged announcements were spread over more than a month. McCain announced on February 14, Lamb Weston on March 15, and Simplot on March 31. DPP Compl. ¶ 117; Commercial Compl. ¶ 81; Consumer Compl. ¶ 133. Cavendish is not alleged to have increased prices at all during this period. Among the three competing producers that did announce increases, the amounts diverged dramatically. After McCain announced an $0.08 increase, Lamb Weston allegedly announced a larger increase of $0.10 to $0.25, and Simplot later undercut with $0.04 to $0.15 increases. *See id*.

These allegations simply do not establish parallel conduct. *See Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 824–25 (N.D. Ill. 2017), *aff'd sub nom. Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018) ("*Kleen I*"); *see also In re Text Messaging Antitrust Litig.*, 782 F.3d at 877. And Plaintiffs' citation to a ***single*** instance in which all Producer Defendants

---

[8] Plaintiffs attempt to fill this gap by alleging that Lamb Weston "quietly" raised prices in February 2021 without a "formal" announcement. DPP Compl. ¶ 106; Commercial Compl. ¶ 74; Consumer Compl. ¶ 119. But Plaintiffs allege no facts describing the amount or timing of any such "quiet" price increase, or how it was communicated to customers. *Id*.

raised prices does not support an inference of a multi-year, industry-wide conspiracy. Because Plaintiffs do not allege parallel conduct, dismissal is warranted. *See*, *e.g.*, *Hansen*, 2025 WL 2731378, at *8.

### 2. At most, Plaintiffs allege lawful independent conduct.

Even if the Producer Defendants' pricing decisions could be described as "parallel," parallel pricing is lawful and, standing alone, cannot support an inference of conspiracy because it is consistent with independent business judgment. *See Kleen II*, 910 F.3d at 935; *Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc*., 328 F. Supp. 3d 824, 843 (N.D. Ill. 2018) ("*Baxter I*"). As the Supreme Court made clear in *Twombly*—a principle every circuit has repeatedly affirmed— this remains true even when price increases are "consciously parallel," meaning they result from one firm's "observation of its competitors' decisions." *Twombly*, 550 U.S. at 553–54 (noting that conscious parallelism is "a common reaction of firms in a concentrated market" and "is not in itself unlawful") (citations omitted); *see also Kleen I*, 276 F. Supp. 3d at 819 ("a firm may follow a competitor's lead in pricing and production … not only because they are reacting to common, external market conditions but also because they are responding to each other").

Parallel pricing is lawful because each firm may decide, "without any conscious coordination with its competitors," that it will "reap greater profits if it imitates, rather than undermines, its peers' price hikes." *Kleen II*, 910 F.3d at 935–36 (quotations omitted); *Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*, 738 F. Supp. 2d 505, 514–15 (D. Del. 2010) ("There is nothing irrational . . . about the alleged parallel pricing in an oligopolistic market in which enlightened economic actors may independently and unilaterally choose to adopt and maintain supra-competitive pricing in order to . . . improv[e] each firm's profits"). Thus, "consciously parallel conduct—i.e., similar conduct resulting from 'observation of [one's] competitors' decisions' and 'the pressures of an interdependent market'—does not violate Section 1." *Gibson*

13

*v. Cendyn Grp., LLC*, 148 F.4th 1069, 1083 (9th Cir. 2025) (citation omitted); *Rsrv. Supply Corp.*

*v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 50 (7th Cir. 1992).

### 3. Plaintiffs' "plus factors" do not plausibly support a conspiracy.

Because Plaintiffs fail to allege parallel pricing, their conspiracy claim fails at the outset

and should be dismissed on that basis alone. But even if Plaintiffs could establish parallel pricing,

"an allegation of parallel conduct and a bare assertion of conspiracy will not suffice" to survive

dismissal. *Twombly*, 550 U.S. at 556. To state a claim, Plaintiffs must also plead "plus factors"

that "push the alleged conspiracy across the line separating the possible from the plausible." *Baxter*

*I*, 328 F. Supp. 3d at 831.[9] In short, "when allegations of parallel conduct are set out in order to

make a [Section] 1 claim, they must be placed in a context that raises a suggestion of a ***preceding***

***agreement***, not merely parallel conduct that could just as well be independent action." *Twombly*,

550 U.S. at 557 (emphasis added). Courts have recognized plus factors to include "a common

motive to conspire, evidence that shows that the parallel acts were against the apparent individual

economic self-interest of the alleged conspirators, and evidence of a high level of interfirm

communications." *Hansen*, 2025 WL 2731378, at *8 (citing *Greco*, 2024 WL 4119169, at *6).

Plaintiffs' allegations fail to "nudge[] their claims" of an agreement "across the line from

conceivable to plausible" through any pleaded plus factors. *Twombly*, 550 U.S. at 570.

### a. Participation in PotatoTrack does not support a conspiracy.

Defendants' long-standing subscription to the third-party benchmarking service

PotatoTrack does not support any inference of a price-fixing conspiracy. Plaintiffs do not allege

that Defendants agreed to exchange competitively sensitive information through PotatoTrack, nor

---

[9] Plus factors are commonly recognized as "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *Hansen*, 2025 WL 2731378, at *8.

do they identify any change in the service after 2008 that could plausibly explain a shift in market outcomes. Plaintiffs also fail to explain how PotatoTrack suddenly caused higher prices in 2021 for the first time, much less that Defendants used PotatoTrack to implement a price-fixing conspiracy—a far more demanding showing that they plainly do not meet.

"Exchange of price data and other information among competitors does not invariably have anticompetitive effects, indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, n. 16 (1978). As a result, mere information exchanges are presumptively lawful under the rule of reason unless a plaintiff plausibly alleges facts showing that the information exchange facilitated price fixing. *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 675 (N.D. Ill. 2023) (rejecting price-fixing claim where competitors "could not have learned their competitors' production and pricing information" from third-party reports); *see also Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 709 (7th Cir. 2011) (An "[i]nformation exchange . . . is not on its own demonstrative of anticompetitive behavior, even when pricing data is what is exchanged."); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 859 (10th Cir. 1999) (because "exchanges of information, even regarding price, are not necessarily illegal," plaintiffs' burden is to allege that the purported "agreement to engage in unlawful" price fixing "resulted from, or was a part of, the information exchange."); *In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp. 3d 681, 716 (N.D. Ohio 2025) (Where "plaintiffs do not offer any explanation of how the exchange of unspecified non-public information could be useful in policing co-conspirators' presumably public prices, the bare allegation that defendants may have been able to do so does not bolster the plausibility of the alleged conspiracy.").

