**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: FROZEN POTATO PRODUCTS ANTITRUST LITIGATION | Case No. 24-cv-11801 |
| | Judge Jeffrey I. Cummings |
| This Document Relates To: | Magistrate Judge Gabriel A. Fuentes |
| All Actions | |

**PLAINTIFFS' OPPOSITION TO**
**ALL DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED**
**CLASS ACTION COMPLAINTS**

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    SUMMARY OF PLAINTIFFS' ALLEGATIONS ........................................ 3

     A.     Defendants Implemented Parallel, Sustained Price Increases ................................ 3

     B.     The Market for Frozen Potato Products Was Ripe for Collusion ........................... 4

     C.     Defendants Exchanged Competitively Sensitive Information in
          Furtherance of the Conspiracy ............................................................................... 6

III.   LEGAL STANDARD ..................................................................................... 8

IV.   PLAINTIFFS PLAUSIBLY PLEAD A PRICE-FIXING
       CONSPIRACY ................................................................................................. 9

     A.     Plaintiffs Plead Parallel Conduct ........................................................................... 9

     B.     Numerous Plus Factors Support Plaintiffs' Allegations ...................................... 13

          1.     Consciousness of Guilt and Concealment of
               Communications ....................................................................................... 14

          2.     Exchange of Competitively Sensitive Information ................................... 15

               a)     Information exchanges through PotatoTrack ............................... 15

               b)     Exchanges of Pricing Information through Personal
                     Relationships ................................................................................ 18

               c)     Circulation of Pricing Letters ...................................................... 19

          3.     Opportunities to Collude .......................................................................... 19

          4.     The Pricing that Cannot Be Explained Away by Higher
               Input Costs ............................................................................................... 21

          5.     The Price Increases Were Contrary to Independent Self-
               Interest ...................................................................................................... 22

          6.     Price Increases Departing from Established Practices .............................. 24

          7.     Industry Characteristics Facilitate Collusion ........................................... 24

     C.     Defendants' Purported Alternative Explanations Do Not Defeat
          Plaintiffs' Plausible Conspiracy Allegations. ...................................................... 25

|   |   | 1. | Horizontal Conspiracies are Plausible When Competitors Face Cost Spikes | 25 |

        1.     Horizontal Conspiracies are Plausible When Competitors Face Cost Spikes ............................................................... 25

        2.     This Case is Not About Forcing a Price Rollback or Policing Margins ............................................................... 27

        3.     Purported Price Lags are Questions of Fact ............................. 28

**V.    PLAINTIFFS ALLEGE AN UNLAWFUL INFORMATION EXCHANGE CLAIM ........................................................... 28**

    A.     Plaintiffs Plausibly Allege an Agreement to Share Competitively Sensitive Pricing Information ............................... 29

    B.     Defendants Incorrectly Assert that Plaintiffs Fail to Allege an Agreement .......................................................... 31

    C.     Plaintiffs Sufficiently Allege Anticompetitive Effects ......................... 34

    D.     The Consumers Plausibly Allege an Information-Exchange Claim ............. 37

**VI.   DEFENDANTS' MOTION AS TO INDIRECT PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DENIED ...................... 39**

    A.     Illinois Brick Does Not Serve to Bar Any of IPPs' Antitrust Claims ........... 39

    B.     Rule 23 of the Federal Rules of Civil Procedure Permits IPPs to Bring Classwide Claims, Regardless of State Procedural Rules ............. 40

    C.     The Consumer Protection Laws Invoked by Commercial Plaintiffs Apply to Antitrust Violations ............................................ 40

    D.     Commercial Plaintiffs Properly Allege Claims Under State Consumer Protection Statutes ............................................ 41

    E.     IPPs Have Article III Standing ............................................ 42

    F.     IPPs Sufficiently Plead the Requisite Effects on Intrastate Commerce .................................................................. 44

    G.     IPPs' Massachusetts Claim Should Not be Dismissed ........................ 45

**VII.  CONCLUSION ...................................................................... 45**

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Agnew v. Nat'l Collegiate Athletic Ass'n,*
  683 F.3d 328 (7th Cir. 2012) ..................................................29

*Am. Column & Lumber Co. v. United States,*
  257 U.S. 377 (1921)..................................................16

*Am. Tobacco v. United States,*
  328 U.S. 781 (1946)..................................................32

*AnchorBank, FSB v. Hofer,*
  649 F.3d 610 (7th Cir. 2011) ..................................................8

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)..................................................8

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)..................................................8, 22, 24

*Benson v. Newell Brands, Inc.,*
  2021 WL 5321510 (N.D. Ill. Nov. 16, 2021) ..................................................44

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.,*
  495 F. Supp. 2d 1027 (N.D. Cal. 2007) ..................................................42

*In re Blood Reagents Antitrust Litig.,*
  266 F. Supp. 3d 750 (E.D. Pa. 2017) ..................................................12, 14

*In re Broiler Chicken Antitrust Litig.,*
  2019 WL 1003111 (N.D. Ill. Feb. 28, 2019) ..................................................17

*In re Broiler Chicken Antitrust Litig.,*
  2025 WL 461407 (N.D. Ill. Feb. 11, 2025) ..................................................15, 35

*In re Broiler Chicken Antitrust Litig.,*
  290 F. Supp. 3d 772 (N.D. Ill. 2017) ..................................................*passim*

*In re Broiler Chicken Antitrust Litig.,*
  702 F. Supp. 3d 635 (N.D. Ill. 2023) ..................................................33

*Burnell v. Swift Transp.,*
  2014 WL 12586436 (C.D. Cal. Mar. 27, 2014)..................................................27

*In re Capacitors Antitrust Litig.*,
　2018 WL 4558265 (N.D. Cal. Sep. 20, 2018) .......................................................39

*Carbone v. Brown Univ.*,
　621 F. Supp. 3d 878 (N.D. Ill. 2022) ...................................................................29

*Cardenas v. Toyota Motor Corp.*,
　418 F. Supp. 3d 1090 (S.D. Fla. 2019) ................................................................40

*City of Moundridge v. Exxon Mobil Corp.*,
　2009 WL 5385975 (D.D.C. Sept. 30, 2009) .........................................................12

*Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*,
　715 F.2d 1115 (6th Cir. 1983) .............................................................................37

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
　370 U.S. 690 (1962).....................................................................................14, 32

*In re Coordinated Pretrial Proceedings in*
*Petroleum Prods. Antitrust Litig.*,
　906 F.2d 432 (9th Cir. 1990) ..........................................................................16, 19

*In re Crop Prot. Prods. Loyalty Program Antitrust Litig.*,
　779 F. Supp. 3d 624 (M.D.N.C. 2025) ................................................................40

*In re Dairy Farmers of Am. Cheese Antitrust Litig.*,
　60 F. Supp. 3d 914 (N.D. Ill. 2014) ......................................................................9

*Dana Container, Inc. v. Sec'y of Lab.*,
　847 F.3d 495 (7th Cir. 2017) ...............................................................................20

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
　313 F. Supp. 3d 931 (N.D. Ill. 2018) .....................................................................8

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
　362 F. Supp. 3d 510 (N.D. Ill. 2019) ...................................................................40

*In re Deere & Co. Repair Serv. Antitrust Litig.*,
　703 F. Supp. 3d 862 (N.D. Ill. 2023) ...............................................9, 13, 14, 22

*Dennis v. Andersons Inc.*,
　2022 WL 22761475 (N.D. Ill. May 3, 2022) .......................................................29

*Duffy v. Yardi Sys., Inc.*,
　2024 WL 4980771 (W.D. Wash. Dec. 4, 2024) ...................................................15

*In re Dynamic Random Access Memory (DRAM)*
   *Indirect Purchaser Antitrust Litig.*,
   28 F.4th 42 (9th Cir. 2022) ...................................................................................23

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
   681 F. Supp. 2d 141 (D. Conn. 2009) ...................................................................15

*Fenerjian v. Nongshim Co., Ltd*,
   72 F. Supp. 3d 1058 (N.D. Cal. 2014) ..................................................................22

*In re Fragrance Direct Purchaser Antitrust Litig.*,
   2025 WL 579639 (D.N.J. Feb. 21, 2025) ..................................................9, 39, 40

*In re Generic Pharm. Pricing Antitrust Litig.*,
   2025 WL 388813 (E.D. Pa. Feb. 3, 2025) .............................................................33

*In re Generic Pharms. Pricing Antitrust Litig.*,
   368 F. Supp. 3d 814 (E.D. Pa. 2019) ..............................................................40, 45

*Gibson v. Cendyn Grp., LLC*,
   148 F.4th 1069 (9th Cir. 2025) .............................................................................33

*Gibson v. City of Chicago*,
   910 F.2d 1510 (7th Cir. 1990) ................................................................................8

*Greco v. Mallouk*,
   2024 WL 4119169 (N.D. Ill. Sept. 9, 2024) ........................................................18

*In re High Fructose Corn Syrup Antitrust Litig.*,
   295 F.3d 651 (7th Cir. 2002) ..........................................................................14, 15

*Hishon v. King & Spalding*,
   467 U.S. 69 (1984) ................................................................................................43

*Hrubec v. Nat'l R.R. Passenger Corp.*,
   981 F.2d 962 (7th Cir. 1992) ................................................................................43

*Hyland v. HomeServices of Am., Inc.*,
   771 F.3d 310 (6th Cir. 2014) ................................................................................23

*Int'l Equip. Trading, Ltd. v. Illumina, Inc.*,
   2018 WL 3861575 (N.D. Ill. Aug. 14, 2018) .........................................................8

*Interstate Circuit v. United States*,
   306 U.S. 208 (1939)..............................................................................................11

*Kleen Prods. LLC v. Georgia-Pac. LLC*,
   910 F.3d 927 (7th Cir. 2018) ................................................................................12

*Kleen Prods. LLC v. Int'l Paper*,
    276 F. Supp. 3d 811 (N.D. Ill. 2017) .........................................................12, 13

*Kleen Prods. LLC v. Int'l Paper Co.*,
    831 F.3d 919 (7th Cir. 2016) ...................................................................25

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
    775 F. Supp. 2d 1071 (N.D. Ill. 2011) ...............................................12, 13, 25, 32

*In re Liquid Aluminum Sulfate Antitrust Litig.*,
    2017 WL 3131977 (D.N.J. July 20, 2017).................................................39, 41

*Lisk v. Lumber One Wood Preserving, LLC*,
    792 F.3d 1331 (11th Cir. 2015) .................................................................40

*In re Local TV Advert. Antitrust Litig.*,
    2020 WL 6557665 (N.D. Ill. Nov. 6, 2020) .......................................... *passim*

*Long v. Dell, Inc.*,
    93 A.3d 988 (D.R.I. 2014) .................................................................41, 42

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).............................................................................43

*Mack v. Bristol-Myers Squibb Co.*,
    673 So. 2d 100 (Fla. Dist. Ct. App. 1996) .................................................39

*In re Manufactured Home Lot Rents Antitrust Litig.*,
    2025 WL 3485693 (N.D. Ill. Dec. 4, 2025).................................................26

*Maple Flooring Mfrs. Ass'n v. United States*,
    268 U.S. 563 (1925)........................................................................36, 37

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
    952 F.3d 832 (7th Cir. 2020) ...................................................................33

*Mass. Laborers' Health & Welfare Fund v. Boehringer*
    *Ingelheim Pharm., Inc.*,
    783 F. Supp. 3d 417 (D. Mass. 2025) ......................................................39

*Mednick v. Precor, Inc.*,
    320 F.R.D. 140 (N.D. Ill. 2017)...............................................................44

*Mitchael v. Intracorp., Inc.*,
    179 F.3d 847 (10th Cir. 1999) .................................................................17

*Moehrl v. Nat'l Ass'n of Realtors*,
    492 F. Supp. 3d 768 (N.D. Ill. 2020) ........................................................20

*Mullins v. Direct Dig., LLC*,
  2014 WL 5461903 (N.D. Ill. Sept. 30, 2014) .........................................................44

*In re MultiPlan Health Ins. Provider Litig.*,
  789 F. Supp. 3d 614 (N.D. Ill. 2025) ............................................................. *passim*

*Nitsch v. Dreamworks Animation SKG Inc.*,
  315 F.R.D. 270 (N.D. Cal. 2016).........................................................................34

*Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*,
  2020 WL 6134982 (N.D. Ill. Oct. 19, 2020).........................................17, 34, 36, 38

*Olson v. Microsoft Corp.*,
  2001 WL 36083237 (D. Mont. Feb. 15, 2001) ......................................................39

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
  629 F.3d 697 (7th Cir. 2011) .........................................................................15, 17

*In re Opana ER Antitrust Litig.*,
  162 F. Supp. 3d 704 (N.D. Ill. 2016) ...................................................................43

*Pa. Emp. Benefit Trust Fund v. Zeneca, Inc.*,
  710 F. Supp. 2d 458 (D. Del. 2020).....................................................................42

*In re Passenger Vehicle Replacement Tires Antitrust Litig.*,
  767 F. Supp. 3d 681 (N.D. Ohio 2025)..................................................................17

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  491 F. Supp. 2d 20 (D. Mass. 2007) ....................................................................34

*In re Polyurethane Foam Antitrust Litig.*,
  314 F.R.D. 226 (N.D. Ohio 2014) .......................................................................28

*In re Pork Antitrust Litig.*,
  2025 WL 965367 (D. Minn. Mar. 31, 2025) .........................................................28

*In re Pork Antitrust Litig.*,
  495 F. Supp. 3d 753 (D. Minn. 2020)......................................................11, 13, 22

*In re Pork Antitrust Litig.*,
  665 F. Supp. 3d 967 (D. Minn. 2023)...................................................................26

*Price v. Long Realty, Inc.*,
  502 N.W.2d 337 (Mich. Ct. App. 1993) ...............................................................41

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*,
  709 F. Supp. 3d 478 (M.D. Tenn. 2023)................................................................15

*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*,
  971 F.2d 37 (7th Cir. 1992) ............................................................................19

*Rubio v. Cap. One Bank*,
  613 F.3d 1195 (9th Cir. 2010) .......................................................................41

*Saltzman v. Pella Corp.*,
  257 F.R.D. 471 (N.D. Ill. 2009) .....................................................................44

*Sanchez v. Walmart, Inc.*,
  733 F. Supp. 3d 653 (N. D. Ill. 2024) ............................................................27

*Sandee's Catering v. Agri Stats, Inc.*,
  2020 WL 6273477 (N.D. Ill. Oct. 26, 2020) ..................................................44

*Segal v. Amadeus IT Grp., S.A.*,
  2025 WL 963751 (N.D. Ill. Mar. 31, 2025) ....................................................37

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010) ........................................................................................40

*Slobin v. Henry Ford Health Care*,
  666 N.W.2d 632 (Mich. 2003) ........................................................................42

