**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE FROZEN POTATO PRODUCTS ANTITRUST LITIGATION | Case No. 1:24-cv-11801 |
| | Judge Jeffrey I. Cummings |
| This Document Relates To: | Magistrate Judge Gabriel A. Fuentes |
| *All Actions* | |

**STATEMENT OF INTEREST OF**
**THE UNITED STATES OF AMERICA**

ANDREW S. BOUTROS
*United States Attorney*

THOMAS P. WALSH
*Assistant United States Attorney*

*United States Department of Justice*
*Office of the United States Attorney for the*
*Northern District of Illinois*
219 South Dearborn Street
Chicago, IL 60604

OMEED A. ASSEFI
*Acting Assistant Attorney General*

DINA KALLAY
*Deputy Assistant Attorney General*

DAVID B. LAWRENCE
*Policy Director*

ALICE A. WANG
*Counsel to the Assistant Attorney General*

DANIEL E. HAAR
NICKOLAI G. LEVIN
PETER M. BOZZO
*Attorneys*

*United States Department of Justice*
*Antitrust Division*
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
(202) 803-1196 (phone)
peter.bozzo@usdoj.gov

**TABLE OF CONTENTS**

INTEREST OF THE UNITED STATES ........................................................................................ 1

STATEMENT .............................................................................................................................. 3

ARGUMENT ............................................................................................................................... 5

I.   CONCERTED ACTION INCLUDES SHARING INFORMATION WITH THE
     MUTUAL EXPECTATION THAT RECIPROCAL INFORMATION WILL BE
     SHARED IN RETURN ......................................................................................................... 6

II.  THIS COURT SHOULD EVALUATE PLAINTIFFS' STANDALONE
     INFORMATION-SHARING CLAIM BY ASSESSING THE FACTS, NOT
     APPLYING A PRESUMPTION OF LEGALITY ................................................................. 10

CONCLUSION ........................................................................................................................... 15

# TABLE OF AUTHORITIES

CASES

*American Column & Lumber Co. v. United States*,
257 U.S. 377 (1921) .................................................................................. 5, 9

*American Needle, Inc. v. NFL*,
560 U.S. 183 (2010) ................................................................................ 6, 7, 9

*Board of Trade of Chicago v. United States*,
246 U.S. 231 (1918) ..................................................................................... 10

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984) ....................................................................................... 7

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961) ....................................................................................... 7

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) .................................................................... 10, 11

*FTC v. Indiana Federation of Dentists*,
476 U.S. 447 (1986) ..................................................................................... 11

*Gibson v. Cendyn Group, LLC*,
148 F.4th 1069 (9th Cir. 2025) ................................................................... 8, 9

*In re Brand Name Prescription Drugs Antitrust Litigation*,
288 F.3d 1028 (7th Cir. 2002) ........................................................................ 8

*In re Broiler Chicken Antitrust Litigation*,
702 F. Supp. 3d 635 (N.D. Ill. 2023) ....................................................... 9, 14

*In re: Generic Pharmaceuticals Pricing Antitrust Litigation*,
No. 16-MD-2724, 2025 WL 388813 (E.D. Pa. Feb. 3, 2025) ......................... 8

*In re Local TV Advertising Antitrust Litigation*,
No. 18 C 6785, 2022 WL 3716202 (N.D. Ill. Aug. 29, 2022) ...................... 14

*In re: RealPage, Inc., Rental Software Antitrust Litig. (No. II)*,
709 F. Supp. 3d 478 (M.D. Tenn. 2023) ...................................................... 14

**PAGE(S)**

CASES

*Interstate Circuit, Inc. v. United States*,
 306 U.S. 208 (1939)...................................................................................... 9

*Kleen Products LLC v. Georgia-Pacific LLC*,
 910 F.3d 927 (7th Cir. 2018) ........................................................................ 7

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
 551 U.S. 877 (2007)................................................................................ 10, 11

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
 952 F.3d 832 (7th Cir. 2020) ........................................................................ 8

*NCAA v. Alston*,
 594 U.S. 69 (2021)........................................................................... 10, 11, 12

*Northern Securities Co. v. United States*,
 193 U.S. 197 (1904)....................................................................................... 7

*North Texas Specialty Physicians v. FTC*,
 528 F.3d 346 (5th Cir. 2008) ...................................................................... 13