Plaintiffs do not plausibly allege that Producer Defendants' subscription to PotatoTrack facilitated price-fixing. While Plaintiffs repeatedly argue that Defendants shared "competitively sensitive" information through PotatoTrack (e.g., DPP Compl. ¶ 124; Commercial Compl. ¶ 100; Consumer Compl. ¶ 141), the Complaints make clear that PotatoTrack reports contained only aggregated "*market* volume and price data broken down by product category (e.g., french fries, curly fries, or hashbrowns)." DPP Compl. ¶¶ 89–93 (emphasis added); Commercial Compl. ¶¶ 95–100; Consumer Compl. ¶¶ 101–05.[10] Plaintiffs allege no facts showing *how* this anonymous, aggregated, historical, and industry-level information in PotatoTrack reports could facilitate a price-fixing conspiracy. Plaintiffs' theory that PotatoTrack "enabled [Producer Defendants] to determine if their prices were above or below the *aggregate* price per pound in a given product category," DPP Compl. ¶ 95 (emphasis added), says nothing about how the reports supposedly "facilitated their price-fixing agreement." DPP Compl. ¶ 91; *see also* Commercial Compl. ¶ 98; Consumer Compl. ¶ 104. Plaintiffs also do not allege (nor can they) that PotatoTrack reports contain information regarding the pricing decisions of any individual Producer Defendant or the individually negotiated pricing offered to the tens of thousands of restaurants, distributors, and grocers who purchase widely varying Frozen Potato Products across the country. As in *Broilers*, the lack of competitor price information in the reports "undermines their usefulness for communicating intent to reach agreement to reduce production." *In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 675 (N.D. Ill. 2023) (rejecting price-fixing claim).

Without any factual allegations showing how PotatoTrack's anonymous, aggregated, historical, and industry-level data reports could have facilitated price-fixing, Plaintiffs' conclusory assertions that PotatoTrack enabled Defendants to "monitor or discipline their co-conspirators" or

---

[10] DPP Compl. ¶ 89 (citing Potato Grower, *PotatoTrac Reports Give Marketing Data* (Feb. 28, 2009), potatogrower.com/2009/02/potatotrac-reports-give-marketing-data, (last accessed Dec. 5, 2025).

"understand the market" are not enough to survive dismissal. *See Hansen*, 2025 WL 2731378, at *9–10 (dismissing alleged information exchange "as a plus factor" because "Plaintiffs include only the most conclusory allegation about Defendants' agreement as to using the collected [] financial information."). The mere fact that competitors chose to receive reports from a common industry consultant does not plausibly establish a price fixing conspiracy. *See Broilers*, 702 F. Supp. 3d at 674–75 (declining to treat industry reports as plus factor where it would be "irrational" not to obtain them given the need to "keep pace" with competitors and "work harder to make sure that they took better advantage of the information in the reports than their competitors").

> **b.    Plaintiffs do not allege that the Producer Defendants acted against their independent self-interest by not reducing prices when costs stabilized.**

Plaintiffs next posit that the Producer Defendants acted against their own interests by declining to cut prices to gain market share once input costs began to moderate in 2022, and that this conduct constitutes a plus factor supporting an inference of conspiracy.  The Complaints themselves defeat that claim. Plaintiffs allege that by maintaining higher prices even as costs fell, each producer sought to maximize its own profits. DPP Compl. ¶¶ 75, 80; Commercial Compl. ¶ 88; Consumer Compl. ¶ 91. That is not conduct against interest; it is the ordinary, lawful objective of any for-profit enterprise. Courts therefore require "something more" before inferring a conspiracy to fix prices in violation of the Sherman Act. *In re Baby Food*, 166 F.3d at 134–35.

Plaintiffs do not plead anything "more." They instead quote an unnamed former Lamb Weston employee as saying that producers had "no incentive to fight that hard for each other's share" and would "behav[e] themselves" to preserve margins. DPP Compl. ¶ 179; Commercial Compl. ¶ 88; Consumer Compl. ¶ 137. But it is uncontroversial that aggressive price cuts can erode profitability and that firms may independently choose to protect margins rather than chase share at any cost. That choice does not suggest collusion. *See Baxter I*, 328 F. Supp. 3d at 842–43; *see*

*also In re DRAM*, 28 F.4th 42, 49–50 (9th Cir. 2022) (it is "economically rational" to "focus on profitability" over "market share"); *Hyland v. Homeservices of Am., Inc.*, 771 F.3d 310, 321 (6th Cir. 2014) (affirming ruling that "Defendants' motive to maximize profits cannot support an inference of a conspiracy" because "then all businesses would be subject to anti-trust liability" (citation omitted)).

At bottom, "Section 1 . . . does not require sellers to compete; it just forbids their agreeing or conspiring not to compete." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010). By conflating these concepts, Plaintiffs plead nothing more than conduct consistent with rational, unilateral pricing decisions.

### c.     Opportunity to collude, without more, is not sufficient to establish a conspiracy.

Plaintiffs' remaining "plus factors" are thin and boil down to repeated claims that, because the Frozen Potato Product industry is allegedly concentrated, Defendants must have had "opportunities" to collude. These allegations do not "nudge[]" Plaintiffs' claims "across the line from conceivable to plausible" or otherwise "move the needle" to transform otherwise benign conduct into a conspiracy. *Twombly*, 550 U.S. at 570; *Baxter I*, 328 F. Supp. 3d at 843–44.