*Snyder v. U.S. Bank N.A.*,
  387 F. Supp. 3d 867 (N.D. Ill. 2019) .............................................................43

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ........................................................................................42

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  580 F. Supp. 2d 896 (N.D. Cal. 2008) ...........................................................30

*In re Sulfuric Acid Antitrust Litig.*,
  743 F. Supp. 2d 827 (N.D. Ill. 2010) ......................................................20, 26

*Sun Oil Co. v. Fed. Trade Comm'n*,
  350 F.2d 624 (7th Cir. 1965) ..........................................................................11

*Supreme Auto Transp. LLC v. Arcelor Mittal*,
  238 F. Supp. 3d 1032 (N.D. Ill. 2017) ...........................................................43

*In re Takata Airbag Prods. Liab. Litig.*
  *(Puhalla v. Mercedes-Benz USA, LLC)*,
  462 F. Supp. 3d 1304 (S.D. Fla. 2020) ..........................................................40

*In re Tecfidera Antitrust Litig.*,
  2026 WL 222173 (N.D. Ill. Jan. 28, 2026) ....................................................22

*Tex. v. Blackrock, Inc.*,
    2025 WL 2201071 (E.D. Tex. Aug. 1, 2025) ........................................................16

*In re Text Messaging Antitrust Litig.*,
    2009 WL 5066652 (N.D. Ill. Dec. 10, 2009) ......................................................11

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) ...................................................................... *passim*

*In re Text Messaging Antitrust Litig.*,
    782 F.3d 867 (7th Cir. 2015) ........................................................................14

*Tichy v. Hyatt Hotels Corp.*,
    376 F. Supp. 3d 821 (N.D. Ill. 2019) ...........................................................9, 23

*Tiz, Inc. v. S. Glazer's Wine and Spirits, LLC*,
    2024 WL 2785142 (N.D. Ill. May 30, 2024) ...................................................25

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001).................................................................30, 31, 34

*Toys "R" Us, Inc. v. F.T.C.*,
    221 F.3d 928 (7th Cir. 2000) .......................................................................23

*In re Turkey Antitrust Litig.*,
    642 F. Supp. 3d 711 (N.D. Ill. 2022) ........................................................ *passim*

*United States v. Consol. Packaging Corp.*,
    575 F.2d 117 (7th Cir. 1978) .......................................................................32

*United States v. Container Corp. of Am.*,
    393 U.S. 333 (1969).............................................................................16, 31

*United States v. Masonite Corp.*,
    316 U.S. 265 (1942).............................................................................32, 33

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940).............................................................................11, 26

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978).................................................................15, 30, 31, 37

*In re Urethane Antitrust Litig.*,
    683 F. Supp. 2d 1214 (D. Kan. 2010)..........................................................22

*In re Urethane Antitrust Litig.*,
    768 F.3d 1245 (10th Cir. 2014) ...................................................................14

*In re Vascepa Antitrust Litig.*,
  2023 WL 2182046 (D.N.J. Feb. 23, 2023) ............................................................40

*Vasquez v. Indiana Univ. Health, Inc.*,
  40 F.4th 582 (7th Cir. 2022) ...............................................................................34

*Wallace v. Bank of Bartlett*,
  55 F.3d 1166 (6th Cir. 1995) ...............................................................................19

*Wash. Cnty. Health Care Auth. v. Baxter Int'l Inc.*,
  2020 WL 1666454 (N.D. Ill. Apr. 3, 2020) ........................................................20

*Wash. Cnty. Health Care Auth. v. Baxter Int'l Inc.*,
  328 F. Supp. 3d 824 (N.D. Ill. 2018) ....................................................20, 23, 25

*Woodman's Food Mkt., Inc. v. Clorox Co.*,
  833 F.3d 743 (7th Cir. 2016) ...............................................................................43

## Statutes

Massachusetts General Laws chapter 93A  ................................................................45

## Other Authorities

Areeda & Hovenkamp, Antitrust Law ¶1436b2 ......................................................29

Fed. R. Civ. P. 12(b)(6)....................................................................................8, 13

Fed. R. Civ. P. 15(a)(2)........................................................................................45

Fed. R. Civ. P. 23.........................................................................................40, 43

## I.    INTRODUCTION

For decades, prices of frozen french fries, hash browns, tater tots, and other potato products ("Frozen Potato Products") were relatively stable. Comm. ¶¶107, 109; Cons.¶¶97–98; *see* DPP ¶81.[1] But during the alleged conspiracy period, there was a seismic change. DPP ¶¶181-84; Comm. ¶¶107, 109–10; Cons. ¶¶95–97. In 2021, the four largest producers of Frozen Potato Products in the United States—Lamb Weston, McCain, Simplot, and Cavendish (collectively, "the Processors")—increased their prices dramatically as input costs rose.[2] DPP ¶¶80, 83, 103–14; Comm. ¶¶72–77, 104, 107–10, 137, 179; Cons. ¶98. When those input costs later fell, one would have expected prices to fall, as they would in a competitive market. DPP ¶¶6, 72, 176; Cons. ¶¶10–12, 88, 98–99; Comm. ¶¶7–8; DPP ¶80. Instead, prices remained sky high, leading to unprecedented profits. Cons. ¶¶11–13, 91, 96; Comm. ¶¶6–8, 110–11. As one Lamb Weston executive observed, the Processors had "never ever seen [profit] margins this high in the history of the potato industry." DPP ¶¶10, 120, 122, 181; Cons. ¶¶13, 137, 139; *see* Comm. ¶¶6, 88, 156.

During the conspiracy period, the Processors changed their pricing methods to collectively impose "strong arm" price hikes. DPP ¶¶10, 11; Cons. ¶¶117–33. As one witness stated, these price increases were not "typical or historically how price increases" occurred and were "very suspect." DPP ¶9; Cons. ¶¶6, 109. Given the conspiracy, the Processors were unconcerned that customers would turn to their competitors for price relief. As one former Lamb Weston VP stated,

---

[1] The operative complaints are: Direct Purchaser Plaintiffs' Consolidated Class Action Complaint (ECF No. 183), Commercial Indirect Plaintiffs' First Consolidated Class Action Complaint (ECF No. 182), and the Consumer Indirect Purchaser Plaintiffs' Consolidated Class Action Complaint (ECF No. 184) (collectively, the "Complaints"). Plaintiffs cite to the complaints herein as follows: "DPP ¶__", "Comm. ¶__", and "Cons. ¶___", respectively.

[2] "Lamb Weston" refers to Lamb Weston Holdings, Inc., Lamb Weston, Inc., Lamb Weston BSW, LLC; Lamb Weston/Midwest, Inc.; and Lamb Weston Sales, Inc. "McCain" refers to Defendants McCain Foods Limited and McCain Foods USA, Inc. "Simplot" refers to Defendant J.R. Simplot Co. "Cavendish" refers to Defendants Cavendish Farms Ltd. and Cavendish Farms, Inc.

the Processors "absolutely" have "no incentive to fight that hard for each other's share." DPP ¶10; Cons. ¶¶7, 137. Instead, they were all "behaving themselves." *Id*. Indeed, recalling customers' threats to switch to competitors after Simplot's 2021 to 2023 price increases, a Director of Sales Solutions acknowledged: "but we knew we weren't worried about it." DPP ¶11; Cons. ¶¶8, 138.

During the conspiracy period, the Processors also advised their employees to take steps to conceal their anticompetitive conduct in order to evade antitrust liability. DPP ¶¶15, 102; Cons. ¶116; Comm. ¶¶69, 102, 175–80. Lamb Weston, for example, "instruct[ed] its managers to communicate about competitor pricing and business intelligence via text message instead of email to avoid creating email records that could be discovered in the event of an antitrust investigation." DPP ¶¶15, 102; *see also* Comm. ¶69; Cons. ¶116. "Although Lamb Weston managers received price announcements from their competitors, they were forbidden to email such announcements to C-suite executives so that company leadership could more plausibly deny receiving information about the announcements." DPP ¶¶15, 102; *see also* Cons. ¶116; Comm. ¶69.

Plaintiffs' allegations thus describe a classic antitrust story: in response to economic hardship, the Processors conspired to raise prices; when economic conditions improved, they continued colluding to maintain high prices. *See* Comm. ¶¶3–8, 102, 104–12; Cons. ¶¶98–99. The Processors implemented their scheme in part by exchanging competitively sensitive price and output data, directly with each other and through Circana LLC's ("Circana") PotatoTrack service. Comm. ¶¶9–10, 36, 95, 99–100, 210, 212–20; Cons. ¶¶2, 100–05; DPP ¶¶85–96. The result was Defendants inflated Frozen Potato Product prices that harmed all three proposed classes. Plaintiffs brought this lawsuit to remedy the substantial economic injuries resulting from Defendants' conduct, and the case should be decided after due consideration of all relevant facts and evidence. Defendants' motions to dismiss improperly seek to usurp this process and should be denied.

## II.     SUMMARY OF PLAINTIFFS' ALLEGATIONS

### A.     Defendants Implemented Parallel, Sustained Price Increases

In the 20 years before the Class Period[3] (1991–2020), Frozen Potato Product prices generally increased by about 2.5% per year. Comm. ¶6; *see* Cons. ¶97. During the Class Period, however, the Processors implemented a series of unprecedented price hikes, implementing near-simultaneous price increases in January 2021, February 2021, May 2021, February 2022, April 2022, and in the Spring of 2023, imposing parallel price increases with their competitors. DPP ¶¶103–17; Comm. ¶¶104–12; Cons. ¶¶117–33. The Processors began their coordinated price increases in 2021 and continued them well after a temporary rise in input costs fell. DPP ¶¶83, 103–17; Comm. ¶1; Cons. ¶98. While the Processors' input costs peaked in 2022—and then fell steadily—their price increases continued, as illustrated by the following graph:



---

[3] Plaintiffs define "the Class Period" as from January 1, 2021 until the time that the adverse effects of Defendants' anticompetitive conduct cease. DPP ¶213; Comm. ¶1; Cons. ¶193.

DPP ¶¶5, 83; Cons. ¶¶11, 98. As a result, Frozen Potato Product prices climbed **62%** between January 2022 and December 2024, allowing the Processors to reap record profits. DPP ¶¶10, 120, 122; Cons. ¶¶96–97; Comm. ¶¶6, 107. This pricing behavior marked a departure from previous price trends and defied fundamental economic principles. Industry analysts expected the Processors' profit margins to not be "durable longer term." Cons. ¶¶12, 95; Comm. ¶7; DPP ¶¶6, 80, 176, and in a competitive market, that prediction would have been correct—high profit margins would have prompted the Processors to undercut one another on price to win one another's customers. Cons. ¶¶88, 111, 134; Comm. ¶¶66, 84, 106; DPP ¶99. But the Processors conspired to maintain their high prices. Cons. ¶¶9, 12, 134–38; Comm. ¶¶66–94, 106, 112. For example, when a McCain employee wanted to compete with Lamb Weston on the price of battered fries, "the higher ups in the room" said no because they didn't want "to screw it up for everyone." Cons. ¶¶8, 138; Comm. ¶92; DPP ¶¶11, 121. And in 2023, the Director of Sales Solutions for Simplot admitted that the Processors were "push[ing] pricing" up rather than "going after new business." Cons. ¶¶7, 136; Comm. ¶¶85, 93; *see* DPP ¶¶10, 119, 179.

### B.      The Market for Frozen Potato Products Was Ripe for Collusion

The United States is one of the world's largest producers of potatoes, most of which are "sold in bulk to the Processors, who in turn use the majority of their purchased potatoes to make Frozen Potato Products." Cons. ¶84; Comm. ¶¶54–55. Approximately 17 billion pounds of United States-produced potatoes are frozen and sold, with an additional 6.39 billion pounds imported to the United States, including from Processors McCain and Cavendish. DPP ¶¶59–60; Comm. ¶55; *see* Cons. ¶84.

The Processors are horizontal competitors in the Frozen Potato Products market. *See, e.g.*, Comm. ¶214; DPP ¶1. They dominate the U.S. market for Frozen Potato Products with a staggering combined 98% market share: Lamb Weston 40%, McCain 30%, Simplot 20%, and Cavendish 7-

8%. DPP ¶¶98, 130; Cons. ¶145; Comm. ¶114. The Processors sell their Frozen Potato Products through two primary distribution streams: foodservice distribution (e.g., hotels, restaurants, schools, and hospitals) and retail distribution (e.g., grocery stores and convenience stores). *See* Cons. ¶87; Comm. ¶¶42, 45, 56, 57. Purchasers in either stream can purchase Frozen Potato Products for resale to indirect purchasers, such as grocery store shoppers. Cons. ¶87; Comm. ¶56.

Significant barriers to entry exist in the market, including the following:

- New frozen potato processing plants require hundreds of millions of dollars and take years to complete. Cons. ¶148; Comm. ¶123; DPP ¶¶136–37.

- New competitors also experience a lengthy timeline before new entrants can operate and achieve profits. DPP ¶137; Comm. ¶124.

- New processors need to acquire scarce inputs from potato growers who already have relationships—some exclusive—with the Processors. Cons. ¶149; Comm. ¶¶125–26; DPP ¶138.

- The buy-side of the market is extremely fragmented. Comm. ¶10.

Moreover, demand is highly inelastic: fluctuations in price minimally affect demand. DPP ¶¶142–48, 190; Cons. ¶¶150–51; Comm. ¶¶10, 128–31, 189. Because Frozen Potato Products are a staple of consumers' diets, "grocery stores will keep stocking them—and consumers will keep buying them—in the face of price increases." Cons. ¶151; Comm. ¶132. In other words, there are no close substitutes, so customers are likely to buy Frozen Potato Products even at supracompetitive prices. Cons. ¶152; Comm. ¶¶113, 132. Moreover, they are fungible commodities, making it easy for purchasers to switch suppliers. Cons. ¶¶153–54; Comm. ¶212; DPP ¶149.

In addition, executives in the Frozen Potatoes Products market share close relationships and communicated with each other closely through their "good ol' boys network." DPP ¶¶149–70; Cons. ¶155. In addition to meeting at trade association events, the Processors also had co-packing arrangements, DPP ¶¶32, 152, 153, 170; Cons. ¶¶156–71; Comm. ¶¶10, 73, 136, 138, 143, 145, 147, which required frequent discussions among the Processors, creating opportunities to

5

discuss prices and production. DPP ¶¶152–53; Cons. ¶¶157, 171; Comm. ¶¶135–50. This insular industry provides the exact conditions for coordinated, anticompetitive activity.

During the Class Period, the Processors took advantage of their overwhelming market power and the market's characteristics to raise and maintain the prices during the Class Period. DPP ¶¶191–92; Cons. ¶95; Comm. ¶¶66, 84, 92, 116, 151–54. In a typical market, the Processors would compete for Frozen Potato Product customers. DPP ¶¶99, 192; Cons. ¶88; Comm. ¶66. Instead, neither the Processors' market shares nor the market's size changed meaningfully over the Class Period. Combined with numerous opportunities to exchange information, monitor, and punish each other, the Processors asserted their market power by agreeing not to compete on price. DPP ¶192; Cons. ¶178; Comm. ¶¶1, 66–94, 105, 135–50, 186–87.