*Ohio v. American Express Co.*,
 585 U.S. 529 (2018)................................................................................ 10, 11

*Olean Wholesale Grocery Cooperative, Inc.*,
 No. 19 C 8318, 2020 WL 6134982 (N.D. Ill. Oct. 19, 2020)............................ 13, 14

*Omnicare, Inc. v. UnitedHealth Group, Inc.*,
 629 F.3d 697 (7th Cir. 2011) ............................................................ 6, 12, 13

*Standard Oil Co. v. United States*,
 221 U.S. 1 (1911)......................................................................................... 10

*Todd v. Exxon Corp.*,
 275 F.3d 191 (2d Cir. 2001)................................................................ 5, 11, 12, 13

*Toys "R" Us, Inc. v. FTC*,
 221 U.S. 928 (7th Cir. 2000) ........................................................................ 9

*United States v. Agri Stats, Inc.*,
 No. 23-3009 (JRT/JFD), 2026 WL 508844 (D. Minn. Feb. 24, 2026)...................... 2

PAGE(S)

CASES

*United States v. American Linseed Oil Co.*,
262 U.S. 371 (1923) ........................................................................ 5, 9, 14, 15

*United States v. American Tobacco Co.*,
221 U.S. 106 (1911) ........................................................................ 7

*United States v. American Tobacco Co.*,
328 U.S. 781 (1946) ........................................................................ 7

*United States v. Consolidated Packaging Corp.*,
575 F.2d 117 (7th Cir. 1978) ........................................................ 9

*United States v. Container Corp. of America*,
393 U.S. 333 (1969) ........................................................ 5, 7, 8, 9, 13

*United States v. Masonite*,
316 U.S. 265 (1942) ........................................................................ 9

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ........................................................ 10, 11

*United States v. U.S. Gypsum Co.*,
438 U.S. 422 (1978) ........................................................................ 12, 13

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) ........................................................ 10

STATUTES

15 U.S.C. § 1 ........................................................................ 2, 4, 7

28 U.S.C. § 517 ........................................................................ 1

EXECUTIVE ORDER

Exec. Order No. 14364, 90 Fed. Reg. 57349 (Dec. 6, 2025) ........................ 1

MISCELLANEOUS

Shane Meyers et al., *Consumer Expenditures in 2023*, U.S. Bureau of Labor Statistics
(Dec. 2024) ........................................................................ 1

**PAGE(S)**

**MISCELLANEOUS**

Catharine Weber, *From Fresh to Frozen: Potato Per Capita Availability Changes over Time*, U.S. Dep't of Agriculture Econ. Res. Serv. (Sept. 4, 2025) ..................................................... 1

## INTEREST OF THE UNITED STATES

The United States submits this Statement of Interest under 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the Department of Justice to attend to the interests of the United States in any case pending in a federal or state court.

This case arises from allegations that producers of frozen potato products, such as frozen French fries and hash browns, harmed consumers by exchanging competitively sensitive information with each other. Americans devote about 12-13% of their overall expenditures to food,[1] and "[a]n affordable and secure food supply is vital to America's national and economic security."[2] Potato products, in particular, are a staple of many Americans' diets. According to the plaintiffs, "[p]otatoes are the leading vegetable crop in the United States," and the potato sector alone "contributed $100.9 billion to the [U.S.] economy in 2021."[3] Frozen potato products play a central role in this sector, accounting for about half of the total U.S. food supply of potatoes in 2022-2024.[4] The plaintiffs estimate the value of the market for these products as $68 billion as of 2023 and note that this figure is projected to rise to $92.6 billion by 2030.[5] An average American allegedly consumes "nearly 48 pounds of [f]rozen [p]otatoes each year."[6]

---

[1] Shane Meyers et al., *Consumer Expenditures in 2023*, U.S. Bureau of Labor Statistics (Dec. 2024), https://www.bls.gov/opub/reports/consumer-expenditures/2023/home.htm.

[2] Exec. Order No. 14364, 90 Fed. Reg. 57349, 57349 (Dec. 6, 2025).

[3] Commercial Indirect Pls.' First Consol. Class Action Compl. ¶ 53, Doc. 182; Direct Purchaser Pls.' Consol. Class Action Compl. ¶ 55, Doc. 183.