**Industry concentration.** Allegations that the industry is highly concentrated do not plausibly show a conspiracy standing alone. *See, e.g.*, DPP Compl. ¶¶ 128–34; Commercial Compl. ¶¶ 114–21; Consumer Compl. ¶¶ 145–46. Indeed, courts have recognized that "with fewer firms, it is easier for [d]efendants to follow each other's pricing decisions—and do so without prior agreement"—an entirely lawful outcome. *Kleen I*, 276 F. Supp. 3d at 824. This "obvious alternative explanation" undercuts Plaintiffs' theory. *See Twombly*, 550 U.S. at 567.

**Trade Associations.** The fact that the Producer Defendants participate in industry and trade association meetings and events likewise fails to establish a conspiracy. Mere membership in a

trade association or attendance at trade association meetings or an industry-wide conferences is not enough to plausibly say that Defendants actually conspired at such meetings or conferences. *See Baxter II*, 2020 WL 1666454, at *10. "Absent additional facts addressing the content of defendants' discussions at or the (nefarious) subjects of trade organization meetings, allegations that defendants were members of the same trade organizations are unspectacular and fail to move the needle." *Baxter I*, 328 F. Supp. 3d at 843.[11]

Plaintiffs never allege any improper communications among the "small group of executives" responsible for the Producer Defendants' pricing at such industry meetings.[12] *See* DPP Compl. ¶¶ 154–70; Commercial Compl. ¶¶ 135–50; Consumer Compl. ¶¶ 106–08. Instead, they rely on boilerplate allegations concerning the commonplace practice of belonging to and attending industry events. Plaintiffs even criticize the Producer Defendants' participation in the USDA-organized National Potato Promotion Board, which is expressly authorized by statute.[13] The Complaints never allege any facts showing that conspiratorial communications occurred at those events.

---

[11] *See also In re Text Messaging Antitrust Litig.*, 782 F.3d at 878 (Absent "evidence of what information was exchanged at these [trade association] meetings, there is no basis for an inference that they were using the meetings to plot prices [sic] increases[.]"); *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295–96 (11th Cir. 2010) ("[It] was well-settled [even] before *Twombly* that participation in trade organizations provides no indications of conspiracy."); *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1177 (10th Cir. 2019) (noting lack of "authority indicating membership in a trade organization, standing alone, is suggestive of a conspiracy").

[12] Many "executives" referenced as being participants in trade associations hold technical or sustainability roles that are unrelated to pricing decisions. For example, Plaintiffs call out Lamb Weston's Richard Burres (Manager, Sustainable Agriculture) and McCain's Jeremy Buchman (Director of Agronomy). DPP Compl. ¶ 167. Likewise, Cavendish's Peter Johnston (Vice President of Technical Regulatory Compliance and ESG) and Lamb Weston's Jennifer Weekes (Senior Director of Global Food Safety) serve on boards concerned with compliance and food-safety standards, not competitive strategy. *Id.* ¶ 157.

[13] *See* U.S. Dep't of Agric., Agric. Mktg. Serv., Nat'l Potato Promotion Bd., https://www.ams.usda.gov/rules-regulations/research-promotion/potato (last accessed Dec. 5, 2025) (cited by DPP Compl. ¶ 144 n.78).

*Pricing Letters.* Plaintiffs also argue that the Producer Defendants conspired by "ensur[ing] that their price increase letters" sent to customers "were readily available to one another." DPP Compl. ¶¶ 13, 105; Commercial Compl. ¶ 63; Consumer Compl. ¶ 94 ("These price-increase letters enabled [Producer Defendants] to coordinate on prices."). But notifying customers of planned price changes is not evidence of conspiracy. In countless industries, prices and price increases are publicized and widely known to both customers and competitors. *See Rsrv. Supply Corp.*, 971 F.2d at 53 ("We agree that the industry practice of maintaining price lists and announcing price increases in advance does not necessarily lead to an inference of price fixing."); *Wallace v. Bank of Bartlett*, 55 F.3d 1166, 1169–70 (6th Cir. 1995) (declining to infer conspiracy from defendants' publication of retail prices because allowing such an inference would impede ability of consumers to obtain information needed to make "efficient market decisions" (quoting *In re Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 448 n.14 (9th Cir. 1990)).

*Business Relationships.* Plaintiffs' conclusory allegations about routine business relationships among the Producer Defendants, such as co-packing arrangements,[14] similarly do not support an inference of conspiracy. Plaintiffs identify only a single instance in which a former Lamb Weston employee, after being hired by Simplot, allegedly provided "price increase information" to his new employer. DPP Compl. ¶ 12; Commercial Compl. ¶ 5; Consumer Compl. ¶ 9. Even credited, that lone allegation describes unilateral conduct by an individual employee—not any interfirm agreement—and it does not support a broader, overarching conspiracy involving four producers. *See, e.g.*, *Greco*, 2024 WL 4119169, at *8 (dismissing claims because "[t]he bottom line is that the allegations of conspiracy are heavy on theories and labels and light on

---

[14] According to Plaintiffs, "co-packing" arrangements are when a manufacturer outsources part of its production to another company. DPP Compl. ¶¶ 152–53; Commercial Compl. ¶ 10; Consumer Compl. ¶¶ 156–58.

details" and thus "lack adequate factual content about Defendants' conduct to infer the existence of any agreement to engage in the schemes alleged by Plaintiffs").

### C. Plaintiffs' own allegations undermine any plausible inference of conspiracy.

Plaintiffs' conspiracy claim also fails because their theory cannot be reconciled with the obvious, non-collusive explanation for the Producer Defendants' 2021–2023 pricing: pandemic-era spikes in costs that compressed margins for years. That "obvious alternative explanation" defeats Plaintiffs' conspiracy inference. *Twombly*, 550 U.S. at 567; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010) ("*Twombly* makes clear that a claim of conspiracy predicated on parallel conduct should be dismissed if 'common economic experience,' or the facts alleged in the complaint itself, show that independent self-interest is an 'obvious alternative explanation' for defendants' common behavior."); *In re Manufactured Home Lot Rents*, 2025 WL 3485693, at *13 ("Section 1 demands more" than allegations of varied price increases, coupled with the exchange of data through a third-party service, that were "merely consistent with, rather suggestive of, a price-fixing conspiracy").