### C. Defendants Exchanged Competitively Sensitive Information in Furtherance of the Conspiracy

One central practice in Defendants' scheme was their exchange of detailed, timely, and competitively sensitive non-public information—both directly and through Circana's PotatoTrack service. DPP ¶¶85–92; Cons. ¶¶77, 101; Comm. ¶¶9, 36, 95–100, 139. Circana is a business that provides market information, tracking, analytics, and advisory services to its client. DPP ¶87. PotatoTrack's only commercial clients are the four Processors: they are the only companies that contribute data and the only companies that receive reports back from PotatoTrack. DPP ¶87; Comm. ¶¶97, 101; Cons. ¶101. The Processors each provide their company-specific data to Circana, which then sends back to the Processors detailed reports based on this information. DPP ¶88; *see* Comm. ¶97; Cons. ¶¶101, 103–05. One report described PotatoTrack as "a cooperative, wholesale and foodservice measurement service providing [individual item] level data for all frozen potato shipments from the four major frozen potato processors—Cavendish, [Lamb Weston], McCain and [Simplot]." DPP ¶89; Cons. ¶102. Since 2021, Circana has provided a

website to the Processors through which they could generate reports containing this competitively sensitive data themselves. DPP ¶¶93–96; *see* Cons. ¶103.

The Processors willingly share their confidential and commercially-sensitive data with Circana with full knowledge that the *only other commercial industry participants* – that is, the only companies that contribute data to, and the only companies that receive reports back from Circana – *are their three competitors in the market*. DPP ¶¶87, 96; Cons. ¶105; Comm. ¶¶9, 97. The granularity of this data—broken down by product type and geographic region—enabled Defendants to determine whether their prices were above or below the aggregate price per pound in a given product category, in a given region. DPP ¶95; Cons. ¶104; Comm. ¶100. Further, by exchanging and monitoring each other's "share" via PotatoTrack, Defendants were disincentivized from competing on price to increase market share. *Id.*; Cons. ¶¶103, 105; Comm. ¶¶9, 95–100.

PotatoTrack's detailed insights into Defendants' pricing strategies also offered the Processors an enforcement mechanism for their conspiracy. The Processors became aware of each other's pricing and market share in nearly real-time. That level of transparency gave the Processors confidence that they each would continue to raise and maintain prices in accordance with the conspiracy. *See id.*; Cons. ¶¶140–41; Comm. ¶¶9, 95–100.

The Processors' employees and executives in the tight-knit industry also shared pricing information directly; such as when a Lamb Weston employee moved to Simplot and provided price increase information to his new employer. DPP ¶12; *see also* DPP ¶¶14, 151; Comm. ¶¶135, 149–50; Cons. ¶9. And the Processors deliberately shared their pricing plans through price-increase letters to their customers—with full knowledge and expectation that these letters would be shared with their ostensible competitors. DPP ¶¶13, 79; Comm. ¶¶68–77, 135; Cons. ¶¶9, 94. Indeed, when a Simplot sales and marketing manager suggested changing the practice, her superiors

quickly shot down the idea because it would interfere with its competitors' access to their pricing information. Cons. ¶¶9, 94; Comm. ¶70. Defendants knew these exchanges were improper. Indeed, Lamb Weston managers were instructed to communicate about competitor pricing and business intelligence via text message instead of email to avoid creating a trail that could be discovered in the event of an antitrust investigation. DPP ¶¶15, 102; Comm. ¶69; Cons. ¶116.

## III.    LEGAL STANDARD

A motion to dismiss must be denied if the complaint alleges "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also In re Local TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *5 (N.D. Ill. Nov. 6, 2020) ("*TV Ads*") ("To survive a motion to dismiss under Rule 12(b)(6), the complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). There is no requirement of probability, rather plausibility calls for "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 938 (N.D. Ill. 2018).

"The Court views the complaint in 'the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor.'" *In re MultiPlan Health Ins. Provider Litig.*, 789 F. Supp. 3d 614, 625 (N.D. Ill. 2025) ("*Multiplan*") (quoting *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011)). "The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." *Int'l Equip. Trading, Ltd. v. Illumina, Inc.*, 2018 WL 3861575, at *2 (N.D. Ill. Aug. 14, 2018) (quoting *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990)).

## IV.    PLAINTIFFS PLAUSIBLY PLEAD A PRICE-FIXING CONSPIRACY

Defendants' primary argument on their motion to dismiss is that Plaintiffs do not allege an agreement. ECF No. 240 (cited herein as "Defs.' Br.") at 1–29 (*passim*). But it is black-letter law that antitrust plaintiffs may plead an agreement through circumstantial evidence, such as "(1) parallel conduct and (2) additional factual circumstances, or 'plus factors,' indicating an agreement." *Tichy v. Hyatt Hotels Corp.*, 376 F. Supp. 3d 821, 834 (N.D. Ill. 2019).[4] In evaluating such allegations, "[p]arsing the complaint to argue that each separate allegation doesn't support a conspiracy is the wrong way to determine if a conspiracy has been plausibly pleaded . . . [T]his type of divide-and-conquer analysis is disfavored across the law." *In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d 862, 904 (N.D. Ill. 2023) ("[T]he Seventh Circuit counsels in favor of analyzing legal issues in the aggregate, rather than disassembling facts."). Plaintiffs' allegations satisfy this standard.

### A.    Plaintiffs Plead Parallel Conduct

A "showing of parallel pricing requires only evidence that defendants acted similarly, not evidence that they charged the same prices or engaged in identical conduct." *In re Fragrance Direct Purchaser Antitrust Litig.*, 2025 WL 579639, at *8 (D.N.J. Feb. 21, 2025) (citation and internal quotations omitted); *MultiPlan*, 789 F. Supp. 3d at 637 ("[C]oncurrent adoption of a price-fixing scheme is not required to prove parallel conduct."); *In re Broiler Chicken Antitrust Litig.*,

---

[4] Because Plaintiffs have sufficiently alleged circumstantial evidence of an agreement, Defendants' argument that Plaintiffs lack direct evidence is of no moment. "Direct evidence of conspiracy is not a sine qua non," and "[c]ircumstantial evidence can establish an antitrust conspiracy." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627–629 (7th Cir. 2010) ("*Text Messaging II*"). Defendants' citation to *In re Dairy Farmers of Am. Cheese Antitrust Litig.*, 60 F. Supp. 914 (N.D. Ill. 2014), which merely describes what constitutes direct evidence, likewise does little to resolve the matter at hand.

290 F. Supp. 3d 772, 792 (N.D. Ill. 2017) ("*Broilers I*") (holding parallel conduct does not require uniformity in methods or amounts).

Leading up to the Class Period, Frozen Potato Product prices were relatively stable. DPP ¶5; Cons. ¶¶97–98; Comm. ¶¶107, 109. This period of stability was followed by repeated parallel price increases starting in 2021 that continued throughout the Class Period, as summarized below:

| | |
|---|---|
| **January 2021** | Within a day of each other, Simplot and McCain announced $0.04 price increases per pound effective March 15. DPP ¶105; Cons. ¶118; Comm. ¶72. (All prices in this table are per pound). |
| **February 2021** | McCain announced a price increase, soon followed by Simplot and Cavendish. DPP ¶106; Cons. ¶119; Comm. ¶74. |
| **May – June 2021** | • McCain announced price increases of $0.04 effective July 15. Comm. ¶75.<br>• Within 2 weeks, Lamb Weston announced price increases of $0.08 effective July 1. DPP ¶107; Cons. ¶121; Comm. ¶75.<br>• Cavendish announced a $0.04 per pound price increase effective July 15, 2021. DPP ¶107; Cons. ¶121; Comm. ¶75. |
| **October 2021** | Lamb Weston, McCain, and Cavendish issued price increase letters adding $0.08 to prices, effective December 15, 2021, within five days of each other. DPP ¶109; Cons. ¶123; Comm. ¶77. |
| **February 2022** | • February 11, Lamb Weston announced price increases on "battered and coated" products by $0.12 and $0.10 per non-battered products. DPP ¶111; Cons. ¶125; Comm. ¶79.<br>• February 15, Simplot announced the same increases on the same product groups and McCain announced $0.12 increases on all potato products. DPP ¶112; Cons. ¶126; Comm. ¶80.<br>• February 16, Cavendish announced $0.12 increases for battered, coated, and "formed items," and non-battered products. DPP ¶113; Cons. ¶127; Comm. ¶80. |
| **April 2022** | The Ivey and Coney restaurant revealed all four defendants raised prices by $0.12, and three hiked prices for coated products, all effective April 4, 2022. DPP ¶114; Cons. ¶129. |
| **February-March 2023** | February 14, McCain's price increase letter announced a $0.08 increase on all frozen potatoes. DPP ¶117; Cons. ¶133; Comm. ¶82.<br><br>• March 15, Lamb Weston issued a price increase letter announcing an increase ranging from $0.10 to $0.25, effective May 1. Cons. ¶133; Comm. ¶81. |

| | • March 31, McCain issued a price increase letter announcing an increase ranging from $0.04 to $0.15 per pound, effective May 15. DPP ¶117; Cons. ¶133; Comm. ¶81. |
|---|---|

Plaintiffs' allegations of near-simultaneous price increases far exceed the bar for alleging parallel pricing. *See, e.g.*, *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 725 (N.D. Ill. 2022) (finding sufficient allegations of parallel conduct when price increases took place over the course of five years); *In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 769-70 (D. Minn. 2020) ("*Pork I*") (finding sufficient allegations of parallel conduct with price increases taken over a period of two years); *Broilers I*, 290 F. Supp. 3d at 791 (finding sufficient allegations of parallel conduct for "two periods of production cuts of approximately one-two years each, in 2008–09 and 2011–12. These allegations are sufficient to allege conduct that took place at the same time."); *In re Text Messaging Antitrust Litig.*, 2009 WL 5066652, at *5 (N.D. Ill. Dec. 10, 2009) (finding price increases occurring ten months apart sufficient to allege parallel conduct).

Moreover, variations in pricing actions do not bar the Court from finding that Plaintiffs properly alleged parallel conduct. *See, e.g.*, *Broilers I*, 290 F. Supp. 3d at 791–792 (quoting *Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939)). Price increases need not be identical because unlawful price-fixing is not confined to agreements to charge uniform prices. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222–23 (1940). To the contrary, "an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Interstate Circuit*, 306 U.S. at 227; *see also Turkey*, 642 F. Supp. 3d at 723 ("[I]t is well settled . . . that the law does not require every defendant to participate in the conspiracy by identical means throughout the entire class period."). Courts have found price increases to be sufficiently parallel even when the amounts varied substantially. *See, e.g.*, *Sun Oil Co. v. Fed. Trade Comm'n*, 350 F.2d 624, 632 (7th Cir. 1965) (holding price-fixing combinations are per se

illegal regardless of whether prices were fixed uniformly); *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1077 (N.D. Ill. 2011) (holding some variation in amount and timing is not substantial enough to overcome the otherwise strong suggestion of conscious parallelism); *In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 769–772 (E.D. Pa. 2017) (finding evidence that one competitor raised prices by 125% while others raised them by between only 58% and 90% sufficient to create a genuine dispute of material fact concerning parallel behavior); *City of Moundridge v. Exxon Mobil Corp.*, 2009 WL 5385975, at *5 (D.D.C. Sept. 30, 2009) ("Price-fixing can occur even though the price increases are not identical in absolute or relative terms.").

Defendants erroneously rest their entire argument on the summary judgment decision, *after* the parties had the benefit of discovery, in *Kleen*. Defs.' Br. at 12; *see Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811 (N.D. Ill. 2017), *aff'd sub nom. Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018). And that decision turned on a finding that defendants were "forced to rescind their attempted price increases six times during the class period," an issue not present here. *Id.* at 826. Notably, the *Kleen* court *denied the motion to dismiss*, holding that the plaintiffs' allegations that "Defendants raised prices simultaneously or most Defendants raised prices closely following announced price increases by a small number of Defendants" was sufficient to allege "the required conscious parallelism." *Kleen Prods.*, 775 F. Supp. 2d at 1077.

Defendants' argument that Plaintiffs "at most" merely "allege lawful independent conduct" is equally without merit. Defs.' Br. at 13-14. Citing an appellate decision affirming *summary judgment,* Defendants argue that even if the Processors' pricing decisions were parallel, "parallel pricing is lawful and, standing alone, cannot support an inference of conspiracy because it is consistent with independent business judgment." *Id. citing Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018). However, as the *Kleen* court had previously observed in

*denying* the *Kleen* defendants' *motion to dismiss*, these arguments "do not refute the obvious plausibility of Plaintiffs' threshold showing of conscious parallelism for Rule 12(b)(6) purposes. Rather . . . they address whether one of the possible additional contextual [plus] factors are present." *Kleen Prods.*, 775 F. Supp. 2d at 1078. As explained below, Plaintiffs satisfy their burden for alleging parallel pricing *and* plus factors.

Together, Plaintiffs' allegations are sufficient, particularly at this stage, to show that Defendants "acted similarly." *See, e.g.*, *Pork I*, 495 F. Supp. 3d at 771 ("Given the inherent difficulty of obtaining solid information of an antitrust conspiracy—especially one involving sophisticated commercial entities—the evidence that Plaintiffs have marshalled is sufficient to survive the relatively low bar of the pleading stage.").

### B.      Numerous Plus Factors Support Plaintiffs' Allegations

Contrary to Defendants' arguments (Defs.' Br. at 14–21), Plaintiffs allege not only parallel conduct but also numerous plus factors,[5] including: (1) consciousness of guilt and concealment of communications; (2) sharing of competitively sensitive information; (3) opportunities to collude in a variety of forums; (4) price increases that cannot be explained by higher input costs; (5) price increases contrary to Defendants' individual self-interest; (6) price increases that depart from established practices; and (7) multiple additional industry characteristics that facilitate collusion.

Plus factors are facts, in addition to parallelism, from which a conspiracy can be inferred. *See Deere*, 703 F. Supp. 3d at 901 n.36. There is no exclusive list of plus factors. *Id.* They often include economic actions that are consistent with or suggestive of coordinated conduct as opposed to unilateral conduct that is in the best interest of a rational firm acting independently in its own

---

[5] A complaint that alleges only parallel behavior alleges facts that are "equally consistent with an inference that the defendants are conspiring and an inference that the conditions of their market have enabled them to avoid competing without having to agree not to compete," not that parallel pricing is presumptively lawful, as Defendants contend. *Compare* Defs.' Br. at 13 *to Turkey*, 642 F. Supp. 3d at 726.

best interest. *Id.* They also may include "a mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion." *Turkey*, 642 F. Supp. 3d at 722.