[4] Catharine Weber, *From Fresh to Frozen: Potato Per Capita Availability Changes over Time*, U.S. Dep't of Agriculture Econ. Res. Serv. (Sept. 4, 2025), https://www.ers.usda.gov/data-products/charts-of-note/chart-detail?chartId=113195.

[5] Direct Purchaser Pls.' Consol. Class Action Compl. ¶ 56, Doc. 183; Consol. Class Action Compl. ¶ 85, Doc. 184.

[6] Commercial Indirect Pls.' First Consol. Class Action Compl. ¶ 55, Doc. 182; *see* Consol. Class Action Compl. ¶ 85, Doc. 184.

The United States has a strong interest in ensuring that courts apply the correct legal principles when analyzing allegedly unlawful information exchanges in this industry of prime importance to many Americans. The United States is currently challenging an anticompetitive information exchange in the agriculture sector. *See United States v. Agri Stats, Inc.*, No. 23-3009 (JRT/JFD), 2026 WL 508844 (D. Minn. Feb. 24, 2026). And the United States has filed amicus briefs and statements of interest in other cases involving alleged exchanges of competitively sensitive information. *E.g.*, Br. for the United States as Amicus Curiae in Supp. of Pls.-Appellants, *Gibson v. Cendyn Grp., LLC*, No. 24-3576 (9th Cir. Oct. 24, 2024); Statement of Interest of the United States of America, *In re: Granulated Sugar Antitrust Litig.*, No. 0:24-md-03110-JWB-DTS (D. Minn. June 24, 2025); Statement of Interest of the United States, *In re Pork Antitrust Litig.*, No. 0:18-cv-01776-JRT-JFD (D. Minn. Oct. 1, 2024).

In this case, Plaintiffs have brought claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, challenging information exchanges among Defendants both as (1) a means of facilitating a price-fixing conspiracy and (2) independently unlawful under the rule of reason. Defendants' motions to dismiss appear to misstate some of the principles relevant to analyzing the second type of claim by urging narrow and incorrect rules of law regarding the primary elements of a Section 1 claim: whether the defendants engaged in "concerted action" and whether their conduct was unreasonable. Defendants seem to argue that, as a matter of law, allegations of reciprocal information exchanges are insufficient to satisfy the concerted-action requirement. The motions also could be read to suggest erroneously that, where the exchanged information is aggregated and backward-looking, it is incapable of generating anticompetitive effects. The United States files this Statement of Interest to explain that both these categorical rules are incorrect. The United States takes no position on Defendants' other arguments,

2

including their arguments regarding Plaintiffs' price-fixing claim, or on the ultimate disposition of the motions to dismiss.

## STATEMENT

Plaintiffs are direct and indirect purchasers of frozen potato products.  Commercial Indirect Pls.' First Consol. Class Action Compl. ("Comm. Compl.") ¶¶ 21-31, Doc. 182; Direct Purchaser Pls.' Consol. Class Action Compl. ("DPP Compl.") ¶¶ 26-28, Doc. 183; Consol. Class Action Compl. ("Consumer Compl.") ¶¶ 23-60, Doc. 184.  Plaintiffs allege that four firms—Cavendish, Simplot, Lamb Weston, and McCain (the "Producer Defendants")—control about 97-98% of the market for these products.  Comm. Compl. ¶ 114; DPP Compl. ¶ 130; Consumer Compl. ¶ 145.

According to the complaints, the four Producer Defendants subscribe to—and are the only subscribers to—a "data analytics platform" called PotatoTrack offered by Defendant Circana LLC.  Comm. Compl. ¶¶ 9, 97; *see* DPP Compl. ¶ 87; Consumer Compl. ¶ 101.  Each Producer Defendant allegedly "furnished competitively sensitive information [to PotatoTrack] with the understanding that it would be reciprocated."  Comm. Compl. ¶ 215; DPP Compl. ¶ 242; Consumer Compl. ¶ 220.  Specifically, the Producer Defendants allegedly submitted "sales and volume data in dollars, pounds, units, and product type" to PotatoTrack on a weekly basis.  DPP Compl. ¶ 90; *see* Comm. Compl. ¶ 97.  According to Plaintiffs, the Producer Defendants then "received reports in return showing their data on one side and data from the three other [Producer Defendants] on the other."  DPP Compl. ¶ 90; *see* Consumer Compl. ¶ 103.  Plaintiffs also assert, "[o]n information and belief," that PotatoTrack data "includes company projections."  DPP Compl. ¶ 96; Consumer Compl. ¶ 105; *see* Comm. Compl. ¶ 9.