Plaintiffs concede that at least *five of the seven* alleged increases—those "[i]n 2021 and the spring of 2022"—occurred while the Producer Defendants "were facing increased input costs." DPP Compl. ¶¶ 6, 105–17; Commercial Compl. ¶¶ 72–83; Consumer Compl. ¶¶ 118–33. That includes the *sole* instance in which all Producer Defendants announced increases within days of each other in February 2022. DPP Compl. ¶¶ 111–13; Commercial Compl. ¶ 80; Consumer Compl. ¶ 124. Plaintiffs' own chronology thus aligns with independent, cost-driven pricing—not collusion.

Plaintiffs' chart underscores the point. It shows input costs rising sharply from June 2020 through July 2022, while prices increased from January 2021 through October 2023. *See* DPP Compl. ¶ 5; Consumer Compl. ¶ 98. This pattern reflects lagged pricing adjustments to

extraordinary cost inflation, not unlawful agreement. Although Plaintiffs assert that "[e]ven as input costs dropped dramatically beginning in mid-2022, the price of Frozen Potato Products continued to rise" (Consumer Compl. ¶ 98), the chart shows the opposite: prices commonly adjust with a lag, and by mid-2022 they had only begun to catch up to the substantial cost increases incurred between late 2020 and mid-2022.

In any event, the antitrust laws do not require the Producer Defendants to **_roll back_** prices to pre-pandemic levels the moment some costs began to decline. Nor does the law condemn the margins that producers earned during this unusual period. *Baxter I*, 328 F. Supp. 3d at 843 (recognizing that price increases in an oligopolistic market even "in the face of falling costs does little to suggest that [defendants] engaged in actual collusion"); *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 229 (3d Cir. 2011) (allegations that defendants seek to increase profits apply to businesses universally and provide no indication of a conspiracy). That is all Plaintiffs offer in support of their conspiracy claim, and it is not enough.

*****

The Court should dismiss Count I because Plaintiffs fail to plausibly allege any facts showing that the Producer Defendants' prices during 2021–2023 were the result of a price-fixing conspiracy instead of self-interested and independent business decisions.

## II. COUNT II SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE NOT ALLEGED AN UNLAWFUL INFORMATION EXCHANGE UNDER THE RULE OF REASON.

In addition to their *per se* price-fixing claim, each putative Plaintiff class also alleges an information-exchange claim under the rule of reason (Count II). Plaintiffs contend that even absent any agreement to fix prices, Defendants violated the antitrust laws by entering into an agreement

22

"to regularly exchange price, supply, and production information through PotatoTrac[k]." DPP Compl. ¶ 243; Consumer Compl. ¶ 221; *see also* Commercial Compl. ¶ 216 (similar).

As Plaintiffs acknowledge in their Complaints, courts evaluate Section 1 information-exchange claims under the "rule of reason" because the "exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances ***increase economic efficiency and render markets more***, rather than less, ***competitive***." *Gypsum*, 438 U.S. at 441 n.16 (emphasis added); *see also* Commercial Compl. ¶ 211 (stating expressly that Count 2 is "subject to rule of reason analysis").

To state a rule-of-reason claim, Plaintiffs must allege facts that plausibly establish that Defendants entered into an agreement to exchange information with each other, causing anticompetitive effects that outweigh any pro-competitive benefits in a relevant market. *See Agnew*, 683 F.3d at 335–36. The Court should grant Defendants' motion to dismiss Count II because Plaintiffs (1) do not properly allege that the Producer Defendants entered into an ***agreement*** to share information ***with each other*** via PotatoTrack; and (2) fail to plausibly allege ***anticompetitive effects***; and (3) fail to plead a properly defined, ***relevant market***. Each of these pleading failures warrants dismissal of Count II.

### A. Plaintiffs do not properly allege that the Producer Defendants entered into an agreement to share information via PotatoTrack.

Plaintiffs may not survive dismissal on their information-exchange claim merely by alleging that each Producer Defendant subscribed to Circana's services. Rather, they must plausibly allege that each Producer Defendant agreed ***with the other Producer Defendants*** to exchange information ***with each other***, via PotatoTrack. *See Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 841–42 (7th Cir. 2020) (affirming dismissal for failure to "show that similarly situated members of the conspiracy coordinated . . . with each other"). As with any

23

Section 1 claim, Plaintiffs must plead facts showing that the alleged conduct, here the exchange of information, was pursuant to an agreement rather than independent actions based on rational self-interest. *See In re Generic Pharm. Pricing Antitrust Litig.*, No. 16-MD-2724, 2025 WL 388813, at \*3 (E.D. Pa. Feb. 3, 2025) (dismissing claim and noting that the "exchange of information . . . without an agreement is not itself a violation of the Sherman Act").

Plaintiffs make no such allegation here. Instead, they simply ask the Court to infer the existence of an information-exchange agreement from the fact that the Producer Defendants each separately subscribed to Circana's industry reporting services. DPP Compl. ¶ 242; Commercial Compl. ¶¶ 210, 215; Consumer Compl. ¶¶ 218, 220. Plaintiffs' conclusory allegation that "[e]ach Defendant furnished competitively sensitive information with the understanding it would be reciprocated" (*see id.*) does not satisfy their burden either.

First, even if true, that does not plausibly infer an agreement among the Producer Defendants. *See Baxter I*, 328 F. Supp. 3d at 830 ("to state a claim under [Section] 1 . . . there must be an explicit agreement, not merely a tacit one") (quotations omitted). "[A]ntitrust law restricts *agreements* between competitors regarding how to compete, it does not require a business to turn a blind eye to information simply because its competitors are also aware of that same information" or decline to "take advantage of a service because its competitors already use that service." *Gibson*, 148 F.4th at 1084 (emphasis in original) (further stating that "such a holding would require [businesses] whose competitors hired the research firm to either seek consumer research from another (possibly inferior) firm or to refrain from obtaining such research regarding its customers altogether").