Defendants improperly attempt to isolate Plaintiffs' plus factor allegations and argue that they lack sufficient detail. Defs.' Br. at 14–21. But the law recognizes that "when a conspiracy is secret such details will not be available without discovery, and thus cannot be required at the pleading stage." *Broilers I*, 290 F. Supp. 3d at 788. When viewed as a whole, as they must be, Plaintiffs' alleged plus factors support the plausibility of the conspiracy. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (citation omitted) ("plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components"); *Deere*, 703 F. Supp. 3d at 903; *Broilers I*, 290 F. Supp. 3d at 797, 808 (rejecting attempt to "isolat[e] each factor" which would inappropriately require the Court to weigh competing evidence and draw inferences against Plaintiffs on a motion to dismiss).

### 1.    Consciousness of Guilt and Concealment of Communications

The Seventh Circuit has acknowledged that allegations of deleted emails can be evidence of collusive conduct (a plus factor) supporting an inference of a conspiracy as it can indicate an awareness of guilt. *See In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 873 (7th Cir. 2015). Numerous courts have found allegations implying consciousness of guilt and intentioned concealment a plus factor. *See, e.g., In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 663 (7th Cir. 2002) (statements suggesting knowledge of guilt "evidence of explicit agreement" sufficient to "present[] a genuine issue of material fact" for summary judgment); *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1264–265 (10th Cir. 2014) (discussing "unusual steps" to conceal conversations with competitors such as using "pay telephones instead of calling from [the] office" and using "a prepaid phone card" as well as meeting "with competitors at off-site locations, such as coffee shops or hotels"); *Blood Reagents*, 266 F. Supp. 3d at 777 ("[Defendant's] efforts to

14

conceal [an intercompetitor meeting] . . . raises an inference of conspiracy."); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 176 (D. Conn. 2009) (frequent and friendly communications between defendants and secrecy of their meetings sufficient to support inference of a price-fixing conspiracy).

Here, the Processors ordered employees to text instead of "creating emails that could be *discovered in the event of an antitrust investigation*." Cons. ¶116 (emphasis added); DPP ¶15; Comm. ¶¶69–70. They also "instructed [managers] not to email those announcements to C-level executives to give those executives *plausible deniability* regarding the information." Cons. ¶116; DPP ¶15; Comm. ¶¶69–70. The Processors' awareness of their guilt and "evidence of [an] explicit agreement" can be inferred from these allegations. *High Fructose*, 295 F.3d at 663.

### 2.    Exchange of Competitively Sensitive Information

Plaintiffs allege that the Processors exchanged competitively sensitive information via Circana's PotatoTrack and other means. It is well-established that exchanges of pricing and other competitive information among competitors—directly and through conduits—is a plus factor. *See MultiPlan*, 789 F. Supp. 3d at 641 (citing *In re Broiler Chicken Antitrust Litig.*, 2025 WL 461407, at *4 (N.D. Ill. Feb. 11, 2025) ("*Broilers III*")).[6]

#### a)    *Information exchanges through PotatoTrack*

Plaintiffs allege that the four Processors, who control approximately 98% of the $68 billion market for Frozen Potato Products in the United States, exchanged granular, non-public, pricing and other competitively sensitive information through PotatoTrack to facilitate their price fixing

---

[6] *See also United States v. U.S. Gypsum Co.*, 438 U.S. 422, 457 (1978); *Duffy v. Yardi Sys., Inc.*, 2024 WL 4980771, at *4 (W.D. Wash. Dec. 4, 2024) (conduits); *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 510 (M.D. Tenn. 2023) (conduits); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 709 (7th Cir. 2011) ("Information exchange can help support an inference of a price-fixing agreement").

conspiracy. *See* § II.C above. From this data and the reports generated, the four Processors could each see and assess side-by-side critical information from their three competitors. *See id.* The Processors submitted data weekly to PotatoTrack—typically end of the day on Friday, including sales and volume data in dollars, pounds, units, and product type. DPP ¶90; Comm. ¶97; *see* Cons. ¶¶101–05. Plaintiffs allege that the Processors used PotatoTrack to facilitate their price-fixing agreement in several ways. The reports enabled the Processors to make near lockstep price increases without fear of losing market share to undetected price competition. DPP ¶¶76–77; Comm. ¶¶95–100, 151–53; Cons. ¶¶140–41, and the data's granularity enabled the Processors to determine if their prices were above or below the aggregate price per pound by product category and to "slice and dice" the data by geographic region. DPP ¶95; Comm. ¶¶9, 36, 95–100; Cons. ¶104. The Processors could also use PotatoTrack to track and monitor each other's market share and output levels, disincentivizing them from competing on price to increase market share. *See, e.g.*, DPP ¶¶46, 90–96, 124–26; Comm. ¶¶9, 96–97, 99; Cons. ¶¶104–05, 141. *See Tex. v. Blackrock, Inc.*, 2025 WL 2201071, at *14 (E.D. Tex. Aug. 1, 2025) (holding information exchange related to output levels can "double as a plus factor" just like with pricing information) (citing *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 462 (9th Cir. 1990) (citing *United States v. Container Corp. of Am.*, 393 U.S. 333 (1969) and *Am. Column & Lumber Co. v. United States*, 257 U.S. 377 (1921)). Because these reports included data for only three other companies, they had tremendous value, and each Processor used the reports to facilitate the price-fixing agreement. DPP ¶91; Comm. ¶¶9, 36, 95–100; Cons. ¶¶103–05.

Defendants argue that mere exchanges of "price data and other information among competitors" is "presumptively lawful under the rule of reason[.]" Defs.' Br. at 15. None of the Defendants' cases (all but one of which are summary judgment opinions) states such a rule or

supports Defendants' argument. Instead, the cases confirm that "information exchange *can* help support an inference of a price-fixing agreement, but, like all circumstantial evidence of conspiracy, it is not on its own demonstrative of anticompetitive behavior, even when pricing data is what is exchanged[.]" *Omnicare*, 629 F.3d at 709 (emphasis added).[7]

Defendants claim that they exchange only anonymized, aggregate industry-level information (Defs.' Br. at 14–17), but such an unproven assertion is not dispositive on a motion to dismiss. Each Processor knew that PotatoTrack's data was sourced from only its own data and that of its three competitors, regardless of whether the data was nominally anonymized or aggregated. Cons. ¶¶101-05, 141, 221; DPP ¶¶87, 124, 243; Comm. ¶97. As courts within this District have observed, the granular level of data and small number of market participants (here four), make it easier to identify competitors' data despite nominal anonymization and creates a plausible inference that the service (here, PotatoTrack) enabled their price coordination. *See e.g., In re Broiler Chicken Antitrust Litig.*, 2019 WL 1003111, at *1–2 (N.D. Ill. Feb. 28, 2019) (denying "benchmarking" defendant Agri Stats' motion to dismiss, concluding its data included such detailed information that "the ostensible anonymity of the information [was] breached" and finding Agri Stats "plausibly knew that it was providing [defendant-broiler producers] with a non-public means for communicating production plans, thereby enabling the price fixing conspiracy"); *Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, 2020 WL 6134982 (N.D. Ill. Oct. 19, 2020)

---

[7] *See also Mitchael v. Intracorp., Inc.*, 179 F.3d 847, 859 (10th Cir. 1999) ("Mere exchanges of information, even regarding price, are not necessarily illegal, *in the absence of additional evidence that an agreement to engage in unlawful conduct resulted from, or was a part of, the information exchange*.") (emphasis added); *In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp. 3d 681, 716 (N.D. Ohio 2025) (identifying that (unlike here) "plaintiffs d[id] not explain what non-public information was supposedly exchanged or how it was, or even how it *could* have been, used" to enforce price-fixing behavior but recognizing that where such information *is* pleaded (as here) exchanging non-public information *can* support the plausibility of a horizontal price fixing conspiracy).

(granularly detailed reports meant defendant-turkey wholesalers could infer the company to which each data set referred).

Defendants also make much of PotatoTrack existing before the alleged conspiracy began, suggesting there is no explanation for why PotatoTrack "suddenly caused higher prices in 2021." Defs.' Br. at 14–15. But it is the Processors who implemented the conspiracy and Plaintiffs allege the first price increases, in 2021, followed the National Potato Council's Potato Expo, plausibly suggesting that the Processors reached an understanding at that meeting to utilize the PotatoTrack data in an anticompetitive manner. DPP ¶¶104, 155–56; Comm. ¶¶73, 136–37; Cons. ¶¶140–41. PotatoTrack's prior existence shows that a tool was available to implement the conspiracy and, further, by 2021, Circana had given the Processors access to a website through which they could run their own reports. DPP ¶94.

b)    *Exchanges of Pricing Information through Personal Relationships*

Plaintiffs also allege that Defendants' employees and executives in the tight-knit industry shared pricing information directly. DPP ¶¶12, 14, 85, 151; Comm. ¶¶135, 149–50; Cons. ¶9. For example, Plaintiffs allege, and Defendants do not deny, that a Lamb Weston employee moved to Simplot and provided price increase information to his new employer. *Id.* Defendants urge the Court to accept their wholly unsupported theory that this is an example of individual unilateral conduct. Defs.' Br. at 20 (citing *Greco v. Mallouk*, 2024 WL 4119169, at *8 (N.D. Ill. Sept. 9, 2024)). However, *Greco* says nothing about the supposed unilateral conduct of employees, and Defendants' unproven contention that the employee's conduct was "unilateral" should not be credited on a motion to dismiss.[8] *See generally id.*

---

[8] The *Greco* court concluded that plaintiffs failed to allege parallel conduct in the absence of other evidence supporting an inference that price cuts made close in time were done so in concert. *Greco*, 2024 WL 4119169, at *7. In contrast, here Plaintiffs allege parallel conduct and numerous plus factors, including allegations from which an explicit agreement and the Processors' awareness of their guilt can be inferred.

c)    *Circulation of Pricing Letters*

The Processors also cannot explain away their deliberate sharing of price increase letters. DPP ¶¶13, 78–79; Comm. ¶¶63–94, 135, 179–80; Cons. ¶¶9, 93–94. For example, when a Simplot sales and marketing manager suggested changing how price increases were communicated to prevent customers from sharing them with competitors, her superiors quickly rejected the idea to protect their competitors' access to their pricing information. DPP ¶¶13, 78–79; Cons. ¶¶9, 94; Comm. ¶70. Managers at Lamb Weston were told to communicate about competitor pricing and business intelligence via text message instead of email to avoid creating email records that could be discovered in the event of an antitrust investigation. DPP ¶¶15, 102; Comm. ¶69; Cons. ¶116. Defendants suggest that their sharing of pricing information is not evidence that they were conspiring[9] (Defs.' Br. at 20), but that certainly begs the question of why Defendants would worry about creating email records and affirmatively facilitate sharing pricing letters with competitors in the first place. Ultimately, Defendants' price sharing is a plus factor supporting denial of the motion to dismiss and a subject for discovery. *See TV Ads.*, 2020 WL 6557665, at *10, n.6 ("In the current posture of this case, the Court does not look to evidence to which Plaintiffs do not have access and instead only concerns itself with the plausibility of the allegations in the pleadings.").

3.    <u>Opportunities to Collude</u>

Industry events and trade association meetings can "facilitate price fixing." *See Text Messaging II*, 630 F.3d at 628; *accord Broilers I*, 290 F. Supp. 3d at 799–800. Although

---

[9] Contrary to Defendants' arguments and the cases they cite (Defs.' Br. at 20), Plaintiffs do not allege that Defendants were merely notifying customers of planned "price changes," and none of the cases cited by Defendants hold that Defendants facilitating and exchanging price information with each other is irrelevant (or as Defendants put it, "not evidence of a conspiracy") in a price-fixing case; all were decided at summary judgment and the courts merely concluded that the evidence of conspiracy was insufficient. *See Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 53 (7th Cir. 1992); *Wallace v. Bank of Bartlett*, 55 F.3d 1166, 1169–170 (6th Cir. 1995); *Petroleum Prods.*, 906 F.2d at 448 n.14.

opportunities to collude at trade association meetings are not *ipso facto* evidence of a conspiracy, when considered in the "larger context of the market and industry actions" including (without limitation) suspicious timing of industry meetings, evidence of these opportunities helps to "plausibly fill-out the picture" of an alleged agreement. *TV Ads*, 2020 WL 6557665, at *10 (citing *Broilers I*, 290 F. Supp. 3d at 799–800). Thus, for example, in *Broilers I*, the court concluded that where the plaintiffs had alleged suspicious timing of important industry conferences followed by unusual producer actions and market movements, those meetings plausibly helped complete the picture of those defendants' alleged conspiratorial agreement. *See Broilers I*, 290 F. Supp. 3d at 800; *see also Turkey*, 642 F. Supp. 3d at 727 ("opportunities to cooperate in trade associations" considered "in broader context" for relevance to plausible conspiracy).

Here, Plaintiffs allege the Processors had opportunities to collude at trade association events, where their executives and other personnel held leadership roles and had regular conversations about their present and future business opportunities with each other.[10] DPP ¶¶4, 158; Comm. ¶135; Cons. ¶155; *see also* DPP ¶¶157–58; Comm. ¶145; Cons. ¶170 (average attendee at American Frozen Food Institute chaired by Defendants' executives had 40+ private meetings to discuss current and future business opportunities). Defendants wrongly contend that the Complaints lack allegations of agreement or of specific, improper, conspiratorial communications made at trade association events. Defs.' Br. at 18–21 (citing *Wash. Cnty. Health Care Auth. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 843 (N.D. Ill. 2018) ("*Baxter I*")) and *Wash.*

---

[10] Defendants quibble about whether executives or other personnel attended the trade association events. Defs.' Br. at 19 n.12. Defendants are bound by the actions of their employees acting within the scope of their employment, regardless of whether they were executives or what their job titles were. *See Dana Container, Inc. v. Sec'y of Lab.*, 847 F.3d 495, 499 (7th Cir. 2017) ("Conduct is within the scope of employment when it is actuated, at least in part, by a purpose to serve the employer, even if it is forbidden by the employer.") (cleaned up) (citation omitted); *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 780 (N.D. Ill. 2020) (applying vicarious liability in antitrust context); *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 886 (N.D. Ill. 2010) (same).

*Cnty. Health Care Auth. v. Baxter Int'l Inc.,* 2020 WL 1666454 (N.D. Ill. Apr. 3, 2020) ("*Baxter II*"). To the contrary, Plaintiffs allege that at these industry events *Defendants made agreements to charge prices at certain levels*. DPP ¶227(b). *Text Messaging II*, 630 F.3d at 629. Moreover, Plaintiffs allege Defendants suspiciously initiated their conspiracy close in time to the January 5–7, 2021 Potato Expo held by the National Potato Council (of which *all* Defendants are sustaining members), issuing price letters in rapid succession around the time of the event, and persisting with successive price letters thereafter. *See* § IV.A above. Defendants also had opportunities to collude through common co-packing arrangements and the reciprocal sharing of competitively sensitive information—including directly shared pricing information—through personal relationships among Defendants' executives and other personnel in the industry's "good ol' boy's network." DPP ¶¶12, 14, 151–53; Comm. ¶¶135, 149–50; Cons. ¶¶155–57.