Plaintiffs claim that these information exchanges had anticompetitive effects.  By accessing each other's "competitive information," the Producer Defendants allegedly "reduce[d]

3

the uncertainty that they each should have faced from not knowing what their competitors were offering, and intending to offer, with respect to price in the Frozen Potato market." Comm. Compl. ¶ 217. Rather than lowering prices to gain customers in the face of this uncertainty, the Producer Defendants allegedly "maintain[ed] artificially high prices," secure in the knowledge that rival producers would not offer better rates. DPP Compl. ¶ 96; Consumer Compl. ¶ 105; *see* Comm. Compl. ¶ 217. If any competitors nonetheless attempted to reduce prices, the information exchanges allegedly enabled the Producer Defendants to "police one another," ensuring that they earned higher profits at consumers' expense. Comm. Compl. ¶ 97; *see* DPP Compl. ¶ 246; Consumer Compl. ¶ 224.

Based on these information exchanges, Plaintiffs bring two claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, along with various state-law claims. Comm. Compl. ¶¶ 198-367; DPP Compl. ¶¶ 224-47; Consumer Compl. ¶¶ 206-387. First, Plaintiffs allege that the information exchanges were means of facilitating an agreement among the Producer Defendants to fix prices of frozen potato products. Comm. Compl. ¶¶ 198-208; DPP Compl. ¶¶ 224-34; Consumer Compl. ¶¶ 206-16. Second, Plaintiffs claim that the information exchanges, even apart from any price fixing, had anticompetitive effects and thus amount to a standalone Section 1 violation. Comm. Compl. ¶¶ 209-20; DPP Compl. ¶¶ 235-47; Consumer Compl. ¶¶ 217-25.

Defendants have moved to dismiss. Regarding Plaintiffs' standalone information-exchange claim, Defendants argue that Plaintiffs failed to allege that the Producer Defendants agreed to share information with each other through PotatoTrack. Mem. of Law in Supp. of All Defs.' Joint Mot. To Dismiss Pls.' Consol. Class Action Compls. ("Joint MTD") at 23-25, Doc. 240. Defendants also argue that the complaints fail to plead that the information exchanges

4

had anticompetitive effects, including because PotatoTrack reports purportedly include only aggregated, anonymized, and backward-looking data. *Id.* at 25-28; Mem. of Law in Supp. of Def. Circana LLC's Mot. To Dismiss Pls.' Consol. Class Action Compls. ("Circana MTD") at 6-12, Doc. 238.

## ARGUMENT

Defendants misstate the legal framework applicable to Plaintiffs' standalone information-exchange claim. The United States urges the Court to reject Defendants' attempts to narrow the application of the antitrust laws in ways that could harm American consumers who depend on those laws to protect competition among producers of staple goods.

For over a century, the Supreme Court has recognized that certain information sharing is "inconsistent with that free and unrestrained trade which the [Sherman Act] contemplates shall be maintained[.]" *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 409 (1921). Even absent a "specific agreement" to fix prices, information exchanges can soften competition. *Id.* at 411. For example, if firms use their "[k]nowledge of a competitor's price" to "match[] that price," the result will be "price uniformity," *United States v. Container Corp. of Am.*, 393 U.S. 333, 336-37 (1969), or "market stabilization," *Todd v. Exxon Corp.*, 275 F.3d 191, 214 (2d Cir. 2001) (Sotomayor, J.)—rather than prices set by "the play of the contending forces" of market competition, *United States v. Am. Linseed Oil Co.*, 262 U.S. 371, 388 (1923). Moreover, by equipping firms "[w]ith intimate knowledge" of their rivals' operations, information exchanges may enable businesses to exploit "widely separated and unorganized customers necessarily ignorant" of the data that the firms have shared. *Id.* at 389-90.

Different information exchanges work in diverse ways and have distinct effects, and analyzing Plaintiffs' information-exchange claim here requires a careful factual assessment.

5

Some arguments in Defendants' motions to dismiss, however, appear to substitute categorical rules for the requisite case-specific analysis.