Second, as another court in this district explained in *Broilers*, when a company like Circana offers a valuable market research product—here, historical aggregated and anonymized industry

data on prices, supply, and production of Frozen Potato Products—it would be "irrational" to "refrain from participation . . . when all your competitors are doing so." 702 F. Supp. 3d at 674. In other words, the fact that multiple companies use an industry benchmarking product cannot be used to infer the existence of an unlawful information-exchange agreement among them. Indeed, courts refuse to impose Section 1 liability on companies for merely buying a product (like Circana's benchmarking reports here) that might serve unilateral self-interest because doing so would equate to "impos[ing] a rule that businesses cannot use the same service providers as their competitors," which could "ultimately *harm* competition, as it would take away a means by which competitors might compete." *Gibson*, 148 F.4th at 1084 (emphasis in original).

Similarly, here, no Section 1 claim can be based on Defendants' mere subscription to Circana's services. As explained above, Circana allegedly provided only the sort of market research that any rational business would seek: historical aggregated and anonymized industry data on prices, supply, and production of Frozen Potato Products. *See supra* Section I.B.3.a. It would be "irrational" for the Producer Defendants to forgo such helpful business information as a matter of unilateral self-interest. *Broilers*, 702 F. Supp. 3d at 674 ("Greater information exchange alone does not demonstrate a conspiracy."). The Court should therefore dismiss Plaintiffs' rule-of-reason claim. *In re Generic Pharm. Pricing*, 2025 WL 388813, at *4–6.

### B. Plaintiffs fail to plausibly allege anticompetitive effects.

Plaintiffs' rule-of-reason claims also fail for the independent reason that Plaintiffs do not allege any facts showing that the Producer Defendants' participation in PotatoTrack caused anticompetitive effects. That is, Plaintiffs fail to allege any facts (as opposed to conclusory assertions) showing that PotatoTrack had any ***impact*** on the Producer Defendants' pricing decisions, much less ***caused*** the Producer Defendants to increase prices in the relevant time period. *See supra* Section I.B.3.a (Count I). *See, e.g., Maple Flooring Mfrs. Ass'n v. United States*, 268

U.S. 563, 567, 585–86 (1925) (rejecting information-exchange claim where there was no evidence that conduct "affected prices adversely to consumers"); *Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*, 715 F.2d 1115, 1119 (6th Cir. 1983) (affirming judgment because "the exchange of rate information among defendants" did not "result[] in a prohibited restraint of trade or commerce"). Failure to allege such facts is grounds for dismissal. *See, e.g.*, *Segal v. Amadeus IT Grp., S.A.*, No. 24-CV-1783, 2025 WL 963751, at *6 (N.D. Ill. Mar. 31, 2025) (When a "case rests . . . on the theory that information was illegally shared, [a plaintiff] needs to make a plausible case . . . for the anticompetitive effect of that information-sharing.").[15]

Plaintiffs plead no facts connecting any PotatoTrack report to the price of any frozen potato product—let alone to prices in 2021–2023. Instead, they rely on the conclusory assertion that the Producer Defendants' PotatoTrack subscriptions had anticompetitive effects. DPP Compl. ¶¶ 242–44; Commercial Compl. ¶¶ 212–17; Consumer Compl. ¶¶ 220–22. Conclusory assertions of that sort cannot withstand a motion to dismiss. "A plaintiff must allege that a price increase is traceable to a restraint on trade." *Intel Corp. v. Fortress Inv. Grp. LLC*, No. 21-CV-16817, 2022 WL 16756365, at *2 (9th Cir. Nov. 8, 2022). As the court in *Gibson* explains, "Section 1 requires a causal link between the contested agreement and an anticompetitive restraint of trade in the relevant market"—a link Plaintiffs do not (and cannot) allege here. 148 F.4th at 1077. Another

---

[15] Plaintiffs also fail to satisfy their "threshold burden" to allege "a precise market definition," including both a geographic and product dimension, capable of showing that Defendants possess sufficient market power for the alleged agreement to "produce anticompetitive effects" *Agnew*, 683 F.3d at 337. For example, their proposed product market—all Frozen Potato Products—is overbroad because it sweeps in products outside PotatoTrack's scope (including all retail products) and groups together disparate items (such as tater tots, hash browns, and various types of fries) without explaining how buyers or sellers view these items as reasonable substitutes within a single antitrust market. *See Vital Pharms., Inc. v. Berlin Packaging LLC*, 632 F. Supp. 3d 780, 786 (N.D. Ill. 2022) ("In defining a market, [the court] must consider substitution both by buyers and by sellers[.]") (collecting cases). This imprecise and intentionally ambiguous market definition falls far short of Plaintiffs' threshold burden. *See In re Manufactured Home Lot Rents*, 2025 WL 3485693, at *16 (dismissing information-exchange claim because Plaintiffs failed to plausibly plead a relevant market).

court in this district reached the same conclusion in *Hansen*, rejecting antitrust claims where the complaint failed to "explain how the University Defendants used the [information at issue] to formulate their financial aid offers or whether all University Defendants based" their decisions "on the same or similar factors." 2025 WL 2731378, at *9. The same pleading defect dooms Plaintiffs' claims here.

Plaintiffs' own allegations foreclose any plausible inference that PotatoTrack produced anticompetitive effects in 2021. Plaintiffs concede that PotatoTrack reports have been available since at least 2008. Consumer Compl. ¶ 102 & n.5. Yet they allege no effect on Frozen Potato Product pricing before 2021 and identify no change in the substance or format of the reports preceding the alleged 2021 price increases. Plaintiffs thus offer no explanation for how reports that had been circulated for more than thirteen years suddenly generated anticompetitive effects only in 2021. On this basis alone, Plaintiffs fail to plausibly allege that any information-exchange agreement facilitated by PotatoTrack produced anticompetitive effects. *See Agnew*, 683 F.3d at 335 ("Under a Rule of Reason analysis, the plaintiff carries the burden of showing that an agreement or contract has an anticompetitive effect on a given market within a given geographic area.").