4.     The Pricing that Cannot be Explained Away by Higher Input Costs

Parallel price increases disproportionate to input costs are probative of "anomalous behavior because falling costs increase a seller's profit margin at the existing price, motivating him, *in the absence of agreement*, to reduce his price slightly in order to take business from his competitors, and certainly not to increase his price." *Text Messaging II*, 630 F.3d at 628 (emphasis added). Plaintiffs allege that the four "producers with near-total market control coordinated nearly identical price hikes for several years, resulting in unprecedented profit margins despite significantly declining input costs." DPP ¶72; Comm. ¶¶3–8, 87–89, 152; Cons. ¶88. These price increases were a sudden, jarring, departure from previous price increase practices and margins. *See* §§ I, II, IV.A above. Industry insiders boasted, and data showed, that the increased prices were untethered to increased costs. For example, in 2021 a former Lamb Weston executive indicated that Lamb Weston, Simplot, and McCain (who together control about 90% of the market) had "never ever seen margins this high." DPP ¶¶10, 120, 122, 181; Comm. ¶¶6, 88, 156; Cons. ¶¶13,

21

137, 139. A Simplot executive bragged in 2023 that "we've done a pretty good job at taking margin with these price increases." DPP ¶¶121, 178; Comm. ¶¶88, 154; Cons. ¶138. Federal Reserve data shows Frozen Potato Product prices climbed 62% between January 2022 and December 2024. DPP ¶¶5–6, 81–84; Comm. ¶¶6, 107–10; Cons. ¶¶97–98. And associated graphs show sharp declines in input costs around the same period. DPP ¶¶5–6, 83; Cons. ¶¶97–98; *see* Comm. ¶110. Defendants suggest they increased prices solely because of increased input costs. Defs.' Br. at 21–22. But the allegations of Defendants' executives' admissions of unprecedented margins belie that assertion. *See also* § IV.C below (responding to Defs.' Br. at 21–22). Ultimately, the Processors' pricing at extraordinarily high levels even after their input costs declined supports denial of their motion to dismiss. *See, e.g., Fenerjian v. Nongshim Co., Ltd*, 72 F. Supp. 3d 1058, 1079–80 (N.D. Cal. 2014) (holding price increases subsequent to onset of conspiracy are attributable to conspiracy at pleadings stage "even if other forces also increased the price at the same time") (citing *In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1235–236 (D. Kan. 2010)). And at this stage of the litigation, Defendants' competing reasoning must be rejected. *In re Tecfidera Antitrust Litig.*, 2026 WL 222173, at *8 (N.D. Ill. Jan. 28, 2026) (rejecting defendant's fact-based argument and finding that "again this would require the Court to weigh competing evidence and draw inferences against Plaintiffs, which is inappropriate on a motion to dismiss").

5.     The Price Increases Were Contrary to Independent Self-Interest

"Actions that would not be in the self-interest of competitors absent an agreement indicate an agreement, as it is irrational for a competitor to work against its own interests without assurances that others will do the same." *MultiPlan*, 789 F. Supp. 3d at 639 (citing *Deere*, 703 F. Supp. 3d at 908; *see also Twombly*, 550 U.S. at 556 n.4 (noting "parallel behavior that would probably not result from . . . mere interdependence unaided by an advance understanding among the parties" indicates explicit agreement); *Pork I*, 495 F. Supp. 3d at 768 (concerted action may be

shown through circumstantial evidence that "similar behavior would probably not" occur absent "an advance understanding among the parties"); *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 935 (7th Cir. 2000); *Tichy*, 376 F. Supp. 3d at 836–837 (actions against self-interest explain why particular actions taken by Defendants tend to bolster the inference of illegal coordination).

The Processors' dramatic price increases (particularly as input costs began to fall) would have been irrationally risky and thus against their individual self-interests *absent collusion.* This is because, by raising and maintaining high prices, each Defendant, acting individually, risked its competitors undercutting prices to take market share. DPP ¶¶99, 118, 177–79; Comm. ¶¶66, 84–85, 88, 93, 106, 112, 151, 153–54; Cons. ¶¶7, 111–12, 134. *Text Messaging II*, 630 F.3d at 628 ("in the absence of agreement, [sellers] reduce . . . price[s] slightly in order to take business from . . . competitors"); *MultiPlan*, 789 F. Supp. 3d at 640 (concluding that plaintiffs plausibly alleged that defendants, acting individually, risked customer loss and thus adequately alleged that defendants acted against their self-interests absent agreement).

Plaintiffs allege that the Processors *collectively* set high prices (despite industry-wide falling input costs) which, if done *individually*, would have exposed them to the risk of lost business. Incredibly, Defendants claim these allegations cannot support an inference of agreement because profit maximization is "ordinary" and "rational." Defs.' Br. at 17–18. The question is not whether Defendants were simply motivated to maximize profits; it is whether factors—taken together—plausibly suggest that Defendants were motivated to maximize profits *by conspiring*, which is what Plaintiffs allege here.[11]

---

[11] These allegations are among the many allegations distinguishing this case from the cases cited by Defendants. *See* Defs.' Br. at 17–18 (*citing Baxter I*, 328 F. Supp. 3d at 842–843 (finding insufficient plus factors and inferences of collusion involving "an implausibly complex and outlandish scheme to restrict output")); *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 49 (9th Cir. 2022) (recognizing typical oligopoly pricing motivations); *Hyland v. HomeServices of Am.*,

6.      Price Increases Departing from Established Practices

A firm's abrupt change in business practices and pricing can support an inference of conspiracy. *See Text Messaging II*, 630 F.3d at 628 (holding "allegation that all at once the defendants changed their pricing structures, which were heterogeneous and complex, to a uniform pricing structure, and then simultaneously jacked up their prices by a third," constitutes "the kind of 'parallel plus' behavior" that "would support a plausible inference of conspiracy") (citing *Twombly*, 550 U.S. at 556 n.4). Here, Plaintiffs allege that shortly after the Processors attended the January 5–7, 2021, National Potato Council's Potato Expo, they began a series of coordinated, regular, and seriatim price increases, that "dramatically changed from established practice" and were far more aggressive than the typical modest price increases they made over the prior decade. DPP ¶¶82, 97, 181; Comm. ¶¶73, 94, 104, 137, 158; Cons. ¶¶97, 109. In their Complaints, Plaintiffs graphically illustrate the sharp divergence from past practices. DPP ¶¶183–84; Comm. ¶¶109–10; Cons. ¶¶96–98. A former Lamb Weston manager stated this "wasn't typical or historically how price increases" occurred, and a former Lamb Weston executive similarly stated that "[i]t was very suspect." DPP ¶¶9–10, 97, 181; Comm. ¶¶4, 6, 88, 94, 156; Cons. ¶¶6, 13, 109, 137.

7.      Industry Characteristics Facilitate Collusion

In this Circuit, high market concentration is a well-recognized plus factor providing a plausible context for antitrust conspiracy. *See Text Messaging II*, 630 F.3d at 628 (high market concentration enhances the plausibility of an alleged conspiracy because "it would not be difficult for such a small group to agree . . . and to be able to detect 'cheating'"). Indeed, courts here

---

*Inc.*, 771 F.3d 310, 321–322 (6th Cir. 2014) (affirming summary judgment where evidence of conspiracy after discovery was insufficient to proceed)).

routinely hold that concentrated markets render price-fixing conspiracies more plausible at the pleading stage although industry structure *alone* may not get the complaint across the finish line.[12] *See TV Ads.*, 2020 WL 6557665, at *10 (cleaned up) (citing *Baxter I*, 328 F. Supp. 3d at 841).

Plaintiffs further bolster the plausibility of their claims by alleging the well-accepted market characteristics that are common to industries subject to cartelization, including concentrated sellers, high entry barriers, inelastic demand, few substitutes, and commodity products.[13] *See Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 927–928 (7th Cir. 2016) (collecting cases). Defendants argue that market structure allegations are not enough "standing alone." Defs.' Br. at 10-11, 18). However, Plaintiffs do not allege market factors *standing alone* but instead allege additional plus factors *and* parallel price increases in addition to market factors. *See* §§ IV.A, IV.B above.

### C. Defendants' Purported Alternative Explanations Do Not Defeat Plaintiffs' Plausible Conspiracy Allegations.

#### 1. Horizontal Conspiracies are Plausible When Competitors Face Cost Spikes

Defendants challenge Plaintiffs' conspiracy allegations by prematurely disputing facts and citing inapposite cases. Defs.' Br. at 21-22. They assert that the Processors' costs were increasing,

---

[12] *See, e.g.*, *Text Messaging II,* 630 F.3d at 627-29 ("four defendants sell 90 percent of U.S. text messaging services"); *Turkey*, 642 F. Supp. 3d at 727 ("80 percent of turkey production and processing"); *Broilers I*, 290 F. Supp. 3d at 796 ("88.8% of the market acting in concert is sufficient to control it"); *MultiPlan*, 789 F. Supp. 3d at 642 ("high market concentration" can "make an agreement possible"); *Tiz, Inc. v. S. Glazer's Wine and Spirits, LLC*, 2024 WL 2785142, at *18 (N.D. Ill. May 30, 2024) (same); *TV Ads*, 2020 WL 6557665, at *4, 9–10 (same); *Kleen Prods.*, 775 F. Supp. 2d at 1081.

[13] *See, e.g.*, *Highly Concentrated Sellers* (DPP ¶¶98, 127–34, 188–92; Comm. ¶¶113–21; Cons. ¶¶144–46); *High Entry Barriers* (DPP ¶¶127, 135–38; Comm. ¶¶113, 122–27; Cons. ¶¶144, 147–49); *Fragmented Buyers* (DPP ¶¶127, 139–41; Comm. ¶¶113, 128–31); *Repetitive Purchases* (DPP ¶16; Comm. ¶10); *Inelastic Demand* (DPP ¶¶127, 142–47; Comm. ¶¶113, 128–31; Cons. ¶¶144, 150–151); *No Close Substitutes* (DPP ¶¶127, 148, 189; Comm. ¶¶113, 132; Cons. ¶¶144, 152); *Commodity Product* (DPP ¶¶72, 127, 149, 149 n.83–84, 186; Comm. ¶¶133–34; Cons. ¶¶88, 144, 153–54, 173); and *Mechanisms to Exchange Confidential Information, Implement, and Monitor the Conspiracy* (*see* §§ IV.B.2 above; *see also* DPP ¶¶127, 150–74; Comm. ¶¶113, 135–50; Cons. ¶¶144, 155–71).

and this must be the sole reason for unprecedented Frozen Potato Product price increases. *Id.* However, as courts have recognized in similar cases, not only are these questions of fact, but "producers facing such economic conditions have an even greater incentive to conspire to fix prices." *Broilers I,* 290 F. Supp. 3d at 802. Therefore, "[t]he circumstances underlying Defendants' alternative innocent explanation also serve to make a price fixing conspiracy more likely." *Id*; *Sulfuric Acid,* 743 F. Supp. 2d at 870 ("producers could have colluded to reduce output and stabilize acid prices precisely to salvage profit—indeed, stay in business—in a dire economic climate"); *In re Pork Antitrust Litig.*, 665 F. Supp. 3d 967, 1004 (D. Minn. 2023) (factors that could lawfully increase pork prices, such as increased corn costs, created issues of fact; conspiracy can inflate prices above competitive levels despite rising costs and other market pressures). This is not surprising because the Supreme Court has long recognized that economic rationales cannot justify or excuse collusion. *See Socony-Vacuum*, 310 U.S. at 219–20 ("That other factors also may have contributed to that rise" in prices "is immaterial" when there is "[p]roof that there was a conspiracy, that its purpose was to raise prices, and that it caused or contributed to a price rise[.]").

These cases demonstrate that a market threatened by cost increases is ripe for collusion as competitors conspire to keep prices high and maintain their margins. Plaintiffs' allegations of prices staying high and the Processors' unprecedented margins defeat Defendants' proposed counter explanations for the price increases.[14] Accordingly, the Court should deny the motions to dismiss and allow this case to proceed to discovery.[15]

---

[14] Defendants' reliance on *In re Manufactured Home Lot Rents Antitrust Litig.*, 2025 WL 3485693 (N.D. Ill. Dec. 4, 2025) is misplaced (Defs.' Br. at 21), as that case had nothing to do with rising prices in the face of input cost increases and merely involved rent increases for mobile home lots coinciding with demand-side pressures in the rental market. *See id.* at *2, *13.

[15] Defendants' insinuation (Defs.' Br. at 5, n.5) that the Court may take judicial notice of "pandemic inflation" and its effect on input costs is inappropriate. These are not only questions of fact but are also outside the pleadings. *See generally* Complaints. On a motion to dismiss, the Court may only consider

### 2. This Case is Not About Forcing a Price Rollback or Policing Margins

Defendants complain that Plaintiffs are policing their margins and rollback prices at a time when costs decline. Defs.' Br. at 22. But the illegal conduct alleged is not merely having high margins; it is the agreement not to compete so as to maintain those margins. *See* DPP ¶116 (alleging that McCain's increased prices resulted in a 30% margin that would not be possible in a competitive market); Cons. ¶¶134, 137, 179; Comm. ¶¶66, 84, 92, 106, 151–54. Plaintiffs make detailed and specific allegations that, "[a]bsent agreement, an individual company's price increases would have been undercut by the other competitors and used to win sales and gain market share by maintaining lower prices." DPP ¶118; Comm. ¶¶66, 84, 106; *see* Cons. ¶134.

For example, a Lamb Weston VP expressly stated that the Processors were "behaving themselves" (a.k.a. adhering to their conspiratorial agreement) in order to maintain margins the level of which he had never seen in the history of the potato industry. DPP ¶¶10, 120; Cons. ¶¶12, 137; Comm. ¶¶88, 92. Similarly, a Simplot senior executive admitted that his company increased its prices and customers threatened to go to competitors, "but we knew we weren't worried about it." DPP ¶¶11, 121; Cons. ¶¶8, 138; Comm. ¶¶85–86, 93. The Processors were not worried and could enjoy their unprecedented margins because they knew that competitors would adhere to the conspiracy and not undercut them on price. DPP ¶121; Cons. ¶138; Comm. ¶¶85–86, 93.