For example, Defendants seem to suggest that sharing information with the mutual expectation that reciprocal information will be provided is insufficient as a matter of law to establish concerted action, but Supreme Court precedent refutes this argument. And to the extent Defendants suggest that exchanges of aggregated, anonymized, or backward-looking information are incapable of causing anticompetitive effects, Defendants fail to grapple with the ways that such information can harm the competitive process. In ruling on the motions to dismiss, this Court should reject these formalistic rules in favor of the fact-intensive analysis that precedent demands in this case. Doing so will help ensure that the antitrust laws remain a supple tool for protecting competition and securing benefits for consumers, including in the industries that have the largest impact on Americans' budgets.

## I.   CONCERTED ACTION INCLUDES SHARING INFORMATION WITH THE MUTUAL EXPECTATION THAT RECIPROCAL INFORMATION WILL BE SHARED IN RETURN

There are two primary elements for claims under Section 1. *See Am. Needle, Inc. v. NFL*, 560 U.S. 183, 186 (2010); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011). First, the plaintiff must show the existence of a "contract, combination, or conspiracy" (i.e., "concerted action"). *Am. Needle*, 560 U.S. at 186. Second, the plaintiff must show that the concerted action "unreasonably restrains trade." *Id.* We address the first element in this section and the second element in the following section.

The Supreme Court has made clear that "[t]he key" to the concerted-action inquiry is whether the challenged conduct "joins together separate decisionmakers"—that is, "separate economic actors pursuing separate economic interests." *Am. Needle*, 560 U.S. at 195

6

(citation omitted). Congress defined concerted action broadly because it "deprives the marketplace of . . . independent centers of decisionmaking" and thus "inherently is fraught with anticompetitive risk." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768-69 (1984).

Concerted action can come in many shapes and sizes. Section 1 applies not only to easily recognizable agreements such as "contract[s]" and "trust[s]," but also to "conspirac[ies]" and "combination[s]." 15 U.S.C. § 1. Specifically, courts have applied the latter term capaciously to encompass, among other things, "express *or implied* agreement[s] or understanding[s] that the participants will jointly give up their trade freedom." *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961) (emphasis added); *see United States v. Am. Tobacco Co.*, 221 U.S. 106, 187 (1911); *N. Sec. Co. v. United States*, 193 U.S. 197, 326-27 (1904). As this definition of "combination" confirms, "[n]o formal agreement" is necessary to establish concerted action. *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946). "[E]ven a wink and a nod[]" suffice. *Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 936 (7th Cir. 2018).

Just as concerted action can take on many forms, plaintiffs can follow a number of paths to establish concerted action. The Supreme Court outlined one such path, which is particularly relevant to this case,[7] in *United States v. Container Corp. of America*, 393 U.S. 333 (1969). "[A]ll that was present" in *Container Corp.* "was a request by each defendant of its competitor for information as to the most recent price charged or quoted, whenever it needed such information and whenever it was not available from another source." *Id.* at 335. Upon receiving the request, each defendant "usually furnished the data with the expectation that it would be furnished reciprocal information when it wanted it." *Id.* The Court held that this "concerted

---

[7] This Statement does not address whether Plaintiffs have pleaded concerted action under any other theories.

7

action [was] of course sufficient to establish [a] combination or conspiracy, the initial ingredient

of a violation of s[ection] 1 of the Sherman Act." *Id.*; *see In re Brand Name Prescription Drugs*

*Antitrust Litig.*, 288 F.3d 1028, 1033 (7th Cir. 2002) (citing *Container Corp.* as "authority for

prohibiting as a violation of the Sherman Act . . . an agreement that facilitates collusive

activity—for example, . . . a system of exchanging price information" (citations omitted)).

    *Container Corp.*, which Defendants do not cite, thus rebuts their suggestion that the

sharing of "competitively sensitive information with the understanding it would be reciprocated"

is insufficient to establish "an agreement among the Producer Defendants" (Joint MTD at 24).  In

arguing otherwise, Defendants rely primarily on the Ninth Circuit's decision in *Gibson v.*

*Cendyn Group, LLC*, 148 F.4th 1069, 1081 (9th Cir. 2025), which addressed software-licensing

agreements between various casino-hotels and a software provider.  Joint MTD at 24-25.  But

*Gibson* did not limit the ways that plaintiffs could plead concerted action.  In addition to

acknowledging that "[a]greements can be tacit or express," the court held that the licensing

agreements *were* concerted action "within the meaning of Section 1."  148 F.4th at 1080-81.

    Nor does *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832 (7th Cir.