Nor could Plaintiffs establish any anticompetitive effects given their concession that PotatoTrack reports include only aggregated and backward-looking market data. DPP Compl. ¶ 95 (alleging that PotatoTrack contains only "aggregate price per pound in a given product category"); Commercial Compl. ¶ 98; Consumer Compl. ¶ 104.[16] That is not the kind of information that courts have held could cause anticompetitive effects—such as data that "indentif[ies] particular parties,

---

[16] That Plaintiffs elsewhere use vague terms (like "granular and competitively sensitive data") to describe the data contained in PotatoTrack cannot mask the allegations elsewhere that clearly show the reports do not contain competitor-specific price or production information. Consumer Compl. ¶ 141.

transactions, and prices." *In re Loc. TV Advert. Antitrust Litig.*, No. 18-C-6785, 2022 WL 3716202, at *3 (N.D. Ill. Aug. 29, 2022) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 212 (2d Cir. 2001));[17] *see also Broilers*, 702 F. Supp. 3d at 678–79 (finding "scant evidence that the information" a third-party benchmarking service provided—"general market production and pricing data"—"was used in a manner that had an anticompetitive effect").

Plaintiffs do not and cannot allege that PotatoTrack included *deanonymized* competitively sensitive information such as individualized pricing, margin, cost, market share, or output information about particular competitors. Nor do they allege that PotatoTrack reports include any *forward-looking data*. Plaintiffs' allegations here thus differ fundamentally from those in information-exchange cases that have survived dismissal. *Cf. In re RealPage, Inc.*, 709 F. Supp. 3d 478, 492–94, 528 (denying motion to dismiss where a revenue software management software provider allegedly pooled together competitors' nonpublic data in order to generate algorithmic pricing recommendations). Count II should therefore be dismissed.

### C. Consumer Plaintiffs fail to state an information-exchange claim because they do not allege any exchanged information on Frozen Potato Products in the retail channel.

The Consumer Plaintiffs' information-exchange claim fails for the independent and additional reason that the Complaints do not allege any exchange of retail channel information through PotatoTrack, with respect to Frozen Potato Products. The Consolidated

---

[17] The court in *In re Local TV Advertising* observed that, to state a claim of an unlawful information exchange, the plaintiffs must make "concrete allegations" that any conduit "compromised the ostensible anonymity" of the competitively sensitive information and show that the information exchanged "enabled co-conspirators to tacitly communicate with one another." *Id.* at *6. The court concluded that the complaint was "devoid of sufficiently concrete allegations" that the defendant's market reports and recommendations (developed from data they received) enabled the readers of the reports to "tacitly communicate with one another." *Id.* at *8. Additionally, the plaintiffs "fail[ed] to allege that . . . analytics were presented with so much specificity that [defendants] could use them to 'police a secret or tacit conspiracy to [fix] prices.'" *Id.* at *6 (quoting *Todd,* 275 F.3d at 212).

Complaints are clear that PotatoTrack contained only information on Frozen Potato Products related to the "food service" channel, i.e., sales to "hotels, restaurants, schools, and hospitals"—not the retail channel, including "grocery stores and convenience stores," where Consumer Plaintiffs allegedly purchased Frozen Potato Products at higher prices for personal consumption. Consumer Compl. ¶¶ 87, 102. Plaintiffs do not (and cannot) allege an agreement to exchange retail pricing information on Frozen Potato Products through PotatoTrack because such information is not contained in PotatoTrack. Necessarily then, there can be no effect by PotatoTrack on Frozen Potato Product retail prices since no such information exists. Consumer Plaintiffs' information-exchange claim should be dismissed on this ground alone.

*****

For all these reasons, the Court should grant the motion to dismiss as to Count II.

## III. INDIRECT PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED

Because Plaintiffs do not plausibly allege facts sufficient to support a viable antitrust claim under federal law, the state law claims brought by Commercial Plaintiffs and Consumer Plaintiffs (together, the "Indirect Plaintiffs") also fail. In addition, many of the state law claims must be dismissed for an assortment of independent reasons.[18]

### A. Indirect Plaintiffs' state antitrust and consumer protection claims fail for the same reasons their federal Sherman Act claims fail.

The Indirect Plaintiffs' state law claims fail for the same reasons as their federal claims. The state antitrust laws that they invoke track federal law, either by statute or judicial construction. *See* App. A, Column. 1. Plaintiffs concede that their state claims rest on the same alleged conduct as their Sherman Act claims, and Plaintiffs simply incorporate their earlier allegations of a

---

[18] For ease of reference, the state-specific legal citations are summarized in Appendix A.

supposed "conspiracy to fix, raise, maintain, and stabilize the price of Frozen Potato prices [*sic*] in various states." Commercial Compl. ¶¶ 221–27; *see also* Consumer Compl. ¶ 189 ("Defendants' contract, combination, or conspiracy also violates the state laws enumerated below.").

Courts routinely dismiss state law antitrust claims that rest on the same deficient allegations as federal claims. *See*, *e.g.*, *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 847 (N.D. Ill. 2020) (dismissing "plaintiffs' state-law antitrust claims for the same reasons" as the dismissal of the federal antitrust claims), *aff'd sub nom. Mayor of Balt. v. Abbvie Inc.*, 42 F.4th 709 (7th Cir. 2022); *In re Concrete & Cement Additives Antitrust Litig.*, No. 24-MD-3097, 2025 WL 1755193, at *24 (S.D.N.Y. June 25, 2025) ("Because the…state law claims are based upon the same allegations of price-fixing conspiracy as [p]laintiffs' Sherman Act claims, they must be dismissed as well."). Accordingly, for the same reasons all the federal claims should be dismissed, Plaintiffs' state law antitrust claims—based on the same deficient allegations—should likewise be dismissed. *See* App. A, Column 1.