---

allegations in the complaint, documents attached to the complaint, documents that are both referenced in the complaint and central to its claims, and information that is subject to proper judicial notice. *See Sanchez v. Walmart, Inc.*, 733 F. Supp. 3d 653, 660-61 (N. D. Ill. 2024) (declining to take judicial notice). It would be improper to take judicial notice of the relationship between generalized macroeconomic inflation and increased Frozen Potato Product prices as facts concerning the effects of inflation on the particular inputs are not before the Court. *See, e.g.*, *Burnell v. Swift Transp.*, 2014 WL 12586436, at *4 (C.D. Cal. Mar. 27, 2014) (declining to take judicial notice where defendant's argument regarding increased cost inputs because "that argument is not based on facts within the Court's ken"). Furthermore, Plaintiffs' complaints specifically allege that the price increases continued for years *after* the Processors' input costs *declined*. DPP ¶¶5, 83; Cons. ¶11; Comm. ¶¶3–8, 87–89, 152.

### 3. Purported Price Lags are Questions of Fact

In an attempt to bolster their wobbly implausibility argument, Defendants interpret a chart in Plaintiffs' Complaints and conclude, without support anywhere in the pleadings, that the chart "reflects lagged pricing adjustments." Defs.' Br. at 21–22 (also arguing that the chart shows that prices commonly adjust with a lag). But the chart does not support a price lag theory because it does not show a proportional decline in Frozen Potato Product prices during the period after input prices peaked and then fell dramatically, from spring 2022 to the present. DPP ¶5. Instead, there was no proportional decline in Frozen Potato Product price levels anywhere near the decline in input costs through August 2025. Moreover, the divergence in price and cost trends demonstrated in the chart indicates economically an increase in profits. This is why the chart demonstrates that January 2021 constitutes a structural change toward greater price aggressiveness induced by Defendants' conspiracy. Whether and why there are lags, and to what degree or duration, are classic questions of fact that will instead be the subject of expert analysis, and testimony that properly occurs at a later stage. *See, e.g.*, *In re Pork Antitrust Litig.*, 2025 WL 965367, at *8 (D. Minn. Mar. 31, 2025) (analyzing expert's use of lagged cost variables in regression analysis on a *Daubert* motion); *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 269 (N.D. Ohio 2014) (discussing expert's use of lagged price announcement variables in regression analysis to calculate classwide damages on a motion for class certification).

## V. PLAINTIFFS ALLEGE AN UNLAWFUL INFORMATION EXCHANGE CLAIM

In addition to their price-fixing claims (Count I), Plaintiffs state an independent claim based on Defendants' exchange of competitively sensitive information (Count II). DPP ¶¶85–96, 235–47; Cons. ¶¶100–05, 217–25; Comm. ¶¶9, 36, 95–100. As discussed in Section IV.B.2 above, Defendants exchanged competitively sensitive information through Circana's PotatoTrack, trade association meetings, and price increase letters. This conduct both supports Plaintiffs' price-fixing

28

claim and establishes an agreement to exchange information under the rule of reason standard.[16] Further, the exchange falls squarely within the category of restraints that courts and enforcement agencies consistently recognize as anticompetitive: the systematic exchange of current and future competitor-specific pricing information in a highly concentrated market with inelastic demand. DPP ¶¶86–96, 127–34, 142–47, 243–46; Cons. ¶¶101–05, 144–79; Comm. ¶¶9, 36, 95–100.[17]

Plaintiffs' information exchange claims easily survive Defendants' motion to dismiss when viewed under the rule of reason. The rule of reason requires three elements at the pleading stage: (1) an exchange of information; (2) resulting in anticompetitive effects; and (3) market power in proper antitrust markets. *See Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). Courts recognize these inquiries as "deeply fact intensive" and are therefore hesitant to grant motions to dismiss on rule of reason claims. *Dennis v. Andersons Inc.*, 2022 WL 22761475, at *6 (N.D. Ill. May 3, 2022). As demonstrated below, Plaintiffs readily satisfy this pleading standard, and Defendants' arguments should be rejected.

## A. Plaintiffs Plausibly Allege an Agreement to Share Competitively Sensitive Pricing Information

An information exchange requires collective and knowing reciprocation among participants, so the exchange itself proves a unity of purpose, common understanding, or meeting of the minds. *See, e.g.*, AREEDA & HOVENKAMP, Antitrust Law ¶1436b2 ("The [] information

---

[16] The Court need not resolve whether Plaintiffs' information sharing claim is subject to the *per se* rule or the rule of reason, as Plaintiffs' allegations are sufficient even under the more exacting rule-of-reason standard. *See Carbone v. Brown Univ.*, 621 F. Supp. 3d 878, 889 (N.D. Ill. 2022) (finding it "unnecessary to resolve" the question of whether the rule of reason or per se rule should apply at the motion to dismiss stage "[b]ecause it concludes that the plaintiffs state a claim for a section 1 violation even if the Rule of Reason applies").

[17] Statement of Interest of the United States, *In re Pork Antitrust Litig.*, No. 0:18-cv-01776-JRT-JFD, ECF No. 2616 (D. Minn. Oct. 01, 2024); *Principal Deputy Assistant Attorney General Doha Mekki of the Antitrust Division Delivers Remarks at GCR Live: Law Leaders Global 2023*, available at https://www.justice.gov/archives/opa/speech/principal-deputy-assistant-attorney-general-doha-mekki-antitrust-division-delivers-0.

exchange itself embodies a conspiracy to [] exchange[.]"); *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.) ("the violation lies in the information exchange itself"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 902 (N.D. Cal. 2008) ("the exchange of price information alone . . . [can show] the initial ingredient of a violation"). Such exchanges may both constitute evidence of a *per se* unlawful price-fixing (as discussed at § IV.B.2 above.) and be independently unlawful under the rule of reason. *See Todd*, 275 F.3d at 198.

Exchanged information has the highest anticompetitive potential when it involves current or future price information, is shared among conspirators, and is disaggregated and non-anonymized. *See Gypsum*, 438 U.S. at 441, n.16 (collecting cases). "Price exchanges that identify particular parties, transactions, and prices are seen as potentially anticompetitive because they may be used to police a secret or tacit conspiracy to stabilize prices." *Todd*, 275 F.3d at 212. And "exchanges of future price information are considered especially anticompetitive." *Id.* at 211.

Here, Plaintiffs allege that the Processors actively participated in Circana's PotatoTrack by providing—and obtaining in return—granular and competitively sensitive data, including pricing data broken down by product type. DPP ¶¶46–47, 77, 86–96, 124; Cons. ¶¶101–05; Comm. ¶¶9, 36, 95–100, 139. This shared data enabled Defendants to coordinate price increases, stabilize pricing, and artificially inflate Frozen Potato Product prices, as well as monitor their co-conspirators' compliance with the conspiracy. DPP ¶¶46, 124; Cons. ¶¶103–05; Comm. ¶¶9, 36, 95–100, 139. In fact, the Processors were able to customize their "dashboard" through which they viewed the PotatoTrack data by requesting customized reports broken down by product category. DPP ¶¶93, 95; Cons. ¶103; Comm. ¶99. In addition to PotatoTrack, the Processors exchanged price increase letters which specified the number of price increases and the effective dates of those

increases. DPP ¶¶78–79; Cons. ¶¶93–94, 118–30; Comm. ¶¶63–94, 70, 135, 179–80. This is an information exchange with the highest anticompetitive potential. *See Todd*, 275 F.3d at 211.[18]

Courts also look to "the structure of the industry involved" in information exchange cases, *Gypsum*, 438 U.S. at 441, n. 16, finding that "the possibility of anticompetitive collusive practices is most realistic in concentrated industries." *Todd*, 275 F.3d at 208. Here, the four Processors collectively control 98% of the Frozen Potato Products market with highly inelastic demand. DPP ¶¶127–34, 142–47, 241; Cons. ¶¶1, 144–46, 150–51; Comm. ¶¶2, 114, 128–31, 189. *Compare Container Corp. of Am.*, 393 U.S. at 337, 342 (deeming market of 18 sellers controlling 90% of the market sufficiently concentrated for an inference that the information exchange would have anticompetitive effects). The fact that only four commercial participants exchange information via PotatoTrack—*which Defendants knew*—further supports Plaintiffs' agreement allegations. *See* Cons. ¶¶77, 103, 141–42; *see also* DPP ¶¶86, 93, 95, 124; Comm. ¶97–100. *See Todd*, 275 F.3d at 211 (noting that aggregation mattered less because the information exchange had few enough participants that they could roughly determine how their competitors acted based on the aggregated data). Plaintiffs thus more than plausibly allege the first element of an information exchange claim.

### B.    Defendants Incorrectly Assert that Plaintiffs Fail to Allege an Agreement

Defendants challenge whether Plaintiffs allege an agreement—arguing that an exchange of information alone, absent an agreement, does not violate the Sherman Act. Defs.' Br. at 23–25. However, Plaintiffs allege that each of the four Processors agreed to provide their commercially sensitive data to PotatoTrack on a weekly basis *in exchange* for access to PotatoTrack reports and

---

[18] Defendants improperly ignore these allegations and argue that the data shared on PotatoTrack is "only aggregated" and "backward-looking market data." Defs.' Br. at 27–28. But Plaintiffs' allegations regarding the exchange of non-public, private, and commercially sensitive data is exactly what courts have proscribed. *See Todd*, 275 F.3d at 213 ("companies participating in the [information exchange] received compensation data broken down to subsets consisting of as few as three competitors"); *id.* ("Another important factor to consider in evaluating an information exchange is whether the data are made publicly available.").

a custom PotatoTrack dashboard containing each other's data. DPP ¶¶89–90; Cons. ¶¶101–02; Comm. ¶¶97–99. Further, Defendants' argument defies binding precedent, which makes clear that no "formal agreement," *Am. Tobacco v. United States*, 328 U.S. 781, 809 (1946), "personal communication," *United States v. Consol. Packaging Corp.*, 575 F.2d 117, 126 (7th Cir. 1978), or "'simultaneous action'" is required to establish a conspiracy. *United States v. Masonite Corp.*, 316 U.S. 265, 275 (1942). Indeed, courts in this Circuit have held that "[a]ll that is required [to allege an agreement to exchange information] is that Plaintiffs 'give enough details about the subject-matter of the case to present a story that holds together.'" *TV Ads*, 2020 WL 6557665, at *11 (concluding plaintiffs sufficiently alleged an agreement to exchange information).

Further, Plaintiffs are not asking the Court to infer the existence of an information-exchange agreement from the fact that each Processor had a separate PotatoTrack subscription *alone*. Defs.' Br. at 24. The Processors' subscriptions are just one allegation among many evincing an agreement. *See* § IV.B.2 above. *See, e.g.*, *Kleen Prods.*, 775 F. Supp. 2d at 1078 (the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole") (quoting *Cont'l Ore Co.*, 370 U.S. at 699).

In addition, there is no reason to credit Defendants' counter explanation that the subscription to PotatoTrack was in Defendants' unilateral best interest, particularly when viewing Plaintiffs' allegations as a whole. *See* Defs.' Br. at 24. In the Supreme Court's decision in *Masonite*, the participants in a price-fixing scheme signed a series of agreements over five years. *Masonite*, 316 U.S. at 270.[19] The Court held that defendants had violated Section 1 of the Sherman Act even though each had "acted independently of the others, negotiated only with Masonite,

---

[19] Courts in this District continue to cite to *Masonite* in their analysis of anticompetitive agreements. *See, e.g.*, *MultiPlan*, 789 F. Supp. 3d at 643 (concluding that plaintiffs plausibly alleged an agreement).

desired the agreement regardless of the action that might be taken by any of the others, did not require as a condition of its acceptance that Masonite make such an agreement with any of the others, and had no discussions with any of the others." *Id.* at 270, 275. This violated Section 1 even though it was "not clear at what precise point of time each [defendant] became aware of the fact that its contract was not an isolated transaction." *Id.* It was sufficient that "the arrangement continued" once each member of the conspiracy "became familiar" with it. *Id.* The same is true here—each Defendant knew Circana was obtaining and distributing forward-looking, competitively sensitive information from its competitors, and continued participating anyway.[20] Likewise, Defendants' argument that Plaintiffs must show individual agreements between each of the Processors (Defs.' Br. at 23–25) is incorrect and demands too much specificity at the pleading stage, as "[a]ny direct evidence of the agreement will only be uncovered through discovery." *See Broilers I*, 290 F. Supp. 3d at 804 ("[a]llegations that each defendant participated in the parallel conduct, participated in the meetings that provided the opportunity to collude, participated in Agri Stats, and participated in variable contracts or exports, are sufficient to allege participation in the agreement" on a motion to dismiss). Regardless, Plaintiffs allege sufficient actions by each

---

[20] Defendants' other cases (Defs.' Br. at 23–25) are factually distinct. Two involved vertical agreements, not horizontal as here. *See Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1083 (9th Cir. 2025) (involving allegations of agreement that were purely vertical in nature: "Plaintiffs do not contest the district court's finding that they failed to allege facts from which such [a horizontal] agreement among Hotel Defendants could be inferred."); *In re Generic Pharm. Pricing Antitrust Litig.*, 2025 WL 388813, at *4 (E.D. Pa. Feb. 3, 2025) (analyzing a series of "vertical agreements, which occur among actors at different levels of market structure"). Another involved an exchange of old information. *See In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 678 (N.D. Ill. 2023) (decision turning on an exchange of **45-day old** information). By contrast, Plaintiffs allege that here Defendants exchanged ***current*** and ***forward-looking*** price information, including price-increase letters, which had a substantial anticompetitive effect. DPP ¶¶79, 86–96, 243–46; Cons. ¶¶93–94, 105, 118–28; Comm. ¶¶63–94, 102–03, 135, 179–80, 187, 216. And another turned on unique facts involving an accused monopolist manufacturer conspiring with its distributors to protect its dominant position from competitors; it did not address a situation, like the one here, where horizontal competitors used a third party to facilitate an agreement not to compete on price. Put simply, there was no PotatoTrack there. *See Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 837 (7th Cir. 2020).

Defendant that would not have occurred absent agreements among the Processors and that plausibly allege that Defendants conspired to exchange competitively sensitive information with one another through Circana's PotatoTrack. *See* § IV.B.2 above.

### C. Plaintiffs Sufficiently Allege Anticompetitive Effects

On a motion to dismiss, a court will find anticompetitive effects when the complaint alleges "a plausible causal relationship between the information exchange and the alleged changes in pricing and output." *Olean*, 2020 WL 6134982, at *7. Plaintiffs identify the Processors' multiple parallel price increases and allege that their conspiracy to inflate, increase, and stabilize prices directly harmed the Classes which had to pay supra-competitive prices for Frozen Potato Products. *See, e.g.*, DPP ¶¶26–28, 80–82, 98, 103–117, 202–206, 230–32, 246; Cons. ¶¶96–99, 136; Comm. ¶¶1, 11, 112, 200, 205, 222–24.[21]

This harm is not theoretical. *See, e.g.*, *Todd*, 275 F.3d at 197, 211–213 (frequent exchange of partially aggregated current and future information "reduced the incentive for defendants to bid up salaries"); *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 36–37 (D. Mass. 2007) (crediting theory that "asymmetric information . . . pose[d] problems for price competition," removing "competitive pressure on doctors to lower [] prices"), *aff'd*, 582 F.3d 156 (1st Cir. 2009); *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 297–298 (N.D. Cal.