2020), support Defendants' argument.  *See* Joint MTD at 23.  To allege a single conspiracy

among a manufacturer and its distributors, *Marion* held, the plaintiff needed to show that the

distributors "coordinated not only with the manufacturer, but also with each other."  952 F.3d at

842; *see In re: Generic Pharms. Pricing Antitrust Litig.*, No. 16-MD-2724, 2025 WL 388813, at

*3-4 (E.D. Pa. Feb. 3, 2025) (reaching similar conclusion regarding alleged "overarching

conspiracy" among manufacturers and distributors).  When firms exchange information on the

understanding that reciprocal information will be provided, they engage in precisely the type of

coordination that was missing in *Marion*.  *See Container Corp.*, 393 U.S. at 335.  In other words,

where competitors "[a]ccept[] . . . an invitation to participate in a plan" with each other, they act concertedly even absent "previous agreement" among themselves. *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939); *see United States v. Masonite Corp.*, 316 U.S. 265, 275 (1942); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935-36 (7th Cir. 2000).

That a third party (here, Circana) facilitated the exchanges makes no difference. The Supreme Court has equally condemned information-sharing arrangements directly between competitors and those facilitated by intermediaries. *See Container Corp.*, 393 U.S. at 335; *Am. Linseed*, 262 U.S. at 380-86, 389-90; *Am. Column*, 257 U.S. at 391, 394-97, 409-12. The touchstone of concerted action is the joining together of separate economic actors, *see Am. Needle*, 560 U.S. at 195, whether the joining together occurs through direct communications or through an intermediary with "no discussions" among the actors themselves, *Masonite*, 316 U.S. at 275; *see United States v. Consol. Packaging Corp.*, 575 F.2d 117, 126 (7th Cir. 1978) ("Tacit understanding" can "constitute agreement even without personal communication.").

Defendants also argue that courts should not "impose Section 1 liability" merely for using the same "benchmarking product" as one's rivals (Joint MTD at 25 (citing *Gibson*, 148 F.4th at 1084; *In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 674 (N.D. Ill. 2023))), but this argument is inapposite. Plaintiffs do not simply allege that the Producer Defendants agreed with one another by subscribing to the same service—but, rather, that they shared information with each other with the understanding that reciprocal information would be provided. *See* Comm. Compl. ¶ 215; DPP Compl. ¶ 242; Consumer Compl. ¶ 220. In any event, concerted action is just one element of a Section 1 claim. *See Am. Needle*, 560 U.S. at 186. Finding that element satisfied thus does not amount to "impos[ing] Section 1 liability" (Joint MTD at 25) unless all other elements are satisfied, as the following section explains.

9

## II. THIS COURT SHOULD EVALUATE PLAINTIFFS' STANDALONE INFORMATION-SHARING CLAIM BY ASSESSING THE FACTS, NOT APPLYING A PRESUMPTION OF LEGALITY

Some of Defendants' arguments appear to place a thumb on the scale in favor of the legality of information exchanges. But, contrary to Defendants' suggestion, information-exchanges are not presumed lawful. Rather, this Court must analyze the precise features of the alleged exchanges to assess their competitive impact, which turns on the facts and circumstances pleaded in the complaints.

1. Once concerted action is established, *see supra* Part I, the question is whether it is unreasonable. "Restraints can be unreasonable in one of two ways." *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018). Some restraints are per se unreasonable based on their inherently anticompetitive "nature and character." *Standard Oil Co. v. United States*, 221 U.S. 1, 64-65 (1911). Agreements among competitors to fix prices fall into this category. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). Other restraints are unreasonable under the rule of reason's "fact-specific assessment." *NCAA v. Alston*, 594 U.S. 69, 81 (2021) (citation omitted). This assessment accounts for "facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; [and] the nature of the restraint and its effect, actual or probable." *Bd. of Trade of Chi. v. United States*, 246 U.S. 231, 238 (1918).