The same principles require dismissal of the Indirect Plaintiffs' consumer protection claims. Courts recognize that plaintiffs may not "repackag[e]" … failed antitrust claim[s]" as consumer protection claims. *In re Dairy Farmers of Am. Cheese Antitrust Litig.*, No. 9-CV-3690, 2015 WL 3988488, at *19 (N.D. Ill. June 29, 2015). Where complaints "sound[] in antitrust," derivative consumer protection claims rise and fall with the antitrust claims unless a plaintiff can allege "something more" to trigger liability. *In re Humira*, 465 F. Supp. 3d at 847–48 ("something more" is needed alleged to "understand why the nonactionable antitrust conduct happens to limn the grievance of state prohibitions against unfairness or unconscionability"). Here, Plaintiffs fail to plead fraudulent, deceptive, unconscionable, or unfair conduct beyond bare allegations of supracompetitive prices. *See, e.g.*, Commercial Compl. ¶ 236; Consumer Compl. ¶ 238. Rather,

they rely only on their same deficient antitrust conspiracy allegations. *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1029 (N.D. Cal. 2007) ("[P]leading unconscionability requires something more than merely alleging that the price of a product was unfairly high."). Without "something more," all the Indirect Plaintiffs' consumer protection claims should be dismissed. *See In re Humira*, 465 F. Supp. 3d at 848; App. A, Column 2.

**B.     The state law claims also fail for independent, state-specific reasons.**

**1.     *Illinois Brick* bars Plaintiffs' antitrust claims in certain states.**

Under federal law, indirect purchasers cannot recover antitrust damages. *See Ill. Brick Co. v. Illinois*, 431 U.S. 720, 735 (1977). Although some states have enacted so-called *Illinois Brick* "repealer" statutes, the federal rule barring recovery by indirect purchasers continues to apply in several relevant jurisdictions, including Florida and Montana. *In re Visa Debit Card Antitrust Litig.*, No. 24-CV-7435, 2025 WL 3019893, at *11 (S.D.N.Y. Oct. 28, 2025) (Florida); *Miami Prods. & Chem. Co. v. Olin Corp.*, 546 F. Supp. 3d 223, 246 (W.D.N.Y. 2021) (Montana); *see also* App. A, Column 5. Indirect Plaintiffs' claims in these states must therefore be dismissed.

In addition, Colorado and New Jersey enacted *Illinois Brick* "repealer" statutes during the class period, effective June 7, 2023, and August 5, 2022, respectively. *See* Colo. Rev. Stat. § 6-4-115(1); N.J. Stat. § 56:9-12(a); *see also* App. A, Column 5. Accordingly, even if those claims survived, the Indirect Plaintiffs' damages claims for purchases in Colorado before June 7, 2023, and in New Jersey before August 5, 2022, are barred.

**2.     Certain state laws prohibit private class actions.**

The Arkansas and Montana consumer protection statutes and the Tennessee and Illinois antitrust statutes prohibit Indirect Plaintiffs' class actions. *See, e.g.,* Ark. Code Ann. § 4-88-113(f)(1)(B) ("A private class action under this subsection is prohibited" except for state constitutional claims); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 539 (E.D. Pa. 2010)

(rejecting Illinois consumer protection class claims based on antitrust allegations as an "end run" around the Illinois Antitrust Act's class action bar);  App. A, Column 5.

### 3. The consumer protection laws of certain states do not apply to antitrust violations.

The consumer protection statutes of Michigan, Minnesota, Oregon, Rhode Island, and South Dakota are limited to specifically enumerated practices and do not reach the conduct alleged here. *See* App. A, Column 5. For example, Michigan Consumer Protection Act's enumerated practices "do[] not include price fixing." *In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, No. 14-MD-2508, 2015 WL 5166014, at *29 (E.D. Tenn. June 24, 2015) (citing Mich. Comp. Laws Ann. § 445.903(1)). Likewise, the Oregon consumer protection statute identifies specific proscribed practices, and "price fixing is not among them." *In re Graphics Processing*, 527 F. Supp. 2d at 1030 (citing Or. Rev. Stat. § 646.608). Plaintiffs' antitrust allegations thus cannot state claims under those consumer protection laws and should be dismissed.

### 4. Commercial Plaintiffs cannot bring claims under consumer protection statutes that apply only to purchases for personal use.

Further, certain consumer protection statutes that Commercial Plaintiffs invoke—including those of the District of Columbia, Michigan, Oregon, Rhode Island, and Vermont—do not cover commercial resellers and apply only to purchases for personal, family, or household use. *See* App. A, Column 5.  Commercial Plaintiffs operate foodservice businesses and purchase Frozen Potato Products for "commercial food preparation"—i.e., for resale to patrons. Commercial Compl. ¶¶ 21–31, 159, 160.  Their claims under these statutes should therefore be dismissed.

### 5. Indirect Plaintiffs cannot bring claims under the laws of states in which they did not purchase Frozen Potato Products.

Plaintiffs must show Article III standing for each claim. That requires, among other things, an "injury in fact" that is fairly traceable to the challenged conduct. *See Lujan v. Defs. of Wildlife*,

504 U.S. 555, 560 (1992). Plaintiffs cannot "satisfy their burden of showing Article III standing for states in which they do not reside [or] did not purchase the products at issue." *In re Dairy Farmers of Am.*, No. 9-CV-3690, 2013 WL 4506000, at *8 (N.D. Ill. Aug. 23, 2013). "[A] named plaintiff cannot acquire standing to sue by bringing his action on behalf of [non-parties] who suffered injury." *Payton v. Cnty. of Kane*, 308 F.3d 673, 682 (7th Cir. 2002) (quotation omitted).

The Commercial Plaintiffs operate only in Arizona, California, Colorado, Connecticut, Florida, Illinois, Minnesota, Mississippi, New Jersey, New York, and Tennessee, yet assert 36 state- and territorial-law claims in 25 other jurisdictions. Commercial Compl. ¶¶ 21–31; ¶¶ 228-367. Therefore, the claims brought under the laws of Alabama, Arkansas, District of Columbia, Hawaii, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Utah, Vermont, West Virginia, and Wisconsin, where no Commercial Plaintiff operates or suffered any injury, must be dismissed for lack of Article III standing. *See* App. A, Column 3.