---

[21] Defendants effectively concede that Plaintiffs have satisfied the third factor for a proper information exchange claim – market power in proper antitrust markets. In a footnote, Defendants contend that Plaintiffs have not sufficiently pled a market definition. Defs.' Br. at 26 n.15. An antitrust complaint needs "to allege only one plausible geographic market to survive a motion to dismiss." *Vasquez v. Indiana Univ. Health, Inc.*, 40 F.4th 582, 584–585 (7th Cir. 2022). Here, Plaintiffs allege a plausible geographic market encompassing the continental United States. DPP ¶187; Cons. ¶174; Comm. ¶¶184, 211. Plaintiffs also allege the existence of a single market for Frozen Potato Products in the United States. Indeed, Frozen Potato Products are a recognized standalone commodity tracked and analyzed by the Federal Reserve. DPP ¶¶149, 186; Cons. ¶173; Comm. ¶¶107, 133–34. Defendants' attempt to fragment Plaintiffs' alleged product market by claiming, that "Frozen Potato Products" sweeps in products that are outside PotatoTrack's scope and "groups together disparate items" not only suggest facts outside the pleadings but also improperly parses Plaintiffs' conspiracy allegations.

2016) (showing anticompetitive effects through "economic models of asymmetric information"). Given the market structure of Frozen Potato Products—including high concentration, commoditized products, and inelastic demand—the type of information exchange facilitated by PotatoTrack was highly likely to produce anticompetitive effects, including suppressing competition among Defendants and inflating, increasing, and stabilizing the price of Frozen Potato Products. DPP ¶¶86–96, 127, 130, 142–47, 243–46; Cons. ¶¶144–54; Comm. ¶¶9, 11, 95–100. Defendants argue that Plaintiffs fail to allege facts that PotatoTrack impacted or caused the Processors to increase prices in the relevant time period. Defs.' Br. at 25–26. But Plaintiffs detail Defendants' simultaneous and near-simultaneous price increases in January 2021, February 2021, May and June 2021, and October 2021, as well as through 2022 and 2023. DPP ¶¶103–19; Cons. ¶¶117–33; Comm. ¶¶4, 71–77, 79–82, 104, 137, 157, 179. These facts, combined with the Processors' reciprocal sharing of price and volume data through various means, including Circana's PotatoTrack, and ability to monitor the conspiracy are sufficient to allege anticompetitive effects. Notably, Simplot's Director of Sales Solutions acknowledged Defendants' confidence in their agreement and its success: they "weren't worried" about customers' threats to switch to its competitors." DPP ¶121; Cons. ¶¶138; Comm. ¶¶88, 154. In any case, such in-depth analysis is better suited for summary judgment on a full record, rather than on a motion to dismiss. *See Broilers III*, 2025 WL 461407, at *6 (rejecting defendant's similar argument, noting that "this isn't summary judgment" and reasoning that "exchange of price information can plausibly indicate participation in a conspiracy under the right circumstances, such as the parallel price increases by competitors alleged here").

Defendants' novel suggestion that PotatoTrack's existence since 2008 precludes it from serving as an anticompetitive tool is unavailing. *See* Defs.' Br. at 27. Plaintiffs allege that the

Processors instigated the conspiracy to exchange information and coordinate with Circana and its PotatoTrack service to implement and monitor it. In fact, Plaintiffs point to a distinct change in the Processors' pricing practices beginning in 2021. As alleged, their parallel price hikes were not "typical or historically how price increases" occurred and were "very suspect." *See* DPP ¶¶9, 97; Cons. ¶¶6, 109. Regardless, nothing in the Complaints suggests that PotatoTrack was static over the years. To the contrary, Plaintiffs allege that by 2021, Circana provided the Processors with a website through which they could readily run the reports themselves. DPP ¶94.

Further, Plaintiffs allege that the price information provided by PotatoTrack was just one means through which the Processors effectuated and policed their unlawful information exchange. Plaintiffs also allege that Defendants, which concentrated price-setting powers among few employees, exchanged price increase letters, had "co-packing agreements," had personal relationships with one another, and attended trade association meetings together to collude. DPP ¶¶14, 73–75, 150–74; Cons. ¶¶64, 89–91, 101–31, 155–71; Comm. ¶¶10, 73, 136, 138, 143, 145, 147. Defendants' focus on PotatoTrack improperly dismembers the alleged conspiracy. *See, e.g.*, *Broilers I*, 290 F. Supp. 3d at 800 (rejecting similar argument, concluding that "[p]laintiffs clearly allege, however, that the information provided by Agri Stats simply facilitated the conspiracy. It was a tool Defendants used to help implement their conspiracy."). Defendants' counterfactual arguments as to why Plaintiffs' allegations do not suggest anticompetitive effects are easily rejected at this stage. *See Olean*, 2020 WL 6134982, at *7 ("Whether the alleged divergence was actually caused by some exogenous phenomenon or was instead the result of the information exchange is a question of fact that is not appropriate for the Court to resolve at this juncture.").[22]

---

[22] Defendants' cases do not require a different result. Defs.' Br. at 25-26. In *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 567–68, 585–586 (1925), the court examined flooring prices and found that they "corresponded to the law of supply and demand" with "no abnormality" compared to commodity prices

### D. **The Consumers Plausibly Allege an Information-Exchange Claim**

Defendants assert that Consumer Plaintiffs' information exchange claim must fail because the information exchanged through PotatoTrack relates only to the food service channel. Defs.' Br. at 28-29. But that ignores the heart of Consumer Plaintiffs' claims. As Defendants point out, Plaintiffs allege information exchanged via PotatoTrack was foodservices data. Cons. ¶102. However, Defendants' assertion that "there can be no effect by PotatoTrack on Frozen Potato Product retail prices" Defs.' Br. at 29, requires a logical leap that Plaintiffs' allegations contradict. Plaintiffs clearly allege that Defendants' unlawful information exchange had anticompetitive effects on both food service *and* retail prices.

First, Consumers allege that the same "senior executives set prices for Frozen Potato Products for both [the Processors'] foodservice and retail divisions." Cons. ¶89. This was "[a] small number of individuals"—"J.R. Simplot invested pricing authority in a single individual, [and] Lamb Weston's entire retail division had a team of three individuals setting prices for Frozen Potato Products." Cons. ¶90. Unsurprisingly, this small group of executives raised prices for both

---

generally. By contrast, Defendants here admitted that they "have never ever seen margins this high in the history of the potato industry," (DPP ¶10; Cons. ¶139; Comm. ¶¶6, 88, 156) and that these price hikes were not due to an increase in demand, (Comm. ¶¶110, 117), nor to a decrease in supply or increase in costs. DPP ¶¶62, 83; Cons. ¶98; Comm. ¶¶110, 175, 178–79. In addition, unlike PotatoTrack, the trade association at issue in *Maple Flooring* did not share current or future price quotations, which carry "the greatest anticompetitive potential." *Gypsum*, 438 U.S. at 441 n.16.

Defendants' reliance on *Segal v. Amadeus IT Grp., S.A.*, 2025 WL 963751, at *6 (N.D. Ill. Mar. 31, 2025), is similarly unpersuasive. There, the plaintiff did not allege sharing of prices, only occupancy information. *Id.* Plaintiffs here, by contrast, allege direct exchange of current and future price information, (DPP ¶¶12–14, 85, 150; Cons. ¶105; Comm. ¶¶102–03, 187, 216) and "make a plausible case, and not a contradictory one," *id.*, that knowing competitors' future prices allowed Defendants to raise prices without fear of being undercut. DPP ¶¶11–12, 96; Cons. ¶¶111–12; Comm. ¶¶66, 84, 106. Likewise, *Cont'l Cablevision of Ohio, Inc. v. Am. Elec. Power Co.*, 715 F.2d 1115, 1119 (6th Cir. 1983), an out-of-circuit, post-trial opinion is inapposite, as it did not assess the sufficiency of a pleading on a motion to dismiss. Further, unlike Defendants here, the *Cablevision* defendants were regulated utilities without ultimate control over their own prices. *See id.* ("The rates charged . . . were established by the service company" rather than the utilities themselves).

the foodservice and retail divisions in tandem. Cons. ¶5. For example, "multiple J.R. Simplot witnesses noted that they could not recall a situation in which a price hike did not impact both foodservice or retail." Cons. ¶89. Likewise, price increases at McCain "were typically made across the board in both foodservice and retail." *Id.* "Defendant Processors' price increases impacted both their foodservice (*e.g.*, restaurants) and retail (*e.g.*, grocery stores) distribution channels. Industry insiders reported that price increases always (or nearly always) impacted both distribution channels." *Id.* ¶5. A "long-time Simplot retail sales and marketing manager suggested that her employer change the method in which it distributed" price increase letters, only for her supervisor to refuse. *Id.* at ¶94. The Processors, therefore, clearly understood their price increases to impact retail sales—and a conspiracy to increase foodservice prices would necessarily impact retail prices.

Second, Plaintiffs more than plausibly allege that this information exchange had anticompetitive effects on Consumer Plaintiffs. Multiple courts have found that a plaintiff need only allege a plausible causal connection between the information exchange and the harm to consumers to survive a motion to dismiss. *See, e.g.*, *TV Ads.*, 2020 WL 6557665 at *8; *Olean*, 2020 WL 6134982 at *6–7. Plaintiffs outline numerous parallel "price increase[s] on *all potato products*[,]" Cons. ¶133, that the Processors instituted over multiple years, with no distinction between foodservice and retail products. *See* Cons. ¶¶118–33. Plaintiffs point to the NPPB's use of Circana data to influence prices, noting that NPPB relied on Circana pricing data to inform the Processors "that '[p]otato retail sales increased 16.9% in sales btu decreased in volume by 4.4% from January – March 2023 […] *[a]ll* categories of potatoes increased in dollar sales[.]'" Cons. ¶163. Plaintiffs specifically allege that NPPB and the Processors used their "access to Circana's data" to "know which direction and how much to move pricing." *Id*. Accordingly, Defendants' attempt to cabin the PotatoTrack information exchange to the foodservice channel fails as a matter

of both logic and pleading, because Plaintiffs allege in detail that pricing decisions, information flows, and anticompetitive effects operated across both markets in tandem.

## VI.    DEFENDANTS' MOTION AS TO INDIRECT PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DENIED

The IPPs bring claims only under consumer protection and antitrust statutes that harmonize with federal law and which rise and fall with the Sherman Act claims. None of Defendants' limited state-specific challenges has merit. Defs.' Br. at 29-34.

### A.    Illinois Brick Does Not Serve to Bar Any of IPPs' Antitrust Claims

Defendants wrongly claim *Illinois Brick* bars IPPs' claims under Florida, Montana, Colorado and New Jersey law. Defs.' Br. at 31. Florida state courts permit indirect purchaser claims under the Florida Deceptive and Unfair Trade Practices Act because the legislature intended to "protect consumers through the authorization of such indirect purchaser actions." *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 108 (Fla. Dist. Ct. App. 1996). Most district courts have followed the state court's reasoning.[23] The "plain language" of Montana's antitrust statute, "as well as Montana's strong policy favoring access to the courts," renders the *Illinois-Brick* rule inapplicable.[24]

As for Colorado and New Jersey, IPPs agree that the *Illinois Brick* repealer statutes there do not have retroactive application and thus IPP's claims under those laws begin on the effective dates of repeal (June 7, 2023, for Colorado and August 5, 2022, for New Jersey). *See Mass. Laborers' Health & Welfare Fund*, 783 F. Supp. 3d at 448; *Fragrances*, 2025 WL 579639, at *19.

---

[23] *See, e.g. In re Capacitors Antitrust Litig.*, 2018 WL 4558265, at *3 (N.D. Cal. Sep. 20, 2018) (declining to dismiss claim because "plain language of the FDUTPA does not on its face rule out IPPs' allegations[]"); *In re Liquid Aluminum Sulfate Antitrust Litig.*, 2017 WL 3131977, at *23 (D.N.J. July 20, 2017) (properly alleged violations of Sherman Act sufficient to constitute deceptive or unfair conduct under FDUTPA).

[24] *Mass. Laborers' Health & Welfare Fund v. Boehringer Ingelheim Pharm., Inc.*, 783 F. Supp. 3d 417, 444 (D. Mass. 2025) (collecting cases); *Olson v. Microsoft Corp.*, 2001 WL 36083237, at *1 (D. Mont. Feb. 15, 2001) ("[N]othing in the statute . . . limits or restricts an injured person to a direct purchaser.").

**B.** **Rule 23 of the Federal Rules of Civil Procedure Permits IPPs to Bring Classwide Claims, Regardless of State Procedural Rules**

Federal Rule of Civil Procedure 23 supersedes state procedural laws that prohibit maintenance of class action lawsuits in *state* courts. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 397–406 (2010); *see also Broilers I*, 290 F. Supp. 3d at 818 ("The availability of the class action procedure does not change the substantive rights or remedies available to [plaintiffs] under Illinois law . . . . Therefore, the Court will not dismiss Plaintiffs' Illinois antitrust claim on the basis of the Illinois's class action bar."). For this reason, Defendants' argument that class actions are barred by the antitrust or consumer protection statutes in Arkansas, Illinois, Montana, and Tennessee fails. Defs.' Br. at 31–32.[25]

**C.** **The Consumer Protection Laws Invoked by Commercial Plaintiffs Apply to Antitrust Violations**

Contrary to Defendants' argument (Defs.' Br. at 32), the consumer protection laws of Michigan, Minnesota, Oregon, Rhode Island, and South Dakota apply to antitrust violations. *See, e.g., Fragrances*, 2025 WL 579639, at *21–22 (sustaining state consumer protection claims based on price-fixing allegations, including under Minnesota law); *In re Generic Pharm. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 845–46 (E.D. Pa. 2019) ("*Generics*") (sustaining claims

---

[25] *See also In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 553 (N.D. Ill. 2019) (denying motion to dismiss class claims under Alaska, Arkansas, and South Carolina statutes despite class action bars in those states); *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1336 (11th Cir. 2015) (state statute restricting class actions does not apply in federal court because "Rule 23 controls"); *In re Crop Prot. Prods. Loyalty Program Antitrust Litig.*, 779 F. Supp. 3d 624, 654 (M.D.N.C. 2025) (denying motion to dismiss plaintiffs' class claims under Arkansas, Illinois, Montana, and South Carolina law); *In re Vascepa Antitrust Litig.*, 2023 WL 2182046, at *5 (D.N.J. Feb. 23, 2023) ("[T]his Court joins those district courts that have found that Rule 23, as a properly enacted federal procedural rule, controls the availability of the class action mechanism in federal court, not Section 7(2) of the Illinois Antitrust Act"); *In re Takata Airbag Prods. Liab. Litig. (Puhalla v. Mercedes-Benz USA, LLC)*, 462 F. Supp. 3d 1304, 1322 (S.D. Fla. 2020) (denying motion to dismiss, holding that plaintiffs' class claims under Arkansas and Tennessee law could proceed despite class action bars in those states); *Cardenas v. Toyota Motor Corp.*, 418 F. Supp. 3d 1090, 1107 (S.D. Fla. 2019) (holding plaintiff could assert class claim under substantive Tennessee law in federal court despite state class action bar).

under Michigan, Minnesota, and South Dakota consumer protection statutes); *Liquid Aluminum*, 2017 WL 3131977, at *27 (sustaining claim under Oregon statute); *Long v. Dell, Inc.*, 93 A.3d 988, 1000 (D.R.I. 2014) (Rhode Island consumer protection statute "is a remedial act and it should be liberally construed.").[26]

Even if any of these statutes are deemed to demand deception or misrepresentation to support consumer protection claims, Commercial IPPs satisfy that standard by alleging that Defendants (i) actively concealed their conspiracy and (ii) affirmatively misled customers into believing Frozen Potato Product prices were competitive and price increases were driven by legitimate market forces. *See, e.g.*, Comm. ¶¶102, 177–80. Accordingly, Commercial IPPs plausibly allege unfair and deceptive business acts and Defendants' motion to dismiss these state law claims should be denied. *See, e.g., Liquid Aluminum*, 2017 WL 3131977, at *27–28 (allegations that defendants issued pretextual explanations for price increases, such as "raw material cost increases" and "worldwide competition" sufficient to allege deception).