Courts applying the rule of reason often use a flexible burden-shifting inquiry, though these steps are not "a rote checklist." *Alston*, 594 U.S. at 96-97; *see Am. Express*, 585 U.S. at 541-42; *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983-94 (9th Cir. 2023); *see also Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 464 n.14 (7th Cir. 2020) (applying same inquiry in Section 2 context); *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001) (en banc)

(same).  First, the plaintiff must show that the challenged conduct has a "substantial anticompetitive effect."  *Alston*, 594 U.S. at 96 (citation omitted).  If the plaintiff succeeds, the burden "shifts to the defendant to show a procompetitive rationale for the restraint."  *Id.* (citation omitted).  "If the defendant can make that showing, 'the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means,'" *id.* at 96-97 (citation omitted), or that "the anticompetitive harms" of the conduct outweigh its "procompetitive benefits," *Epic*, 67 F.4th at 993-94.

To make a prima facie case under the first step, plaintiffs can rely on either direct or indirect evidence of anticompetitive effects.  *See Am. Express*, 585 U.S. at 542.  Direct evidence is "proof of actual detrimental effects on competition."  *Id.* (internal quotation marks and brackets omitted).  Such effects can include "reduced output, increased prices, or decreased quality," among other things.  *Id.*; *see also FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (treating "limiting consumer choice" as anticompetitive effect).  Indirect evidence is "proof of market power plus some evidence" that the challenged restraint is likely to lead to anticompetitive effects.  *Am. Express*, 585 U.S. at 542.

There are at least two well-established ways information exchanges may be relevant to a Section 1 claim.  First, an "[i]nformation exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement," *Todd*, 275 F.3d at 198—which, if horizontal, is per se unreasonable, *Leegin*, 551 U.S. at 886.  Second, "[t]here is a[n] . . . analytically distinct type of claim . . . where the violation lies in the information exchange itself[.]"  *Todd*, 275 F.3d at 198.  This type of "exchange of information is not illegal *per se*, but can be found unlawful under a rule of reason analysis."  *Id.*

11

2.  Defendants assert that "mere information exchanges are presumptively lawful under the rule of reason unless a plaintiff plausibly alleges facts showing that the information exchange facilitated price fixing."  Joint MTD at 15.  But Defendants offer no basis to presume that the exchanges challenged here are "legitimate, commercial conduct" (Circana MTD at 6), rather than to apply the rule of reason's "fact-specific assessment" for "distinguish[ing] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest."  *Alston*, 594 U.S. at 81 (citation omitted). Similarly, by discounting the potential harm of information exchanges absent price fixing, Defendants understate the ways that Plaintiffs can allege anticompetitive effects.  Among other ways, they may proceed using indirect evidence that Defendants collectively have market power and that the alleged information sharing is likely to harm competition, which requires no showing of price fixing.  *See Todd*, 275 F.3d at 199, 208-14; *see supra* at 11.

Courts analyzing standalone information-exchange claims typically consider "[a] number of factors" to determine the likelihood of harm to competition, including "the structure of the industry involved," "the nature of the information exchanged," *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978), and "whether the data are made publicly available," *Todd*, 275 F.3d at 213; *see Omnicare*, 629 F.3d at 710 ("[l]ooking at the pricing information that was exchanged").  Under this framework, Defendants are wrong to suggest that Plaintiffs cannot "establish any anticompetitive effects given their concession that PotatoTrack reports include only aggregated and backward-looking market data."  Joint MTD at 27; *see* Circana MTD at 8.[8]

---

[8] It is not clear that Plaintiffs actually made this "concession."  *See* Pls.' Opp. to All Defs.' Joint Mot. To Dismiss Pls.' Consol. Class Action Compls. at 31 n.18, Doc. 261; *see also* Comm. Compl. ¶ 9; DPP Compl. ¶ 96; Consumer Compl. ¶ 105.  Even if they did, however, it would not automatically defeat their information-sharing claim.

While information exchanges with certain features, such as those involving current price information, may "have the greatest potential for generating anticompetitive effects," *U.S. Gypsum*, 438 U.S. at 441 n.16, those features are not a checklist that every information-sharing claim must satisfy to qualify as anticompetitive.[9]

In *Container Corp.*, for example, the exchanged information involved "the most recent price charged or quoted," the exchanges were characterized by "infrequency and irregularity," and the information provided "was sometimes fragmentary." 393 U.S. at 335-36. But the defendants were able to use this information to "compute the price charged by a competitor on a specific order to a specific customer" and to determine "the current price which a customer would need to pay in order to obtain products from the defendant furnishing data." *Id.* at 336. Despite the "somewhat casual[]" nature of the exchanges, their tendency to "chill[] the vigor of price competition" rendered them unlawful. *Id.* at 337.