Likewise, because no named Consumer Plaintiff resides in Montana, Nebraska, New Jersey, North Dakota, Puerto Rico, or South Dakota, their claims under those states' jurisdictions must be dismissed for lack of Article III standing. Consumer Compl. ¶¶ 23–60; App. A, Column 3.

### 6. Certain claims lack sufficient allegations of intrastate conduct.

Indirect Plaintiffs fail to state a claim under the antitrust statutes of Alabama, the District of Columbia, Maryland, Mississippi, South Dakota, Tennessee, West Virginia, and Wisconsin because they do not plead the requisite intrastate conduct. *See* App. A, Column 4. Several of these statutes expressly limit their reach to conduct occurring "within" the jurisdiction. *See, e.g.*, Md. Code Ann., Com. Law § 11-202(a)(1), 204 (stating the Act's purpose is to "protect … intrastate

competition" and prohibit conspiracies "within the State"); *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1156–57 (N.D. Cal. 2007) (dismissing Maryland Antitrust Act claim for lack of allegations tied to intrastate commerce). Other courts impose the same instrastate requirement even absent express statutory text. *See, e.g., Abbott Lab'ys v. Durrett*, 746 So. 2d 316, 339–40 (Ala. 1999) (per curiam) (Alabama Antitrust Act "does not provide a cause of action" for price-fixing of "goods shipped in interstate commerce"). These claims should be dismissed.

Plaintiffs plead only conclusory nationwide price effects, with no allegations of conspiratorial acts within these states. *See, e.g.,* Commercial Compl. ¶ 228–30; Consumer Compl. ¶ 229-31. Because Plaintiffs do not plausibly allege intrastate anticompetitive acts within these jurisdictions, the corresponding claims should be dismissed. *See In re Cast Iron Soil Pipe And Fittings Antitrust Litig.*, 2015 WL 5166014 at *26 (dismissing antitrust claims under the laws of D.C., South Dakota, West Virginia, and others where plaintiffs did not "address[] any connection between the individual state and the wrongful conduct.").

### 7. Plaintiffs' Massachusetts claim fails for failure to notify Defendants.

The Massachusetts Consumer Protection Law requires that plaintiffs send a written demand for relief to a prospective defendant at least 30 days before filing a complaint. Mass. Gen. Laws ch. 93A, § 9(3). Because Plaintiffs did not provide such notice (nor allege that they did), this claim must be dismissed. *See Rodi v. S. New England Sch. Of L.*, 389 F.3d 5, 19 (1st Cir. 2004).

*\*\*\*\*\**

In sum, the Indirect Plaintiffs' state law claims fail for multiple, independent reasons. As explained above, each claim is deficient under its governing statute, and, more fundamentally, each state law claim rests on the same flawed allegations Plaintiffs advance to support their federal antitrust claims. Accordingly, these claims rise and fall together and the Court should dismiss the state claims for the same reasons Plaintiffs' Sherman Act claims fail.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss each of the Plaintiffs' Complaints in their entirety with prejudice.

Respectfully submitted,

Dated: December 5, 2025

/s/ James F. Herbison
James F. Herbison
Michael P. Mayer
Kevin B. Goldstein
Anthony J. Baker
WINSTON & STRAWN LLP
300 N. LaSalle Dr.
Suite 4400
Chicago, Illinois 60654
Telephone: (312) 558-5600
jherbison@winston.com
mmayer@winston.com
kbgoldstein@winston.com
ajbaker@winston.com

***Attorneys for Defendants Lamb Weston Holdings, Inc., Lamb Weston, Inc., Lamb Weston BSW, LLC, Lamb Weston/Midwest, Inc., and Lamb Weston Sales, Inc.***

/s/ Christopher Yook
Christopher Yook
Jeffrey Spigel
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
cyook@kslaw.com
jspigel@kslaw.com

Zachary Fardon
KING & SPALDING LLP
110 N Wacker Drive
Suite 3800
Chicago, IL 60606
Telephone: (312) 995-6333

Facsimile: (312) 995-6330
zfardon@kslaw.com

**Attorneys for Defendant J.R. Simplot Co.**

/s/ Gary Feinerman
Gary Feinerman (ARDC No. 6206906)
Sean M. Berkowitz (ARDC No. 6209701)
LATHAM & WATKINS LLP
330 North Wabash Avenue
Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
gary.feinerman@lw.com
sean.berkowitz@lw.com

Marguerite Sullivan
Molly M. Barron
LATHAM & WATKINS LLP
555 11th Street NW #1000
Washington, DC 20004
Telephone: (202) 637-2200
marguerite.sullivan@lw.com
molly.barron@lw.com

Brendan McShane
Sylvia Zhang
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
brendan.mcshane@lw.com
sylvia.zhang@lw.com

**Attorneys for Defendants Cavendish Farms Ltd. and Cavendish Farms, Inc.**

/s/ Justin Bernick
Justin Bernick
Holden Andrew Steinhauer
HOGAN LOVELLS US LLP
555 13th St NW
Washington, DC 20004
Telephone: (202) 637-5600
justin.bernick@hoganlovells.com

holden.steinhauer@hoganlovells.com

***Attorneys for Defendants McCain Foods Limited and McCain Foods USA, Inc.***

*/s/ Daniel E. Laytin*
Daniel E. Laytin, P.C.
Christa C. Cottrell, P.C.
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
daniel.laytin@kirkland.com
christa.cottrell@kirkland.com

Christine Shang
KIRKLAND & ELLIS LLP
609 Main Street
Suite 4500
Houston, TX 77002
Telephone: (713) 836-3431
christine.shang@kirkland.com

Norman Armstrong, Jr.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave. NW
Washington, DC 20004
Telephone: (202) 389-5000
norman.armstrong@kirkland.com

Neil K. Gilman
Jonathan L. Lewis
Nicole Ruth Johnson
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 955-1500
Fax: (202) 778-2201
ngilman@hunton.com
lewisj@huntonak.com
njohnson@hunton.com

***Attorneys for Defendant Circana, LLC***