### D. Commercial Plaintiffs Properly Allege Claims Under State Consumer Protection Statutes

Defendants argue that Commercial Plaintiffs' state law claims for District of Columbia, Michigan, Oregon, Rhode Island, and Vermont do not cover commercial resellers and apply only to purchases for "personal, family or household use." Defs.' Br. at 32. However, as a general matter, state consumer protection laws should be construed liberally and given the broadest possible remedial effect. *See, e.g.*, *Price v. Long Realty, Inc.*, 502 N.W.2d 337, 342 (Mich. Ct. App. 1993) (Michigan consumer protection statute "is a remedial statute designed to prohibit

---

[26] Defendants also argue in Appendix A that IPPs' California Unfair Competition Claims should be dismissed because "fraud claims require reliance." ECF No. 240-1 at 2. IPPs bring their claims under the "unlawful" prong of the statue, not fraud. *See Rubio v. Cap. One Bank*, 613 F.3d 1195, 1204 (9th Cir. 2010) (by alleging a federal statute violation, a plaintiff "also alleged a UCL violation under the prong of the UCL that prohibits 'unlawful' business acts or practices).

unfair practices in trade or commerce, it must be liberally construed to achieve its intended goals."); *Long*, 93 A.3d at 1000 (same).

Accordingly, when interpreting consumer protections statutes that limit their scope to not cover commercial resellers, courts focus on "the use to which the goods [will ultimately] be put," rather than on the characterization of any particular plaintiffs. *Pa. Emp. Benefit Trust Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 482–483 (D. Del. 2020). Courts will recognize the claims of those who act as "conduit[s] or intermediar[ies]," obtaining goods and then "pass[ing] them along" for the ultimate consumer's "personal, family or household" use. *Slobin v. Henry Ford Health Care*, 666 N.W.2d 632, 635 (Mich. 2003); *see also In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 495 F. Supp. 2d 1027, 1033–34 (N.D. Cal. 2007) (allowing insurance intermediaries to bring consumer protection claims).

Here, the Commercial Plaintiffs are "intermediar[ies]" that purchase Frozen Potato Products and then "pass them along" to individual consumers who will use and consume them for "personal, family or household purposes." *Slobin*, 666 N.W.2d at 635. Furthermore, Frozen Potato Products are consumer-oriented products. Therefore, the Commercial Plaintiffs' consumer protection claims are properly stated and should not be dismissed.

### E.     IPPs Have Article III Standing

Article III requires a plaintiff to show that she has suffered injury in fact that is "fairly traceable to the challenged conduct of the defendant" and is likely to be "redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The IPP named plaintiffs allege that they were overcharged (i.e., the injury in fact), because of Defendants' anticompetitive acts (i.e., the injury is traceable to the defendants), and that these wrongs should be redressed by injunctive relief and money damages (i.e., these wrongs can be remedied by a favorable decision here). In short, all claims asserted in the IPP named plaintiffs' complaints, whether or not brought

under the laws of a state in which an IPP named plaintiff resides, are fundamentally of the same type and will be redressed by the same kind of remedies. While Defendants concede that IPPs have Article III standing for state claims in the states where IPPs reside, Defendants contend that IPPs lack standing with claims in the remaining states because there is not yet a named plaintiff who resides in these states. Defs.' Br. at 32–33.

"Rule 8 establishes a system of notice pleading. A complaint need not narrate all relevant facts or recite the law; all it has to do is set out a claim for relief." *Hrubec v. Nat'l R.R. Passenger Corp.*, 981 F.2d 962, 963 (7th Cir. 1992) (citations omitted). "Over and over, appellate courts insist that a complaint not be dismissed unless no relief may be granted 'under any set of facts that could be proved consistent with the allegations.'" *Id.* (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)). At the pleading stage, general factual allegations of injury resulting from the defendant's conduct are sufficient. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs' claims should not be dismissed for failure to show an "injury in fact."

Courts in the Seventh Circuit have regularly concluded that "[w]hether the named plaintiffs may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends rather on meeting the prerequisites of Rule 23 governing class actions." *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 722 (N.D. Ill. 2016) (cleaned up); *see also Snyder v. U.S. Bank N.A.*, 387 F. Supp. 3d 867, 873 (N.D. Ill. 2019); *Supreme Auto Transp. LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032, 1037–38 (N.D. Ill. 2017), *aff'd*, 902 F.3d 735 (7th Cir. 2018); *Broilers I*, 290 F. Supp. 3d at 809–810. The question of who is authorized to bring an action under a statute is one of statutory interpretation; it does not implicate Article III or jurisdiction. *See Woodman's Food Mkt., Inc. v. Clorox Co.*, 833 F.3d 743, 750 (7th Cir. 2016);

43

*Saltzman v. Pella Corp.*, 257 F.R.D. 471, 480 (N.D. Ill. 2009) (rejecting defendant's argument that standing was lacking for states in which the two named plaintiffs did not make purchases).

Here, IPPs sufficiently allege injuries to establish Article III standing.[27] IPPs intend to move for class certification and reserve the right to refine their proposed class definitions at that time, if necessary.[28] Should the Court address class representation now, the resolution of this issue should not result in dismissal with prejudice as IPPs may add additional plaintiffs for the states at issue.

### F.    **IPPs Sufficiently Plead the Requisite Effects on Intrastate Commerce**

Defendants' argument that IPPs fail to properly state a claim under the antitrust statutes of Alabama, the District of Columbia, Maryland, Mississippi, South Dakota, Tennessee, West Virginia, and Wisconsin (Defs.' Br. at 33–34) because they do not plead the requisite intrastate conduct is contrary to the law. This District follows the majority view of federal courts that nationwide conspiracy allegations satisfy any intrastate commerce requirements. *See, e.g.*, *Sandee's Catering v. Agri Stats, Inc*., 2020 WL 6273477, at *7 (N.D. Ill. Oct. 26, 2020) ("This Court joins the majority of courts in concluding that the [plaintiffs] have sufficiently pled intrastate activity where they allege nationwide antitrust violations, the antitrust impact of which was felt within each state.") (citation modified); *see also Broilers I*, 290 F. Supp. 3d at 816 ("In light of the obvious fact that Broilers are purchased in substantial numbers throughout the United States, these

---

[27] Cons. ¶¶5, 87, 98, 151, 201, 214, 224; Comm. ¶¶16, 18, 172, 174–75, 196–97, 207, 220, 223–24, 242, 244, 261, 264, 293, 302, 335, 343, 351.

[28] Even at the class certification stage, courts in this District have certified multi-state classes brought by plaintiffs who themselves did not make purchases in all of the certified states. *See, e.g., Benson v. Newell Brands, Inc.*, 2021 WL 5321510 (N.D. Ill. Nov. 16, 2021) (class action brought by two Illinois consumers certified on behalf of consumers in ten states); *Mednick v. Precor, Inc.*, 320 F.R.D. 140, 157 (N.D. Ill. 2017) (class action brought by two Illinois residents on behalf of consumers in five states); *Mullins v. Direct Dig., LLC*, 2014 WL 5461903, at *4 (N.D. Ill. Sept. 30, 2014), *aff'd*, 795 F.3d 654 (7th Cir. 2015) (class action brought by one Illinois plaintiff certified on behalf of consumers in 10 states).

allegations plausibly establish 'substantial' *intra*state effects[.]") (emphasis in original). Here, IPPs plead a nationwide conspiracy artificially increased Frozen Potato Product prices. Cons. ¶¶84, 92–99, 172–79; Comm. ¶¶193, 206–16. This is sufficient.

### G. IPPs' Massachusetts Claim Should Not be Dismissed

Defendants argue that Plaintiffs' Massachusetts claim should be dismissed for failure to provide requisite notice. Defs' Br. at 34. However, courts have repeatedly rejected such efforts to dismiss state law claims. *See, e.g.*, *Generics*, 368 F. Supp. 3d at 834–835 (declining to dismiss antitrust claims based on pre-suit notice provisions because "[r]egardless of whether the relevant notice provisions are substantive or procedural, they do not alter the substantive elements of Plaintiffs' claims and are not a pleading requirement for the Complaints"). Furthermore, pursuant to Massachusetts General Laws chapter 93A, section 9(3), a plaintiff is exempt from the notice requirement if the defendant "does not maintain a place of business or does not keep assets within the commonwealth," which IPPs allege with respect to Defendants Simplot, Lamb Weston and McCain. Cons. ¶¶61–71. Therefore, IPPs' Massachusetts claim should not be dismissed.

## VII. CONCLUSION

Plaintiffs respectfully request that Defendants' motion to dismiss Plaintiffs' Complaints be denied. Should the Court rule in Defendants' favor, in whole or in part, Plaintiffs respectfully request leave to amend their Complaints to expand upon their allegations. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

Dated: February 4, 2026

/s/ Justin N. Boley
Kenneth A. Wexler
Justin N. Boley
Melinda J. Morales
WEXLER BOLEY & ELGERSMA LLP
311 S. Wacker Dr., Suite 5450
Chicago, IL 60606
(312) 346-2222
kaw@wbe-llp.com
jnb@wbe-llp.com
mjm@wbe-llp.com

Robert J. Gralewski, Jr.
Marko Radisavljevic
KIRBY McINERNEY LLP
1420 Kettner Boulevard, Suite 100
San Diego, CA 92101
(858) 834-2044
bgralewski@kmllp.com
mradisavljevic@kmllp.com

***Plaintiffs' Steering Committee for the Direct Purchaser Plaintiff Class***

Daniel E. Gustafson
Michelle J. Looby
Catherine K. Smith
Emily B. Egart
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 333-8844
dgustafson@gustafsongluek.com
mlooby@gustafsongluek.com
csmith@gustafsongluek.com
eegart@gustafsongluek.com

Karin E. Garvey
Robin A. van der Meulen
SCOTT+SCOTT ATTORNEYS AT LAW
LLP
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
(212) 223-6444
kgarvey@scott-scott.com
rvandermeulen@scott-scott.com

Michael L. Roberts
Karen Halbert
Erich P. Schork
Sarah DeLoach
Christopher Sanchez
Joshua Zuckerman
ROBERTS LAW FIRM US, PC
1920 McKinney Ave, Suite 700
Dallas, TX 75201
(501) 821-5575
mikeroberts@robertslawfirm.us
karenhalbert@robertslawfirm.us

erichschork@robertslawfirm.us
sarahdeloach@robertslawfirm.us
chrissanchez@robertslawfirm.us
joshzuckerman@robertslawfirm.us

Heidi M. Silton (MN #025759X)
Jessica N. Servais (MN #0326744)
Joseph C. Bourne (MN #0389922)
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900
hmsilton@locklaw.com
jnservais@locklaw.com
jcbourne@locklaw.com

*Interim Co-Lead Counsel for the Direct Purchaser Plaintiff Class*

Daniel L. Warshaw
Bobby Pouya
Michael H. Pearson
Matthew A. Pearson (*Pro Hac Vice*)
Naveed Abaie (*Pro Hac Vice*)
PEARSON WARSHAW, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
(818) 788-8300
dwarshaw@pwfirm.com
bpouya@pwfirm.com
mpearson@pwfirm.com
mapearson@pwfirm.com
nabaie@pwfirm.com

Douglas A. Millen
Robert J. Wozniak
Matthew W. Ruan
FREED KANNER LONDON
& MILLEN LLC
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
(224) 632-4500
dmillen@fklmlaw.com
rwozniak@fklmlaw.com
mruan@fklmlaw.com

Kimberly A. Justice
FREED KANNER LONDON
& MILLEN LLC
923 Fayette Street
Conshohocken, PA 19428
(484) 243-6335
kjustice@fklmlaw.com

Brian S. Pafundi (*Pro Hac Vice*)
PEARSON WARSHAW, LLP
328 Barry Ave. South, Suite 200
Wayzata, MN 55391
(612) 389-0600
bpafundi@pwfirm.com

*Interim Co-Lead Counsel for the Commercial Indirect Purchaser Class*

Steven A. Hart
Julie A. Murphy
HART Mclaughlin & ELDRIDGE, LLC
One South Dearborn, Suite 1400
Chicago, IL 60603
(312) 955-0545
shart@hmelegal.com
jmurphy@hmelegal.com

*Liaison Counsel for the Commercial Indirect Purchaser Class*

Brent W. Johnson (*pro hac vice*)
Alison Deich (*pro hac vice*)
Zachary R. Glubiak (*pro hac vice*)
Alex Bodaken (*pro hac vice*)
COHEN MILSTEIN SELLERS
 & TOLL, PLLC
1100 New York Ave. NW
Suite 800, West Tower
Washington, DC 20005
(202) 408-4600
bjohnson@cohenmilstein.com
adeich@cohenmilstein.com
zglubiak@cohenmilstein.com
abodaken@cohenmilstein.com

Breanna Van Engelen (*pro hac vice*)
HAGENS BERMAN SOBOL
 SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292
breannav@hbsslaw.com

Shana E. Scarlett (*pro hac vice*)
John M. Grant (*pro hac vice*)
HAGENS BERMAN SOBOL
 SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
(510) 725-3000
shanas@hbsslaw.com
john.grant@hbsslaw.com

*Counsel for the Consumer Indirect Plaintiff Class*