Similarly, in *Todd*, the Second Circuit held that the plaintiffs had stated an information-exchange claim because, although data "was aggregated and distributed by a third-party consulting firm," the defendants received the "data broken down to subsets consisting of as few as three competitors." 275 F.3d at 212; *cf. N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 363, 365, 370 (5th Cir. 2008) (upholding agency finding that exchange of "the mean, median, and mode of . . . responses" about minimum rates or fees contributed to price-fixing scheme). A court in this district similarly held that plaintiffs had alleged an information-exchange claim where, "although [an intermediary] ostensibly anonymized the data in the reports, the data was

_____

[9] These features may also be relevant to whether the alleged information exchanges can be used to infer a price-fixing agreement. *See Omnicare*, 629 F.3d at 711 (assessing whether "the information exchanged facilitated the development or advancement of a coordinated negotiating and pricing strategy"). This Statement takes no position on that issue.

so detailed that . . . Defendants were able to infer which data corresponded to which Defendant."
*Olean Wholesale Grocery Coop., Inc.*, No. 19 C 8318, 2020 WL 6134982, at *6-7 (N.D. Ill.
Oct. 19, 2020); *see In re: RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp.
3d 478, 510, 525-28 (M.D. Tenn. 2023) (upholding information-exchange claim even though at
least some data "was aggregated and anonymized").  Regardless of whether the data shared by
parties is aggregated or backward-looking, the key question is whether the exchange's "tendency
is to suppress competition," *Am. Linseed*, 262 U.S. at 389.

The cases cited by Defendants are consistent with this fact-bound approach.  *See* Joint
MTD at 28; Circana MTD at 8-11.  In *In re Broiler Chicken Antitrust Litigation*, the court
applied the rule of reason's burden-shifting framework and assessed multiple factors, including
"[t]he 'nature of the information exchanged,'" "whether the information is current or past,"
"whether it identifies particular parties, transaction[s], and prices," and "whether the data is
publicly available."  702 F. Supp. 3d at 678 (citation omitted).  *In re Local TV Advertising
Antitrust Litigation*, too, emphasized that rule-of-reason analysis requires "consider[ing] 'a
number of factors'" and recognized that "'[c]ourts have not prescribed what conspiratorial
communications must look like' for a plaintiff to plausibly state a claim."  No. 18 C 6785, 2022
WL 3716202, at *3 (N.D. Ill. Aug. 29, 2022) (citation omitted).  Thus, neither case purports to
identify categories of information that are definitively or presumptively incapable of producing
anticompetitive effects.

In this case, Plaintiffs allege that each Producer Defendant obtained "granular and
competitively sensitive data, including pricing data broken down by product type," about its
three main rivals, along with "company projections."  DPP Compl. ¶¶ 86-87, 96; *see* Comm.
Compl. ¶¶ 9, 100; Consumer Compl. ¶¶ 101, 105.  Plaintiffs also allege that this information

14

"disincentivized [the Producer Defendants] from competing on price" because they were able to "maintain artificially high prices" without concern that rivals would offer better rates. DPP Compl. ¶ 96; *see* Comm. Compl. ¶¶ 9, 100; Consumer Compl. ¶¶ 104-05. The Court should determine whether these allegations, among others, plead an information exchange whose "tendency is to suppress competition," *Am. Linseed*, 262 U.S. at 389, without applying any presumption in favor of legality.

## CONCLUSION

The Court should reject Defendants' incorrect legal rules regarding Plaintiffs' standalone information-sharing claim.

February 27, 2026

ANDREW S. BOUTROS
*United States Attorney*

THOMAS P. WALSH
*Assistant United States Attorney*

*United States Department of Justice*
*Office of the United States Attorney for the*
*Northern District of Illinois*
219 South Dearborn Street
Chicago, IL 60604

Respectfully submitted,

OMEED A. ASSEFI
*Acting Assistant Attorney General*

DINA KALLAY
*Deputy Assistant Attorney General*

DAVID B. LAWRENCE
*Policy Director*

ALICE A. WANG
*Counsel to the Assistant Attorney General*

DANIEL E. HAAR
NICKOLAI G. LEVIN
PETER M. BOZZO
*Attorneys*

 */s/ Peter M. Bozzo*
*United States Department of Justice*
*Antitrust Division*
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
(202) 803-1196 (phone)
peter.bozzo@usdoj.gov

15